## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JANE DOE NO. 1, a minor child, by her parent and next friend MARY ROE, JANE DOE NO. 2, and JANE DOE NO. 3, a minor child, by her parents and next friends SAM LOE and SARA LOE, | ) ) ) ) ) ) |
| Plaintiffs, | ) ) ) |
| v. | ) ) |
| BACKPAGE.COM, LLC, CAMARILLO HOLDINGS, LLC (f/k/a VILLAGE VOICE MEDIA HOLDINGS, LLC), and NEW TIMES MEDIA, LLC, | ) ) ) ) ) |
| Defendants. | ) ) ) |

Civil Action No. 14-13870-RGS

**FIRST AMENDED COMPLAINT**

## <u>INTRODUCTION</u>

1.      This is an action for damages and injunctive relief against the owners and operators of the website Backpage.com (the "Backpage Defendants"). The Backpage Defendants have purposefully designed Backpage.com to facilitate and broker illegal commercial sex transactions. Through their website, the Backpage Defendants knowingly transmit the vast majority of Internet advertisements for illegal commercial sex in the United States, including advertisements involving child sex trafficking victims.

2.      Over a period of years, the Backpage Defendants have implemented and perfected a business model that profits substantially from aiding and participating with pimps and traffickers in the sexual exploitation of children, in violation of federal and state anti-trafficking statutes. In addition, the Backpage Defendants have sustained their business model through a series of unfair and deceptive practices that have deceived law enforcement and nonprofit

advocacy organizations, protected the anonymity of pimps and traffickers, increased the perceived advantages of using the website among pimps and traffickers, and expanded the market for advertisements for illegal sex with children.

3.      The three plaintiffs were repeatedly forced as minors to engage in illegal commercial sex transactions in Massachusetts.  As a direct and proximate result of their participation in the illegal sex trafficking of the plaintiffs, as set forth more fully below, the Backpage Defendants caused the plaintiffs to be repeatedly purchased and raped by customers who found the plaintiffs by utilizing Backpage.com's commercial sex brokering service.  There are numerous other children who have been similarly injured by the actions of the Backpage Defendants.

4.      The Backpage Defendants knowingly participated in and benefitted financially from the unlawful sexual exploitation suffered by the plaintiffs.  Specifically, in exchange for assisting in the crafting, placement, and promotion of illegal advertisements offering the plaintiffs for sale that would attract potential customers yet escape detection by law enforcement, the Backpage Defendants solicited and accepted money from the pimps who illegally recruited, manipulated, enticed, and coerced the plaintiffs into engaging in commercial sex acts.

5.      The Backpage Defendants have knowingly and intentionally designed Backpage.com in a manner that results in all or nearly all illegal sex advertisements being posted in the "Escorts" section.  In addition to knowing that all or nearly all of the advertisements posted in the "Escorts" section involve illegal offers of sex for money, the Backpage Defendants know that a significant percentage of the advertisements on the "Escorts" section of their website (perhaps 10 percent or more) involve minors  between ages 12 and 17, who are illegally trafficked through Backpage.com.

6.      The Backpage Defendants believe that the availability of children on their website enhances the perceived advantages of the website in the eyes of many potential pimps and traffickers, which thereby allows the Backpage Defendants to reap greater profits from their business venture.  Accordingly, while the Backpage Defendants recognize that some media and law enforcement scrutiny is a natural part of their business, they also understand that the elimination of child sex trafficking on their website would be detrimental to the success of their business model.

7.      Through their concerted efforts to ingratiate themselves with and obtain the trust of pimps and traffickers, the Backpage Defendants are now the dominant players in the illegal online sex market.  Previously, however, the Backpage Defendants had been a distant second in that market to Craigslist.com.  The Backpage Defendants undertook to replace Craigslist as the market leader in or about 2010, when Craigslist.com eliminated its online "Adult Services" section in response to withering public criticism of its participation in the exploitation of children.

8.      As they initiated their effort to become the dominant player in the market, the Backpage Defendants concluded that the most significant obstacle to achieving their goal would be sustained media and law enforcement attention to their own role in the sex trafficking of children.  In order to minimize and overcome this obstacle, the Backpage Defendants launched a concerted campaign to cast themselves as a new breed of website operator dedicated to the protection of children.   In the process, they have made various false and misleading representations to law enforcement agencies, non-profit advocacy and service organizations, the media, and parents that they are dedicated to reducing the utilization of the website for the sex trafficking of children, that they actively detect and report any advertisement which they suspect involves a child, and that they are evaluating and intend to adopt both routine and advanced

methods and technologies to substantially improve their ability to accomplish this goal.  These misrepresentations resulted, just as the Backpage Defendants intended, in a critical reduction of law enforcement and media scrutiny of their business activities, including their involvement in illicit advertisement involving child sex trafficking victims.

9.     Having achieved their goal of minimizing law enforcement and media scrutiny, the Backpage Defendants knowingly and intentionally (i) refined their website to increase the incidence and profitability of advertisements reflecting and encouraging the exploitation of children; (ii) took various steps to sustain the impression among pimps, traffickers and customers that Backpage.com is a safe and effective vehicle for transactions involving young girls and boys, including actions to minimize the risk of detection by law enforcement; (iii) implemented various enhancements to their website to increase its effectiveness for pimps and traffickers; (iv) sustained the perception of support for law enforcement efforts by selectively reporting certain advertisements that the Backpage Defendants know are unlikely to involve child trafficking victims, solely for the purpose of increasing the total number of reports; and (v) declined to investigate or adopt analytic measures, some routine and some developed by expert academic and technology organizations, and available at little or no cost that would enable the Backpage Defendants to reliably detect advertisements involving exploited children and identify the pimps and traffickers behind those advertisements.

10.     The consequence of these various actions by the Backpage Defendants has been to dramatically increase the revenues and market share of Backpage.com, increase the market demand for illegal sex with children, increase the number of child sex trafficking victims that are advertised for sale on Backpage.com, increase the number of times each particular victim is raped or otherwise sexually exploited, and impede law enforcement's ability to find and recover

victims.   These actions have caused enormous injury to each of the plaintiffs, as well as to numerous other children, while generating immense profits for the Backpage Defendants.

11.      The plaintiffs make claims for violations of the Trafficking Victims Protection Reauthorization Act of 2008, 18 U.S.C. §§ 1591, 1595 ("TVPRA"), and the Massachusetts Anti-Human Trafficking and Victim Protection Act of 2010, M.G.L. c. 265, § 50 et seq. ("TVPA"), both of which include provisions that specifically respond to the child sex trafficking epidemic and that allow victims to pursue a private action against individuals and entities, like the Backpage Defendants, that participate in and benefit from  unlawful commercial sex ventures.

12.      In addition, the plaintiffs each make claims for unauthorized use for advertising purposes of photographic images in violation of Massachusetts General Laws,  c. 214,  § 3A. Claims also are made by one of the plaintiffs for unauthorized use for advertising purposes of photographic images in violation of Rhode Island Statutes § 9-1-28.1; and by another plaintiff for infringement of her protected interest in certain photographs in violation of the Copyright Act, 17 U.S.C. § 101 *et seq.*

13.      Finally, the plaintiffs make claims under M.G.L. c. 93A, § 9 for injury resulting from unfair and deceptive acts and practices by the Backpage Defendants in the design and operation of a business model that (i) promotes, encourages, supports, and profits from the systematic sexual abuse of children, and (ii) seeks to lull and inhibit law enforcement authorities with false representations and promises that Backpage.com utilizes robust methods to eliminate and report unlawful and exploitative behavior.

14.      The Backpage Defendants have openly structured their business on the assumption that, because their unlawful and deceptive business model utilizes the Internet, they are immune from any liability for their conduct under the Communications Decency Act of 1996,

47 U.S.C, § 230.  To the contrary, however, Section 230(c)(1) is wholly inapplicable here because, *inter alia*, it is the Backpage Defendants' own course of egregious conduct in violation of the federal TVPRA and Massachusetts TVPA that forms the basis of plaintiffs' claims. Moreover, Section 230(c)(2) is also unavailable to shield the Backpage Defendants because any measures purportedly adopted to limit the exploitation of children on the website have not been undertaken with the "good faith" that is expressly required under Section 230.  Finally, the plaintiffs' claims in Counts IV and V fall outside of the Communications Decency Act under Section 230(e)(2) concerning intellectual property claims.

