UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| JANE DOE NO. 1, a minor child, by her parent and next friend MARY ROE, JANE DOE NO. 2, and JANE DOE NO. 3, a minor child, by her parents and next friends, SAM LOE and SARA LOE,<br><br>Plaintiffs,<br><br>v.<br><br>BACKPAGE.COM, LLC, CAMARILLO HOLDINGS, LLC (f/k/a VILLAGE VOICE MEDIA HOLDINGS, LLC) and NEW TIMES MEDIA HOLDINGS, LLC,<br><br>Defendants. | Civil Action No. 14-13870-RGS |

## DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(6)

BACKPAGE.COM, LLC, et al.

By Their Attorneys,

Robert A. Bertsche (BBO #554333)
Jeffrey J. Pyle (BBO #647438)
PRINCE LOBEL TYE LLP
100 Cambridge Street, Suite 2200
Boston, MA 02114
(617) 456-8000 (tel.); (617) 456-8100 (fax)
rbertsche@PrinceLobel.com
jpyle@PrinceLobel.com

James C. Grant (admitted *Pro Hac Vice*)
Ambika K. Doran (admitted *Pro Hac Vice*)
DAVIS WRIGHT TREMAINE LLP
1201 Third Avenue, Suite 2200
Seattle, WA 98101
(206) 622-3150 (tel.); (206) 757-7700 (fax)
jimgrant@dwt.com
ambikadoran@dwt.com

## I.     INTRODUCTION

In 1996, Congress enacted Section 230 of the Communications Decency Act ("CDA"),

47 U.S.C. § 230 ("Section 230").  The law, which has become a bulwark of Internet free speech,

recognizes that websites and other online service providers cannot screen each of the millions of

postings provided by their users to ensure none are harmful, and imposing liability on providers

for such content would chill online speech and commerce.  To avoid this result, Section 230 bars

lawsuits against websites based on content provided by users.  Websites cannot be treated as "the

publisher or speaker" of such material and cannot be sued for decisions regarding whether to

publish, edit or remove information.  *Id.* § 230(c)(1).  Rather than restrict or censor content,

Section 230 aims to encourage providers to self-police for harmful or offensive materials by

providing immunity for such efforts.  And it expressly preempts all contrary state laws.  *Id.*

§ 230(e)(3).

Section 230 squarely bars Plaintiffs' claims.  Plaintiffs allege pimps trafficked them for

sex and posted ads about them on the Backpage.com website.  Plaintiffs seek to hold

Backpage.com liable for these ads, even though they admit the pimps or their associates created

and posted them.  This is third-party content, for which Backpage.com is immune.

Plaintiffs try to avoid Section 230 by alleging the entire Backpage.com website is

unlawful and designed to "facilitate and broker" sex trafficking.  Plaintiffs admit Backpage.com

monitors, screens and blocks ads for improper content; removes and reports suspect ads; and

cooperates with law enforcement and support groups.  But they allege all this is deceptive, unfair

and a ruse.  Plaintiffs' assertions are flatly wrong, and Backpage.com vehemently denies them.

But even if the Court assumes the truth of Plaintiffs' well-pleaded allegations, it must dismiss

this lawsuit.  Under well-established law, plaintiffs cannot avoid Section 230 by alleging a

1

website encourages unlawful content, as that would destroy the immunity.  Allegations about the "construct and operation" of a website cannot override immunity and are irrelevant, as Section 230 turns on who created or developed the particular content that allegedly caused harm. *Universal Commcn's Sys., Inc. v. Lycos, Inc.*, 478 F.3d 413, 420-21(1st Cir. 2007).  Even if a website has notice that third-party information may be or is unlawful, that "is not enough to make it the service provider's own speech."  *Id.* at 420.

"No amount of artful pleading can avoid" Section 230.  *Id.* at 418.  Thus, Plaintiffs cannot invoke the exception for federal criminal prosecutions by asserting civil claims based on criminal statutes.  They cannot pursue claims under Chapter 93A, G.L. c. 214, § 3A or R.I. St. § 9-1-28.1, because Section 230 preempts state statutes.  They cannot avoid dismissal by alleging Backpage.com has not acted in good faith (although it has) because Section 230(c)(1) does not require good faith.  And they cannot invoke Section 230's exception for "intellectual property" claims because they fail to adequately allege any such claims.

Backpage.com does not mean to minimize the egregious harm Plaintiffs allege they suffered.  But Congress has made a considered policy decision to protect the Internet and foster First Amendment values, directing that "plaintiffs may hold liable the person who creates or develops unlawful content, but not the interactive computer service provider that merely enables that content to be posted online."  *Nemet Chevrolet, Ltd. v. Consumraffairs.com, Inc.*, 591 F.3d 250, 254 (4th Cir. 2009).  As a matter of law, Plaintiffs cannot sue Backpage.com.

## II.       BACKGROUND

### A.       Backpage.com.

Backpage.com operates an online classified advertising service through which users can post ads in a variety of categories, including local places, buy/sell/trade, automotive, rentals, real

estate, jobs, forums, dating, adult, and services.  *See* Second Amended Complaint (Dkt. No. 22,

"Complaint" or "SAC") ¶ 38; Boston-Backpage, http://boston.backpage.com; *Backpage.com,*

*LLC v. Cooper*, 939 F. Supp. 2d 805, 813 (M.D. Tenn. 2013).[1]  The site is organized

geographically, by state and municipality.  SAC ¶ 41; *Cooper*, 939 F. Supp. 2d at 813.  Users

post over three million ads every month; Backpage.com is the second-largest online classified ad

service in the country, after Craigslist.  *Backpage.com, LLC v. McKenna*, 881 F. Supp. 2d 1262,

1266 (W.D. Wash. 2012).

Users provide all the content for ads they post using an automated interface.  SAC ¶ 53.

The website does not dictate or require any content.  Users may post ads for free in most

categories, but are charged $12-$17 for ads in the adult and dating categories.  *See* SAC ¶¶ 38,

43; *Cooper*, 939 F. Supp. 2d at 813.  The charges discourage abusive postings and help identify

and track users who post ads for illegal activities.  *Cooper*, 939 F. Supp. 2d at 813.

Users posting or viewing ads in the adult or dating categories must first confirm they are

18 or older and agree to comply with the site's posting rules.  SAC ¶¶ 48, 53; *Cooper*, 939 F.

Supp. 2d at 813-14; Backpage-Posting Rules, http://www.backpage.com/gyrobase/central/

PostNationalAdPPI?introSeen=yes&section=3848891&category=3848995.  The rules are

designed to prevent improper ads or misuse of the website.  *See* SAC ¶¶ 54-55 (alluding to

rules).  The site's Terms of Use also prohibit illegal acts and nude or lewd photos.  Boston-

---

[1] Plaintiffs reference the Backpage.com website throughout the Complaint, *see, e.g.*, SAC ¶¶ 38-70, and the Court may consider it in deciding this motion.  *Blay v. Zipcar, Inc.*, 716 F. Supp. 2d 115, 119 (D. Mass. 2010) (considering website on 12(b)(6) motion).  When a complaint's allegations are based on an undisputedly authentic document, it "merges into the pleadings and the trial court can review" it in deciding a motion to dismiss under Rule 12(b)(6).  *United Auto., Aerospace, Agr. Implement Workers of Am. Int'l Union v. Fortuno,* 633 F.3d 37, 39 (1st Cir. 2011).  The Court may also take judicial notice of court decisions about the website and similar claims.  *See Kowalski v. Gagne,* 914 F.2d 299, 305 (1st Cir. 1990) ("[F]ederal courts may take judicial notice of proceedings in other courts if those proceedings have relevance to the matters at hand."); *Pease v. Burns,* 719 F. Supp. 2d 143, 146 n.1 (D. Mass. 2010).

Backpage, Terms of Use, http://boston.backpage.com/online/TermsOfUse; *McKenna*, 881 F. Supp. 2d at 1266.  They state:  "[a]ny post exploiting a minor in any way will be subject to criminal prosecution and will be reported to the <u>Cybertipline</u> for law enforcement."  *Id.* (underscored term is a hyperlink).  The site contains hyperlinks throughout to a "User Safety" page, which includes phone numbers and links for the National Center for Missing and Exploited Children ("NCMEC") and similar resources.  *See McKenna*, 881 F. Supp. 2d at 1266; Boston Backpage-User Safety, http://boston.backpage.com/online/UserSafety.  Every ad contains a "Report Ad" button, and Backpage.com has an email address (abuse@backpage.com) for users to identify ads they believe improper or suspect.  *See Cooper*, 939 F. Supp. 2d at 814.

