# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| JANE DOE NO. 1, a minor child, by her parent and next friend MARY ROE, JANE DOE NO. 2, and JANE DOE NO. 3, a minor child, by her parents and next friends SAM LOE and SARA LOE,<br><br>Plaintiffs,<br><br>v.<br><br>BACKPAGE.COM, LLC, CAMARILLO HOLDINGS, LLC (f/k/a VILLAGE VOICE MEDIA HOLDINGS, LLC), and NEW TIMES MEDIA, LLC,<br><br>Defendants. | Civil Action No. 14-13870-RGS |

## PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

JANE DOE NO. 1, JANE DOE NO. 2,
and JANE DOE NO. 3,

By their attorneys,

John T. Montgomery (No. 352220)
Aaron M. Katz (No. 662457)
Dara A. Reppucci (No. 679511)
Jessica L. Soto (No. 683145)
Christine E. Singer (No. 681525)
Cassandra Bolanos (No. 686297)
ROPES & GRAY LLP
800 Boylston Street
Boston, MA 02199
Telephone:  (617) 951-7000
Email: john.montgomery@ropesgray.com
        aaron.katz@ropesgray.com
        dara.reppucci@ropesgray.com
        jessica.soto@ropesgray.com
        christine.singer@ropesgray.com
        cassandra.bolanos@ropesgray.com

# TABLE OF CONTENTS

**Page**

INTRODUCTION ....................................................................................................1

STANDARD OF REVIEW .......................................................................................4

ARGUMENT ...........................................................................................................6

I.    The Business Practices Claims in Counts I, II, and III Each State a Claim for Relief.................................................................................................................6

    A.    Defendants Have Waived the Defense that Plaintiffs' Sex Trafficking Claims in Counts I and II Fail to State a Claim. ......................................6

    B.    The TVPRA Creates a Private Right of Action for Victims of Child Sex Trafficking and the Well Pled Allegations in Count I Are More Than Sufficient to State a Claim. .......................................................6

    C.    The MATA Also Creates a Private Right of Action for Victims of Child Sex Trafficking and the Well Pled Allegations in Count II Are More Than Sufficient to State a Claim. ................................................11

    D.    The Well Pled Allegations in Count III State a Claim Under M.G.L. c. 93A. ...............................................................................................11

II.    The Communications Decency Act Does Not Preclude Any Of the Business Practices Claims..........................................................................................13

    A.    While Section 230 Has Played an Important Role in the Development of the Internet, Its Application is Appropriately Limited by its Plain Language and Purpose. ........................................................................13

    B.    Section 230 of the CDA Does Not Apply to the Business Practice Claims in Counts I, II, and III. ..........................................................15

        1.    Counts I and II do not treat Defendants as a publisher, but rather involve participation in and aid to child sex trafficking ventures..............15

        2.    The Chapter 93A claim involves an unfair and deceptive scheme to grow market share, not any aspect of the publisher function. ...................17

        3.    Any efforts by Defendants to limit unlawful content on their website must be tested under the good faith standard of section 230(c)(2). ...............................................................................18

        4.    Defendant's heavy reliance on M.A. v. Village Voice is misplaced. ........19

    C.    In Any Event, The Business Practice Claims Fall Squarely Into The Exceptions to CDA Immunity in Section 230(e)..................................20

        1.    Plaintiffs' Federal Sex Trafficking Claim Seeks to Enforce a Federal Criminal Statute and Is Therefore Unaffected by the CDA's "Immunity" Provisions. ........................................................20

        2.    Section 230(e)(3) exempts Plaintiffs' state law claims in Counts II and III from the intended scope of CDA protection. ...............................23

III.    The intellectual property claims in Counts IV and V are exempt from Section 230, and Each States a claim for relief under Rule 12(b)(6). .................................................25

A.    Count IV is Exempt from Section 230 "Immunity" Provision and States a Claim Under the Applicable Right of Publicity Statutes .......................................25

B.    Count V States a Claim for Copyright Infringement. .............................................27

    1.    Direct Infringement..............................................................................27

    2.    Vicarious Liability ...............................................................................29

    3.    Contributory Infringement ...................................................................30

CONCLUSION...............................................................................................................30

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*A.G. ex rel. Maddox v. Elsevier, Inc.*,
   732 F.3d 77 (1st Cir. 2013) ...................................................................................13

*A&M Records, Inc. v. Napster, Inc.*,
   239 F.3d 1004 (9th Cir. 2001) .............................................................................31

*Anthony v. Yahoo!, Inc.*,
   421 F. Supp. 2d 1257 (N.D. Cal. 2006) ..............................................................18

*Atl. Recording Corp. v. Project Playlist, Inc.*,
   603 F. Supp. 2d 690 (S.D.N.Y. 2009)............................................................25, 26

*Bank of N.Y. Mellon v. Lezdey*,
   2014 WL 4656585 (D. Mass. Sept. 10, 2014) ......................................................6

*Barnes v. Yahoo! Inc.*,
   570 F. 3d 1096 (9th Cir. 2009) ......................................................................14, 18

*Bell Atlantic Corp. v. Twombly*,
   550 U.S. 544 (2007)...........................................................................................4, 5

*Ben Ezra, Weinstein & Co. v. Am. Online, Inc.*,
   206 F. 3d 980 (10th Cir., 2000) ...........................................................................14

*Chicago Lawyers' Comm. v. Craigslist, Inc.*,
   461 F. Supp. 2d 681 (N.D. Ill. 2006) ..................................................................14

*Cisneros v. Sanchez*,
   403 F. Supp. 2d 588 (S.D. Tex. 2005) ................................................................25

*Coach, Inc. v. Sapatis*,
   994 F. Supp. 2d 192 (D.N.H. 2014)....................................................................31

*CoStar Group, Inc. v. LoopNet, Inc.*,
   373 F.3d 544 (4th Cir. 2004) ...............................................................................28

*CYBERsitter v. Google*,
   905 F. Supp. 2d 1080 (C.D. Cal. 2012) ..............................................................15

*Dart v. Craigslist, Inc.*,
   665 F. Supp. 2d 961 (N.D. Ill. 2009) ..................................................................20

*Doe v. Bates*,
   2006 WL 3813758 (E.D. Tex. Dec. 27, 2006).....................................................23

*Doe v. Friendfinder Network, Inc.*,
   540 F. Supp. 2d 288 (D.N.H. 2008) ...................................................................26

*Doe v. Internet Brands, Inc.*,
   767 F.3d 894 (9th Cir. 2014) ...............................................................4, 14, 15, 17

*Doyle v. Hasbro, Inc.*,
   103 F.3d 186 (1st Cir. 1996) .............................................................................6

*Fair Hous. Council v. Roommates.com, LLC*,
   521 F.3d 1157 (9th Cir. 2008) (en banc) ............................................................15

*García-Catalán v. United States*,
   743 F.3d 100 (1st Cir. 2013) ...........................................................................18

*Green v. Am. Online*,
   318 F.3d 465 (3rd Cir., 2003) .........................................................................14

*In re Lupron Mktg. and Sales Practices Litig.*,
   295 F. Supp. 2d 148 (D. Mass. 2003) ...............................................................13

*In re Pharm. Indus. Average Wholesale Price Litig.*,
   582 F.3d 156 (1st Cir. 2009) ...........................................................................12

*Jalbert v. Grautski*,
   554 F. Supp. 2d 57 (D. Mass. 2008) .................................................................30

*Jean-Charles v. Perlitz et al.*,
   937 F. Supp. 2d 276 (D. Conn. 2012) ...............................................................11

*Jones v. Dirty World*,
   2014 WL 2694184 (6th Cir., 2014) ..................................................................14

*Kendall v. City of Chesapeake*, *Virginia*,
   174 F.3d 437 (4th Cir. 1999) ..........................................................................21

*Lamie v. United States Tr.*,
   540 U.S. 526 (2004) ......................................................................................22

*Leddy v. Narragansett Television LP*,
   843 A.2d 481 (D.R.I. 2004) ............................................................................26

*Luka v. Proctor & Gamble Co.*,
   785 F. Supp. 2d 712 (N.D. Ill. 2011) ...............................................................21

*M.A. v. Village Voice Media*,
   809 F. Supp. 2d. 1041 (E.D. Mo. 2011) ......................................................19, 23

*Markarian v. Conn. Mut. Life Ins. Co.*,
   202 F.R.D. 60 (D. Mass. 2001) .......................................................................12

*Mass. Ass'n. of Health Maint. Orgs. v. Ruthhardt*,
194 F.3d 176 (1st Cir. 1999) ................................................................23

*Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*,
545 U.S. 913 (2005) ...........................................................................30

*Moving and Storage v. Panaytov*,
2014 WL 949830 (D. Mass. Mar. 12, 2014) ................................. passim

*Negusie v. Holder*,
555 U.S. 511 (2009) .............................................................................7

*Nieman v. Versuslaw, Inc.*,
2012 WL 3201931 (C.D. Ill. Aug. 3, 2012) .........................................21

*Obado v. Magedson*,
2014 WL 3778261 (D.N.J. July 31, 2014) ...........................................23

*Peckham v. New Eng. Newspapers, Inc.*,
865 F.Supp.2d 127 (D. Mass. 2012) ...................................................26