## PARTIES

15.    Mary Roe is the parent of plaintiff Jane Doe No. 1, a minor who is currently 17 years old.  Jane Doe No. 1 was between the ages of 15 and 16 when she was sold for sex in Massachusetts and Rhode Island through the Backpage.com website.  Mary Roe is a resident of Rhode Island, and Jane Doe No. 1 currently resides at a treatment facility in Massachusetts.

16.    Plaintiff Jane Doe No. 2, who is currently 20 years old, was between the ages of 15 and 17 when she was sold for sex in Massachusetts through the Backpage.com website.  She currently resides in Massachusetts.

17.    Sam Loe and Sara Loe are parents of plaintiff Jane Doe No. 3, a minor who is currently 16 years old.  Jane Doe No. 3 was 15 years old when she was sold for sex in Massachusetts through the Backpage.com website.  Sam Loe, Sara Loe, and Jane Doe No. 3 all currently reside in Massachusetts.

18.    Defendant Backpage.com, LLC is a Delaware limited liability company that does business as Backpage.com and owns, operates, designs, and controls the website Backpage.com.

At all times material hereto, defendant Backpage.com, LLC transacted business in Massachusetts through its Backpage.com website.

19.     Defendant Camarillo Holding, LLC, formerly known as Village Voice Media Holdings, LLC, is a Delaware limited liability company that does business as "Backpage.com" and owns, operates, designs, and controls the website Backpage.com.  At all times material hereto, Village Voice Media Holdings transacted business in Massachusetts through its subsidiary Backpage, LLC.

20.     New Times Media, LLC is a Delaware limited liability company that at relevant times did business as "Backpage.com" and was a participant in owning, operating, designing, and controlling the website Backpage.com.

## JURISDICTION AND VENUE

21.     This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, § 1338(a), and § 1367, as well as § 1332 (with an amount in controversy which exceeds $75,000).

22.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 and § 1400(a).

## FACTS COMMON TO ALL COUNTS

**A.     Backpage.com Is the Largest Purveyor of Online Prostitution and Child Sex Trafficking in the United States**

23.     Backpage.com takes its name from the infamous "Back Page" of the Village Voice newspaper, a printed circular whose back pages were known to contain classified ads for commercial sex.  Indeed, until 2012, the Village Voice owned the Village Voice newspaper.

24.     Over the past decade or more, marketing for prostitution services has migrated to the Internet, as website operators have sought to enable buyers and sellers of sex to maintain their anonymity and minimize the risk of detection by law enforcement.

25.     Backpage.com now accounts for 80 percent or more of online commercial sex advertising in the United States, involving thousands of advertisements daily in each of 394 separate geographic areas in the country.  The Backpage Defendants understand, and indeed they have admitted from time to time, that "prostitution advertisements regularly appear on the [website]."  In fact, at least one judge has concluded that it is reasonable to infer that the Backpage Defendants know their website is used primarily for prostitution and knowingly contribute to the success of these advertisements for the pimps and traffickers.

26.     It is estimated that as many as 100,000 children or more are being trafficked for sex annually in the United States, with the average age of first exploitation only 12-13 years old, and the vast majority of these children are sold through the Internet.

27.     The vast majority of the children sexually exploited on the Internet are advertised on Backpage.com.  Though the Backpage Defendants publicly dispute the frequency with which those advertisements involve children, they concede there are numerous instances in which advertisements for minors have appeared on the website.  Moreover, various studies known to the Backpage Defendants estimate that perhaps 10 percent of the advertisements on Backage.com feature children who are being sold for sex.  While no precise figures are available, a significant portion of the adult women who are offered for sale on Backpage.com, particularly those between 18 and 21 years of age, were first trafficked as children on either Backpage.com or other websites.

28.     Punishing and deterring child sex trafficking has become a significant priority for law enforcement in recent years.  Nevertheless, law enforcement's resources are scarce, and those resources have been spent predominantly on (a) prosecuting the pimps and traffickers who are most directly responsible for conscripting children into sex slavery, and (b) prosecuting the customers and would-be customers of child sex trafficking victims.  As a result, the Backpage

8

Defendants have, to this point, managed to conceal their internal business records from judicial scrutiny, which has allowed the Backpage Defendants to perpetuate the false impression that they are assisting law enforcement's efforts to eradicate child sex trafficking.

**B.    The Backpage Defendants Knowingly Pursued a Scheme to Portray Their Website as a Leader in the Effort to Combat Online Child Sex Trafficking**

29.    In 2010, as noted above, in response to sustained public attention and withering criticism directed at the Craigslist website operation, Craigslist shut down its Adult Services categories and stopped hosting so-called "escort" ads.  Thereafter, anticipating an opportunity to capitalize on this development, Backpage.com initiated a concerted effort to minimize public scrutiny of its own business while it undertook to expand its market share to become the dominant presence in the commercial sex trafficking business.  The Backpage Defendants concluded that sustained public attention by law enforcement, media, and nonprofit organizations to the sexual exploitation of children on the Internet was the most significant obstacle to the achievement of their business objective.  At the same time, the Backpage Defendants understood that their revenues would be negatively affected by adopting and implementing restrictions and other readily available measures that would reduce the number of exploited children being advertised for sex on Backpage.com.  More importantly, the Backpage Defendants understood that such measures would affect a more critical element of their business model: the perception among potential customers for illegal commercial sex that they can find underage targets on Backpage.com.

30.    Accordingly, the Backpage Defendants developed a plan to minimize the attention devoted to its activities by the public and by law enforcement agencies, particularly concerning children.  This plan protected the ability of traffickers to advertise underage girls for

sale, and helped to burnish Backpage.com's reputation among human traffickers as a "safe" and favorable place to advertise sex trafficking victims, including children.

31.     The Backpage Defendants were aware that the development of the Internet as the primary marketplace for illegal commercial sex had caused law enforcement agencies to focus more attention on online commercial sex activities.  Given the overwhelming volume of commercial sex trafficking, and the limited resources available to law enforcement agencies, it is well known in the commercial sex community that law enforcement agencies principally target their efforts on identifying underage sex trafficking victims.  Thus, the Backpage Defendants undertook to forge seemingly cooperative relationships with many law enforcement agencies and to convey the impression that they are (i) actively and successfully engaged in efforts to identify and report child sex trafficking victims and (ii) otherwise "partnering" with law enforcement to minimize the risk of exploitation of children on the website.  As part of this façade, the Backpage Defendants regularly assert to the media that they are actively engaged in efforts to stop human trafficking through Backpage.com.  Indeed, the Backpage Defendants regularly characterize themselves as the "sheriff" of the Internet and helping to defeat the "scourge" of online child sex trafficking.

32.     In furtherance of this scheme to achieve and sustain a dominant market share in the commercial sex market, the Backpage Defendants initiated numerous interactions with state and federal law enforcement agencies beginning in or about 2010.  In the course of these various communications, the Backpage Defendants provided assurances to these agencies that they would be vigilant in attempting to detect unlawful trafficking of minors through various means, improve and increase the volume of reporting of suspicious advertisements, and would be a model for cooperation with law enforcement efforts.

33.     Contrary to these representations, the Backpage Defendants intended only to engage in the most superficial efforts to work with these agencies, and only to the extent necessary to divert the attention of these agencies from the growing market share and business success of Backpage.com.  To provide these efforts with an appearance of credibility, and as a point of departure from their prior record, the Backpage Defendants hired their first in-house general counsel.  She previously had served as a partner at a law firm representing Craiglist.com until its dramatic effort to distance itself from the online sex business.  The Backpage Defendants utilized her as the "public face" of their communications concerning various supposed initiatives to combat sex trafficking of children.

34.     Among other specific steps taken in furtherance of this scheme by the Backpage Defendants, were the following:

(i)     The Backpage Defendants initiated a series of meetings with the National Center of Missing & Exploited Children ("NCMEC"), the leading nonprofit organization in the United States working with law enforcement, families and the professionals who serve them on issues related to missing and sexually exploited children.  In those meetings, the Backpage Defendants represented that they were actively engaged in efforts to evaluate and adopt both routine and advanced technologies to detect underage sex trafficking, and that they were evaluating certain "best practices" identified by NCMEC to prevent the sexual victimization of children.  On the basis of these various representations, the Backpage Defendants induced NCMEC to make public statements supportive of Backpage.com.