Backpage.com takes extensive measures to police user posts.  *See* SAC ¶¶ 34, 54-55, 58 (alluding to screening).  This multi-tiered system includes automated filtering and two levels of manual review by over 100 personnel.  The filter scans for tens of thousands of "red-flag" terms, phrases, URLs, and email and IP addresses.  Backpage.com blocks over a million posts per month and refers any that may indicate child exploitation to NCMEC.  *See McKenna*, 881 F. Supp. 2d at 1266-67.  "Backpage.com also regularly works with local, state and federal law enforcement officials by responding to subpoena requests, providing officials with Internet search tools, and removing posts and blocking users at the request of officials."  *Cooper*, 939 F. Supp. 2d at 814.

In 2010, Craigslist shut down its adult services category in response to pressure from a group of state attorneys general, *see* SAC ¶ 29, initially resisting the pressure as improper censorship.  *See* M. Lindenberger, *Craigslist Comes Clean: No More 'Adult Services,' Ever* (Sept. 16, 2010), http://content.time.com/time/nation/article/0,8599,2019499,00.html.  Less than a week later, the AGs targeted Backpage.com, demanding it shut down its adult services section.

*See* State Attorney General Letter, http://www.illinoisattorneygeneral.gov/pressroom/2010_09/ Backpage_com9-20-2010.pdf.  In 2012-13, three states—Washington, Tennessee and New Jersey—passed criminal laws aimed at Backpage.com, but courts promptly enjoined and struck down all three laws as unconstitutional and preempted by Section 230.  *See McKenna*, 881 F. Supp. 2d 1262; *Cooper*, 939 F. Supp. 2d 805; *Backpage.com, LLC v. Hoffman*, 2013 WL 4502097 (D.N.J. Aug. 20, 2013).  Throughout, Backpage.com has maintained that censorship of online content is not an effective or permissible approach to combat sex trafficking.[2]

**B.     Plaintiffs' Allegations and Claims.**

Plaintiffs allege that pimps and their associates trafficked them for sex.  SAC ¶¶ 71, 90, 100.  Jane Doe 1 alleges her pimp "required" her to post ads on Backpage.com, *id.* ¶¶ 74, 75, "instructed" and "directed" her to post ads, and otherwise "required" and "directed" her acts.  *Id.* ¶¶ 74, 78, 80, 82, 83.  Jane Doe 2 alleges her pimp or his associate posted ads about her.  *Id.* ¶¶ 93, 94.  Jane Doe 3 alleges her pimp and at least one associate posted ads about her.  *Id.* ¶¶ 100, 101.  Plaintiffs allege the ads included photos taken by "traffickers," *id.* ¶¶ 87, 95, 102, except Jane Doe 3 alleges she took one photo of herself, which was registered with the U.S. Copyright Office after filing of this suit, *id.* ¶ 143.

---

[2] Many experts and law enforcement officials agree and advocate working with online providers to prevent trafficking.  *See, e.g.*, D. Boyd, *Combating Sexual Exploitation Online: Focus on the Networks of People, not the Technology* (Oct. 19, 2010), http://www.danah.org/papers/talks/2010/ CombatingSexualExploitationOnline.pdf. (Harvard scholar's statement to Mass. AG Coakley: "Going after specific sites where exploitation becomes visible and attempting to eradicate the visibility does nothing to address the networks of supply and demand—it simply pushes them to evolve and exploiters to find new digital haunts and go further underground."); M. Latonero, *et al.*, *The Rise of Mobile and the Diffusion of Technology Facilitated Trafficking* (Nov. 2012)*, at* 26-27, https://technologyandtrafficking.usc.edu/files/2011/08/HumanTrafficking2012.pdf; Letter from Attorney General Harris, *Human Trafficking*, http://oag.ca.gov/human-trafficking (California AG: technology can provide a digital trail, prevent and disrupt trafficking, and provide ways to reach victims and raise public awareness).

Plaintiffs do not provide or quote any of the ads about them, except Doe 3 alleges that headlines in some unidentified ads "contained words such as 'new,' 'sweet,' and 'playful.'"  *Id.* ¶ 101.  Indeed, based on the allegations in their Complaint, Backpage.com cannot determine whether any ads about Plaintiffs ever appeared on the website.  Regardless, the allegations indicate that all the ads were written, created and posted by the pimps or their associates.  *Id.* ¶ 75 (pimp "instructed Jane Doe No. 1 to post advertisements of herself"); ¶ 88 ("traffickers advertised Jane Doe No. 1"); ¶ 93 (Jane Doe 2's "pimp or an older female who worked closely with him" posted ads); ¶ 94 (same); ¶ 101 ("the traffickers drafted and posted an advertisement" about Jane Doe 3 and "continued to post additional advertisements for [her]").  Plaintiffs do not allege that Backpage.com created, developed or required any content in the ads.[3]

Plaintiffs' other allegations are attacks on the website as a whole.  And they largely allege conclusory characterizations rather than facts.  For example, Plaintiffs admit Backpage.com works with and receives support from law enforcement and social service agencies, but then conclude these efforts are a ruse.  *See* SAC ¶¶ 30-34, 36.  They also acknowledge Backpage.com's program to monitor ads and refer suspect ones to NCMEC, but conclude these efforts "appear[] to be merely superficial."  *Id.* ¶ 34.  Plaintiffs admit the website uses automated filtering to block improper ads, but then denigrate this screening and assert Backpage.com should

---

[3] Plaintiffs claim "[e]very advertisement on Backpage.com for Jane Doe No. 1 included the label 'Escorts,' which Backpage.com added to the advertisement."  SAC ¶ 75.  This refers to an auto-generated line on all pages on the site, showing the path a user followed to reach the page.  This is called a "breadcrumb" trail.  *See* Wikipedia-Breadcrumbs, http://en.wikipedia.org/wiki/Breadcrumb_(navigation).  For example, if a Boston user is shopping for furniture, this line will display:  "backpage.com > boston buy, sell, trade > boston furniture for sale."  Courts have rejected the argument that an auto-generated breadcrumb trail is content added by a website.  *See Seldon v. Magedson*, 2014 WL 1456316, at *4-6 (D. Ariz. Apr. 15, 2014).

use different measures.  *Id.* ¶¶ 34(iv), 49, 50, 56, 57; *see id.* ¶ 58 (asserting site's protections are "deceitful").  Otherwise, Plaintiffs characterize common website features as nefarious.[4]

Plaintiffs assert five causes of action, while making clear they plan to argue Section 230 is "wholly inapplicable."  SAC ¶ 14.  They assert claims under:  (1) 18 U.S.C. § 1595, which allows civil claims based on 18 U.S.C. § 1591 (criminal anti-trafficking statute); (2) G.L. c.265, § 50(d), allowing civil claims based on G.L. c. 265, § 50(a) (criminal anti-trafficking law); (3) G.L. 93A, § 9 (consumer protection law); (4) G.L. c. 214, § 3A and R.I. St. § 9-1-28.1 (respectively, Massachusetts right of publicity law and Rhode Island privacy statute); and (5) 17 U.S.C. § 101, *et seq.* (Copyright Act).  The Complaint does not allege causation, injury or damages for these claims respectively.  Instead, it describes Plaintiffs' injuries from having been victimized by pimps and allege, for all claims, Backpage.com should be held responsible.

## III.    ARGUMENT

### A.    Applicable Standards Under Rules 12(b)(6) and 9(b).

Under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)).  While the Court must accept fact allegations and reasonable inferences in favor of the plaintiff, this "does not mean [it]

---

[4] For example, Plaintiffs assail Backpage.com for categorizing ads by geographic market, SAC ¶ 41, yet this is common.  *See, e.g.*, Boston Craigslist, http://boston.craigslist.org.  They attack Backpage.com for accepting prepaid credit cards, SAC ¶ 47, but so do most online merchants, as the use of prepaid cards has grown.  *See, e.g.*, T. Groenfeldt, *Prepaid Cards To Hit $200 Billion In Merchant Sales in 2014* (April 16, 2014), www.forbes.com/sites/tomgroenfeldt/2014/04/16/prepaid-cards-to-hit-200-billion-in-merchant-sales-in-2012.  Plaintiffs disparage the site for offering sponsored ads, SAC ¶ 61, yet this too is common, including on Google and Facebook.  Plaintiffs assert Backpage.com blocks posts of support groups for exploited children, *id.* ¶ 40, yet fail to mention the website prominently features such ads.  *See* Boston Backpage, http://boston.backpage.com/FemaleEscorts (Children of the Night post stating "Want Out? National Free Help 24/7:  1-800-551-1300.  Tired of Turning Tricks?  Pimps Don't Care.  We Do!").

must (or should) accept every allegation …, no matter how conclusory or generalized." *United States v. AVX Corp.,* 962 F.2d 108, 115 (1st Cir. 1992).  It must separate "factual allegations" from "conclusory statements … to analyze whether the former, if taken as true, set forth a plausible, not merely a conceivable, case for relief." *Juarez v. Select Portfolio Servicing, Inc.,* 708 F.3d 269, 276 (1st Cir. 2013) (quotation marks omitted).