*Perfect 10, Inc. v. Amazon.com, Inc.*,
508 F.3d 1146 (9th Cir. 2007) .............................................................28

*Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*,
632 F.3d 762 (1st Cir. 2011) .................................................................5

*Reves v. Ernst & Young*,
507 U.S. 170 (1993) .............................................................................8

*RLI Ins. Co. v. Gen. Star Indem. Co.*,
997 F. Supp. 140 (D. Mass. 1998) .......................................................12

*Russello v. United States*,
464 U.S. 16 (1983) ...............................................................................7

*Sarvis v. Polyvore, Inc.*,
2013 WL 4056208 (D. Mass Aug. 9, 2013) ..........................................28

*Scattered Corp. v. Chi. Stock Exch., Inc.*,
98 F.3d 1004 (7th Cir. 1996) ..............................................................21

*Shaw v. Digital Equip. Corp.*,
82 F.3d 1194 (1st Cir. 1996) .................................................................5

*Small Justice LLC v. Xcentric Ventures, LLC*,
2014 WL 1214828 (D. Mass. Mar. 14, 2014) ...............................17, 25

*Soc'y of Holy Transfig. Monastery, Inc. v. Gregory*,
689 F.3d 29 (1st Cir. 2012) ...........................................................27, 28

*Sony Corp. of Am. v. Universal City Studios, Inc.*,
   464 U.S. 417 (1984) .......................................................................................30

*Suk Jae Chang v. Wozo LLC*,
   2012 WL 1067643 (D. Mass. Mar. 28, 2012) ........................................15

*Tropeano v. Atl. Monthly Co.*,
   400 N.E.2d 847 (D. Mass. 1980) .............................................25, 26, 27

*Universal Commc'ns Sys., Inc. v. Lycos, Inc.*,
   478 F.3d 413 (1st Cir. 2007) .......................................................... passim

*Viacom Int'l Inc. v. YouTube, Inc.*,
   676 F.3d 19 (2d Cir. 2012) ............................................................29

*Zeran v. Am. Online, Inc.*,
   129 F.3d 327 (4th Cir. 1997) ...................................................13, 14

## STATUTES

17 U.S.C. § 101 *et seq.* The Copyright Act, ...........................................27

17 U.S.C. § 106(1), (3), and (5) ...............................................................27

17 U.S.C. § 512(i)(1), (i)(2) ......................................................................28

17 U.S.C. § 512(c) .....................................................................................28

17 U.S.C. § 512(c)(1) .................................................................................29

17 U.S.C. § 512(c)(1)(A)(i)-(iii), (c)(1)(C) ...............................................29

18 U.S.C. § 1591 .......................................................................................19

18 U.S.C. § 1591(a)(1) .................................................................................6

18 U.S.C. § 1591(a)(2) .................................................................................7

18 U.S.C. § 1595 ............................................................................7, 19, 20

18 U.S.C. § 1955(a) ......................................................................................8

18 U.S.C. § 1961, *et seq.*, Racketeer Influence and Corrupt Organizations Act, ................. passim

18 U.S.C. § 1962(c) .....................................................................................8

18 U.S.C. § 2255 ..................................................................................19, 22

47 U.S.C. § 230 ................................................................................. passim

47 U.S.C. § 230(c)(1) ........................................................................ passim

47 U.S.C. § 230(c)(2) ............................................................15, 17, 18, 19

47 U.S.C. §230(e)(1) ................................................................................20, 21, 22, 23

47 U.S.C. § 230(e)(2) ................................................................................4, 22, 25, 27

M.G.L. c. 93A ...................................................................................................... passim

M.G.L. c. 214 § 3(a) ....................................................................................................25

M.G.L. c. 265 § 50(d) ..................................................................................................11

R.I. Gen. Laws § 9-1-28................................................................................................25, 26

## OTHER AUTHORITIES

Fed. R. Civ. P. Rule 8 .............................................................................................4, 5

Fed. R. Civ. P. Rule 9(b)..............................................................................................5

Fed. R. Civ. P. Rule 12(b)(6) .......................................................................... passim

Plaintiffs Jane Doe No. 1, Jane Doe No. 2 and Jane Doe No. 3 (collectively "Plaintiffs") respectfully submit this Opposition to Defendants' Motion to Dismiss Plaintiffs' Second Amended Complaint.

## INTRODUCTION

In their Memorandum in Support of the Motion to Dismiss ("Def. Br."), Defendants attempt to focus the Court narrowly on section 230 of the Communications Decency Act ("CDA") without undertaking any serious analysis of the child sex trafficking allegations presented by the Second Amended Complaint ("SAC" or "Complaint"). In essence, this approach takes the general expression that section 230 is to be broadly construed and attempts to convert it into a prophylactic bar to all claims against Internet service providers ("ISPs"), without regard to the nature and sufficiency of the claims. As the First Circuit acknowledged in *Universal Commc'ns Sys., Inc. v. Lycos, Inc.*, 478 F.3d 413, 415, 422 (1st Cir. 2007), however, the CDA does not offer unlimited protection to ISPs, and whether an ISP defendant can obtain refuge in the CDA's so-called "immunity" provisions turns upon the precise nature of the well pled claims. Here, the CDA does not provide Defendants with an escape hatch from liability for their illegal conduct with respect to child sex trafficking ventures and Plaintiffs' injuries.

This Opposition begins in Part I by showing the sufficiency of the allegations supporting the statutory claims involving Defendants' business practices promoting and supporting child sex trafficking (the "Business Practices Claims"). In the Complaint, Plaintiffs have sufficiently alleged claims under the federal Trafficking Victims Protection Reauthorization Act ("TVPRA") and the Massachusetts Anti-Trafficking Act ("MATA"). These statutes, which address a growing public crisis, address a broad range of conduct related to human trafficking, including not only the conduct of the direct "perpetrators" of illegal commercial sex acts, but also the conduct of those who financially benefit from "participation in," or "aid," trafficking ventures.

In addition, these statutes provide private rights of action that allow victims to obtain civil damages against entities, like Defendants, whose conduct violated the statutes' prohibitions.

The nature and extent of Defendants' participation in the trafficking ventures, described in extensive detail in the complaint, include (i) designing and promoting a website that has become the dominant online marketplace for illegal sex with children and others; (ii) facilitating the completion of transactions between traffickers and customers; (iii) taking numerous specific measures to shield the traffickers from exposure to law enforcement; and (iv) avoiding known technological methods to identify and locate child sex trafficking victims sold on their website. In response to these detailed allegations—which show that Defendants have purposefully designed Backpage.com to be a lucrative "matchmaker" that helps pimps successfully sell sex trafficking victims (including child victims) to customers—Defendants concede awareness that child sex trafficking occurs on their website, acknowledge that the experience of these children (including Plaintiffs) is "egregious," Def. Br. 2, but offer no analysis of the factual allegations in relation to the elements of the trafficking statutes on which the claims rest. By failing to advance any developed legal argument to the contrary, Defendants effectively have conceded that Plaintiffs' allegations state claims under the relevant federal and state anti-trafficking statutes. Despite that waiver, however, this Court should consider and absorb the seriousness of the claims and underlying allegations in assessing the defense that Defendants assert under section 230 of the CDA.

The Plaintiffs also have stated a claim under M.G.L. Chapter 93A for implementation of an unscrupulous, but successful, scheme to grow market share by manipulating law enforcement and other agencies, which has helped Defendants (i) shield their business from public scrutiny at a critical time in its development; (ii) convince law enforcement agencies that they are

combatting, rather than participating in, the sex trafficking market; (iii) and solidify Backpage.com as the dominant player in the market for illegal sex, enabling Defendants to continue their active participation in the trafficking of children.  In response to this claim, but without any analysis to support their position, Defendants assert only that Plaintiffs have not sufficiently alleged a causal link between Defendants' unfair and deceptive practices and Plaintiffs' injuries.  To the contrary, absent Defendants' *prima facie* unlawful conduct—one foreseeable consequence of which is the trafficking of children through Backpage.com—there is a reasonable possibility that Plaintiffs would not have been victimized at all or would not have been victimized for as long and as extensively as they were.  This is more than sufficient to establish the necessary causal link.

After showing their sufficiency at the pleading stage, the Opposition then explains in Part II why Plaintiffs' Business Practices Claims are not precluded by section 230(c)(1) of the CDA. First, the CDA offers a defendant "immunity" from a claim only where the defendant shows that, *inter alia*, the claim "treats" the defendant as the "publisher or speaker" of Internet content that, in fact, it was "provided by another . . . ."  Here, in alleging that Defendants violated the applicable federal and state anti-trafficking statutes and Chapter 93A, Plaintiffs neither seek nor need to "impute" to Defendants Internet content that third parties posted on Backpage.com. Defendants themselves seem to recognize this, making only a passing and conclusory assertion to the contrary.  As the Complaint makes clear, Defendants violated the law through purposeful business decisions and conduct that occurred before, contemporaneous with, and after the victimization of Plaintiffs.  To be sure, advertisements on Backpage.com holding Plaintiffs' bodies out for sale—posted by or at the direction of traffickers that, like Defendants, violated criminal anti-trafficking statutes—provide a link between Defendants' independent, underlying

criminal conduct and Plaintiffs' injuries.  As the Ninth Circuit  recently emphasized in a case involving  tort claims arising out of a sexual assault, "Congress has not provided an all-purpose get-out-of-jail-free card for businesses that publish content on the Internet."  *Doe v. Internet Brands, Inc.*, 767 F.3d 894, 899 (9th Cir. 2014).  Thus, a defendant is not entitled to section 230 "immunity" for its own wrongful acts merely because a third party's posting of content on the defendant's website "could be described as a 'but-for' cause of [the plaintiff's] injuries."  *Id.* Second, even assuming that Defendants have met the threshold requirements for "immunity" under section 230(c)(1)—which they have not—section 230(e)(1) and (e)(3) of the CDA expressly provide that the statute does not immunize a defendant from either (i) a claim that seeks to enforce a federal criminal statute, which, as explained below, aptly describes Plaintiffs' TVPRA claims, or (ii) for state laws that are not "inconsistent" with section 230, which aptly describes Plaintiffs' state anti-trafficking and Chapter 93A claims.