(ii)     Eventually, however, after several years and multiple meetings and numerous other communications, it became clear that the Backpage Defendants did not

intend to adopt these readily available technologies or other practices, that they had rejected the adoption of "best practices" to minimize child sex trafficking, and that their communications with NCMEC were simply an effort to create a diversion as Backpage.com solidified its market position.

(iii)     While abandoning compliance with their own representations to NCMEC, the Backpage Defendants developed and publicly touted a so-called monitoring program which supposedly assured that every proposed advertisement was reviewed by a "trained" moderator before being posted on the website; in fact, however, the program review appears to be merely superficial, designed only to produce a record of referrals to NCMEC and various law enforcement agencies to which Backpage.com can point as evidence of its purported efforts to eliminate child exploitation.  While the Backpage Defendants have repeatedly touted the high volume of their referrals to NCMEC, the referrals received from Backpage moderators are not well correlated to the actual exploitation of children that occurs through Backpage.com.  As such, these referrals have produced relatively few instances of actual identification and/or rescue of exploited children.

(iv)     To complete their effort to secure the support of various law enforcement agencies, the Backpage Defendants took various steps internally to enhance their compliance with subpoenas and other information requests from law enforcement agencies as a "low cost" means to induce these agencies to view Backpage.com as a useful, even necessary, partner in the efforts of resource strapped agencies.  Consistent with the impression they wished to convey to law enforcement and the media, the Backpage Defendants also developed internal policies governing the removal of

advertisements.  These policies provided the façade of concern with child sex trafficking, but the Backpage Defendants knew and desired that the policies would be ineffective in actually eradicating child sex trafficking on Backpage.com.  For example, if a third party provides the Backpage Defendants with evidence that an advertisement in a particular city involves a child, the Backpage Defendants will consider removing the advertisement in that city and reporting the advertisement to NCMEC.  However, the Backpage Defendants take no steps to remove or report *other* advertisements for the same child, including even *identical* advertisements that are posted in other geographical regions; they do not identify or report other advertisements that are linked to the reported advertisement; and they do not identify or report advertisements involving the same phone number, web address, or other identifying information indicative of trafficking of that child or other children.  Indeed, the Backpage Defendants do not even consistently remove advertisements when parents report their minor children are pictured in the advertisements.

35.    The Backpage Defendants have been made aware on numerous occasions that both routine and advanced analytic techniques, including computer algorithms, all of which are available at little or no cost, can detect with reasonable accuracy whether an advertisement for sexual services involves a child, whether a child is being advertised in multiple cities, or whether the same trafficker is advertising multiple children.  Yet, contrary to their representations to NCMEC and law enforcement agencies, the Backpage Defendants have deliberately chosen not to utilize these tools or to consider any alternative methods to identify, report, and reduce instances of child sex trafficking that occur through Backpage.com.  The Backpage Defendants have eschewed these readily-available technologies not for a legitimate business reason, but rather

because they do not want to unduly compromise their ability to reap profits from the numerous child trafficking ventures that depend upon Backpage.com.  Ironically, the Backpage Defendants have adopted other technologies, such as the acceptance of Bitcoin as a form of payment, that increase the prevalence (and thus profitability) of child sex trafficking on Backpage.com.

36.     As a result of these various unfair and deceitful efforts, the Backpage Defendants succeeded in securing the general support of various social service and law enforcement agencies. Most importantly, they succeeded in achieving their goal to become the dominant player in the online commercial sex trade business.  Indeed, Defendant Camarillo Holdings, LLC has sold its ownership interests in the Village Voice newspaper (as well as other print publications) to concentrate exclusively on the online commercial sex business.

37.     Annual profits for Backpage.com were estimated by experts in 2010, at about the time that Craigslist closed its "Adult Entertainment" section, at $22 million from advertisements placed in just 23 of 394 markets in which Backpage.com operates in the United States.  Since then, Backpage.com has increased its revenues and profits dramatically in those same markets (as well as the numerous other markets in which it operates), increased its total market share from little more than 20 percent to more than 80 percent, and increased the overall size of the market. As a result, experts are confident that the number of children trafficked on the Internet, and on Backpage.com specifically, has grown steadily since the commencement by the Backpage Defendants of their scheme to dominate the online illegal sex business.

## C.     Backpage.com Provides a Brokering Service that Successfully Matches Buyers and Sellers of Commercial Sex

38.     The Backpage Defendants designed their website from the outset to maximize the perception among pimps and traffickers that their website is the most advantageous venue for the online advertising of illegal commercial sex.  More recently, and as set forth more fully below,

Backpage has secured the dominant market share of the unlawful commercial sex industry by developing a brokering service that promotes, supports, and contributes to the occurrence of commercial sex transactions.   To organize its website to achieve its purposes, Backpage.com includes an advertisement category conspicuously labeled "Adult Entertainment."   Within the "Adult Entertainment" category are a number of subcategories, one of which is labeled "Escorts." The Backpage Defendants have subdivided the "Adult Entertainment" category into multiple subcategories in a deliberate effort to help customers distinguish between those advertisements that involve legal adult services (such as erotic dancers) from those that involve illegal commercial sex (including commercial sex involving exploited children).



Although Backpage.com allows individuals to post free classified advertisements for lawful consumer products such as used bicycles and furniture, the focus of its business always has been the unlawful commercial sex industry, and advertisements in the "Adult Entertainment" category are the only ones for which the Backpage Defendants charge a fee.

      39.     The Backpage Defendants know that customers understand that the "Escorts" subcategory is where they will find offers of sex in exchange for money.   In fact, as the Backpage

Defendants have conceded, the "Escorts" subcategory was created for the purpose of organizing advertisements for illegal commercial sex in a single location, thus making it easier for customers seeking to pay for sex to find those services on Backpage.com.  This, in turn, increases the frequency and speed of responses to the advertisements by individuals seeking to pay for commercial sex, which allows the Backpage Defendants to keep and grow its commercial sex advertising revenue.  A typical screen for the Boston Escort subcategory is shown below.[1]



40.     Moreover, the Backpage Defendants monitor this category and remove advertisements from the website that would undermine its effectiveness as a marketplace for pimps and traffickers.  For example, when non-profit support and advocacy organizations post advertisements advising victims of sex trafficking (who often are forced by pimps and traffickers to post their own advertisements on the website) that support services are available to protect and assist them, the Backpage Defendants promptly remove the advertisement from the "Escorts"

---

[1] Phone numbers are obscured in this Complaint for privacy reasons.

category.  Similarly, the Backpage Defendants also have knowingly and intentionally *removed* advertisements placed by law enforcement agencies engaged in "sting" operations which, if successful in achieving the goal of identifying pimps and traffickers, would decrease the effectiveness of the website as a market for illegal commercial sex.

41.     Furthermore, Backpage.com separates the advertisements into 394 geographic categories or markets in the United States so that users can locate prostitutes and sex trafficking victims within their region.  By routing these advertisements in its "Adult Entertainment" category into the appropriate category and geographic region, Backpage.com increases the likelihood of buyers and sellers connecting for illegal transactions.  In addition, as described more fully below in paragraphs 52 – 59, the Backpage Defendants provide various inducements, guidance, and communications support to pimps and traffickers to maximize the prospect of illegal sex transactions being completed as a result of the placement of advertisements on their website.  Sample screen shots showing some of the geographic markets are shown below.



42.     The geographic designations provided by Backpage also assist sellers by providing multiple markets in which to sell sex.  Instead of victims being forced to walk up and down a street corner, i.e., a "track," in search of customers, Backpage enables sellers to post advertisements in multiple cities and regions, allowing them to maximize profitability by traveling to the location with the highest amount of Backpage generated interest in their services. By enabling sellers to post advertisements in multiple cities, Backpage also assists their efforts to evade detection by law enforcement by moving frequently from location to location.