Here, because nearly all Plaintiffs' claims are based on allegations of fraudulent conduct, Plaintiffs must also satisfy Rule 9(b)[5] and "state with particularity the circumstances constituting [the] fraud."  Fed. R. Civ. P. 9(b); *see SEC v. Tambone*, 597 F.3d 436, 442 (1st Cir. 2010); *Schwartz v. Indep. Appraisals, LLC*, 2011 WL 5593108, at *7 (D. Mass. Nov. 17, 2011) (Chapter 93A claim sounding in fraud requires plaintiff to plead fraud with particularity).  Plaintiffs must identify the "time, place and content of [each] alleged misrepresentation with specificity," *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 193 (1st Cir. 1999), *i.e.*, "the who, what, where, and when," *Alternative Sys. Concepts, Inc. v. Synopsys, Inc.*, 374 F.3d 23, 29 (1st Cir. 2004).

Moreover, enforcing Section 230 at this juncture is important because it provides "*immunity from suit* rather than a mere defense to liability and it is effectively lost if a case is erroneously permitted to go to trial."  *Nemet Chevrolet*, 591 F.3d at 254 (emphasis in original) (quotation marks omitted); *accord Jones v. Dirty World Entm't Recordings LLC*, 755 F.3d 398, 417 (6th Cir. 2014) ("determinations of immunity … should be resolved at an earlier stage of litigation" given law's role "in an open and robust internet").  Scores of cases have dismissed suits when, as here, plaintiffs' complaints assert claims against online providers based on third-

---

[5] *See, e.g.*, SAC ¶ 2 ("Backpage [has] implemented and perfected a business model that profits substantially from aiding and participating with pimps and traffickers in the sexual exploitation of children [through] unfair and deceptive practices"); *see also id*. ¶ 8 ("false and misleading representations"); ¶ 13 ("false representations and promises"); ¶ 14 ("unlawful and deceptive business model"); ¶ 34(iv) ("façade of concern").

party content.  *See, e.g.*, *Lycos*, 478 F.3d 413 (affirming 12(b)(6) dismissal); *Klayman v. Zuckerberg*, 753 F.3d 1354, 1357 (D.C. Cir. 2014) (same).

### B.      Section 230 Aims to Promote Free Speech and Encourage Self-Policing.

Section 230(c)(1) unambiguously bars suits against websites and other online providers based on content provided by third parties:  "No provider … of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1).  A user who posts content is an "information content provider" under the statute's definition of a party "responsible, in whole or in part, for the creation or development of information."  *Id.* § 230(f)(3).  A website loses immunity only if it "create[s]" or "develop[s]" the allegedly unlawful content itself.  In addition to barring federal claims,[6] Section 230 expressly preempts state laws:  "[N]o liability may be imposed under any State or local law that is inconsistent with this section."  *Id.* § 230(e)(3).  Section 230 provides limited exceptions for federal criminal prosecutions and intellectual property laws, *id.* § 230(e)(1), (2), which do not apply here.  *See infra* Section III.E.

Congress enacted Section 230 to achieve two goals.  First, it "wanted to encourage the unfettered and unregulated development of free speech on the Internet, and to promote the development of e-commerce."  *Batzel v. Smith*, 333 F.3d 1018, 1027 (9th Cir. 2003); *see also Ben Ezra, Weinstein, & Co. v. Am. Online Inc.*, 206 F.3d 980, 985 n.3 (10th Cir. 2000) (law is meant "to promote freedom of speech"); 47 U.S.C. § 230(b)(2) (statute intended to "preserve the vibrant and competitive free market that presently exists for the Internet.").  Second, it sought to

---

[6] *See, e.g.*, *Chicago Lawyers' Comm. for Civil Rights Under Law v. Craigslist, Inc.*, 519 F.3d 666, 668–69 (7th Cir. 2008) (Section 230 preempts claim under the Fair Housing Act); *Noah v. AOL Time Warner Inc.*, 261 F. Supp. 2d 532, 538–39 (E.D. Va. 2003), *aff'd*, 2004 WL 602711 (4th Cir. Mar. 24, 2004).

encourage online providers to "self-police" for potentially harmful or offensive material by providing immunity for such efforts. *Batzel*, 333 F.3d at 1028; *see also* 47 U.S.C. § 230(c)(2).

As the First Circuit has stated, Congress made a "policy choice … not to deter harmful online speech through the … route of imposing tort liability on companies that serve as intermediaries for other parties' potentially injurious messages." *Lycos*, 478 F.3d at 418 (quoting *Zeran v. Am. Online, Inc.*, 129 F.3d 327, 330-31 (4th Cir. 1997)). Congress sought to eliminate the "obvious chilling effect" that imposing tort liability on online providers would cause, "given the volume of material communicated through [the Internet], the difficulty of separating lawful from unlawful speech, and the relative lack of incentives to protect lawful speech." *Id.* at 418-19 (quoting *Zeran*, 129 F.3d at 331). "Section 230 therefore sought to prevent lawsuits from shutting down websites …." *Batzel*, 333 F.3d at 1028. Congress recognized that some material on the Internet could be harmful but decided "plaintiffs may hold liable the person who creates or develops unlawful content, but not the interactive computer service provider who merely enables that content to be posted online." *Nemet Chevrolet*, 591 F.3d at 254.

Thus, courts have interpreted Section 230 to establish broad immunity for online providers, as the First Circuit and nine other circuit courts have held.[7]  The same is true of state courts, one of which noted that some 300 reported decisions have interpreted Section 230, and

---

[7] *Lycos,* 478 F.3d at 419 ("Section 230 immunity should be broadly construed"); *see also Zeran*, 129 F.3d at 330-31; *Ben Ezra*, 206 F.3d at 985 n.3; *Green v. Am. Online*, 318 F.3d 465, 471 (3d Cir. 2003); *Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119, 1123-24 (9th Cir. 2003) (noting a "consensus" that "§ 230(c) provides broad immunity for publishing content provided primarily by third parties"); *Almeida v. Amazon.com, Inc.* 456 F.3d 1316, 1321 (11th Cir. 2006) ("federal circuits have interpreted [Section 230] to establish broad federal immunity to any cause of action that would make service providers liable for information originating with a third-party user" (internal citations and quotations omitted)); *Johnson v. Arden*, 614 F.3d 785, 791 (8th Cir. 2010) (same); *Doe v. MySpace, Inc.*, 528 F.3d 413, 418 (5th Cir. 2008) ("Courts have construed the immunity provisions in § 230 broadly…"); *Chicago Lawyers' Comm.*, 519 F.3d at 671; *Jones*, 755 F.3d at 406-07; *Klayman*, 753 F.3d at 1359.

"[a]ll but a handful … find that the website is entitled to immunity from liability." *Hill v.*

*StubHub, Inc.*, 727 S.E.2d 550, 558 (N.C. Ct. App. 2012).[8]

### C.      Plaintiffs' Claims Are Barred Under Section 230's Three-Part Test.

Section 230 sets forth a three-part test.  A website or other online service provider is

immune if "(1) [it] is a 'provider or user of an interactive computer service'; (2) the claim is

based on 'information provided by another information content provider'; and (3) the claim

would treat [the website] 'as the publisher or speaker' of that information."  *Lycos*, 478 F.3d at

418 (quoting 47 U.S.C. § 230(c)(1)).  Applying the test in this case, Plaintiffs' claims are barred.

First, Backpage.com, as a website operator, is a "provider … of an interactive computer

service."  *See id.* at 419 ("web site operators … are providers of interactive computer services

within the meaning of Section 230"); *Fair Hous. Council of San Fernando Valley v.*

*Roommates.com, LLC*, 521 F.3d 1157, 1162 n.6 (9th Cir. 2008) (en banc) (websites are the "most

common interactive computer services").

Second, Plaintiffs base their claims on "information provided by another information

content provider."  Their Complaint makes clear the ads about them were created and posted by

pimps or other individuals the pimps directed.  Plaintiffs do not allege (nor could they) that

Backpage.com had anything to do with creating or developing the ads.[9]

---

[8] *See also Shiamili v. Real Estate Grp. of N.Y.*, 952 N.E.2d 1011, 1017 (N.Y. 2011) ("the national consensus reads section 230 as generally immunizing Internet service providers from liability for third-party content"); *Barrett v. Rosenthal*, 146 P.3d 510, 522 (Cal. 2006) (Section 230 "broadly shield[s] *all* providers from liability for 'publishing' information received from third parties"); *Doe v. Am. Online, Inc.*, 783 So. 2d 1010, 1018 (Fla. 2001).