Finally, the Opposition in Part III addresses the right of publicity and copyright claims (the "Intellectual Property Claims"), each of which is likewise expressly exempt from the CDA's "immunity" provisions, *see* 47 U.S.C. § 230(e)(2), and, as explained below, states a plausible claim for relief.  Although Defendants suggest they have various defenses to the claims, Defendants' do not develop these supposed defenses,  provide little if any detail, and ultimately merely highlight that the claims cannot be resolved prior to discovery.

## STANDARD OF REVIEW

To satisfy Rule 8 and survive a motion to dismiss under Rule 12(b)(6), a complaint need only allege sufficient facts to "state a claim to relief that is plausible on its face."  *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570 (2007).  The "plausible entitlement to relief" standard does not "impose a probability requirement at the pleading stage; it simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of [plaintiff's allegations]."  *Id.*

at 556. "When considering a motion under Rule 12(b)(6), a trial court "accept[s] as true all well-pled facts in the complaint and draw[s] all reasonable inferences in favor of plaintiffs." *Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*, 632 F.3d 762, 771 (1st Cir. 2011) (internal quotation marks omitted).

In an effort to impose a heightened pleading standard on Plaintiffs, Defendants assert that Plaintiffs' claims are subject not to Rule 8, but rather to Rule 9(b). According to Defendants, "nearly all Plaintiffs' claims are based on allegations of fraudulent conduct." Def. Br. 8. Defendants offer no precedent for their assertion, nor does it withstand any scrutiny. The federal and state anti-trafficking claims (Counts I and II) are not fraud claims and do not sound in fraud, and thus Rule 9(b) is inapplicable. *See* SAC ¶¶ 109-18; *see, e.g.*, *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1223 (1st Cir. 1996) (explaining that a claim "sound[s] in fraud" where "fraud might be said to lie at the core of the action"). The same is true of the intellectual property claims (Counts IV and V). *See* SAC ¶¶ 129-47. Furthermore, while the Chapter 93A claim is likely to be tested primarily on "unfairness" grounds, the claim  does rest in part on certain misrepresentations made to third parties (especially law enforcement) in order to build market share. Even those aspects of the claim, however, do  not involve the traditional elements of fraud: Plaintiffs were not the targets of the communications from Defendants, nor is there any allegation that Plaintiffs knew of or relied upon Defendants' intentional misrepresentations. In any event, even if Rule 9(b) were to apply to the Chapter 93A claim, the "circumstances constituting fraud"—namely, Defendants deceptive public statements regarding their supposed efforts to combat child sex trafficking—are pled with considerable detail. SAC ¶¶ 31-35, 124-25. Tellingly, Defendants do not assert that, absent even more particularized allegations, they

will be "blind sided" by the Chapter 93A claim. *Doyle v. Hasbro, Inc.*, 103 F.3d 186, 194 (1st Cir. 1996).

## ARGUMENT

### I. THE BUSINESS PRACTICES CLAIMS IN COUNTS I, II, AND III EACH STATE A CLAIM FOR RELIEF.

#### A. Defendants Have Waived the Defense that Plaintiffs' Sex Trafficking Claims in Counts I and II Fail to State a Claim.

Defendants baldly assert that Plaintiffs' federal and state trafficking claims fail to state a claim. Def. Br. 7. They do so, however, without providing any analysis in support of their position. Most critically, they do not even discuss the statutory language upon which the claims rest, nor do they address the substance of the trafficking allegations in the SAC. Without any argument, much less developed argument, the Court should treat Defendants' Rule 12(b)(6) defense against the trafficking claims as waived. *See Bank of N.Y. Mellon v. Lezdey*, No. 13-11118-MLW, 2014 WL 4656585, at *4 (D. Mass. Sept. 10, 2014) (holding that defendants "waived" their asserted ground for dismissal because they "had not offered any legal authority" for that ground).

#### B. The TVPRA Creates a Private Right of Action for Victims of Child Sex Trafficking and the Well Pled Allegations in Count I Are More Than Sufficient to State a Claim.

In 2000, Congress enacted the Trafficking Victims Protection Act. Congress subsequently "reauthorized" the statute in 2003 with some amendments; this reauthorized statute is known as the Trafficking Victims Protection Reauthorization Act, or "TVPRA." The TVPRA is a criminal statute, housed in Title 18 of the United States Code, that imposes severe penalties on any person who, *inter alia*, knowingly engages in sex trafficking of children for the purposes of engaging in "a commercial sex act." 18 U.S.C. § 1591(a)(1). Rather than punishing only the directors or members of an unlawful sex trafficking venture, however, the TVPRA extends

criminal liability to anyone who "benefits, financially or by receiving anything of value, from participation in [the underlying sex trafficking] venture . . . ." 18 U.S.C. § 1591(a)(2). In addition, to enhance the enforcement of the statute, Congress chose to provide the victims of sex trafficking ventures, like Plaintiffs, a private right of action against any persons who "knowingly benefit financially . . . from participation in [the underlying sex trafficking] venture . . . *See* 18 U.S.C. § 1595. That private right of action provision makes clear that, to be liable for participating in a child sex trafficking venture, a defendant does not need to have been the "perpetrator." *Id.*

Defendants do not contest that Plaintiffs were victims of sex trafficking ventures that violated the TVPRA. Defendants also do not contest that they received financial benefits, in the form of posting fees, from the unlawful sex trafficking ventures. Read most charitably, Defendants' motion to dismiss at most asserts that Plaintiffs' complaint does not plausibly allege that Defendants "participated" in the underlying sex trafficking ventures knowingly or in reckless disregard of the ventures' illegality. Defendants are wrong.

In construing other penal statutes, the Supreme Court has held that "participate" is a "term[] and concept[] of breadth." *Russello v. United States*, 464 U.S. 16, 21 (1983). In *Negusie v. Holder*, 555 U.S. 511, 544 (2009), the Supreme Court confirmed that "'participate' means simply 'to take part' or 'to have a share, to take part in something,'" a relatively low bar. *Id.* (internal citations omitted). Consistent with this Supreme Court precedent, section 1595's plain language makes clear that one can be guilty of unlawful "participation" without being the actual "perpetrator" of the commercial sex or trafficking acts. No doubt aware of the myriad ways that various actors may aid modern sex trafficking ventures, Congress made the purposeful decision to punish and deter all forms of knowing or reckless conduct that, in any fashion, help sex

trafficking ventures to succeed.  Had Congress meant to limit the TVPRA's reach to direct "perpetrators" or a sex trafficking venture's "insiders" (*i.e.*, its members or directors), it would have chosen different statutory language.  For example, in a neighboring statute prohibiting "illegal gambling businesses," Congress chose to impose criminal penalties only on those persons who "conduct[ ], finance[ ], manage[ ], supervise[ ], direct[ ], or own[ ] all or part of an illegal gambling business."  18 U.S.C. § 1955(a).  Moreover, had Congress intended to narrow the potential liability of a sex trafficking venture's "outsiders" (*i.e.*, non-members and non-directors whose conduct in some way touches the venture) it would have used statutory language mirroring that found in RICO, which punishes persons who "participate . . . in the *conduct* of [the RICO] enterprise's affairs . . . ."  18 U.S.C. § 1962(c) (emphasis supplied); *see Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993) (holding that Congress purposefully narrowed the liability of a RICO enterprise's "outsiders" by using the more exacting statutory phrase "'participate . . . in the conduct of . . . [the enterprise's] affairs,'" rather than a broader phrase such as "participate in [the] affairs [of the enterprise]").

In this case, Plaintiffs' detailed factual allegations, which must be assumed true at this stage of the litigation, state a plausible claim that Defendants participated, with the requisite *mens rea*, in the underlying sex trafficking ventures that ensnared Plaintiffs.  Plaintiffs allege that Defendants know that Backpage.com is a haven for illegal sex trafficking ventures, including a substantial number of ventures involving children, *see* SAC ¶ 27, and that for years Defendants have purposefully engaged in decisions and conduct—prior to, contemporaneous with, and after Plaintiffs were illegally advertised for sale on Backpage.com—that were integral to the sex trafficking ventures' success and ability to evade law enforcement, *see id.* ¶¶ 42-59.