43.     The "Escorts" subcategory is extremely lucrative for the Backpage Defendants. While advertisers of goods or services unrelated to adult services are permitted to post advertisements without charge, Backpage.com charges a fee in its "Adult Entertainment" category.  The current charge to place an advertisement in the "Escorts" section is $12.00 in most geographic areas, including Boston and the surrounding metropolitan region, as shown in the screen below, though Backpage.com charges up to $17.00 per advertisement in some areas of New York City.

Postings in this category are $12.00

Backpage.com also offers to repost advertisements for an additional charge.  Four reposts cost $48.00, eight reposts cost $96.00, twelve reposts cost $144.00, and twenty-six reposts cost $288.00.

44.     In addition, as described below in paragraphs 60 - 70, the Backpage Defendants also generate revenue, and enhance the effectiveness of the website for pimps and traffickers, through so-called Sponsored Ads and through its Affiliate Program, each of which involve an even closer "partnering" between Backpage.com and the pimps and traffickers.

   D.     **The Backpage.com Business Model Depends Substantially On Its Success In Minimizing the Scrutiny of Traffickers By Law Enforcement Agencies**

45.     While the Backpage Defendants pursued their efforts to achieve the support of law enforcement agencies and other organizations, they understood that the success of their business model depended on the perceived advantages the website presents to pimps and traffickers seeking to avoid detection by law enforcement.  With that understanding in mind, the Backpage Defendants maintained an active effort by various means to assist traffickers to avoid detection.

46.     For example, and of critical importance, Backpage.com does not require advertisers to provide any identifying information for the poster or the subject of the advertisement to post an advertisement in its "Escorts" section.

47.     In addition, Backpage.com does not require the use of a registered credit card when posting advertisements to the "Escorts" section.  Instead, Backpage.com allows users to pay for advertisements using prepaid credit cards that need not be linked to a name, address, or any other identifying information.  This makes it more difficult to track these transactions, and allows

users to maintain anonymity and evade law enforcement.  Moreover, as noted above, the Backpage Defendants now accept Bitcoin as payment.  Bitcoin is a digital currency that permits transactions to be completed without a bank.  Backpage.com is the first adult website in the country to accept Bitcoin.  The Backpage Defendants accept Bitcoin because they know that such payments are largely untraceable and therefore attractive to traffickers and other predators. Backpage.com also offers a 10 percent discount for those paying by Bitcoin, which reduces the price of an escort advertisement in Boston from $12 to $10.80.



48.    Backpage.com also does not require any age verification to post an advertisement in the "Escorts" section.  While a poster must enter his or her age as part of the advertisement drafting interface prior to paying for and posting an advertisement in the "Escorts" section, if the poster enters an age under 18, he or she receives a message that reads: "Oops!  Sorry, the ad poster must be over 18 years of age."  Then, no matter how many times the poster has entered an age under 18 along with other information necessary to complete the advertisement, the poster has the option to then enter an age above 18, but to otherwise use the same information entered previously, without being blocked from completing the advertisement.



49.    Backpage.com does not require phone number verification and allows posters to include phone numbers in obscured forms that include letters and numbers rather than strictly numeric characters (e.g., "twoO13fourFive678niNe" rather than "201-345-6789").   In contrast, they do require a numerical phone number from posters placing advertisements in the Pets section. Additionally, the Backpage Defendants do not search for phone numbers in response to law enforcement requests in any format other than strictly numeric), notwithstanding that technology exists that would easily allow the Backpage Defendants to search for phone numbers that are written in an obscured form.  The use of obscured phone numbers is well understood as a signal to prospective customers that the individual in the advertisement is being sold for sex.

xOxO**347three.four.nine.0820 OUTCALLS & INCALLS!!

50.    Similarly, Backpage.com does not require email verification from individuals seeking to post an advertisement in the "Escorts" section.  Where an advertiser discloses an email

address, Backpage.com offers to "hide" the advertiser's email address and then offers a menu of options to the advertiser to facilitate and manage communications with the customer responding to the advertisement and seeking to purchase sex, including:

(i)      Backpage.com forwards, upon request, any email inquiries from a prospective customer to the pimps and traffickers who place the advertisements.

(ii)     Backpage.com sends, upon request, auto-reply messages to email inquiries from persons interested in purchasing commercial sex, and then allows the pimp or trafficker to create a response without complying with the website's posting guidelines, even if the message includes terms such as "sex" and "little girl."

(iii)    Backpage.com servers host and maintain a database of email conversations between the pimps or traffickers and the customers without regard to the content of the messages.

51.     The Backpage Defendants also assist traffickers by making it difficult, indeed nearly impossible, to track the photographs that are posted to accompany the advertisements posted on the website.  Photographs are "uploaded" by traffickers embedded with so-called "metadata" consisting of identifying information that typically reflects the date, time, geo-location, and other critical identifying information regarding the photograph.  The Backpage Defendants deliberately adjusted their server software, at additional expense, to delete the metadata on each uploaded photo so that law enforcement cannot track the photo, or otherwise determine whether photos bearing the same metadata are posted elsewhere on Backpage.com. Incredibly, the Backpage Defendants publicly represent that they are engaged in active efforts to adopt "hashing" technology to enable them to compare photo images to detect repeat efforts to

advertise children, although they have taken no action and do not intend to take any action consistent with those representations.

      **E.**      **The Backpage Defendants Have Adopted Tools That Are Specifically Intended to, and Do, Assist Advertisers in Crafting Child Sex Advertisements That Will Attract Potential Customers Yet Evade Law Enforcement Detection**

      52.      As Backpage.com refined its business model, it also developed various means that assist advertisers in posting advertisements for illegal commercial sex, though the Backpage Defendants assert that these measures are merely efforts to restrict or minimize the extent of child exploitation on their website.

      53.      When posting an advertisement in the "Escorts" section on Backpage.com, the user must draft an advertisement on Backpage.com's posting interface.  The interface, as shown below, requires that the advertiser or "poster" first provide a title; the age of the poster; a description, i.e., the text of the advertisement; and the poster's email address.  Backpage.com then offers the poster the option of entering a location and contact information, and the opportunity to upload images (and more recently video) to include with the advertisement.



54.     At this point, Backpage.com screens the draft advertisement for certain non-permitted words and phrases using an "automated filtering" system.  Examples of non-permitted terms include: "barely legal," "high school," "innocent," "sex," "blow job," "hand job," "schoolgirl," "teen" or "teenage."   Yet, Backpage permits the phrases "perfect gum drop nipple," "huge boobs," and "no panties."

55.     If the poster attempts to include any of these non-permitted terms, he or she receives this message: "Oops! The term '___' is forbidden in this category."   However, Backpage.com does not block the poster from continuing after he or she attempts to include a non-permitted term, no matter what the import of the non-permitted term or how many times the

poster has attempted to use non-permitted terms.  Rather, Backpage.com allows the poster to delete or alter the offending term and once again elect to "Continue."

| **Oops!** | **Oops!** |
| --- | --- |
| The term "innocent" is forbidden in this category. | "Barely legal" is a forbidden term in this category. |

56.    Despite creating the appearance that it prohibits certain transactions, Backpage.com allows a poster to include close synonyms and misspellings of the non-permitted terms after receiving the advisory "Oops!" message.  For example, rather than "teenage" or "schoolgirl," the poster may include the terms "girl," "young," "underage," or "fresh."  Similarly, while a poster may not include "barely legal" or "high school," which are known to be code words for underage, Backpage.com permits "brly legal" (as shown below) and "high schl."



57.     By flagging certain terms for posters and allowing the posters to adjust those terms and continue posting their advertisements, Backpage.com attempts to essentially coach individuals about how to advertise the sale of sexual services and the exploitation of underage sex trafficking victims without including terms that will most likely trigger detection by law enforcement.   Two examples of the previews screens of advertisements that were placed after proceeding through the "filtering" system are shown below.[2]

   100% YOUNG ASIAN ☐ SeXxY BaBies NEW IN TOWN   ☐☐☐  HOT☐☐☐☐ - - 22 (quincy)
☐☐☐ Are you ready to have the time of your life with a HOT AND SWEET Asian Girl? we have beautiful face and a "out of the world" body to go along with. amazing and sweet personality! we promise that you'll...

   Looking for a good time ;) holla at me - 20 (02122)
Young Hispanic female with long hair and loves to have fun...