[9] Plaintiffs do not allege Backpage.com required unlawful content or retained the pimps to create and post the ads—the two circumstances in which federal circuit courts have held providers fell outside Section 230.  *See Roommates.com*, 521 F.3d at 1166-68, 1172 n.33, 1174 (roommate-matching service responsible for developing content as to one portion of site, which required users to provide discriminatory preferences, but immune for section allowing users to post "Additional Comments"); *FTC v. Accusearch Inc.*, 570 F.3d 1187, 1192, 1199-1200 (10th Cir.

Finally, Plaintiffs' claims treat Backpage.com "as the publisher or speaker" of the ads. Section 230(c)(1) immunity applies to all "lawsuits seeking to hold a service provider liable for its exercise of a publisher's traditional editorial functions, such as deciding whether to publish, withdraw, postpone or alter content." *Zeran*, 129 F.3d at 330.  Accordingly, "any activity that can be boiled down to deciding whether to exclude material that third parties seek to post online is perforce immune under section 230." *Roommates.com*, 521 F.3d at 1170-71.

This test is straightforward by design, to provide clarity to online providers and others.  . *See Jones*, 755 F.3d at 415 ("muddiness" of a test based on whether websites "encouraged" illegal content would defeat Congress's purposes).  Thus, the test comes down to determining whether a plaintiff's claims "arise or stem" from third-party content, no matter how they are labeled or phrased.  *Hinton v. Amazon.com.dedc, LLC*, 2014 WL 6982628, at *3 (S.D. Miss. Dec. 9, 2014) (quoting *Doe v. MySpace*, 528 F.3d at 418) (internal alteration omitted); *see Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1101-02 (9th Cir. 2009) ("[W]hat matters is not the name of the cause of action [but] whether [it] inherently requires the court to treat the defendant as the 'publisher or speaker' of the content provided by another.").

Here, no matter how Plaintiffs characterize their claims, they  "arise" and "stem" from Backpage.com's publishing of (or failure to block) third-party ads on the website.  This is the heart of Section230 immunity.  *See Doe v. MySpace*, 528 F.3d at 419-20 (MySpace immune from suit by girl who was sexually assaulted by a man who contacted her through the website, despite plaintiff's allegations she only sought to hold site liable for not implementing adequate protective measures (such as age verification); plaintiffs' claims were "artful pleading" and "merely another way of claiming that MySpace was liable for [its] role as a publisher of online

---

2009) (website operator responsible for developing content because it sold private telephone records and hired researchers to obtain them, which required violating or circumventing laws).

third-party-generated content"); *Green*, 318 F.3d at 471 (enforcing immunity because plaintiff's "fundamental tort claim" was that "AOL was negligent in promulgating harmful content and in failing to address [it]," "thus attempt[ing] to hold AOL liable for decisions relating to the monitoring, screening, and deletion of content from its network—actions quintessentially related to a publisher's role").[10]

> ### D.   Plaintiffs' Claims Contravene Well-Established Case Law.

Plaintiffs seek to plead around Section 230, asserting the statute is "wholly inapplicable here."  SAC ¶ 14.  They level a host of accusations against the entire website and argue their claims fall within the statute's limited exceptions.  The exceptions do not apply, *see infra* Section III.E, but more fundamentally, Plaintiffs' tack contravenes several well-established principles from cases interpreting Section 230.

> #### 1.   Plaintiffs' Attacks on the Website as a Whole Are Irrelevant.

First, courts uniformly hold that a plaintiff may not avoid Section 230 by challenging the website as a whole or its construct and operation.  By its terms (and consistent with Congress's purposes), Section 230 requires courts to focus on the specific content that allegedly caused harm, and to enforce immunity if the content was provided by a third party (as here).

---

[10] To the extent Plaintiffs assert Backpage.com should lose immunity because they allege it has not acted in good faith, SAC ¶ 14, they misunderstand the law.  Section 230(c)(1) does not require showing good faith. *See Levitt v. Yelp! Inc.,* 2011 WL 5079526, at *7 (N.D. Cal. Oct. 26, 2011) (good faith is not mentioned in Section 230(c)(1) but only in subsection (c)(2)(A), and "the text of the two subsections of § 230(c) indicates that (c)(1)'s immunity applies regardless of whether the publisher acts in good faith").  If Plaintiffs mean to rely on *Moving & Storage, Inc. v. Panayotov*, 2014 WL 949830 (D. Mass. Mar. 12, 2014), this argument, too, misunderstands the statute.  In that case, a moving company brought suit against a competitor about a review website the competitor operated.  The plaintiff did not base its claims on the content of user reviews, but rather the defendant's deletion of negative reviews about itself and positive reviews about the plaintiff, while representing that information on the website was accurate and objective. *Id.* at *2.  Here, Plaintiffs do not claim they were harmed by deletion of third-party ads about them, but rather because Backpage.com published the ads.

The First Circuit applied this principle in *Lycos*, 478 F.3d 413, in which a company claimed websites operated by Lycos published inaccurate, disparaging comments about its financial condition and prospects.  The plaintiff claimed Lycos fell outside Section 230 because it "involved itself with its subscriber[s'] conduct/activities and/or rendered culpable assistance through the construct and operation of its web site" and "actively induce[d] its subscribers to post unlawful content."  478 F.3d at 420-21.  The First Circuit characterized this as "artful pleading" and concluded the claims "fit[] comfortably within the immunity intended by Congress."  *Id.* at 418-19.  It noted that a website's policies and practices (and decisions not to change them) are "as much an editorial decision [immunized under Section 230] as a decision not to delete a particular posting."  *Id.* at 422.  Moreover, "message board postings do not cease to be 'information provided by another information content provider' merely because the 'construct and operation' of the web site might have some influence on the content of the postings."  *Id.*

Many cases are in accord.  *See Nemet Chevrolet,* 591 F.3d at 256-58 (rejecting claim that website loses Section 230 immunity because of its "structure and design" and allegations it "solicited" content).  As the *Hill* court noted—rejecting arguments that StubHub.com is designed to enable illegal ticket scalping—such an "'entire website' approach is fatally flawed" under Section 230.  727 S.E.2d at 562.  Rather, a website is liable only if it created or developed "the specific content that was the source of the alleged liability."  *Accusearch*, 570 F.3d at 1198-99; *accord Jones*, 755 F.3d at 409 ("immunity under the CDA depends on the pedigree of the content at issue"); *Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119, 1125 (9th Cir. 2003); *Gentry v. eBay, Inc.*, 99 Cal. App. 4th 816, 121 Cal. Rptr. 2d 703, 717 n.11 (2002) (allegations that a

website operator provides some content are "irrelevant if [it] did not itself create or develop the content for which the [plaintiffs] seek to hold it liable").[11]

Here, no matter how artfully they plead, Plaintiffs' claims arise from the ads posted by the pimps.  Proper application of Section 230 turns on the undisputed fact that those ads are third-party content.  *Carafano*, 339 F.3d at 1124 (when "a third party willingly provides the essential published content, the interactive service provider receives full immunity").  All of Plaintiffs' attacks on the website as a whole are "fatally flawed" and irrelevant under Section 230.

### 2. Plaintiffs Cannot Evade Section 230 With Allegations that a Website Promotes or Encourages Unlawful Content.

Plaintiffs' approach is equally flawed because it relies on allegations Backpage.com "promotes, encourages, supports, and profits" from child sex trafficking.  SAC ¶ 13, *see also id.* ¶¶ 4, 38, 42, 45, 51, 52, 112, 122, 130.  To be clear, Backpage.com categorically denies these accusations—it works to *prevent* misuse of the website and to *combat* sex trafficking.  More important here, *every court* that has considered similar "encouragement" arguments to evade Section 230 has rejected them.