There is no dispute at this stage that Defendants have designed, continuously refined, and operated a website that has become the dominant player in the online sex trade, SAC ¶¶ 29, 36-37, or that Backpage.com contains numerous advertisements offering children for sale, *id.* ¶¶ 25-27, or that Plaintiffs were trafficked for sexual servitude on the website, *id.* ¶¶ 3, 71, 90, 100. The Complaint plausibly alleges that Defendants "participated" in the illegal ventures that victimized Plaintiffs by, among other things, (1) designing the Backpage.com website to efficiently match prospective "buyers" of underage trafficking victims with the "sellers" of underage victims, SAC ¶¶ 38-39, 41-42; (2) steering traffickers toward advertising language that would best avoid law enforcement scrutiny, *id.* ¶ 54; (3) facilitating the completion of sale transactions by hosting private, offline communications between traffickers and customers, *id.* at ¶ 50; (4) protecting the anonymity of traffickers by accepting non-traditional methods of payment such as pre-paid credit cards and Bitcoin that allowed sellers to post sex advertisements without leaving a paper trail accessible to law enforcement, *id.* ¶¶ 46-47; (5) stripping critical metadata, including geolocation information, from photographs uploaded to the site, with the intent and effect of impairing law enforcement's ability to detect and prosecute individuals who traffic children through Backpage.com, *id.* ¶¶ 40, 51; and (6) removing from the Backpage.com website so-called "sting" advertisements, posted by law enforcement, the presence of which would serve to deter buyers and sellers from utilizing Backpage.com for illicit purposes and, therefore, damage Defendants' lucrative business model, *id.* ¶ 40. None of these purposeful business practices can be written off as "neutral" or typical of community posting boards in general.

In addition, it is uncontested at this stage that, when Backpage.com receives a report about a child advertised for sex on the website, Defendants further assist traffickers by reporting

only the specified ad to law enforcement, but not ads for the very same child that Defendants know or should know are posted in other geographic locations elsewhere on their website. SAC ¶ 34. Indeed, when the parents of Jane Doe No. 3 reported to Defendants that she was being advertised for child sex on Backpage.com, the illegal advertisement (an advertisement that Defendants received money to host) remained on Backpage.com for at least another week. *Id.* ¶¶ 105, 107.[1] Finally, while conceding that trafficking of children on its website has caused "egregious harm," Def. Br. 2, Defendants know that both routine and advanced analytic techniques are available that would enable them to identify with reasonable accuracy whether a sex advertisement on their website is offering a child for sale. SAC ¶ 35. Instead of adopting these measures, as they had promised law enforcement and other agencies, *id.* ¶¶ 34, 35, Defendants continued to aggressively develop and grow their market share, *id.* ¶¶ 58, 126.[2]

Both individually and collectively, therefore, Defendants' knowing and purposeful business conduct, none of which seeks to "impute" to Defendants web content created by others, constituted the active support and involvement (*i.e.*, "participation") in the underlying ventures that unlawfully trafficked Plaintiffs for sex. Based on the detailed allegations in the complaint, Defendants are not meaningfully different from a hotel that knows or recklessly disregards the fact that the rental of its rooms for the rape of minor sex trafficking victims make up a significant portion of business and rather than taking steps to reduce the problem, actually decides to adopt

---

[1] Plaintiffs expect discovery to show that Defendants either had actual knowledge that the other Plaintiffs were also children, or that their supposed filtering and monitoring system, Def. Br. 4, recklessly disregarded information that disclosed that fact.

[2] Most recently, it has been reported that Defendants have sold their business to an unidentified Dutch company, though management of the new owner will remain with principals of Defendants. These reports also note the Backpage.com now operates in at least 88 countries around the world. http://www.bizjournals.com/dallas/news/2014/12/30/backpage-com-sold-to-dutch-company-for-undisclosed.html

business practices that are more hospitable to the traffickers.  The fact that Defendants chose to operate on the Internet is, for purposes of the TVPRA, completely irrelevant.[3]

### C.  The MATA Also Creates a Private Right of Action for Victims of Child Sex Trafficking and the Well Pled Allegations in Count II Are More Than Sufficient to State a Claim.

The MATA is part of a sustained national effort to comprehensively address the problem of human trafficking at the federal and state levels.  *See generally* Melissa Dess, An Analysis of the Massachusetts Human Trafficking Statute, Boston College Jour. of Law & Social Justice, Vol. 33, Issue 1, 147, 151 (2013).  Like its federal analog, the MATA includes not only criminal penalties, but also provides victims with a private right of action.  Under the MATA's private right of action, a victim is entitled to sue not only the individuals who forced her to engage in commercial sex, but also to sue "[a]ny business entity that knowingly aid[ed] . . . [the] joint venture []" that trafficked her "for sexual servitude."  M.G.L. c. 265 §50(d).  The ordinary meaning of "aid" is "to help or furnish with help, support, or relief."  American Heritage College Dictionary (3d ed.1997).  Given the litany of allegations that also support the TVPRA claim, *see supra* pp. 9-10.  Plaintiffs' Complaint plausibly and adequately alleges that Defendants, through their purposeful business conduct, knowingly aided the underlying trafficking ventures that illegally sold Plaintiffs for sex.

### D.  The Well Pled Allegations in Count III State a Claim Under M.G.L. c. 93A.

Defendants confine their Rule 12(b)(6) challenge of the Chapter 93A claim to the issue of causation.  *See* Def. Br. 24.  Relying primarily on summary judgment decisions, *id.,* Defendants argue that the causal connection between the unfair and deceptive conduct alleged in the

---

[3] Furthermore, the complaint here adequately alleges that Defendants either knew or were placed on adequate notice that the sex trafficking ventures involved children (i.e., violated the TVPRA).  Compare SAC, ¶¶ 27, 31, 34, 104 with *Jean-Charles v. Perlitz et al.*, 937 F. Supp. 2d 276, (D. Conn. 2012) (plaintiffs stated a plausible TVPRA claim that Fairfield University and one of its administrators overseeing a Haitian boarding school "participated" in a sex trafficking venture where the complaint supported an inference that defendants  were on notice of sexual abuse occurring at the foreign school).

complaint and any injuries to Plaintiffs is "far too attenuated" to state a Chapter 93A claim. *Id.* 25. At the pleading stage, however, a plaintiff need only allege a plausible "causal connection between the unlawful conduct and the [injury] and that the [injury] was foreseeable as a result of the deception." *In re Pharm. Indus. Average Wholesale Price Litig.*, 582 F.3d 156, 185 (1st Cir. 2009). In other words, the complaint must allege that the conduct was both the "but for" and the proximate cause of the harm. *See Markarian v. Conn. Mut. Life Ins. Co.*, 202 F.R.D. 60, 68 (D. Mass. 2001). This is the standard both under the statute's "deception" prong and its broad "unfairness" prong, both of which apply here. *RLI Ins. Co. v. Gen. Star Indem. Co.*, 997 F. Supp. 140, 151 (D. Mass. 1998).

Plaintiffs have more than plausibly alleged the requisite causal connection between Defendants' conduct and their losses. As described in detail in the Complaint, Defendants' misleading statements to law enforcement shielded their business from the barrage of public scrutiny that cratered the "adult services" section of Craiglist.com and the federal law enforcement scrutiny that resulted in MyRedBook.com being seized by the Department of Justice, and, by minimizing the risk of prosecution for sex traffickers, Defendants' unfair and deceptive business practices solidified Backpage.com as pimps' and johns' go-to advertising channel and the leading online sex market for underage children. *See* SAC ¶¶ 8, 27, 37. This scheme plausibly expanded and protected the market in which the traffickers operated, while continuing Defendants' unlawful participation in sex trafficking ventures, and therefore increased the risk that Plaintiffs would be victimized in this expanded market. Absent Defendants' careful development and protection of such a lucrative online sex market, there is a reasonable possibility that Plaintiffs would not have suffered the repeated rapes that they did. These allegations are sufficient to satisfy the "but for" aspect of the causation requirement.

Moreover, Defendants cannot credibly claim, particularly at this stage of the proceedings, that the repeated rapes of Plaintiffs was not foreseeable, as they were well aware that traffickers were selling minors for sex on their website.  SAC ¶¶ 27, 105.

To the extent that Defendants mean to suggest that intervening causes render their contribution to Plaintiffs' injuries unforeseeable, they misunderstand the law.  As this Court pointed out in rejecting a motion to dismiss a RICO claim: "A proximate cause need not be . . . the last cause in a chain of events leading to the harm, but need only be a substantial cause of a succession of events that in a logical sequence ultimately causes a plaintiff injury."  *In re Lupron Mktg. and Sales Practices Litig.*, 295 F.Supp.2d 148, 175 (D. Mass. 2003).  On a motion to dismiss, "it is neither necessary nor desirable to balkanize the plausibility standard element by element . . . .  The critical question is whether the claim, viewed holistically, is made plausible by 'the cumulative effect of the factual allegations.'" *A.G. ex rel. Maddox v. Elsevier, Inc.*, 732 F.3d 77, 82 (1st Cir. 2013) (quoting *Ocasio-Hernández v. Foruño-Burset*, 640 F.3d 1, 14 (1st Cir. 2011)).  Thus, Count III adequately states a claim under Chapter 93A.

## II.     THE COMMUNICATIONS DECENCY ACT DOES NOT PRECLUDE ANY OF THE BUSINESS PRACTICES CLAIMS.

### A.     While Section 230 Has Played an Important Role in the Development of the Internet, Its Application is Appropriately Limited by its Plain Language and Purpose.