58.     In keeping with their efforts to deflect public attention by law enforcement and social service agencies, the Backpage Defendants claim that this "automated filtering" service helps to combat the underage sex trafficking occurring on Backpage.com.  In reality, however, the Backpage Defendants have designed this filtering tool to support the deceitful assertion that they are attempting to fight underage sex trafficking, while at the same time increasing their market share by brokering successful commercial sex transactions, including those for sex with underage trafficking victims.  In fact, the Backpage Defendants deliberately and intentionally seek to help traffickers successfully advertise and sell underage victims for sex without detection.

59.     By successfully facilitating the marketing, transportation, and sale of underage victims for sex with minimal detection by law enforcement, the Backpage Defendants increase the number of commercial sex transactions each underage victim is subject to on any given day.  This

_____

[2] The faces of the girls advertised, as they appeared on Backpage.com, have been obscured in this Complaint to protect their privacy.

scheme helps traffickers increase their profits gained from the sale of underage victims for sex.  In turn, this ensures traffickers' repeated use of Backpage.com for commercial sex brokering services, all to the financial benefit of the Backpage Defendants.  At the same time, it increases the number of times that underage victims marketed on Backpage.com (including Jane Doe No. 1, No. 2, and No. 3) are raped by customers.

**F.   The Design of Backpage.com Has Been Enhanced Repeatedly to Increase the Volume of Traffic on the Site**

60.   The Backpage Defendants continuously revise the design of their site, and over time several features have been added which are intended to improve the overall effectiveness of advertisements connecting buyers and sellers of commercial underage sex.

61.   Among these features, Backpage.com displays so-called "Sponsored Ads" in the "Escorts" section in a banner on the right hand side of every page of that section.  An advertiser on Backpage.com may pay to convert his or her advertisement into a "Sponsored Ad" for up to fifty-two weeks at a cost of $16.45 per week.  The advantageous placement and repetition of sponsored advertisement substantially increases the likely frequency of responses by prospective customers.



62.     Sponsored Ads on the right hand side of the page include thumbnails of images attached to the advertisement (if the poster attached images), excerpted text from the full advertisement selected by Backpage.com, and a summary of the advertised individual's location and/or availability.

63.     In contrast, regular, non-sponsored advertisements are listed in the order they are posted to the "Escorts" section using only the title of the advertisement.  Customers must click on the title as it appears on Backpage.com to read the text of the non-sponsored advertisement whereas Backpage.com's excerpt of the text of a Sponsored Ad appears in the Sponsored Ad column on the right of every "Escorts" page.

64.     The Sponsored Ads that appear on the right side of the page do not include all of the text as originally written by the poster.  Instead, in creating the Sponsored Ad, Backpage.com selects certain portions of the text for inclusion, excludes other portions, and sometimes elects to summarize some parts of the text.  Below is an example; the first screen shot includes a sponsored advertisement on the right hand side and the second image is the full advertisement that appears when the sponsored advertisement is clicked.[3]



---

[3] The phone number in this Sponsored Ad is obscured in the Complaint for privacy reasons.  Also, in the full advertisement, the visible nudity is obscured.



65.     In a Sponsored Ad, Backpage.com generally includes information regarding whether the individual advertised for sex is able to travel to the location of the customer, i.e. whether she will do an "out-call," or whether she is "in-call" only.  Backpage.com often itself creates and inserts that text in the Sponsored Ad link to draw attention to the advertised person's availability.

66.     Backpage.com does not always randomize the placement of Sponsored Ad links within the Sponsored Ad space on the right hand side of the "Escorts" section pages.  Indeed Backpage.com sometimes chooses some Sponsored Ads for higher, and thus more lucrative, placement than others.

67.     By choosing to include textual excerpts and availability descriptions that are most likely to attract customers seeking sex in exchange for money without highlighting blatantly illegal conduct, the Backpage Defendants ensure the success of the more profitable Sponsored Ads while avoiding interference from law enforcement, particularly where the subject of the

advertisement is an underage sex trafficking victim. The success of Sponsored Ads in Backpage.com's "Escorts" section entices advertisers to purchase more Sponsored Ads, thus increasing the profits of the Backpage Defendants from the illegal sex trade, including the trafficking of underage victims for sex.

68.     In an additional effort to improve the attractiveness of the website to advertisers, Backpage.com permits pimps and traffickers to provide links to other well-known sex trafficking sites on its website. Some of these linked sites, like MyRedBook.com,[4] TheEroticReview.com, Eccie.net, and others are designed to solicit reviews from customers concerning the "performance" of the individuals (including minors) who are advertised on Backpage.com. These links further cement Backpage.com's role as the Internet hub of commercial sex transactions.

69.     The Backpage Defendants also have a robust so-called "affiliate program" that has allowed them to identify buyers of sex and direct them to the website. Backpage.com affiliates earn commissions for referring others to advertise on the website. When a link to Backpage.com is clicked from an affiliated site, the associated affiliate ID of the referrer is recorded. If that user clicks on the Backpage.com assisted link and signs up for paid advertising service upgrades, the referrer earns commissions paid by the Backpage Defendants.

70.     Affiliates earn commissions from the Backpage Defendants by placing advertisements on their websites to direct traffic to Backpage.com. Examples of these advertisements are text ads with dropdown menus, banner ads, buttons and widgets. These options provide the affiliate with multiple ways to direct potential advertisers to Backpage.com and maximize their own earnings.

---

[4] In June, 2014, the U.S. Department of Justice indicted the operators of MyRedBook.com in the Central District of California for, *inter alia*, facilitating prostitution and money laundering, effectively shutting down the Internet site. See DOJ press release http://www.justice.gov/opa/pr/california-operators-myredbookcom-website-arrested-facilitating-prostitution-and-money

**G.      Backpage.com Provided a Brokering Service that Resulted in the Repeated Victimization of Jane Doe No. 1**

71.      Jane Doe No. 1 was trafficked and sold by pimps — utilizing the brokering services offered by Backpage.com — to men across Massachusetts and Rhode Island who raped her in exchange for payment.  Jane Doe No. 1 estimates that she was raped over 1000 times over the course of one and a half years.

72.      Jane Doe No. 1 was first trafficked on Backpage.com in February of 2012, when she was 15 years of age, after running away from home.  She was told that Backpage.com was the best website on which to be sold because ads on Backpage.com would generate more customer responses than other websites and that traffickers were unlikely to be apprehended by law enforcement if they used Backpage.com rather than other websites.  Jane Doe No. 1 was also told that selling on Backpage.com "was like selling a car."

73.      In March 2013, after leaving home once again, Jane Doe No. 1 was again trafficked on Backpage.com.  From early June 2013 to September 10, 2013 she was trafficked on Backpage.com every single day.  During this time, Backpage.com facilitated an average of 10-12 sex transactions per day with Jane Doe No. 1.

74.      Jane Doe No. 1's pimp required her to post on Backpage.com because they could "avoid getting caught" by using that site, instead of other websites available online.  He also told her that Backpage.com would "make him the most money" and "was the most popular with customers."  Jane Doe No. 1 was only trafficked on Backpage.com.

75.      The pimp often instructed Jane Doe No. 1 to post advertisements of herself in the "Escorts" section of Backpage.com as directed by the website.  Every advertisement on Backpage.com for Jane Doe No. 1 included the label "Escorts," which Backpage.com added to

the advertisement.   The term "Escort" is known to be a signal that the individual in the advertisement is being offered for sex in exchange for money.

76.     "Escorts" as it is used on Backpage.com is understood among pimps, prostitutes, sex traffickers, sex trafficking victims, and individuals seeking to purchase sex to indicate not legal escort services, but the illegal sale of sex in exchange for money, including prostitution and child sex trafficking.

77.     Thus, Backpage.com's addition of the "Escorts" label to advertisements for Jane Doe No. 1 made users aware that she was for sale.   This increased her vulnerability to men preying on trafficked girls and increased the number of times that Jane Doe No. 1 was raped.

78.     At the direction of her pimp, Jane Doe No. 1 always used a pre-paid mobile phone to post advertisements on Backpage.com, and she provided the same pre-paid mobile phone number for customers to contact her.   Also as directed by her pimp, Jane used this mobile phone only for taking customer calls and for placing ads on Backpage.com.