The Sixth Circuit recently held this in *Jones v. Dirty World*, 755 F.3d 398.  There, the plaintiff sued a gossip website (TheDirty.com) for disparaging user posts about her, and the district court refused to apply Section 230 because it concluded the site "intentionally encourage[d] illegal or actionable third-party postings."  *Jones v. Dirty World Entm't Recordings, LLC,* 965 F. Supp. 2d 818, 821 (E.D. Ky. 2013).  The Sixth Circuit reversed.  It

---

[11] *See also S.C. v. Dirty World, LLC*, 2012 WL 3335284, at *4 (W.D. Mo. Mar. 12, 2012) (rejecting allegations about "the general structure and operation of the Website" because "the CDA focuses on the specific post at issue"); *M.A.*, 809 F. Supp. 2d at 1051-52 (focusing on the "specific content" at issue); *Doe v. Bates*, 2006 WL 3813758, at *17 (E.D. Tex. Dec. 27, 2006) ("the immunity analysis turns on who was responsible for the specific harmful material at issue, not on whether the service provider was responsible for the general features and mechanisms of the service").

noted that "[m]any websites not only allow but also actively invite and encourage users to post particular types of content," which might be "unwelcome to others."  755 F.3d at 414.  But such websites cannot be sued on an "encouragement" theory because that would "eclips[e] the immunity from publisher-liability that Congress established."  755 F.3d at 414.  "Congress envisioned an uninhibited, robust, and wide-open internet … but the muddiness of an encouragement rule would cloud that vision."  *Id.* at 415.

*Jones* follows the Ninth Circuit's decision in *Roommates.com*, 521 F.3d 1157, finding a website immune from claims based on a section providing an open-text field for user comments (analogizing this to Craigslist, *id.* at 1172 n.33, which is structured the same as Backpage.com). The court rejected the argument that the site encouraged subscribers to make unlawful discriminatory statements, noting that in many cases "a clever lawyer could argue that *something* the website operator did encouraged the illegality," but such cases "must be resolved in favor of immunity, lest we cut the heart out of section 230 by forcing websites to face death by ten thousand duck-bites, fighting off claims that they promoted or encouraged – or at least tacitly assented – to the illegality of third parties."  *Id.* at 1174.  As it cautioned, "in cases of enhancement by implication or development by inference – such as with respect to the "Additional Comments" here – section 230 must be interpreted to protect websites not merely from ultimate liability, but from having to fight costly and protracted legal battles."  *Id.* at 1174-75.  Many other cases have similarly rejected "encouragement" arguments.  As one court put it, "there is simply no authority for the proposition that [encouraging unlawful content] makes the website operator responsible, in whole or in part, for the creation of every post on the site."

*Ascentive, LLC v. Opinion Corp.*, 842 F. Supp. 2d 450, 476 (E.D.N.Y. 2011) (quotation omitted).[12]

### 3.  *Plaintiffs Cannot Avoid Section 230 by Alleging a Website Promotes or Induces Criminal Conduct.*

The same principle applies—and websites remain immune under Section 230—notwithstanding allegations they promote *criminal* conduct, as Plaintiffs allege here.  This too is clear from many cases, but two are particularly important here, because they rejected near-identical claims against Backpage.com and Craigslist.

In *M.A. v. Village Voice Media Holdings, LLC*, 809 F. Supp. 2d 1041 (E.D. Mo. 2011), the plaintiff alleged she was trafficked by a pimp who posted ads on Backpage.com.  *Id.* at 1043-44.  As Plaintiffs do here, M.A. attacked the website as a whole, alleging Backpage.com set out to create "a highly tuned marketing site" with "the veil of legality," but "had knowledge" that "postings on their website were advertisements for prostitution" and "illegal sexual contact with minors."  *Id.* at 1044.[13]  She also alleged the site "had a desire that these posters accomplish[] their nefarious illegal prostitution activities so [they would] pay for more posting," and was "an aider and abettor of minor sex trafficking by virtue of [its] culpable conduct."  *Id.* at 1045, 1053.

The court rejected all of these arguments and dismissed the case under Rule 12(b)(6).  *Id.* at 1058-59.  Relying on *Lycos*, it rejected the plaintiff's challenges about the site's "construct

---

[12] *See, e.g.*, *S.C. v. Dirty World*, 2012 WL 3335284, at *4  ("[E]ncouraging defamatory posts is not sufficient to defeat CDA immunity.").*Goddard v. Google, Inc.*, 640 F. Supp. 2d 1193, 1196 (N.D. Cal. 2009) (Google immune despite allegations it "encourages[,] collaborates in the development of [and] effectively, requires [illegal content]" in ad program); *Global Royalties, Ltd. v. Xcentric Ventures, LLC*, 544 F. Supp. 2d 929, 933 (D. Ariz. 2008) (ripoffreport.com immune despite allegations it encouraged defamatory reviews for financial benefit); *Shiamili*, 952 N.E.2d at 1018 (rejecting claims that ShittyHabitats.com "encouraged users to post negative comments about the New York City real estate industry").

[13] Plaintiffs' allegations are strikingly similar to those asserted (and rejected) in *M.A.*, including about sponsored ads, that users may "pay anonymously," commissions, and posting rules. *Compare* 809 F. Supp. 2d at 1044-45 (quoting complaint), *with* SAC ¶¶ 45-70.

and operation," *id.* at 1050 (quoting *Lycos*, 478 F.3d at 420-21), observing that a website is "immune under § 230 unless it created the offending ads," and "however horrific the consequences to M.A., … the ads were created by [the pimp]." *Id.* at 1051 (internal quotation omitted). Similarly, it was "immaterial" Backpage.com allegedly elicit[ed] online content for profit"; what matters is whether the website or third parties create the content at issue. *Id.* at 1050 (quotation omitted). Finally, the court rejected M.A.'s assertion that she was not seeking to hold Backpage.com liable as a publisher but "as an aider and abettor of minor sex trafficking by virtue of [its] culpable conduct." *Id.* at 1053-54 (rejecting claim under 18 U.S.C. § 2255, the same provision Plaintiffs invoke here, *see infra* Section III.E.1). The court concluded that Section 230 "errs on the side of robust communication" and barred the plaintiff's claims. *Id.* at 1053 (quotation omitted).

Similarly, *Dart v. Craigslist, Inc.*, 665 F. Supp. 2d 961 (N.D. Ill. 2009), upheld Section 230 immunity and granted 12(b)(6) dismissal of claims by the Cook County sheriff that Craigslist aided and abetted violation of prostitution laws because of escort ads in the site's erotic services category. *Id.* at 967. The court held that even if "users routinely flout Craigslist's guidelines" prohibiting improper ads, it had not caused them to do so, except "in the sense that no one could post [unlawful content] if craigslist did not offer a forum." *Id.* at 969 (quotation omitted). The court disregarded the sheriff's "conclusory allegations … that Craigslist induces users to post ads for illegal services," reasoning Section 230 "would serve little if any purpose if companies like Craigslist were found liable under state law for 'causing' or 'inducing' users to post unlawful content in this fashion." *Id.* It concluded: "Sheriff Dart may continue to use Craigslist's website to identify and pursue individuals who post allegedly unlawful content" but "cannot sue Craigslist for [its] conduct." *Id.*

Many other cases hold that plaintiffs may not avoid Section 230 by alleging a website promotes or induces criminal conduct.  This "would effectively abrogate the immunity" whenever "a plaintiff simply alleged intentional [criminal] conduct."  *Doe v. Bates*, 2006 WL 3813758, at *4, *16 (upholding immunity despite allegations Yahoo! hosted and profited from a forum for "illegal child pornography"); *see also GoDaddy.com, LLC v. Toups*, 429 S.W.3d 752, 759-60 (Tex. App. 2014) (rejecting plaintiff's allegations that a "revenge porn" website published and promoted "obscenity and child pornography"; "Congress decided not to allow private litigants to bring civil claims based on their own beliefs that a service provider's actions violated the criminal laws" (quotation omitted)); *Cooper*, 939 F. Supp. 2d at 822-28 (Accepting Backpage.com's argument that "Section 230 … prohibits state laws from imposing liability on interactive computer services for third-party content, even if the content is unlawful and the website has reason to know of the unlawfulness.").

Accordingly, Plaintiffs' accusations that Backpage.com promotes unlawful content or criminal conduct cannot overcome Section 230.  If they could—and if Plaintiffs could also base their claims on a site's efforts to prevent harmful content—that would destroy Congress's purposes and turn Section 230 on its head.