Anticipating a risk to the development potential of the then nascent Internet, particularly from unrestrained exposure to defamation-related claims, Congress enacted section 230 of the Communications Decency Act ("CDA"), 47 U.S.C. § 230, to provide some protection for "companies that serve as intermediaries for other parties' potentially injurious messages." *Zeran*

*v. Am. Online, Inc.*, 129 F.3d 327, 330-31 (4th Cir. 1997).[4]   In constructing the CDA, however, "Congress did not intend to grant a vast, limitless immunity" to ISPs, *Chicago Lawyers' Comm. v. Craigslist, Inc.*, 461 F. Supp. 2d 681, 696 (N.D. Ill. 2006), or to declare "a general immunity from liability deriving from third party content," *Barnes v. Yahoo! Inc.*, 570 F. 3d 1096, 1100 (9th Cir. 2009).   Indeed, the Ninth Circuit recently reiterated that "Congress has not provided an all purpose get-out-of-jail-free card for businesses that publish user content on the Internet" and rejected the application of section 230 to a state law failure to warn claim.   *Doe v. Internet Brands, Inc.,* 767 F.3d 894, 899 (9th Cir. 2014).

In determining whether Section 230 "immunizes" a defendant from the Plaintiff's claims, the Court's analysis must start with the language of the statute itself.   Section 230(c) contains two subsections.   Subsection (c)(1) provides that: "No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1).   This provision precludes a claim only where each of three requirements are met: (i) defendant is an interactive service provider; (ii) the claim "treats" defendant as a publisher or speaker of the content at issue; and (iii) the content at issue was provided solely by another information content provider.   Thus, section 230(c)(1) precludes claims premised on an ISP defendant's "exercise of a publisher's traditional editorial functions—such as deciding whether to publish, withdraw, postpone or alter content," *Zeran,* 129 F.3d at 330, but only where the defendant is not itself responsible, in whole or in part, for the harmful content that appears on is website, *Fair Hous. Council v. Roommates.com, LLC,*

---

[4] The vast majority of cases applying section 230(c)(1) involve common law defamation-like claims which require evidence of publication as an element of the legal claim.   *See, e.g., Zeran v. Am. Online*, 129 F.3d 327 (4th Cir., 1997); *Green v. Am. Online*, 318 F.3d 465 (3rd Cir., 2003); *Ben Ezra, Weinstein & Co. v. Am. Online, Inc.*, 206 F. 3d 980 (10th Cir., 2000); *Jones v. Dirty World*, 2014 WL 2694184  (6th Cir., 2014).   Indeed, the terms publisher or speaker employed in section 230(c)(1) are drawn directly from the law of defamation.   *See* Prosser & Keeton, The Law of Torts, *supra*, § 113, at p. 803; Rest.2d Torts, § 568.

521 F.3d 1157, 1171 (9th Cir. 2008) (en banc).  In this case, as explained more fully below, Plaintiffs' claims do not treat Defendants as a publisher, and therefore section 230(c)(1) does not preclude the claims here.[5]

A wholly different role is played by section 230(c)(2), which is designed to avoid creating disincentives to websites' good faith regulation of offensive content.  *Internet Brands*, 767 F.3d at 898.  It provides that websites shall have no liability for "any action voluntarily taken in good faith to restrict access to or availability of  . . . [objectionable] material."  47 U.S.C. § 230(c)(2); *see Moving and Storage v. Panaytov*, 12-12262-GAO, 2014 WL 949830 (D. Mass. Mar. 12, 2014).  Again, for reasons explained below, section 230(c)(2) is applicable here, though only in a secondary role that will require the development of a complete record.

**B.    Section 230 of the CDA Does Not Apply to the Business Practice Claims in Counts I, II, and III.**

**1.    Counts I and II do not treat Defendants as a publisher, but rather involve participation in and aid to child sex trafficking ventures.**

Defendants make only a conclusory assertion that Plaintiffs' claims satisfy the third "publisher" requirement of the three prong test under section 230, and they do so based on only bare denials of the facts alleged and the claims asserted.  Def. Br. 12.  This approach flatly contravenes *Lycos*, which counsels that section 230's "immunity" provision applies only when the plaintiff's specific "cause of action is one that would treat the service provider as the publisher of a particular posting."  478 F.3d at 422.  Thus, in *Lycos*, the First Circuit held that

---

[5] Plaintiffs do not contend at this stage of the litigation that Backpage.com is an "information content provider" for purposes of Section 230 because, at least in this case, those are fact-based inquiries best considered after discovery. *See Suk Jae Chang v. Wozo LLC*, 2012 WL 1067643, at *14 (D. Mass. Mar. 28, 2012) (denying motion to dismiss on section 230 grounds in light of allegations of defendant's contribution to content justifying discovery); *see also CYBERsitter v. Google*, 905 F. Supp. 2d 1080, 1086 (C.D. Cal. 2012).  The Complaint does allege facts, however, supporting a reasonable inference that Defendants contribute to certain illegal features of advertisements on the website. *See, e.g.*, SAC ¶¶ 48, 85 concerning age verification and the response of Jane Doe No. 1 circumventing the age limitation (the "Oops!" message); *id.* ¶¶ 54-57 concerning the use of filters that encourage the insertion of "signaling" synonyms that are understood in the marketplace to refer to illegal sex with children); and ¶¶ 64-65 regarding the editing of sponsored ads. *See Fair Hous.Council*, 521 F.3d at 1172  (website not protected by section 230 to the extent that it contributes materially to aspects of the content that are illegal).

section 230 barred a state securities fraud claim against an online message board operator because the cause of action arose out of short sellers' "spreading misinformation" about Universal Communications, Inc. on a Lycos message board. *Id.* The First Circuit reasoned that the message board operator had neither bought nor sold the securities in question and could be liable for securities fraud only if the misinformation posted by the short sellers was directly "imput[ed]" to it. *Id.*

Here, Plaintiffs' trafficking claims do not seek to "impute" to Defendants any advertisements created by others. In contrast to *Lycos*, where the short sellers' posting of false information about Universal Communications *was* the alleged securities fraud, here it is Defendants' own business conduct, and not traffickers ultimate posting of specific advertisements featuring Plaintiffs, that constitutes Defendants' violations of the statutes at issue. Specifically, the Complaint details the means by which Defendants purposefully engaged in decisions and conduct—prior to, contemporaneous with, and after Plaintiffs were illegally trafficked on Backpage.com—that were integral to the sex trafficking ventures' success and the traffickers' ability to evade law enforcement. Indeed, as discussed earlier, even if the advertisements had never been posted, Defendants' conduct would have still violated the federal anti-trafficking statute. *See supra* pp. 7-8.

Of course, it is true that Backpage.com is the medium for the advertisements that offered the Plaintiffs for sale. As the Ninth Circuit observed in *Internet Brands*, however, while harmful or offensive content published on a website will often be a "but-for" cause of a plaintiff's injury, "that [does] not mean that the CDA immunize[s] the proprietor of [the] website from all potential liability." 767 F.3d at 899. So long as a defendant need not alter its editorial or publication decisions to avoid liability, the Ninth Circuit concluded, the claims are not grounded in

traditional publisher functions, and section 230 therefore does not apply.  Here, if Defendants were truly neutral intermediaries, rather than an active participant in trafficking ventures in violation of the TVPRA and MATA, the section 230 analysis would be different.

Contrary to Defendants' argument, a claim does not treat a website operator as the "speaker" of third-party content merely because that content is one link in the chain that connects the website's independently illegal conduct and plaintiff's injuries.  To hold otherwise allows the presence of any third-party speech to insulate online service providers from liability for unlawful conduct that is separate from and independent of that speech.

### 2. The Chapter 93A claim involves an unfair and deceptive scheme to grow market share, not any aspect of the publisher function.

Plaintiffs' Chapter 93A claim similarly does not impute any of the advertisements to Defendants. Instead, Defendants' unfair and deceptive conduct rests on detailed allegations involving systematic misrepresentations to law enforcement and advocacy organizations to secure their public support and to reduce media scrutiny of Backpage.com, while Defendants aggressively (and successfully) grew the market share of their business.  This conduct, which had the effect of expanding the market for illegal sex with children and increasing the incidence of rapes of the trafficking victims, is wholly independent of the publication of the advertisements.[6]  *See supra* pp. 9-10.

---

[6] For recent cases involving the denial of a motion to dismiss Chapter 93A claims in the face of section 230 defenses, see: *Moving & Storage, Inc.*, 2014 WL 949830, at *2-3; *Small Justice LLC v. Xcentric Ventures, LLC*, No. 13-cv-11701, 2014 WL 1214828 (D. Mass. Mar. 14, 2014); *see also Barnes*, 570 F.3d at 1107 ("[Plaintiff] does not seek to hold Yahoo liable as a publisher or speaker of third-party content, but rather as the counter-party to a contract, as a promisor who has breached."); *Anthony v. Yahoo!, Inc.*, 421 F. Supp. 2d 1257, 1263 (N.D. Cal. 2006) ("[T]he CDA only entitles Yahoo! not to be 'the publisher or speaker' of the profiles.  It does not absolve Yahoo! from liability for any accompanying misrepresentations. Because [plaintiff] posits that Yahoo!'s manner of presenting the profiles—not the underlying profiles themselves—constitute fraud, the CDA does not apply.").