79.     Men seeking to purchase sex responded to the advertisements for Jane Doe No. 1 on Backpage.com by calling this pre-paid mobile phone and arranging to have sex with her in exchange for money.   Typically, within five minutes of posting an advertisement on Backpage.com, interested customers would begin to call Jane Doe No. 1.

80.     Jane's Doe No. 1's pimp also required her to simultaneously post multiple advertisements on Backpage.com in multiple cities.   That way, Jane understood that her pimp could use the multi-city functionality of Backpage.com to gauge the volume of responses and determine where to traffic Jane Doe No. 1 for maximum profitability.   By posting multiple ads in multiple cities, her pimp was able to maximize the number of customers willing to purchase sex with her at any given time.   Backpage.com's multi-city functionality further enabled Jane Doe

No. 1's pimp to evade law enforcement by moving frequently.  Jane Doe No. 1's pimp moved her from city to city usually every one or two days.

81.     Jane Doe No. 1 was trafficked in Boston, Cambridge, Dorchester, Mattapan, Malden, Dedham, Worcester, Northborough, Marlborough and Quincy, Massachusetts.  She was also trafficked in Warwick, Woonsocket, North Providence and South Providence, Rhode Island. She typically remained in any one location for no more than a day or two at a time before moving on to another city or town.

82.     The pimp required Jane Doe No. 1 to "repost" or "refresh" her ads a few times per day. This would involve posting an ad again so it would show at the top of the page when new customers visited the "Escorts" section.  Jane Doe No. 1 posted around three ads per day to maximize exposure to customers and maximize her pimp's profits.

83.     In order to avoid detection by law enforcement, the pimp required Jane Doe No. 1 to use a prepaid credit card, to use the well understood appropriate terminology such as "roses" to refer to money, not to list an email address, to never list a specific location, and never to show identifiable scars, tattoos or piercings in the photos displayed on Backpage.com.

84.     In order to take advantage of the features of Backpage.com that would minimize the risk of detection, the advertisements for Jane Doe No. 1 would obscure her telephone number by using letters and symbols in addition to numbers.  Jane understood from her pimp that Backpage.com had a search capability that could detect identical phone numbers for law enforcement agencies, but that Backpage.com limited its searches only to purely numeric expressions of a number (e.g., 012-345-6789).  Thus, it was understood that Backpage.com would not track a phone number that was obscured by using an alternative format.  An obscured phone

number on Backpage.com is also well understood by pimps, traffickers, trafficking victims, and customers to signal to customers that Jane No. 1 was being sold for sex.

85.     On several occasions, Jane Doe No. 1 attempted to put her actual age into Backpage.com and received the "Oops!" message described above in paragraph 48.   At her pimp's direction, she then lied about her age by entering an age over 18, and she then proceeded to post the advertisement.   Jane Doe No. 1 was told by her pimp that this was one of the "best parts" of Backpage.com: that if an attempt to post an advertisement suggested to Backpage.com that you were being sold for underage sex, Backpage.com would ask the poster to correct the ad to post a false age but then allow the posting to go forward.

86.     At the time that he trafficked Jane Doe No. 1, her pimp understood that if he attempted to include certain terms, such as "sex," "teenage," or "schoolgirl," in his advertisement, Backpage.com would flag those terms prior to the final submission of his advertisement and ask him to change those terms.   Thus, the advertisements typically would avoid certain terms such as "sex," "money," and "teenaged" to successfully post the ads.   To achieve the same end, however, the Pimp understood that he could include words, phrases, and symbols such as "young," "girl," "fresh," "tiny," "roses," and "party" to indicate that an underage girl was being sold for sex.   In addition, to further take advantage of known features of Backpage.com that minimize detection, the  advertisements for Jane Doe No. 1 were posted without a valid address and paid for using a prepaid debit card that was not linked to a name or address.   Jane understood that prepaid Visa cards should be used to pay for the Backpage.com ads because they are "untraceable" and cannot be tracked by law enforcement.

87.     In addition to the text portion of the advertisement, the advertisements offering Jane Doe No. 1 for sale would always include at least several photographs of her.   The

photographs of Jane Doe No. 1 were generally taken by her pimps or traffickers and uploaded from various Massachusetts locations, as well as various Rhode Island locations. The photographs would omit or obscure Jane Doe No 1's face but show her back, shoulders, legs, buttocks and/or breasts. On at least one occasion, the photographs included certain tattoos which were unique to Jane Doe. No. 1. Jane Doe No. 1 lacked the legal capacity to consent to the commercial use of the photographs and, in any event, did not purport to provide any such consent, either personally or through her parent or a legal guardian.

88.     During the time her traffickers advertised Jane Doe No. 1 for sex on Backpage.com, she estimates that she was sold and raped 10-12 times per day, on average, by men responding to the advertisements. On some days, Jane Doe No. 1 was raped as many as 15 times.

89.     Between June and September 2013, Jane Doe No. 1 was raped approximately 1000 times, as the result of approximately three hundred advertisements placed on Backpage.com. During this period, Backpage.com gained significant revenue and profit from the victimization of Jane Doe No.1.

**H.     Backpage.com Provided a Brokering Service that Resulted in the Repeated Victimization of Jane Doe No. 2**

90.     Jane Doe No. 2 was trafficked and sold by a pimp – utilizing the brokering services offered by Backpage.com – to men across Massachusetts who raped her in exchange for payment. Between 2010 and September 2012, Jane Doe No. 2 was raped over 900 times as a direct result of the advertisements placed on Backpage.com.

91.     Jane Doe No. 2 was trafficked on Backpage during various periods of time between 2010 until 2012. Jane Doe No. 2 was first trafficked on Backpage.com in or around June 2010, when she was 15 years old, after leaving a residential program where she was then residing.

92.     Jane Doe No. 2 was told by her pimp that Backpage.com was "fast," which she understood to mean that it easily and quickly connected sellers and buyers of sex.

93.     Jane Doe No. 2 was posted exclusively on Backpage.com by either a pimp or an older female who worked closely with him in sex trafficking on Backpage.com (also known as his "bottom").  During this time, they sold two additional girls on Backpage.com.

94.     When Jane Doe No. 2 was under the control of  the pimp, either he or the bottom posted advertisements for Jane Doe No. 2 on Backpage.com an average of 6 times per day.  As a result of those advertisements, Jane Doe No. 2 was sold, through Backpage.com's brokering services, to between 5 and 15 customers per day, seven days a week.

95.     The advertisements posted on Backpage.com offering Jane Doe No. 2 for sale would include one or more photographs.  The photographs of Jane Doe No. 2 that were included with the advertisements were taken of Jane Doe No. 2 by her traffickers and uploaded from various locations in Massachusetts to Backpage.com.  These photographs would invariably omit or obscure her face but displayed her shoulders, legs, buttocks and/or breasts.  Jane Doe No. 2 lacked the legal capacity to consent to the commercial use of the photographs and, in any event, did not purport to provide any such consent, either personally or through a parent or legal guardian.

96.     To further avoid detection of illegal activity and recovery by law enforcement of the victims in their stable, the pimp or the bottom either used credit cards that did not belong to them or pre-paid credit cards that they purchased at local convenience stores to pay the fee charged by Backpage.com to post the advertisements.

97.     Jane Doe No. 2 was given a pre-paid mobile phone to answer customer calls.  She would start to receive calls on the phone as quickly as 10 minutes after she was posted on

Backpage.com.  Customers would begin their conversations with Jane Doe No. 2 by telling her that they had seen her advertisement on Backpage.com.  Generally, they would proceed to inquire about her location, whether she would travel to them, and the price she was charging.

98.     Jane Doe No. 2 was trafficked in Boston, Saugus, Cambridge, and Somerville, Massachusetts.  Jane Doe No. 2's pimp would typically keep his group of girls in one location for one to seven days, depending on how secure he felt at a particular location, before moving to a new location, where Jane Doe No. 2 would be raped again by those who had seen and responded to her Backpage.com advertisements.

99.     During the time she was sold for sex on Backpage.com, Jane Doe No. 2 was sold and raped numerous times by men responding to the Backpage.com advertisements.  During this period, Backpage.com gained significant revenue and profit from the victimization of Jane Doe No. 2.