### 4.    *Plaintiffs Cannot Evade Section 230 By Claiming a Website Had Notice of Unlawful Content.*

Finally, Plaintiffs' attempt to evade Section 230 and impose liability on Backpage.com based on allegations it knows or should know users may misuse the website for sex trafficking. *See, e.g.*, SAC ¶¶ 1, 4, 5, 25, 27, 75, 101, 104, 105, 110, 113, 118, 131, 145.  Yet, as the First Circuit has said, "[i]t is, by now, well established that notice of the unlawful nature of the information provided is not enough to make it the service provider's own speech." *Lycos*, 478 F.3d at 420; *accord Obado v. Magedson*, 2014 WL 3778261, at *7 (D.N.J. July 31, 2014); *Hill*,

727 S.E.2d at 559.  The law under Section 230 is clear that if an online provider has *actual* knowledge of illegal content posted on its site, the provider  is immune even if it fails or refuses to delete the content.  *See, e.g.*, *Goddard*, 2008 WL 5245490, at *3; *Gregerson v. Vilano Fin. Inc.*, 2008 WL 451060, at *9 n.3 (D. Minn. Feb. 15, 2008).  This is because "[l]iability upon notice would defeat the dual purposes advanced by § 230." *Zeran*, 129 F.3d at 333.  It would also subject providers to a "heckler's veto," as anyone who objected could provide notice and thereby impose the grim choice of removing content or facing litigation and liability.  *Jones*, 755 F.3d at 407 (Section 230 "shields service providers from this choice").  Thus, in *M.A.*, the court rejected the same argument Plaintiffs make here, *i.e.*, that Backpage.com should be denied immunity because it allegedly knows or should know "of minors being sexually trafficked on its website." *M.A.*, 809 F. Supp. 2d at 1050-51.

Plaintiffs' suit gives the appearance of a heckler's veto, in that they obviously disagree with Backpage.com's approaches to prevent improper content and combat sex trafficking.  But, whether or not that is the aim, Plaintiffs cannot evade Section 230 by alleging Backpage.com knows, should know, or has notice of unlawful third-party content.

### E.      The Exceptions to Section 230 Immunity Do Not Apply.

To avoid Section 230, Plaintiffs attempt to invoke the limited exceptions to immunity under the statute.  They argue Section 230 is inapplicable because they assert civil claims based on criminal statutes and other claims they characterize as "intellectual property claims."  But Plaintiffs' claims do not come within the statute's exceptions or fail as a matter of law.

### 1.      *Section 230 Bars Plaintiffs' Civil Claims Based on Criminal Laws.*

Plaintiffs first argue Section 230 does not apply because they allege civil claims based on two criminal statutes concerning human trafficking, 18 U.S.C. § 1591, and Mass. Gen. Laws ch. 265, § 50 *et seq.*  SAC ¶¶ 11, 12, 14, 108-114 (Count I), 115-119 (Count II).  This is

apparently intended to invoke Subsection 230(e)(1), which exempts federal criminal

prosecutions.  Entitled "No effect on criminal law," subsection (e)(1) states:

> Nothing in this section shall be construed to impair the enforcement of section
> 223 or 231 of this title, chapter 71 (relating to obscenity) or 110 (relating to sexual
> exploitation of children) of Title 18, or any other Federal criminal statute.

47 U.S.C. § 230(e)(1).  But this subsection does not permit *civil* claims based on criminal laws.

"[T]he CDA exception for federal criminal statutes applies to *government prosecutions*,

*not* to civil private rights of action under [statutes] with criminal aspects."  *Obado*, 2014 WL

3778261, at *8 (emphasis added).  Indeed, in *M.A.*, the plaintiff tried the same tack, alleging civil

claims under 18 U.S.C. §§ 2255 and 1595, contending Backpage.com violated federal criminal

laws by facilitating sex trafficking of minors.  809 F. Supp. 2d at 1053.  The court rejected the

plaintiff's argument that Section 230 immunity did not apply, because her claims were civil, not

criminal.  *Id.* at 1055-56.  It also found the plaintiff could not plausibly allege criminal claims

against Backpage.com.  As in that case, Plaintiffs here do not "even remotely suggest[]"

Backpage.com knew of, shared, participated in or sought to accomplish the pimp's "*specific*

intent to commit the sexual offenses" against Plaintiffs."  *Id.* at 1054 (quoting *Doe v. Liberatore*,

478 F. Supp. 2d 742, 756-57 (M.D. Pa. 2007); emphasis added by *M.A.* court).  But the Court

need not reach this issue because it is equally clear subsection (e)(1) does not allow Plaintiffs to

assert *civil* claims by alleging (without basis) Backpage.com has violated federal criminal laws.[14]

---

[14] *See also Hinton*, 2014 WL 6982628, at *4 (Section 230 barred civil claim alleging eBay violated criminal provisions of 15 U.S.C. § 2070; "[t]he problem for the Plaintiff is that this is not a criminal proceeding being prosecuted by the United States government."); *Goddard v. Google*, 2008 WL 5245490, at *5 n.5 (Google immune for civil claim seeking to hold it liable for money laundering under 18 U.S.C. § 1957); *Doe v. Am. Online, Inc.*, 783 So.2d 1010, 1017 (Fla. 2001) (AOL immune from claims it knowingly hosted chat rooms where users violated federal child pornography laws).

Plaintiffs' claims under the Massachusetts anti-trafficking law, Mass. Gen. Laws ch. 265 § 50, fare no better.  Subsection (e)(1) of Section 230 provides an exception only for prosecutions under "*Federal* criminal statute[s]," not *state* criminal laws.  And subsection (e)(3) provides that "no liability may be imposed under *any State or local law* that is inconsistent with this section," expansive language that preempts claims under state civil *or criminal* laws.  47 U.S.C. § 230(e)(3) (emphasis added).  Here, too, every court to consider the issue has held Section 230 immunity preempts state criminal laws, including the three federal courts that struck down state criminal laws aimed at Backpage.com.  In *McKenna*, 881 F. Supp. 2d 1262, for example, the court concluded:  "If Congress did not want [Section 230] to apply in state criminal actions, it would have said so."  *Id.* at 1275.  Instead, Section 230 expressly and impliedly preempted the Washington law, as it would have "create[d] an incentive for online service providers *not* to monitor the content[,] … precisely the situation [Section 230] was enacted to remedy."  *Id.* at 1273 (emphasis in original).  The court in *Cooper*, 939 F. Supp. 2d 805, held Section 230 preempted Tennessee's criminal statute because it was "directly at odds" with Congress's goals and "would encourage websites either to restrict speech or to relax their current self-policing."  *Id.* at 825; *see also Hoffman*, 2013 WL 4502097, at *6 (New Jersey criminal law "runs afoul of Section 230 by imposing liability on [Backpage.com] for information created by third parties").

As these cases and others reflect, Section 230 provides immunity for claims under *any* state law, including criminal laws.  *See also Voicenet Commn'cns, Inc. v. Corbett*, 2006 WL 2506318, at *4 (E.D. Pa. Aug. 30, 2006) ("[T]he plain language of the CDA provides … immunity from inconsistent state criminal laws."); *People v. Gourlay*, 2009 WL 529216, at *3 (Mich. Ct. App. Mar. 3, 2009) ("the phrase 'any State or local law' includes civil and criminal

laws"). Thus, Section 230 preempts claims under c. 265, § 50. Backpage.com would be immune from a *prosecution* under the statute, and it is immune as well from *civil* claims based on the statute.

### 2.    *Section 230 Bars Plaintiffs' Chapter 93A Claims.*

In Count III of their Complaint, Plaintiffs assert claims against Backpage for "various knowing and willful unfair and deceptive acts and practices" under Mass. Gen. Laws ch. 93A, § 9. SAC ¶ 122. But Section 230 preempts claims under Chapter 93A as much as other state-law claims.

Courts have widely held Section 230 immunity encompasses claims under consumer protection acts and other state statutes. *See, e.g.*, *Lycos*, 478 F.3d at 422 (claims under Florida securities and cyberstalking statutes); *Hinton*, 2014 WL 6982628, at *1 (Mississippi Consumer Protection Act); *Obado*, 2014 WL 3778261, at *1 (New Jersey Consumer Fraud Act); *Goddard*, 2008 WL 5245490, at *1 (California Unfair Competition Law); *Doe v. Sexsearch.com*, 502 F. Supp. 2d at 723, 728 (Ohio Consumer Sales Practices Act). Where Section 230 applies, "providers are immune from 'any' claim arising out of content originating from a third party, regardless of the theory of the underlying cause of action." *Obado*, 2014 WL 3778261, at *4. Plaintiffs cannot use Chapter 93A as "an end run around the CDA." *Small Justice LLC v. Xcentric Ventures LLC*, 2014 WL 1214828, at *8 (D. Mass. Mar. 24, 2014).[15]

To support their Chapter 93A claim, Plaintiffs offer speculative, conclusory allegations about Backpage.com's cooperation with law enforcement, reporting of ads to NCMEC, alleged

---

[15] In *Small Justice*, 2014 WL 1214828, an individual asserted claims against a review website (Ripoffreport.com) because the site hosted and refused to remove negative reviews about the plaintiff and offered to redact the reviews and "restore" the subject's reputation in exchange for a fee. *Id.* at *9. The court held Section 230 barred the plaintiff's claims with respect to the site's hosting and refusal to remove reviews. *Id.* at *8. But it declined to dismiss the plaintiff's claim about the website's fee-based program. Plaintiffs here assert no such claim; their claims stem from ads they allege were published on Backpage.com.

failure to adopt "security and other practical measures," and efforts to "refine[] their website." SAC ¶¶ 124-125.  These are attacks on the website's "construct and operation," which cannot overcome Section 230.  *Lycos*, 478 F.3d at 420-21; *see supra* Section I.A.1.  Plaintiffs likewise cannot assert claims based on their insistence that Backpage.com adopt different monitoring or security measures, as Section 230 expressly immunizes its efforts to self-police.  And, fundamentally, this claim, too, seeks to hold Backpage.com liable because it publishes third-party content or fails to block it, the functions Section 230 expressly protects.