### 3.    Any efforts by Defendants to limit unlawful content on their website must be tested under the good faith standard of section 230(c)(2).

Defendants assert that they exercise "publisher" functions through certain affirmative efforts to limit illegal content on their website.  In particular, Defendants refer to filtering software and manual monitors used to screen advertisements, as well as the removal of advertisements that are suspected to involve child trafficking.  Def. Br. 14.  According to Defendants, these actions fall within the scope of section 230(c)(1) protection because they represent traditional editorial efforts to control or affect content.  This argument effectively attempts to peel away a handful of allegations and to treat them as if they capture the whole of the claims in the Complaint.  In analyzing a motion to dismiss under Rule 12(b)(6), the "complaint must be read as a whole." *García-Catalán v. United States*, 743 F.3d 100, 103 (1st Cir. 2013).  Here, any affirmative actions by Defendants to control the content on the website are part of the mosaic of allegations supporting Counts I, II, and III, but Plaintiffs do not rely on any of them, standing alone, as the basis for a claim.

Moreover, in their selection of "content" control measures, Defendants ignore other affirmative measures that are designed to protect the anonymity of traffickers and minimize the effectiveness of law enforcement.  These include stripping metadata from photographs posted to the website to deprive law enforcement of key identifying information, SAC ¶ 51, and protecting traffickers by removing law enforcement sting advertisements from the website, *id.* ¶ 40.  All of these various affirmative actions are integral to Defendants' business model, and are evidence of Defendants' violations of the TVPRA, MATA, and Chapter 93A.

Even if Plaintiffs were making claims that were wholly dependent on these affirmative actions by Defendants, which they are not, the applicability of section 230 to any of the content control allegation should be judged under section 230(c)(2)'s "good faith" requirement.  As

Judge O'Toole concluded in *Moving and Storage*, the assertion by a website that it cannot be liable in light of its efforts to "filter[] out inaccurate or otherwise suspect material" is not tested under section 230(c)(1), but rather under section 230(c)(2).  2014 WL 949830, at *2.  Since "the plaintiffs have sufficiently alleged bad faith," the court in that case concluded that "the issue [of § 230(c)(2) protection] cannot be appropriately decided at [the pleadings] stage."  *Id.*  In this case too, there are ample allegations of bad faith by Defendants—indeed, Plaintiffs maintain that any efforts to monitor the website are a facade—that would preclude Defendants from satisfying section 230(c)(2)'s "good faith" requirement.

### 4.     Defendant's heavy reliance on *M.A. v. Village Voice* is misplaced.

Defendants rely heavily on *M.A. v. Village Voice Media Holdings, LLC*, 809 F. Supp. 2d 1041, 1055 (E.D. Mo. 2011), a case which involves Backpage.com, and is inapposite for multiple reasons.  In *M.A.*, the plaintiff alleged that the defendants violated 18 U.S.C. § 2255 for aiding and abetting a violation of 18 U.S.C. § 1591, and that they also were liable under 18 U.S.C. § 1595.  The factual allegations focused principally on the defendants' knowledge of trafficking on their website.  The plaintiff argued on that basis that Backpage.com was not an ISP and also that it was a developer of content for purposes of section 230.  The opinion by the Magistrate Judge in *M.A.* is inapposite here.  First, the court was not called upon to consider the publisher element of section 230 with regards to § 1595, nor did its analysis bear on that essential predicate to the application of section 230.  Second, the case did not involve the extensive factual allegations present here of participation in trafficking ventures that Plaintiffs have made.  Indeed, the amended complaint included just three paragraphs, repeated *in haec verba* in two counts, alleging the conduct supposedly supporting the claims.  *See M.A. v. Village Voice Media Holdings, LLC*, 10-CV-1740, E.D.  Mo., First Am. Compl. ¶¶ 11-13 (dkt. No. 23).  Third, the court did not discuss or analyze the operative language of section 1595 of the TVPRA, or its

application to the limited facts alleged in the complaint. *Id*. at 1056. Defendants also rely on *Dart v. Craigslist*, *Inc.,* 665 F. Supp. 2d 961 (N.D. Ill. 2009), but plaintiff there alleged only that Craigslist facilitated prostitution and constituted a public nuisance, and thus the case bears no legal significance for the claims asserted here. *Id.* at 961.

      **C.**      **In Any Event, The Business Practice Claims Fall Squarely Into The Exceptions to CDA Immunity in Section 230(e).**

            **1.**      **Plaintiffs' Federal Sex Trafficking Claim Seeks to Enforce a Federal Criminal Statute and Is Therefore Unaffected by the CDA's "Immunity" Provisions.**

Section 230(e)(1) of the CDA provides that the statute "shall [not] be construed to impair the enforcement of . . . any [ ] Federal criminal statute." 47 U.S.C. § 230(e)(1). In other words, the CDA's "immunity" provisions do not afford a defendant, even a website operator, any protection from an action that seeks to enforce a federal criminal statute.

Plaintiffs' federal sex trafficking claims allege that Defendants are liable under TVPRA, 18 U.S.C. 1595; SAC ¶ 109-11, and Defendants concede that the TVPRA is a federal criminal statute. Accordingly, for purposes of section 230(e)(1), the only remaining question is whether a private lawsuit, brought under 18 U.S.C. § 1595, seeking civil damages for a defendant's underlying violations of the TVPRA constitutes "enforcement" of the TVPRA. The answer to this question is "yes," precluding Defendants' immunity argument.

The definition of "enforce" is "[t]o give force or effect to" or "to compel a person to pay damages for not complying with . . . ." Black's Law Dictionary 608 (9th ed. 2009). Similarly, the definition of "enforcement" is any "act or process of compelling compliance with a law, mandate, command, decree or agreement." *Id.* The terms "enforce" and "enforcement" are therefore broader than the term "prosecution," which is narrowly defined as a "criminal proceeding in which an accused person is tried." *Id.* at 1341.

It is not uncommon for Congress to embed a private right of action in criminal statutes. As the court recognized in *Luka v. Proctor & Gamble Co.*, 785 F. Supp. 2d 712, 719 (N.D. Ill. 2011), Congress does this so that "private parties [can] sue to enforce [criminal] statutory prohibitions." Indeed, where Congress has determined that the violation of a criminal statute should be subject both to criminal penalties and to private civil actions, courts routinely refer to the latter as part of the statute's "enforcement scheme." *Kendall v. City of Chesapeake, Virginia*, 174 F.3d 437, 443 (4th Cir. 1999); *see also Scattered Corp. v. Chi. Stock Exch., Inc.*, 98 F.3d 1004, 1005 (7th Cir. 1996) (stating that "private rights of action to enforce provisions of the securities laws . . . are helpful supplements to administrative and criminal enforcement").

In *Nieman v. Versuslaw, Inc.*, No. 12-3104, 2012 WL 3201931, at *9 (C.D. Ill. Aug. 3, 2012), where plaintiff sued a number of website defendants for civil RICO violations, the district court recognized that the CDA's immunity provisions "arguably . . . may not be used to bar" a civil claim that a plaintiff brings under a criminal statute's private right of action provision, "because that would impair the enforcement of a Federal criminal statute." The court's reasoning in *Nieman* is analytically sound and grounded firmly in the plain language of section 230(e)(1). This Court should follow *Nieman* here and, accordingly, hold that the CDA's immunity provisions may not "impair" Plaintiffs' enforcement of federal criminal sex trafficking claims: The TVPRA provides a private right of action to a plaintiff who suffers injury as a result of defendant's violations of the TVPRA's criminal prohibitions; such a private civil action is one of the legal mechanisms that Congress chose to adopt in order to enforce the TVPRA's criminal prohibitions, and "enforcement" of the TVPRA's criminal prohibitions would be "impair[ed]" were a defendant facing a trafficking victim's private lawsuit allowed to cloak itself in the CDA's immunity provisions.