**I.       Backpage.com Provided a Brokering Service that Resulted in the Victimization of Jane Doe No. 3**

100.    Jane Doe No. 3 was trafficked and sold by a pimp and at least one of his associates – utilizing the brokering services offered by Backpage.com – and raped in Massachusetts in exchange for payment.

101.    In December 2013, Sam and Sara Loe dropped Jane Doe No. 3 at her friend's house.  While at her friend's home, Jane Doe No. 3 was picked up by a man and a woman whom she had met through a friend.  At an apartment located in Boston where Jane Doe No. 3 was taken, the traffickers drafted and posted an advertisement on Backpage.com using a pre-paid, anonymous debit card to pay for the advertisement.  The traffickers continued to post additional similar advertisements for Jane Doe No. 3.  Each subsequent advertisement contained a link to all of the other prior advertisements that offered Jane Doe No. 3 up for sale.  The headlines for the

advertisements contained words such as "new," "sweet," and "playful," all of which are known by the Backpage Defendants (as well as commercial sex customers) to be code words indicating that the advertisement is offering up a minor. Jane Doe No. 3 was trafficked exclusively on Backpage.com in Massachusetts.

102.    The advertisements posted on Backpage.com offering Jane Doe No. 3 for sale included several photographs which were uploaded from Massachusetts to be displayed with the text of the advertisements.   Photographs of Jane Doe No. 3 that were included with the advertisements were taken either by the traffickers or by Jane Doe No. 3 herself.   The photographs omitted or obscured her face, but they displayed her shoulders, legs, buttocks, and/or breasts.   Jane Doe No. 3 lacked the legal capacity to consent to the creation or use of the photographs, but in any event did not purport to provide any such consent, either personally or through her parents Sam and Sara Loe.

103.    After the advertisements involving Jane Doe No. 3 were placed on Backpage.com, Jane Doe No. 3 started receiving calls and texts from men who wanted to purchase her for sex.   Jane Doe No. 3 was driven by the traffickers to a hotel located in Foxborough, Massachusetts where she was raped in exchange for payment that went to her trafficker.

104.    At some point shortly after Jane Doe No. 3 began being trafficked on Backpage.com, Sam and Sara Loe were alerted that advertisements featuring their minor daughter were posted on Backpage.com.   When they accessed Backpage.com, they found multiple advertisements featuring Jane Doe No. 3 under the Escort section in the Adult Entertainment Category of Backpage.com for Massachusetts.

105.     Sam and Sara Loe contacted the Backpage Defendants by email and reported that a 15 year old was being illegal offered for sale on Backpage.com.  Sam and Sara Loe demanded that the Backpage Defendants remove the illegal advertisements immediately.  They provided the Backpage Defendants with information that would allow the Backpage Defendants to easily locate and remove all advertisements involving Jane Doe No. 3.  Sam and Sara Loe reiterated their demand in at least one other follow up communication to the Backpage Defendants.

106.     When she returned home, Sam and Sara Loe took Jane Doe No. 3 to the hospital, and she then participated in an out-patient treatment program.

107.     A week after the rape of their daughter, the advertisements for Jane Doe No. 3 remained on Backpage.com.  Sam and Sara Loe have not received any communication from Backpage.com advising them whether any action has been taken to remove the advertisements of Jane Doe No. 3 from the website.

## CLAIMS FOR RELIEF

## COUNT I

### Trafficking Victims Protection Reauthorization Act of 2008, 18 U.S.C. § 1595

108.     The allegations set forth in paragraphs 1 through 107 are hereby incorporated by reference.

109.     Jane Doe No. 1, Jane Doe No. 2, and Jane Doe No. 3 are victims of child sex trafficking within the meaning of 18 U.S.C. § 1591 and are entitled to bring a civil action under 18 U.S.C. § 1595 against any individual or entity whose violations of the TVPRA proximately caused Jane Doe No. 1, Jane Doe No. 2, and Jane Doe No. 3 to sustain physical or psychological injuries.

110.     The Backpage Defendants knowingly participate in illegal child trafficking ventures, all in violation of the TVPRA.  The Backpage Defendants participate in these ventures by, *inter alia*, engaging in both acts and omissions that are intended to facilitate and aid and abet traffickers' and pimps' marketing, transportation, and sale of child victims for commercial sexual exploitation.

111.     Through such acts and omissions, the Backpage Defendants participated in the illegal child trafficking ventures that involved Jane Doe No. 1, Jane Doe No. 2, Jane Doe No.3 and they profited from this participation in that they reaped substantial revenues from the daily advertisements that successfully offered Jane Doe No. 1, Jane Doe No. 2, and Jane Doe No. 3 for sale for sex with customers.

112.     Jane Doe No. 1, Jane Doe No. 2, and Jane Doe No. 3 are victims of the unlawful ventures which the Backpage Defendants participated in, promoted, and supported by various means, *inter alia*,   (i)   designing their website to increase the incidence and profitability of advertisements reflecting and encouraging the exploitation of children; (ii) taking various steps to sustain the impression among pimps, traffickers and customers that Backpage.com is a safe and effective vehicle for transactions involving young girls and boys, including actions to minimize the risk of detection by law enforcement; (iii) implementing various enhancements to its website to increase its effectiveness for pimps and traffickers; and (iv) failing to investigate or adopt available analytic measures developed by expert academic and technology organizations, and available at little or no cost, that would enable the Backpage Defendants to reliably detect advertisements involving exploited children and identify and apprehend the pimps and traffickers behind those advertisements.

113. The Backpage Defendants knew or should have known that Jane Doe No. 1, Jane Doe No. 2, and Jane Doe No.3 were among the minors being advertised and trafficked on Backpage.com, and that the plaintiffs were sold for sex through their website, trafficked in various venues in the region, and raped on many occasions each day in which they were offered for sale.

114. As a result of the Backpage Defendants violations of the TVPRA, Jane Doe No. 1, Jane Doe No. 2, and Jane Doe No.3 have suffered substantial physical and psychological injuries, and other damage.

## COUNT II

### Massachusetts Anti-Human Trafficking and Victim Protection Act of 2010, G.L. c. 265, § 50

115. The allegations set forth in paragraphs 1 through 114 are hereby incorporated by reference.

116. Jane Doe No. 1, Jane Doe No. 2, and Jane Doe No. 3 are victims of child sex trafficking, as defined by Mass. Gen. Laws c. 265 § 50(a), who are entitled to bring a civil action under Mass. Gen. Laws c. 265 § 50(d).

117. The Backpage Defendants knowingly benefit financially, in violation of Mass. Gen. Laws c. 265 § 50(a)(ii), from conduct by pimps and traffickers which involves repeated sexual exploitation of the growing number of children, such as the plaintiffs, who have been victimized through Backpage.com.

118. The Backpage Defendants knowingly aid and abet these pimps and traffickers by, *inter alia*, the various means described in paragraphs 38 – 59 *infra*.

119. Jane Doe No. 1, Jane Doe No. 2, and Jane Doe No. 3 have suffered substantial physical and psychological injuries, and other damage, as a result of being trafficked through

Backpage.com in violation of the Massachusetts Anti-Human Trafficking and Victim Protection Act. As a result of the acts of the Backpage Defendants, the plaintiffs were sold for sex, trafficked in various venues in the region, and were raped on many occasions each day in which they were offered for sale.

## COUNT III

### Unfair and Deceptive Acts and Practices, G.L. c. 93A, § 9

120. The allegations set forth in paragraphs 1 through 119 are hereby incorporated by reference.

121. The Backpage Defendants are engaged in trade or commerce, as defined by G.L. c. 93A, in the Commonwealth of Massachusetts.

122. The Backpage Defendants have committed various knowing and willful unfair and deceptive acts and practices in the design and operation of a business model which promotes, encourages, supports, and profits from the systematic sexual abuse of children.

123. Among these acts and practices, the Backpage Defendants (i) assist commercial sex traffickers, many of whom are known to be trafficking children, to enhance the effectiveness of their advertisements, to protect the anonymity of the traffickers, and to minimize the risk of detection by law enforcement of their unlawful activity; and (ii) create and maintain a model that protects the ability of traffickers to advertise underage girls and boys for sale.