Even absent Section 230 immunity, Plaintiffs Chapter 93A claims are fatally flawed and must be dismissed under Rule 12(b)(6).  To state a claim under Chapter 93A, Plaintiffs must show they have been "injured by" Backpage.com's "use or employment" of "unfair or deceptive acts or practices in the conduct of any trade or commerce." Mass. Gen. Laws ch. 93A, §§ 2, 9. "[A] causal connection between a deceptive act and a loss to the consumer is an essential predicate for recovery."  *Hershenow v. Enterprise Rent-A-Car Co. of Boston*, 840 N.E.2d 526, 528 (Mass. 2006); *see also A.G. ex rel. Maddox v. Elsevier, Inc.,* 732 F.3d 77, 81 (1st Cir. 2013) (upholding Rule 12(b)(6) dismissal of ch. 93A claim where "the allegation of causation [was] unembellished by any supporting facts."); *RSA Media, Inc. v. AK Media Group, Inc.,* 260 F.3d 10, 16 (1st Cir. 2001) ("causation remains a necessary element of a successful 93A claim");.[16]

Plaintiffs fail to assert any plausible causation for their Chapter 93A claim.  They apparently contend Backpage.com, through its policies and practices (such as working with law enforcement) has minimized public scrutiny that "could have been expected to interfere with, if

---

[16] To survive a motion to dismiss, a complaint "must allege facts that sufficiently support, either directly or by inference, every material element necessary to sustain recovery."  *Varney v. R.J. Reynolds Tobacco Co.,* 118 F. Supp. 2d 63, 67 (D. Mass. 2000).  A plaintiff asserting a Chapter 93A claim must show there was a "separate, identifiable harm arising from the violation itself," not merely incidental to it.  *Tyler v. Michaels Stores, Inc.,* 464 Mass. 492, 503 (2013).

not terminate" the website, and "[a]s a result … the plaintiffs were sold for sex." SAC ¶ 126.  In

other words, if Backpage.com had *not* imposed its policies and practices, it would have faced

greater scrutiny and been forced to shut down, meaning Plaintiffs never would have been

trafficked by their.  This is obviously far too attenuated to "'raise a right to relief above the

speculative level.'"  *Feldman v. Rhimes*, 2014 WL 7183290, at *1 (D. Mass. Dec. 16, 2014)

(quoting *Twombly*, 550 U.S. at 555); *Hershenow*, 840 N.E.2d at 536, 537, (Cowin, J.,

concurring) (when impact o of alleged unfair or deceptive act is "speculative and uncertain," the

required "causal connection" is absent).

### 3.      *Plaintiffs Fail to State Claims Under State "Intellectual Property" Laws.*

Count IV of the Complaint again tries to plead around Section 230 by alleging claims

under Massachusetts's right of publicity statute, G.L. c. 214, § 3A, and Rhode Island's privacy

act, R.I. St. § 9-1-28.1 (as to Jane Doe 1 only).  *See* SAC ¶¶ 129-137.  This is an apparent effort

to invoke the exception in subsection (e)(2) for "intellectual property claims."  *Id.* ¶ 14.  But a

privacy claim is not an "intellectual property claim,"[17] and at least one federal circuit has refused

to apply this exception to state intellectual property claims.[18]  Regardless, this Court need not

reach these issues because Plaintiffs' Count IV claims fail as a matter of law.

Count IV is based solely on the premise that ads posted on Backpage.com by the pimps

(or at their direction) "displayed photographs" of the Plaintiffs.  SAC ¶ 133.  Plaintiffs cannot

assert a claim under G.L. c. 214, § 3A, however, because they do not allege (and cannot allege)

---

[17] Many cases have dismissed privacy claims as barred by Section 230.  *See, e.g.*, *Carafano*, 339 F.3d at 1125 (9th Cir. 2003); *Dowbenko v. Google Inc.*, 991 F. Supp. 2d 1219, 1220 (S.D. Fla. 2013).

[18] *See Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102, 1118-19 (9th Cir. 2007) (noting difficulties in determining which state laws concern "intellectual property").  But other courts have disagreed, *see Doe v. Friendfinder Network, Inc.*, 540 F. Supp. 2d 288, 298-302 (D.N.H. 2008) (noting dicta in Lycos that "[c]laims based on intellectual property laws are not subject to Section 230 immunity" (quoting Lycos, 478 F.3d at 422-23)).

that Backpage.com used their likenesses for *its own commercial benefit*.  Merely running third-party ads containing photos does not violate the law.

The statute applies when a party appropriates another's name or likeness "for advertising purposes or for the purposes of trade."  Mass. Gen. Laws ch. 214, § 3A.[19]  It protects "the interest in not having the commercial value of one's name, portrait or picture appropriated to the benefit of another."  *Tropeano v. Atlantic Monthly Co.*, 400 N.E.2d 847, 850 (Mass. 1980).  Such appropriation occurs when it is done to "tak[e] advantage of [plaintiff's] reputation, prestige, or other value associated with him, for purposes of publicity."  *Id.*  As the Supreme Judicial Court has held:  "'It is only when the publicity is given for the purpose of appropriating to the *defendant's benefit* the commercial or other values associated with the name or likeness' that this cause of action can exist."  *Id.* (quoting *Nelson v. Maine Times*, 373 A.2d 1221 (Me. 1977)) (emphasis added).  "'The fact that the defendant is engaged in the business of publication, for example of a newspaper, out of which he makes or seeks to make a profit, is not enough to make the incidental publication a commercial use of the name or likeness.'" *Id.* (quoting *Nelson*, 373 A.2d at 1224)); *see also* RESTATEMENT (SECOND) OF TORTS, § 652C, cmt. d.

The Complaint contains no plausible allegations that Backpage.com published photos of the Plaintiffs "for the purpose of appropriating to *[its] benefit*" any "commercial or other value" associated with their likenesses.  *Tropeano*, 400 N.E.2d at 850 (emphasis added).  Plaintiffs do not allege, for example, that Backpage.com used their likenesses to advertise or promote the website itself.  Rather, they allege that *pimps* used their photos "for advertising purposes."  SAC

---

[19] Mass. Gen. Laws ch. 214, § 3A provides:  "Any person whose name, portrait or picture is used within the commonwealth for advertising purposes or for the purposes of trade without his written consent may bring a civil action in the superior court against the person so using his name, portrait or picture, to prevent and restrain the use thereof; and may recover damages for any injuries sustained by reason of such use."

¶ 134.  The fact that Backpage.com, like a newspaper, is a publisher that seeks to make a profit is insufficient to make out a claim under the right of publicity law.  *Tropeano*, 400 N.E.2d at 850. *See also Curran v. Amazon.com, Inc.*, 456 F.3d 1316, 1324-26 (11th Cir. 2006) (Amazon.com did not violate Florida right of publicity statute by displaying book cover, on which plaintiffs' picture appeared); *Galuck v. Karamian*, 805 F. Supp. 2d 495, 502-03 (W.D. Tenn. 2011) (rejecting claim under Tennessee statute where website published third-party posts containing plaintiff's photo but did not use it to advertise website itself); *Cabaniss v. Hipsley,* 151 S.E.2d 496, 506-07 (Ga. Ct. App. 1966) (dismissing claim against magazine publisher for photograph used in an ad placed by a club in the magazine; "[t]he appropriation of plaintiff's photograph did not inure to [the magazine publisher's] benefit, use or advantage, but to that of his advertiser").