According to Defendants, the CDA's immunity provisions protect them from Plaintiffs' federal sex trafficking claims because Section 230(e)(1) applies only to "federal criminal prosecutions." Def. Br. 21.  Defendants' reading of section 230(e)(1), however, is not consistent with the provision's plain language.  Indeed, if accepted, it would mean that a defendant could claim immunity even from, for example, a civil RICO claim initiated by the Attorney General of the United States.  There is no reason to believe that is the result Congress intended.  Other than to avoid an "absurd" result, courts are not permitted to "read an absent word into [a federal] statute." *Lamie v. United States Tr.,* 540 U.S. 526, 534 (2004).  In the case of section 230(e)(1), Congress's choice of words shows that it was mindful of the intricacies of enforcement policy embedded in so many provisions of criminal statutes, and did not wish for section 230 to disturb them.[7]

The three cases that Defendants rely upon for their argument are thinly and poorly reasoned and should not be followed.  In *Doe v. Bates*, 05-CV-91-DF-CMC, 2006 WL 3813758, at *3 (E.D. Tex. Dec. 27, 2006), the court completely failed to grapple with section 230(e)(1) actual statutory language, grounding its decision instead on its view that categorical "immunity from all private civil liability comports with the clear Congressional policies to avoid disincentives to innovation and to encourage self-regulation."  The *Bates* court's upside-down approach to statutory interpretation, ignoring section 230(e)(1)'s language in favor of the court's apparent notion of "Congressional policies," is improper.  Moreover, even taken on its own terms, the *Bates* court's reasoning cannot be squared with section 230(e)(2) or (e)(4), both of which show that Congress did not intend the CDA to provide defendants "immunity from all

---

[7] In case there were any doubt, the Court need only review the portion of Section 230(e)(1) expressly exempting enforcement of "chapter . . . 110 (relating to sexual exploitation of children) of title 18."  Chapter 110 includes Section 2255, a private civil action for exploited children that operates in parallel with Section 1595.  It is inconceivable that Congress meant to preserve Section 2255 actions under the "federal criminal statutes," but not a more advanced remedy enacted long after the CDA.

private civil liability." The *M.A.* court's decision is also flawed. With scant analysis, the district court leaped to the conclusion that the only type of action that constitutes "enforcement" of a federal "criminal statute" within the meaning of section 230(e)(1) is a criminal prosecution. *See* 809 F. Supp. 2d at 1055. But, as explained above, federal courts have long recognized that civil lawsuits brought under a criminal statute's private right of action provision are an integral part of the criminal statute's enforcement mechanism. Congress would have been aware of that case law when it drafted section 230(e)(1), and this Court must assume that Congress's choice not to expressly limit section 230(e)(1) to "prosecutions" was an intentional one. Finally, in *Obado v. Magedson*, No. 13-2382, 2014 WL 3778261 at *8 (D.N.J. July 31, 2014), none of plaintiff's claims were based on an alleged violation of federal criminal law, let alone brought under a federal criminal statute's private right of action provision. Moreover, in cataloguing the "causes of action that are specifically not barred by section 230," the *Obado* court included "causes of action based on . . . federal criminal statutes," *id.* at *3, which is precisely what Plaintiffs' TVPRA claim against Defendants are here. In sum, under the plain language of section 230(e)(1), the CDA's immunity provisions are inapplicable to Plaintiffs' federal sex trafficking claims.

### 2. Section 230(e)(3) exempts Plaintiffs' state law claims in Counts II and III from the intended scope of CDA protection.

Section 230(e)(3) contains express preemption language that extends the CDA immunity to state law claims that are "inconsistent" with section 230. Where, as here, the statute merely states that "inconsistent laws" are precluded by federal law, it remains for the court to determine the scope of the preemption from the text as well as the context of the statute. *See Mass. Ass'n. of Health Maint. Orgs. v. Ruthhardt*, 194 F.3d 176, 179 (1st Cir. 1999) (applying test to determine the scope of a Medicare statute that expressly preempted "inconsistent" state laws).

Moreover, in addressing preemption issues, courts "start with the assumption that the historic police powers of the States [are] not to be superseded … unless that [is] the clear and manifest purpose of Congress." *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, (1947).

Defendants do not offer any substantive argument that the MATA and Chapter 93A claims are inconsistent with the CDA.   Instead, they brazenly argue that the CDA should essentially be read to immunize *all* Internet providers from *all* state law claims.  Def. Br. 22. The courts have concluded otherwise.   Indeed, in *Lycos,* the First Circuit concluded that the metric for what is "consistent" or "inconsistent" with section 230 is that which falls under the three part test for immunity in section 230(c)(1).   *See* 478 F.3d at 418; *see also Atl. Recording Corp. v. Project Playlist, Inc.*, 603 F. Supp. 2d 690, 702 (S.D.N.Y. 2009) (since section 230(e)(3) itself does not define substantively what is consistent or inconsistent, defendants must demonstrate why plaintiffs state law claims are inconsistent with the CDA); *Cisneros v. Sanchez*, 403 F. Supp. 2d 588, 592 (S.D. Tex. 2005) (CDA is not intended to entirely preempt state law because section 230(e)(3) is narrowly tailored to allow state and local laws that are consistent and do not seek to hold a website responsible for the content of others).

In this case, the MATA and Chapter 93A claims (Counts II and III) readily survive the application of the strict inconsistency standard adopted by Congress.  For the reasons set forth in sections I(B) and I(C), *supra*, these claims do not treat Defendants as a "publisher or speaker," and thus *ipso facto* the claims cannot be inconsistent with section 230.  Applying this reasoning, two courts in this district recently have declined to dismiss Chapter 93A claims in the face of motions to dismiss under section 230.  *Moving and Storage,*  2014 WL 949830, at *2  (section 230 did not preclude c. 93A claim where plaintiffs did not seek to "treat defendants as the publisher or speaker of the third party reviews," but rather made claims against defendants for

their own conduct in making certain misrepresentations); *Small Justice LLC*, 2014 WL 1214828, at *9 (holding that section 230 did not bar plaintiff's Chapter 93A claim for unfair practices premised on defendant's refusal to take down defamatory posts from the website while separately offering services to restore plaintiff's reputation for a fee).

## III.   THE INTELLECTUAL PROPERTY CLAIMS IN COUNTS IV AND V ARE EXEMPT FROM SECTION 230, AND EACH STATES A CLAIM FOR RELIEF UNDER RULE 12(B)(6).

### A.   Count IV is Exempt from Section 230 "Immunity" Provision and States a Claim Under the Applicable Right of Publicity Statutes

Section 230(e)(2) provides that "[n]othing in this section shall be construed to limit or expand any law pertaining to intellectual property." 47 U.S.C. § 230(e)(2).   As Defendants concede, Def. Br. n. 18, that courts in this Circuit have held that state law intellectual property claims—including right of publicity claims—are "not subject to Section 230 immunity."  *Doe v. Friendfinder Network, Inc.*, 540 F. Supp. 2d 288, 298, 302 (D.N.H. 2008) (quoting *Lycos*, 478 F.3d at 422-23); *see also Atl. Recording Corp.*, 603 F. Supp. 2d at 704 (concluding that section 230 does not provide immunity for state intellectual property claims); 4 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 28:1 (2014) ("The right of publicity "is properly categorized as a form of intellectual property.").[8]

Moreover, Plaintiffs have sufficiently plead violations of their rights of publicity under state law—that is, the use of their pictures "for advertising purposes or for the purposes of trade" without consent.   M.G.L. c. 214 § 3A; *see also* R.I. Gen. Laws § 9-1-28; *Tropeano v. Atl. Monthly Co.*, 400 N.E.2d 847, 850 (D. Mass. 1980) (M.G.L. c. 214 § 3A protects "the interest in

---

[8] The Complaint mistakenly refers to Rhode Island's privacy statute, § 9-1-28.1, instead of Rhode Island's right of publicity statute, § 9-1-28.).  In the interest of efficiency, Plaintiffs respectfully request this Court to consider the sufficiency of the right of publicity claim under the laws of both Massachusetts and Rhode Island.  In the alternative, Plaintiffs respectfully request that this Court dismiss the Rhode Island claim without prejudice and with leave to move to amend to refer to R.I. Gen. Laws § 9-1-28 rather than § 9-1-28.1.

not having the commercial value of one's name, portrait or picture appropriated to the benefit of another."); *Leddy v. Narragansett Television LP,* 843 A.2d 481, 490 (D.R.I. 2004) ("To establish a statutory claim [under § 9-1-28] . . . the plaintiff must demonstrate that the defendant commercially exploited him without his permission."). Here, Plaintiffs have alleged that Defendants deliberately exploited the value of their pictures for advertising and trade purposes in a manner that was not "incidental."  SAC ¶¶ 129-137; *Tropeano*, 400 N.E.2d at 850 ("[T]he crucial distinction [is] between . . . an incidental use of the . . . picture and those in which the defendant uses the plaintiff's . . . picture deliberately to exploit its value for advertising or trade purposes.").  Defendants argue that only the non-defendant "*pimps* used [Plaintiffs'] photos 'for advertising purposes.'"  Def. Br. 26 (emphasis in original).  But Plaintiffs' allegations show that Defendants made use of the photographs to further their pecuniary interests as well.  SAC ¶ 132 (Defendants decided to display photographs only after monitoring and reviewing each one); *id.* ¶¶ 129-137 (use of photographs is "an integral part of [Defendants'] business model").  Indeed, Defendants have  offered no argument that they did not receive such a direct benefit, and, given their business model, cannot do so.

Defendants argue that the use of Plaintiffs' photographs on Backpage.com is similar to that of a newspaper.  This is disingenuous.  Plaintiffs' photographs were used in advertisements and for the purposes of trade, and no connection has been shown between the use of the images and the public interest, or any newsworthy purpose.  The claims here, therefore, are like the situation in *Peckham v. New Eng. Newspapers, Inc.*, 865 F.Supp.2d 127, 129-30 (D. Mass. 2012), in which a motion to dismiss the claim under M.G.L. c. 214 § 3A was denied where a photograph was used on merchandise, and wholly different from the claims in *Tropeano*, 400

N.E.2d at 851, where "the photograph was published in connection with what is apparently a sociological commentary. . . ."  Defendants' heavy reliance on *Tropeano* thus fails.[9]

### B.     Count V States a Claim for Copyright Infringement.

It is undisputed that Section 230 provides no immunity to claims brought under the Copyright Act, 17 U.S.C. § 101 *et seq.*  *See* 47 U.S.C. § 230(e)(2); *Lycos*, 478 F.3d at 422-23. To present a *prima facie* case of copyright infringement a plaintiff need only show: (1) ownership of a valid copyright and (2) copying of original constituent elements of the work.  *See, e.g.*, *Soc'y of Holy Transfig. Monastery, Inc. v. Gregory*, 689 F.3d 29, 39 (1st Cir. 2012).  Here, Jane Doe No. 3 has satisfied this standard by pleading ownership of a valid copyright in the photograph at issue, SAC ¶ 143, and that Defendants violated her exclusive rights in that work under 17 U.S.C. §§ 106(1), (3), and (5)—by reproducing, displaying, and distributing that photograph in its entirety.  SAC ¶¶ 34, 51, 60-67, 138-147.  Defendants' arguments to the contrary underscore that disputed issues of fact preclude dismissal.