124. To further this unfair and deceptive scheme, the Backpage Defendants have made various misrepresentations to law enforcement agencies and social service organizations that they are dedicated to reducing the utilization of the website for trafficking underage children, that they actively detect and report any advertisement which they determine to involve a child, and that they are evaluating and intend to adopt methods and technologies to substantially improve their

ability to accomplish this goal.  These representations have served to minimize law enforcement scrutiny of Backpage.com for a number of years.

125.    In order to sustain this unfair and deceptive scheme, the Backpage Defendants have knowingly and intentionally (i) reported an increasingly high volume of advertisements to NCMEC to create the misimpression of active cooperation by the Defendants, knowing all the while that most of the advertisements selected and reported by the moderators of the Backpage Defendants are unlikely to involve children; (ii) declined to investigate or adopt readily available analytic measures that would enable the reliable detection of advertisements involving children, (iii) refused to adopt readily available security and other practical measures suggested by expert agencies that would substantially reduce the ability of traffickers to place such advertisements without law enforcement detection; and (iv) refined their website repeatedly to increase the incidence, success, and profitability of advertisements reflecting and encouraging the sexual exploitation of children.

126.    As a result of these unfair and deceptive acts and practices, the Backpage Defendants have avoided,  minimized and delayed the intense publicly media, legislative, and law enforcement scrutiny that reasonably could have been expected to interfere with, if not terminate, its efforts to grow market share and eventually to dominate the market for online illegal commercial sex advertising.   As a result of the acts of the Backpage Defendants, the plaintiffs were sold for sex, trafficked in various venues in the region, and were raped on many occasions each day in which they were offered for sale.

127.    Jane Doe No. 1, Jane Doe No. 2, and Jane Doe No. 3 are persons entitled to bring an action under Section 9 of Chapter 93A, each of whom has been injured as a result of the unfair and deceptive acts and practices of the Backpage Defendants.

128.     The Backpage Defendants do not have a place of business or maintain assets in Massachusetts.

## COUNT IV

### Unauthorized Use of Pictures of a Person, G.L. c. 214, § 3A and R.I. St. § 9-1-28.1

129.     The allegations set forth in paragraphs 1 though 128 are hereby incorporated by reference.

130.     The Backpage Defendants have developed a business model that supports and enables pimps and traffickers to exploit children.  As an integral part of their business model, the Backpage Defendants encourage, support, and materially contribute to the use by pimps and traffickers in of photographic images to enhance the effectiveness of advertisements placed on the website.

131.     The Backpage Defendants know that pimps and traffickers routinely take photographs of persons they control, including children who are victims of sex trafficking, which are then uploaded and displayed with advertisements on Backpage.com.

132.     At all relevant times, the Backpage Defendants have had the right and the ability to control the display of the photographs displayed on their website.  Indeed, the Backpage Defendants claim that they monitor and review the advertisements, including the photographs, posted by pimps and traffickers and make an affirmative decision whether the photographs may be displayed on Backpage.com.  In addition, once the Backpage Defendants determine to display a photograph on their website, they exercise an additional, unique level of control over the photograph by removing the metadata from photographs to minimize the risk of law enforcement detection.

133.     On multiple occasions, the Backpage Defendants displayed photographs of Jane Doe No. 1, Jane Doe No. 2, and Jane Doe No. 3 in connection with advertisements on Backpage.com.

134.     The photographs of each of the plaintiffs were displayed by the Backpage Defendants for use within Massachusetts for advertising purposes.  In the case of Jane Doe No. 1, photographs also were displayed for advertising purposes in Rhode Island by and for the benefit of the Backpage Defendants.

135.     The plaintiffs each lacked legal capacity to consent to the use or display of the photographs on Backpage.com, and none of their parents or guardians provided their consent, written or otherwise, to the use of the photographs for advertising purposes.

136.     The plaintiffs each have been damaged by the unauthorized use of the photographs by the Backpage Defendants.

137.      The Backpage Defendants are liable to each of the plaintiffs under M.G.L. c. 214, § 3A, and to Jane Doe No. 1 under R.I. St. § 9-1-28.1.

## COUNT V

### The Copyright Act, 28 U.S.C. §§ 101 *et seq*.

138.     The allegations set forth in paragraphs 1 through 137 are hereby incorporated by reference.

139.     The Backpage Defendants have developed a business model that supports and enables pimps and traffickers in conduct which exploits children for commercial sex.  As an integral part of their business model, the Backpage Defendants encourage, support, induce, and materially contribute to the use by pimps and traffickers of photographic images to enhance the effectiveness of advertisements placed on the website.  The Backpage Defendants derive a

financial benefit directly attributable to the public display of such photographs by virtue of the payment of fees by the pimps and traffickers to Backpage.com.

140.    At all relevant times, the Backpage Defendants have had the right and the ability to control the display of the photographs displayed on their website.   Indeed, the Backpage Defendants monitor and review the advertisements posted by pimps and traffickers, including the photographs, to make an affirmative decision whether to post each advertisement and display the photographs on their website.   In addition, once the Backpage Defendants determine to display a photograph on their website, they exercise an additional level of control by removing the metadata from photographs to minimize the risk of law enforcement detection.

141.    It is common knowledge, and well known to the Backpage Defendants, that pimps and traffickers routinely direct child trafficking victims under their control to take photographs of themselves or to provide such photographs to the pimps and traffickers for use in Backpage.com advertisements.

142.    At the direction of her traffickers, plaintiff Jane Doe No. 3 provided certain photographs that she took of herself (the "copyright protected photographs") which the traffickers then included in the Backpage.com advertisements for Jane Doe No. 3.

143.    The Copyright Act grants to Jane Doe No. 3, through her parents, the exclusive rights to use, reproduce, distribute, and display the copyright protected photographs that she took of herself and provided under coercion to the traffickers.

144.    Jane Doe No. 3 lacked legal capacity to consent to the distribution or use of the copyright protected photographs displayed on Backpage.com, and her parents Sam and Sara Loe did not provide their consent to any such use or distribution.

145.    The Backpage Defendants have actual and constructive knowledge that the pimps and traffickers routinely use the website and the services provided through the website to unlawfully publicly display copyright protected photographs.

146.    As a result, the Backpage Defendants have violated plaintiff Jane Doe No. 3's exclusive rights to reproduce, distribute, and display the relevant photographs and their actions constitute direct and secondary infringement of her copyrights and exclusive rights under copyright to the copyright protected photographs.

147.    In addition, because the Backpage Defendants knew or should have known that these acts of infringement were occurring on their website, their infringing conduct occurred both willfully and intentionally, and in disregard of and with indifference to the rights of plaintiff Jane Doe No. 3.

## PRAYERS FOR RELIEF

WHEREFORE, plaintiffs seek for judgment against the defendants for:

a.    The actual and compensatory damages determined to have been suffered by each plaintiff under Counts I, II, III, IV, and V;

b.    Punitive damages under Count I and II;

c.    Multiple damages under Count II for willful and malicious conduct and under Count III for knowing and willful conduct;

d.    Costs and reasonable attorney's fees under Counts I, III, and V;

e.    Statutory damages pursuant to 17 U.S.C. § 504(c) for infringement of each of the copyright protected photographs wrongfully used, distributed, or displayed.

e.    Such injunctive relief as the Court deems appropriate;

f.    Such further relief as the Court may deem just and equitable.

The plaintiffs demand a trial by jury on all issues so triable.

JANE DOE NO. 1, a minor child, by her parent and next friend MARY ROE, JANE DOE NO. 2, JANE DOE NO. 3, a minor child, by her parents SARA LOE and SAM LOE,

Respectfully submitted,

 /s/   John T. Montgomery

John T. Montgomery (No. 352220)
Aaron M. Katz (No. 662457)
Kevin P. Budris (No.680075)
Dara A. Reppucci (No. 679511)
Jessica L. Soto (No. 683145)
ROPES & GRAY LLP
800 Boylston Street
Boston, MA 02199
Telephone:  (617) 951-7000
Email: john.montgomery@ropesgray.com
        aaron.katz@ropesgray.com
        kevin.budris@ropesgray.com
        dara.reppucci@ropesgray.com
        jessica.soto@ropesgray.com

Dated: November 6, 2014