Jane Doe 1's claim based on R.I. Gen. Laws § 9-1-28.1, fails because that statute applies to *non-commercial* uses of a person's name or likeness.  *See Mendonsa v. Time Inc.*, 678 F. Supp. 967, 973 (D.R.I. 1988) (because a separate statute, § 9-1-28, specifically applies to use of individual's name or likeness for commercial purposes, the later-enacted section 9-1-28.1 was intended "only to prohibit the misappropriation of likeness for noncommercial purposes.").  Jane Doe 1 specifically alleges the use of her image in Rhode Island was for commercial, not noncommercial, purposes.  *See* SAC ¶ 134 ("In the case of Jane Doe No. 1, photographs also were displayed *for advertising purposes* in Rhode Island") (emphasis added)).  Accordingly, this claim also fails as a matter of law.[20]

---

[20] Even if Plaintiffs were to amend to cite § 9-1-28, the claim would still fail.  Like the Massachusetts statute, section 9-1-28 applies only when a defendant appropriates a person's name or likeness "for commercial purposes," meaning for the defendant's own "advertising purposes."  *Mendonsa,* 678 F. Supp. at 970; *see also Herink v. Harper & Row Publishers, Inc.*, 607 F. Supp. 657, 659 (S.D.N.Y. 1985) (under New York statute, on which § 9-1-28 was based, "[t]he advertising purposes prong … is not violated where the use of a plaintiff's name is not

### 4.    *Jane Doe 3 Fails to State a Claim for Copyright Infringement.*

Lastly, one Plaintiff (Jane Doe 3) alleges a copyright claim for a photo she allegedly took of herself and her traffickers included in ads on Backpage.com.  SAC ¶ 142.  Again, Plaintiffs seek to invoke subsection 230(e)(2)'s exception for intellectual property laws.  But this is another patent attempt to plead around Section 230 immunity.  Doe 3 alleges the ads were posted in 2013, but did not obtain a copyright registration until after filing this suit.  She does not allege she ever served or Backpage.com failed to comply with a notice of infringement, as required to defeat the safe harbor for third-party content under the Digital Millennium Copyright Act.  17 U.S.C. § 512(c).  She does not identify any injury or damages specific to her copyright claim.[21] And, in any event, Doe 3 fails to state a plausible claim for copyright infringement.

First, Doe 3 cannot plausibly assert a claim for direct copyright infringement because the Complaint admits that third parties—not Backpage.com—uploaded the photo to the website.

"[A] person [must] engage in volitional conduct—specifically, the act constituting infringement—to become a direct infringer."  *CoStar Group, Inc. v. LoopNet, Inc.*, 373 F.3d 544, 549, 551 (4th Cir. 2004).  Thus, many cases hold websites are not liable for direct copyright infringement when *users* upload the allegedly infringing material.  *See, e.g, ALS Scan, Inc. v. RemarQ Communities, Inc.*, 239 F.3d 619, 622 (4th Cir. 2001) (DMCA codified prior cases ruling out "passive, automatic acts engaged in through a technological process initiated by

---

designed primarily to solicit purchasers for *defendant's* products" (emphasis added)).  Again, Backpage.com did not use Doe 1's photo to advertise Backpage.com (or for any purpose).

[21] Even if she could state a claim for infringement, because registration is "a condition precedent for obtaining certain remedies, such as statutory damages and attorneys' fees," *Johnson v. Gordon*, 409 F.3d 12, 20 (1st Cir. 2005), Doe 3 could only recover actual damages and profits. But Doe 3 does not claim she was deprived of revenue she would have received for licensing the photo, or that any profits are "attributable" to the alleged infringement.  *See Davis v. Gap, Inc.*, 246 F.3d 152, 160 (2d Cir. 2001) (affirming summary judgment; "the overall revenues of the Gap, Inc. had no reasonable relationship to the act of alleged infringement," the use of plaintiff's eyeglass design in ad).

another"; ISP not liable for direct infringement based on infringing images uploaded by users);

*Sarvis v. Polyvore, Inc.*, 2013 WL 4056208, at *7 (D. Mass. Aug. 9, 2013) (magistrate judge

recommendation of dismissal; no direct infringement where website allowed users to upload and

edit art).[22]  Thus, Backpage.com cannot be liable for direct infringement of Doe 3's photograph.

Second, Doe 3 has failed to state a claim for vicarious liability.  The Complaint  alleges

Backpage.com has the "right and the ability" to supervise the infringing activity and a direct

"financial benefit" in it, *see* SAC ¶ 139, *see also id.* ¶ 140, but such "[t]hreadbare recitals of the

elements of a cause of action … do not suffice" under Rule 12(b)(6).  *Iqbal*, 556 U.S. at 678.

*See also, e.g.*, *Perfect 10, Inc. v. Visa Int'; Serv. Ass'n*, 494 F.3d 788, 803 (9th Cir. 2007)

(affirming Rule 12(b)(6) dismissal of vicarious liability claim against credit card companies for

processing payments relating to infringing images on websites).  Moreover, the fact a website

monitors content and has the ability to remove or block access to it does not establish the site has

"the right and ability to supervise" infringing conduct.  *Hendrickson v. eBay Inc.*, 165 F. Supp.

2d 1082, 1093-94 (C.D. Cal. 2001); *see also Columbia Pictures Indus., Inc. v. Fung*, 710 F.3d

1020, 1045 (9th Cir. 2013) ("direct financial benefit" requires defendant's revenue be tied

"directly to the infringing activity involving [its] websites").  Doe 3 has therefore failed to state a

claim for vicarious infringement.

Finally, Doe 3 has offered no basis for a contributory infringement claim.  She does not

allege Backpage.com knew the photo at issue was infringing or materially contributed to the

infringement—except, again, in a conclusory fashion.  SAC ¶ 139 (Defendants "encourage,

---

[22] *See also Williams v. Scribd, Inc.*, 2010 WL 10090006 (S.D. Cal. June 23, 2010) (dismissing
direct infringement claim based on user's uploading of book excerpts to website); *Parker v.
Google, Inc.*, 422 F. Supp. 2d 492, 497 (E.D. Pa. 2006) ("Google's automatic archiving of
USENET postings and excerpting of websites in [search query] results … do not include the
necessary volitional element to constitute direct copyright infringement").

support, induce, and materially contribute to the use by pimps and traffickers of photographic images"); ¶ 145 ("Defendants have actual and constructive knowledge that the pimps and traffickers routinely use the website … to unlawfully publicly display copyright protected photographs").  This, too, is insufficient as a matter of law.  *See Luvdarts, LLC v. AT & T Mobility, LLC*, 710 F.3d 1068, 1072 (9th Cir. 2013) (affirming dismissal where mobile greeting card distributor alleged wireless carriers did nothing to stop users from sharing cards multiple times; "conclusory allegations that the Carriers had the required knowledge of infringement are plainly insufficient").  "[A]ctual knowledge of specific acts of infringement is required for contributory infringement liability."  *Id.* at 1072.  Doe 3 provides no facts to show Backpage.com knew the specific photo of her was infringing, much less that the site materially contributed to the infringement.  *See also* Terms of Use (users grants website a license to use the content they post).

Doe 3 has no cognizable copyright claim, and the Court should reject this obvious attempt to end run Section 230 immunity.

## IV.    CONCLUSION

Plaintiffs obviously attempt to phrase their allegations and claims to avoid Section 230.  However, their allegations do not distinguish this case from hundreds of others in which individuals claim third-party content posted on websites led to their injury.  Congress made a policy decision to hold websites immune from suits arising from such injuries.  Plaintiffs may not like that policy, but they cannot override Section 230, and their claims must be dismissed.

Dated: _January 16, 2015

Respectfully submitted,

s/      *Robert A. Bertsche*
Robert A. Bertsche (BBO #554333)
Jeffrey J. Pyle (BBO #647438)
PRINCE LOBEL TYE LLP
100 Cambridge Street, Suite 2200
Boston, MA 02114
(617) 456-8143 (tel.); (617) 456-8100 (fax)
rbertsche@PrinceLobel.com
jpyle@PrinceLobel.com

James C. Grant (admitted *Pro Hac Vice*)
Ambika K. Doran (admitted *Pro Hac Vice*)
DAVIS WRIGHT TREMAINE LLP
1201 Third Avenue, Suite 2200
Seattle, WA 98101
(206) 622-3150 (tel.); (206) 757-7700 (fax)
jimgrant@dwt.com
ambikadoran@dwt.com

**CERTIFICATE OF SERVICE**

I hereby certify that on this day, I electronically filed the foregoing document with the

Clerk of the Court using the CM/ECF system which will send notification of such filing to the

following:

    John T. Montgomery
    john.montgomery@ropesgray .com
    Aaron M. Katz
    aaron.katz@ropesgray.com
    Kevin P. Budris
    kevin.budris@ropesgray.com
    Dara A. Reppucci
    dara.reppucci@ropesgray.com
    Jessica L. Soto
    jessica.soto@ropesgray .com


DATED this ___16th_____day of ____January_____, 2015.


                    PRINCE LOBEL TYE LLP
                    Attorneys for Defendants


                    By s/ *Robert A. Bertsche*_____
                       Robert A. Bertsche