### 1.     Direct Infringement

Defendants assert that "many cases"—for example, in the Fourth Circuit—hold that direct infringement requires volitional conduct, or that "websites are not liable for direct infringement when *users* upload the allegedly infringing material."  Def. Br. 28 (emphasis in original).[10]  The cases Defendants cite, however, hold only that a website must do more than act as a "passive"  "conduit" to be liable for copyright infringement.  *See, e.g.*, *CoStar Group, Inc. v. LoopNet, Inc.*, 373 F.3d 544, 550-51 (4th Cir. 2004); *see also Monastery*, 689 F.3d at 57 n. 19

---

[9] The other cases that Defendants cite are similarly unavailing; all interpret different statutes from other states rather than the statute at issue here, G.L. c. 214, § 3A.  *See* Def. Br. 27.  For example, in *Gauck v. Karamian*, relied on by Defendants, the court explained that "*Tennessee's* right of publicity is narrower than the Restatement approach adopted by other states."  805 F.Supp.2d 495, 500 (W.D. Tenn. 2011) (emphasis added).

[10] The First Circuit has yet to decide whether a plaintiff must show a volitional act in order to establish direct infringement.  *See Monastery*, 689 F.3d at 55.

(observing that *CoStar* is limited to an ISP that *passively* stores material). The First Circuit has held that a defendant that performs supervisory acts which ensure that works are available on a server and posted to a website—even if defendant did not personally post the material—may be liable for direct infringement.[11] *Monastery*, 689 F.3d at 55-57. Moreover, even certain automated conduct may be sufficient to support a claim of direct infringement. *See*, *e.g.*, *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1160 (9th Cir. 2007) (finding "prima facie case that communication of "stored thumbnail images directly infringes Perfect 10's display right"). Here, Plaintiffs have alleged not only that Defendants infringed Jane Doe No. 3's rights by reproducing, displaying, and distributing her copyrighted work on and through their website but also, *inter alia*, that they (i) reviewed that work, (ii) removed metadata from that work, and (iii) made an affirmative decision to post certain advertisements and/or "Sponsored Ads" in conjunction with that work. SAC ¶¶ 34, 51, 60-67, 138-147.

At this stage, Defendants cannot seek refuge in the Digital Millennium Copyright Act's safe harbor protection for "[i]nformation residing on systems or networks at [the] direction of users" because they have not shown that they meet the applicable standard. 17 U.S.C. § 512(c). Unresolved questions exist regarding, for example, whether Defendants "adopted and reasonably implemented" a "repeat infringer" policy and "accommodate[d] and d[id] not interfere with standard technical measures," such as the metadata embedded in the photographs, that are "used by copyright owners to identify or protect copyrighted works." *See* 17 U.S.C. § 512(i)(1), (i)(2); SAC ¶¶ 51, 140. Plaintiffs also have plausibly alleged that Defendants' conduct in reviewing, editing and posting the work was not "at the direction of a user," which further removes

---

[11] *Sarvis v. Polyvore, Inc.*, 2013 WL 4056208 (D. Mass Aug. 9, 2013), cited by Defendants, is inapposite. In *Sarvis*, plaintiff made no mention in the complaint of defendant's involvement in the infringement and instead raised these facts for the first time in its opposition to dismissal. *Id.* at *8. Here, Jane Doe No. 3 has specifically alleged Defendants' involvement in the infringement. *See* SAC ¶¶ 34, 40, 51, 60-67, 138-147.

Defendants from the safe harbor.  17 U.S.C. § 512(c)(1); *see* SAC ¶¶ 34, 40, 60-67, 138-147.

Moreover, Defendants are not entitled to the safe harbor if they have "actual knowledge" of the

infringement, "aware[ness] of facts or circumstances from which infringing activity is apparent,"

or if they do not "expeditiously" remove the material.  17 U.S.C. § 512(c)(1)(A)(i)-(iii),

(c)(1)(C); *see Viacom Int'l Inc. v. YouTube, Inc.*, 676 F.3d 19, 27-28 (2d Cir. 2012).  Here,

Plaintiffs have alleged that Defendants were or should have been aware of the infringement and

that such material remained on Defendants' webpage for *at least* one week after receiving a

communication requesting that the advertisement be taken down.  SAC ¶¶ 105-107, 138-147.

These open factual issues also support a denial of Defendants' motion to dismiss.

### 2.      Vicarious Liability

In addition to their direct infringement claim, Plaintiffs have also stated a claim for

vicarious liability.  For vicarious liability to attach, actual knowledge of the infringement is not

required; rather  the court "must find that the defendant had (1) the right and ability to supervise

the infringing activity, and (2) a direct financial interest in the exploitation of copyrighted

materials."  *Jalbert v. Grautski*, 554 F. Supp. 2d 57, 67-68 (D. Mass. 2008) (citing *Gershwin

Publ'g Corp. v. Columbia Artists Mgmt., Inc.*, 443 F.2d 1159, 1162 (2d Cir. 1971)).  *Id.* at 67.

With respect to the first prong, Defendants have touted that they review *every* proposed

advertisement before deciding to post it.  SAC ¶¶ 34, 40, 140.  Similarly, Defendants edit and

post Sponsored Ads after receiving payment.  SAC ¶¶ 51, 60-67.  Further, Defendants

undeniably have a direct financial interest in the infringement.  After all, there is no dispute that

Defendants charge between $12.00 and $17.00 for each advertisement; for Sponsored Ads, the

fee is $16.45 per week.  SAC ¶¶ 43, 61.

### 3.    Contributory Infringement

Plaintiffs also have stated a claim for contributory infringement.  "[A] party 'who, with knowledge of the infringing activity, induces, causes, or materially contributes to the infringing conduct of another, may be held liable as a 'contributory' infringer.'"  *Jalbert*, 554 F. Supp. 2d at 68 (quoting *Gershwin*, 443 F.2d at 1162).[12]  Contrary to Defendants' assertion, the law requires only that a defendant "knew *or had reason to know*" of the infringement.[13]  *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1021 (9th Cir. 2001) (emphasis added).  Here, at a minimum, Defendants were informed in writing that the image of Jane Doe No. 3 depicted a minor and was posted without authorization at a specific location on their website.  SAC ¶¶ 105-107.  They thus possessed actual or constructive knowledge of the infringing use.  *See Napster*, 239 F.3d at 1020-21.  Moreover, contributory liability may be found "where evidence . . . shows statements or actions directed to promoting infringement."  *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 935 (2005).  In addition to the inexcusable delay in removing the infringing material, Defendants materially contributed to the infringement by removing metadata from the photograph making it difficult to locate instances of infringement.  SAC ¶¶ 51-59, 140.

In sum, while "the lines between direct infringement, contributory infringement and vicarious liability are not clearly drawn," *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 435 n. 17 (1984), Plaintiffs have pled facts adequate to support each of these theories.

### CONCLUSION

For the foregoing reasons, Defendant's Motion to Dismiss should be denied in its entirety.

---

[12] Plaintiffs note that "[t]he First Circuit has never directly addressed contributory copyright infringement."  *Coach, Inc. v. Sapatis*, 994 F. Supp. 2d 192, 202 (D.N.H. 2014).

[13] *See* Def. Br. at 30.  The *Luvdarts* case that Defendants cite for its "actual knowledge" proposition relies upon *Napster*, which correctly sets forth *both* parts of the "knew or had reason to know" standard for contributory infringement.  710 F.3d 1068, 1072 (9th Cir. 2013).

## REQUEST FOR ORAL ARGUMENT

Pursuant to Local Rule 7.1(d), Plaintiffs respectfully request oral argument on this motion.

Respectfully submitted,

/s/   John T. Montgomery

John T. Montgomery (No. 352220)
Aaron M. Katz (No. 662457)
Dara A. Reppucci (No. 679511)
Jessica L. Soto (No. 683145)
Christine E. Singer (No. 681525)
Cassandra Bolanos (No. 686297)
ROPES & GRAY LLP
800 Boylston Street
Boston, MA 02199
Telephone:  (617) 951-7000
Email: john.montgomery@ropesgray.com
        aaron.katz@ropesgray.com
        dara.reppucci@ropesgray.com
        jessica.soto@ropesgray.com
        christine.singer@ropesgray.com
        cassandra.bolanos@ropesgray.com

February 13, 2015

## CERTIFICATE OF SERVICE

I, John T. Montgomery, hereby certify that a true and correct copy of this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as nonregistered participants on February 13, 2015.

/s/   John T. Montgomery
John T. Montgomery
