# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JANE DOE NO. 1, a minor child, by her parent and next friend MARY ROE, JANE DOE NO. 2, and JANE DOE NO. 3, a minor child, by her parents and next friends SAM LOE AND SARA LOE, <br><br>            Plaintiffs, <br><br>     v. <br><br> BACKPAGE.COM, LLC, CAMARILLO HOLDINGS, LLC (f/k/a VILLAGE VOICE MEDIA HOLDINGS, LLD), and NEW TIMES MEDIA, LLC, <br><br>            Defendants. | Civil Action No. 14-13870-RGS <br><br> **Leave to File Granted Feb. 20, 2015** |

## BRIEF OF *AMICUS CURIAE* COMMONWEALTH OF MASSACHUSETTS IN SUPPPORT OF PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS

MAURA HEALEY
  Attorney General

GENEVIEVE C. NADEAU
   Assistant Attorney General
   Civil Rights Division
COMMONWEALTH OF MASSACHUSETTS
Office of the Attorney General
One Ashburton Place
Boston, MA 02108
(617) 727-2200
genevieve.nadeau@state.ma.us

**TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................................1

I.  THE PLAINTIFFS' COMPLAINT TELLS A FAMILIAR AND INCREASINGLY
    COMMON STORY ABOUT CHILD SEX TRAFFICKING ........................................2

    A.  The Problem of Human Trafficking ....................................................................2

    B.  Victims of Sex Trafficking ..................................................................................3

    C.  Perpetrators of Sex Trafficking ..........................................................................5

    D.  The Role of the Internet.......................................................................................6

    E.  Human Trafficking is a Priority of State Attorneys General, Who Have Long
        Been Skeptical of Backpage's Claims Regarding Its Efforts to Curb Child Sex
        Trafficking on Its Website....................................................................................8

II.  THE PLAINTIFFS CREDIBLY ALLEGE THAT BACKPAGE KNOWINGLY AND
     ACTIVELY FACILITATES SEX TRAFFICKING.....................................................11

    A.  If Proven, the Plaintiffs' Allegations Would Establish That Backpage Does
        Much More Than Simply Publish Third-Party Advertisements .........................11

    B.  Backpage's Alleged Facilitation of Sex Trafficking Violates the Massachusetts
        Anti-Trafficking Law and Chapter 93A..............................................................13

        1.  Massachusetts Anti-Trafficking Law .......................................................13

        2.  Chapter 93A..............................................................................................14

III.  THE COMMUNICATIONS DECENCY ACT DOES NOT PREEMPT STATE LAWS
      PROHIBITING ACTIVE PARTICIPATION IN SEX TRAFFICKING .....................17

CONCLUSION....................................................................................................................20

## INTRODUCTION

The Attorney General for the Commonwealth of Massachusetts respectfully submits this *amicus curiae* brief in support of the plaintiffs' opposition to the motion to dismiss filed by defendants Backpage.com, LLC et al. ("Backpage").

As the Commonwealth's chief law enforcement officer, the Attorney General has a statutory and common law duty to protect the public interest and enforce state law for the benefit of the residents of the Commonwealth, including those who are most vulnerable to abuse and victimization.  Because human trafficking is a serious and widespread problem in the Commonwealth, causing unspeakable physical, psychological, and financial harm, the Attorney General's Office has been aggressive in its efforts to tackle the problem.  It established a Human Trafficking Division and led efforts to pass the comprehensive human trafficking legislation at issue in this case.  The Attorney General also chairs a statewide Interagency Human Trafficking Task Force charged with addressing all aspects of human trafficking, and has been actively involved in nationwide efforts by the National Association of Attorneys General (NAAG).  Accordingly, the Attorney General has a particular interest in ensuring that state laws, including Mass. Gen. Laws c. 265, § 49 *et seq.* ("Massachusetts Anti-Trafficking Law") and Mass. Gen. Laws c. 93A, § 2 ("Chapter 93A"), remain viable tools for redressing conduct by individuals and entities—including websites—that facilitate human trafficking in the Commonwealth.[1]

The plaintiffs' experiences being trafficked for sex as minors in Massachusetts are both heartbreaking and much too familiar.  A staggering number of minors are trafficked each year in the United States, often through the Internet.  Modern sex trafficking operations frequently target at-risk young people, advertise them online, and then transport them within and between states to

---

[1] Though the plaintiffs have asserted claims under a number of state and federal laws, this brief focuses on the state laws for which the Attorney General has primary enforcement authority.

be sold for sex.  In fact, online advertising is now a critical component of sex trafficking, and Backpage dominates the market.  But, the plaintiffs credibly allege that Backpage does far more than publish third-party advertisements selling minors for sex.  According to the plaintiffs' allegations, Backpage has perfected a business model predicated on facilitating pimps and traffickers in illegal sex trafficking, including by deceiving the public and law enforcement in order to protect its profits and prevent more intense scrutiny.  If these allegations are true, subjecting Backpage to liability under the Massachusetts Anti-Trafficking Law and Chapter 93A is entirely consistent with the purpose and scope of the Communications Decency Act, 47 U.S.C. § 230 ("CDA")—a law that was enacted in large part to protect children.  Because the plaintiffs have sufficiently stated claims against Backpage, the motion to dismiss should be denied.

## ARGUMENT

### I.     THE PLAINTIFFS' COMPLAINT TELLS A FAMILIAR AND INCREASINGLY COMMON STORY ABOUT CHILD SEX TRAFFICKING

The plaintiffs' allegations are consistent with our experience and understanding of the problem of human trafficking generally, and sex trafficking in particular.

#### A.  The Problem of Human Trafficking

Human trafficking is a form of criminal enterprise in which women and girls in particular, but also men and boys, are exploited for labor and commercial sex.  It is a widespread and urgent problem in Massachusetts and throughout the country.  In fact, human trafficking is one of the largest and fastest growing criminal enterprises in the world—second only to narcotics trafficking.[2]  The nature of the crime and the isolation of its victims make statistical research difficult, but some experts estimate that there are as many as 27 million victims of human

---

[2] U.S. Department of Homeland Security, *Blue Campaign: What is Human Trafficking?*,  http://www.dhs.gov/blue-campaign/what-human-trafficking (last visited Feb. 20, 2015).

trafficking worldwide at any given time,[3] including 4.5 million people trapped in sexual exploitation.[4]

The widespread nature of human trafficking is driven by high profits and low risk. Like narcotics and arms trafficking, human trafficking is a market-driven criminal industry. Unlike drugs or weapons, however, human beings are a reusable resource. The same girl can be sold for sex, for example, hundreds or thousands of times by the same trafficker, and the demand is substantial. Jane Doe Nos. 1 and 2 were sold for sex between 5 and 15 times per day, and as many as 1,000 times overall. (SAC ¶¶ 71, 73, 90, 94). It is therefore no surprise that human trafficking brings in billions of dollars per year in profits for traffickers.[5]

### B. Victims of Sex Trafficking

According to the Department of Justice, over 80% of suspected human trafficking incidents in the United States involve sex trafficking,[6] and children are at particular risk. In fact, some studies suggest that sex traffickers victimize hundreds of thousands of children annually in the United States and that over half of sex trafficking victims are under age 18.[7] On average, girls first enter into the sex trade between the ages of 12 and 14 years old.[8] Jane Doe Nos. 1, 2,

---

[3] U.S. Department of State, *Trafficking in Persons Report 2013*, at 7 (June 2013), available at http://www.state.gov/documents/organization/210737.pdf.

[4] Polaris Project, *Sex Trafficking in the U.S.*, http://www.polarisproject.org/human-trafficking/sex-trafficking-in-the-us (last visited Feb. 20 2015).

[5] Polaris Project, *Human Trafficking Overview*, http://www.polarisproject.org/human-trafficking/overview (last visited Feb. 20, 2015).

[6] Banks, D. & Kyckelhahm, T., *Characteristics of Suspected Human Trafficking Incidents, 2008-2010*, Bureau of Justice Statistics, U.S. Dept. of Justice (April 2011), available at http://bjs.ojp.usdoj.gov/content/pub/pdf/cshti0810.pdf.

[7] U.S. Dept. of Justice, Office of Juvenile Justice & Delinquency Prevention, *Literature Review: Commercial Sexual Exploitation of Children/Sex Trafficking* (2014), available at http://www.ojjdp.gov/mpg/litreviews/CSECSexTrafficking.pdf [hereinafter *DOJ Literature Review*].

[8] Clawson, H., Dutch, N., Solomon, A., & Goldblatt Grace, L., *Human Trafficking Into and Within the United States: A Review of the Literature*, U.S. Dept. of Health & Human Services, at 8 (August 2009), http://aspe.hhs.gov/hsp/07/humantrafficking/litrev/.

and 3 each were first trafficked when they were only 15 years old. (SAC ¶¶ 72, 91, 105). These children are brought into the sex industry—often referred to as "the life"— and are then forced, through a variety of physical, psychological, and emotional forms of abuse, to stay there.[9] Jane Doe No. 1 was trafficked for a year and a half, while Jane Doe No. 2 was trafficked over the course of two years. (SAC ¶¶ 71, 91). Many victims remain in the life for much longer.

Not all victims of human trafficking are young girls, but some data suggest that almost 95 percent of sex trafficking victims are female. The data also suggest that more than half are Latina or African-American—far exceeding their representation in the general population.[10] In addition, there is evidence that LGBTQ youth are especially susceptible to sex trafficking.[11]

Irrespective of gender, race, or sexual orientation,  however, most victims of sex trafficking share certain characteristics that leave them particularly vulnerable to traffickers, including poverty, limited education, lack of work opportunities, lack of family support, history of physical or sexual abuse, substance abuse, and mental health problems.[12] Reports suggest that anywhere from 70 to 90 percent of commercially sexually exploited youth have a history of sexual abuse, and that a majority are or were formerly involved with child welfare services.[13] The National Center for Missing & Exploited Children (NCMEC) also estimates that one in six endangered runaways become sex trafficking victims.[14] Jane Doe No.1 was trafficked after twice running away from home. (SAC ¶¶ 72-73). Jane Doe No. 2 was trafficked after she left

---

[9] U.S. Dept. of Health & Human Services, *Sex Trafficking Fact Sheet*, available at: http://www.acf. hhs.gov/sites/default/files/orr/fact_sheet_sex_trafficking.pdf [hereinafter *HHS Fact Sheet*].

[10] DOJ Literature Review, *supra* n. 7, at 3.

[11] U.S. Dept. of Health & Human Services, Administration for Children & Families, *Guidance to States and Services on Addressing Human Trafficking of Children and Youth in the United States*, at 5 (September 2013), available at http://www.acf.hhs.gov/programs/cb/resource/human-trafficking-guidance [hereinafter *HHS Guidance*].

[12] Clawson, *et al.*, *supra* n. 8, at 7.

[13] HHS Guidance, *supra* n. 11, at 2-3.

[14] National Center for Missing & Exploited Children, http://www.missingkids.com/KeyFacts (last visited Feb. 20, 2015).

the residential program where she was living.  (SAC ¶ 91).  These young people are commonly recruited in public places like shopping malls and bus stops, around youth shelters, near schools and group homes, and over the Internet—all locations where vulnerable youth are easily targeted.[15]

### C.  Perpetrators of Sex Trafficking

Sex trafficking most often takes place in the context of pimp-controlled prostitution—on the street, through "escort" services, and at strip clubs, massage parlors, truck stops, hotels, and brothels.  It also takes place within intimate partner relationships and families.[16]  Most trafficking operations in the Northeast are transient, mobile, and operate under layers of deception.[17]  Unlike other illicit markets, the sex trade is made up of mostly small-scale operations.[18]

The plaintiffs' experiences in this case are fairly typical examples of many sex trafficking operations.  Jane Doe No. 1's trafficker required her to place daily advertisements on Backpage. (SAC ¶¶ 72-75).  At his direction, she posted the advertisements using a pre-paid mobile phone and included the phone number for customers to call.  (SAC ¶¶ 78-79).  She was required to post the advertisements in multiple cities at the same time.  (SAC ¶ 80).  Her trafficker then moved her from city to city every one or two days, so that she was sold for sex in a number of different locations across both Massachusetts and Rhode Island.  (SAC ¶¶ 80-81).

Jane Doe. No 2 was part of a trafficking operation including at least two other girls. (SAC ¶ 93).  She was advertised on Backpage by either a pimp or an older female who worked closely with him (sometimes referred to as his "bottom").  (SAC ¶ 93).  The advertisements were

---

[15] HHS Guidance, *supra* n. 11, at 4.

[16] *Id.* at 2;  Raymond, J.  & Hughes, D., *Sex Trafficking of Women in the United States: International and Domestic Trends*, Coalition Against Trafficking in Women (2001), available at https://www.ncjrs.gov/pdffiles1/nij/grants/187774.pdf.

[17] *Id.*

[18] Annie Lowrey, *In-Depth Report Details Economics of Sex Trade*, N.Y. Times (March 12, 2014).

placed with either stolen or pre-paid credit cards, and Jane Doe No. 2 was given a pre-paid

mobile phone to answer customer calls.  (SAC ¶¶ 96-97).  Jane Doe No. 2 and the other girls

were trafficked in several cities in the Boston area.  (SAC ¶ 98).  Their pimp kept the girls in one

place for no more than a week at a time.  (SAC ¶ 98).

Jane Doe No. 3 was trafficked by a man and woman who picked her up at a friend's

home.  (SAC ¶ 101).  They took her to an apartment in Boston and then posted advertisements

on Backpage using an anonymous pre-paid debit card.  (SAC ¶ 101).  After receiving responses

to the advertisements, Jane Doe No. 3's traffickers drove her to a hotel in Foxborough, where she

was raped in exchange for payments that went to her traffickers.  (SAC ¶ 103).

The plaintiffs' stories are also similar to many cases prosecuted by the Massachusetts

Attorney General's Office.  In one of its first cases under the Massachusetts Anti-Trafficking

Law, the Attorney General's Office arrested a Dorchester man in connection with an extensive

human trafficking operation in and around Boston.  The defendant allegedly recruited women

with substance abuse problems, advertised them on Backpage, and then brought them to either

hotels or "johns'" homes to be sold for sex.  In its most recent case, the Attorney General's

Office indicted the operator of an unlicensed massage parlor in Everett where the "masseuses"—

mostly immigrants—offered sexual services to clients in exchange for cash.  The defendant

allegedly advertised on Backpage, set up appointments for the women, and managed the daily

financial aspects of the organization.

### D.  The Role of the Internet

The Internet has had a profound effect on the sex trade and intensified the problem of

human trafficking.  In 2014, the Urban Institute (funded by the National Institute of Justice)

issued the most comprehensive study of its kind, analyzing a number of different aspects of the

economics of the sex trade in eight major cities.  Consistent with the findings of earlier studies,

the Urban Institute determined that the Internet has "transformed the street-based sex market."[19]

Overall, the study concluded that as a result of the Internet, the sex market has expanded, sex

workers are able to solicit a broader clientele and are displaced from the streets, "johns" are able

to organize dates more covertly, and law enforcement detection has been reduced.[20]  The results

of the study are consistent with the plaintiffs' experiences.  Jane Doe No. 1 estimates that she

was advertised on Backpage as many as 300 times, often simultaneously in multiple cities.

(SAC ¶¶ 80, 89).  Jane Doe No. 2's traffickers posted advertisements of her an average of six

times per day.  (SAC ¶ 94).  Jane Doe No. 3's traffickers also posted repeated advertisements of

her each day, and all of these ads were "linked" on the website.  (SAC ¶ 101).  Each of the

hundreds of online advertisements for Jane Doe Nos. 1, 2 and 3 also led to anonymous

communications with "johns" and the girls being sold for sex repeatedly and in multiple

locations.

The results of the Urban Institute study are also consistent with the experience of state

and federal law enforcement agencies.  The vast majority of prosecutions for sex trafficking now

involve online advertising, and most of those advertisements appear on Backpage.[21]  In

Massachusetts, seventy-five percent of the cases that the Attorney General has prosecuted under

our state human trafficking law, plus a number of additional investigations, involve advertising

on Backpage.  While the Internet has been a useful investigative and evidentiary tool in these

particular cases, it has also contributed to a proliferation of prostitution and sex trafficking.

---

[19] Urban Institute, *Estimating the Size and Structure of the Underground Commercial Sex Economy in Eight Major US Cities*, at 234 (March 2014), available at http://www.urban.org/uploadedpdf/413047-underground-commercial-sex-economy.pdf.

[20] *Id*.

[21] Abigail Kuzma, *A Letter to Congress: The Communications Decency Act Promotes Human Trafficking*, 34 Child. Legal Rts. J. 24, 27-30 (2013).

Websites like Backpage allow customers to shop for sex covertly from the privacy of their own homes or hotel rooms, and to further hide behind coded communications and anonymous transactions.  In the experience of law enforcement—and Jane Doe Nos. 1, 2 and 3—these websites also allow sex traffickers to exploit a greater number of victims and to advertise their services more frequently and across geographic boundaries.  Thus, overall, there are now many more trafficking cases that go undetected and/or unprosecuted.

### E.  Human Trafficking Is a Priority of State Attorneys General, Who Have Long Been Skeptical of Backpage's Claims Regarding Its Efforts to Curb Child Sex Trafficking On Its Website

Given the scope of the sex trade and the profound harms it causes our residents, attorneys general across the country recognize that human trafficking has emerged as one of the most serious civil rights threats within the United States.[22]  All fifty states and the District of Columbia have passed human trafficking laws.  NAAG also made combating human trafficking a top priority by establishing a Special Committee on Human Trafficking to investigate and promote tools for combating trafficking at a state level.[23] These include law enforcement and prosecution strategies, educational outreach efforts, and alliances with partner agencies and non-governmental organizations.  NAAG also organized a broad and bipartisan coalition of attorneys general (including the Massachusetts Attorney General) urging Congress to continue to make human trafficking a priority.  Among other things, this group of attorneys general has been advocating for legislation to protect children from being trafficked on the Internet.[24]  As a part of these efforts, NAAG and state attorneys general have paid particular attention to Backpage.

---

[22] NAAG, *Resolution in Support of the Principles Embodied within the NAAG 2012 Presidential Initiative on Human Trafficking*, available at http://www.naag.org/assets/files/pdf/resolution.201203.Human_Trafficking.pdf.

[23] *See* http://www.naag.org/naag/committees/naag-special-committees/human-trafficking-committee.php (last visited Feb. 20, 2015).

[24] *See, e.g.*, NAAG Letter to Senate Judiciary Committee Chairman and Ranking Member (Oc. 20, 2014), available at http://atg.sd.gov/LinkClick.aspx?fileticket=M3knPAdhbFA%3D&tabid=442.

It is well known that Backpage gets its name from the New York-based Village Voice newspaper, whose "back pages" were once known for classified advertisements for commercial sex.  It is no accident, therefore, that Backpage makes its money by selling ad space to individuals peddling sex.  Nevertheless, Backpage continues to make public and private pronouncements concerning its efforts to curb prostitution and the sexual exploitation of children, including in letters and testimony to NAAG and state attorneys general.[25]  Backpage maintains that it enforces strict policies prohibiting illegal activity and aggressively monitors its website for illegal content.  It also reportedly filters or screens terms that suggest the subjects of advertisements are minors, and reports suspected child sex trafficking to NCMEC.

State attorneys general have long had concerns about Backpage's role in facilitating human trafficking and have been skeptical of Backpage's claims about its efforts to limit the exploitation of women and children.[26]  The reality is that despite its assurances, Backpage has grown its share of the online market for commercial sex in recent years—a market that is premised almost entirely on illegal activity.[27]  It now hosts an estimated 80 percent of online commercial sex advertising.[28]  Backpage also reportedly generates more than $30 million per year in revenue from advertising in the "adult entertainment" section of its website—the primary

---

[25] *See, e.g.,* Letter from Samuel Fifer, Esq. on Behalf of Backpage.com to NAAG (Sept. 23, 2011), available at http://www.atg.wa.gov/uploadedFiles/Another/News/BACKPAGE_com%20RESPONSE%20TO%20NAAG.PDF ; Written Testimony by Samuel Fifer, Esq. on Behalf of Backpage.com, Massachusetts Attorney General's Hearing on Sexual Exploitation Online (Oct. 29, 2010), available at http://www.mass.gov/ago/docs/community/testimony/backpage-ma-ag.pdf.

[26] Kuzma, *supra* n. 21, at 41-42.

[27] With the exception of a few counties in Nevada, prostitution is illegal throughout the United States.

[28] AIM Group*, Online Prostitution-Ad Revenue Crosses Craigslist Benchmark* (July 2013), http://aimgroup.com/2013/07/10/online-prostitution-ad-revenue-crosses-craigslist-benchmark/ (last visited Feb. 20, 2015); AIM Group, *Monthly Revenue from Online Prostitution Ads Crosses $5 Million* (April 2013), http://aimgroup.com/2013/04/22/monthly-revenue-from-online-prostitution-ads-crosses-5-million/ (last visited Feb. 20, 2015).

source of its revenue.[29]   Even a cursory review of the website reveals that the advertisements

posted in the "escorts" sections of the website all offer sex for sale, and that Backpage does not

enforce its policies restricting the content of such advertisements.[30]   Furthermore, some studies

suggest that as many as ten percent of the advertisements on the website feature children who are

being sold for sex.[31]   Backpage itself has acknowledged that it identifies more than four hundred

advertisements per month that likely involve minors.[32]

     Moreover, as discussed above, the vast majority of state and federal prosecutions for sex

trafficking involve advertisements posted on Backpage.  While Backpage is responsive (to

varying degrees) to requests for information and assistance by law enforcement in connection

with specific investigations, the affirmative monitoring and reporting efforts it touts rarely yield

results.  As the plaintiffs correctly allege, Backpage's "monitoring program" rarely produces

helpful information leading to the identification and/or rescue of exploited children, or to the

prosecution of their traffickers.  (SAC ¶34(iii)).  The reality is that the number of investigations

and prosecutions for which Backpage provides useful assistance is far outweighed by the number

of illegal transactions that Backpage facilitates on a daily basis.

     Motivated by these concerns, NAAG and 51 attorneys general (including Massachusetts)

called on Backpage in 2011 and 2012 to substantiate its claims regarding its efforts to restrict

---

[29] *Id.*

[30] Backpage purports to prohibit postings containing "obscene or lewd and lascivious graphics or photographs which depict genitalia, actual or simulated sexual acts," and "any solicitation directly or in coded fashion for any illegal service, including exchanging sexual favors for money or other valuable consideration."  *See* Backpage Terms of Use, http://boston.backpage.com/online/TermsOfUse (updated Jan. 9, 2014).

[31] *See, e.g.*, ASU News, *Study Finds Extensive Prostitution Ads On Backpage.com* (Sept. 24, 2012), https://asunews.asu.edu/20120924_backpage_study (last visited Feb. 20, 2015).

[32] Letter from NAAG to Samuel Fifer, Esq., Counsel for Backpage.com LLC (Sept. 16, 2011) (referencing admission by Backpage), available at http://www.kirk.senate.gov/pdfs/naagbackpage.pdf.

illegal activity on the website.[33]  Although Backpage professed an intent to cooperate, ultimately

it produced little helpful information.  Instead, Backpage turned its attention to challenging state

laws intended to punish the online commercial exploitation of children.[34]  Since then, Backpage

has not produced any information responsive to NAAG's requests.

In sum, Backpage's recent growth and dominant position in the market belie its supposed

efforts to curb prostitution and child exploitation.  State attorneys general, including the

Massachusetts Attorney General, therefore remain deeply concerned about Backpage's conduct

and its role in facilitating sex trafficking.

## II.    THE PLAINTIFFS CREDIBLY ALLEGE THAT BACKPAGE KNOWINGLY AND ACTIVELY FACILITATES SEX TRAFFICKING

While other websites allow, and perhaps even enable, some amount of unlawful activity

as a consequence of hosting forums for lawful speech or commerce, the plaintiffs allege that

Backpage's very business model is premised on facilitating and profiting from criminal sex

trafficking conduct.  The plaintiffs allege that Backpage both knowingly and purposefully aids

sex traffickers in breaking the law and evading law enforcement.  The plaintiffs' allegations

place Backpage's business conduct squarely within the ambit of both the Massachusetts Anti-

Trafficking Law and Chapter 93A.

### A.  If Proven, the Plaintiffs' Allegations Would Establish That Backpage Does Much More Than Simply Publish Third-Party Advertisements

The plaintiffs allege that Backpage developed its business specifically to profit from the

online advertisement of illegal commercial sex.  The website's name is an explicit reference to

classified advertisements for sex.  (SAC ¶ 23).  It hosts a separate "adult entertainment" section

---

[33] NAAG Letter, *supra* n. 32.

[34] Although Backpage's success in these cases seems to have emboldened the company, the cases involved state laws that were found to conflict directly with the CDA and they therefore have no bearing on the plaintiffs' case. *See, e.g. Backpage.com LLC v. McKenna*, 881 F. Supp. 2d 1262 (W.D. Wash. 2012) (finding the Washington statute likely unconstitutional on First Amendment grounds and likely preempted by the CDA).

where, unlike the rest of the site, users are required to pay substantial fees to post advertisements. (SAC ¶ 43). Within that section, it hosts "escorts" subsections that no reasonable person could understand as offering anything other than illegal prostitution.[35] (SAC ¶¶ 38-39). Backpage "coaches" users through the posting process, allowing them unlimited attempts at entering an appropriate age and an acceptable "description." (SAC ¶¶ 48, 55). Acceptable description terms include numerous words and phrases that clearly convey that the advertisement is for some form of prostitution, and in some cases, that the subject of the advertisement is a minor—but exclude words and phrases most likely to be flagged by law enforcement. (SAC ¶¶ 52-58). Backpage also allows users to pay and post anonymously, and to obscure their contact information (e.g., phone numbers) so as to make the information difficult to search. (SAC ¶¶ 43, 47-49). Backpage even creates (for an extra charge) special "Sponsored Ads" that actually highlight advertisements clearly offering sex for sale, including advertisements that violate Backpage's own supposedly "strict" policies regarding content. (SAC ¶¶ 61-67).

At the same time, the plaintiffs allege, Backpage has taken various affirmative steps to maximize the security of the website for traffickers and to hinder law enforcement, including stripping metadata from uploaded photos and removing advertisements posted by victim support organizations and the police. (SAC ¶¶ 40, 51). The plaintiffs also allege that Backpage touts ineffective "monitoring" and "automatic filtering" programs—while at the same time refusing to utilize available technology to identify instances of child sex trafficking—as part of a deliberate effort to shield pimps and traffickers and mislead law enforcement. (SAC ¶¶ 34-35, 58).

In short, the plaintiffs allege that Backpage does much more than simply publish third-party advertisements that happen to include advertisements for commercial sex. Rather, they

---

[35] Although slightly less explicit, the other subsections in the "adult entertainment" section—including "body rubs" and "adult jobs"—are also known for containing advertisements for prostitution.

allege that Backpage has implemented and honed a business model designed to profit from aiding pimps and traffickers in illegal activity, including the sexual exploitation of children. In other words, Backpage knowingly and actively engaged in conduct that materially assisted the men who trafficked Jane Doe Numbers 1, 2, and 3.

### B. Backpage's Alleged Facilitation of Sex Trafficking Violates the Massachusetts Anti-Trafficking Law and Chapter 93A

Plaintiffs have adequately alleged violations of the Massachusetts Anti-Trafficking Law and Chapter 93A.

#### 1. Massachusetts Anti-Trafficking Law

The Massachusetts Anti-Trafficking Law includes civil enforcement provisions intended to allow victims of human trafficking to vindicate their own rights and to recover damages directly from their traffickers for the physical, psychological, and financial harms inflicted on them. The statute also recognizes that many different kinds of business operations—both legitimate and otherwise—facilitate human trafficking. Accordingly, the statute makes it unlawful to benefit financially from sex trafficking and provides that "[a]ny business entity that knowingly aids . . . in trafficking of persons for sexual servitude shall be civilly liable." Mass. Gen. Laws c. 265, § 50(a)(ii), (d).

The plaintiffs have alleged that Backpage runs a very lucrative business premised on facilitating pimps and traffickers in the sale of women and children for sex. Backpage knows that its website and related services (e.g., its messaging services and affiliate program) are a critical component of the methods employed by many traffickers, and that minors are trafficked through its website. (SAC ¶¶ 4-6, 50, 68-70). In fact, assuming the truth of the plaintiffs' allegations, Backpage intentionally promotes sex trafficking by protecting (or even expanding) the market for illegal commercial sex and by helping traffickers both to develop effective

advertisements and to evade detection and prosecution.  These actions fall within the plain meaning of the terms "knowingly" and "aid," and constitute precisely the type of conduct that the Massachusetts Anti-Trafficking Law was intended to prohibit.[36]  *See Go-Best Assets Ltd. v. Citizens Bank of Mass.*, 463 Mass. 50, 64 (2012) (defendant may liable for aiding and abetting a tort where it knew the primary wrongdoer was committing the tort and actively participated or substantially assisted in the commission of the tort); Restatement (Second) of Torts, § 876(b).

    2.  <u>Chapter 93A</u>

Chapter 93A contains a broad prohibition against "unfair or deceptive acts or practices in the conduct of any trade or commerce." Mass. Gen. Laws c. 93A, § 2.  The plain language of the statute is disjunctive, prohibiting unfair *or* deceptive business conduct.  While particular acts or practices may be (and often are) both unfair *and* deceptive, proof of deception is not required to sustain a claim under the statute.  *See, e.g.*, *Massachusetts Farm Bureau Federation, Inc. v. Blue Cross of Massachusetts, Inc.*, 403 Mass. 722, 729 (1989); *Service Publications, Inc. v. Goverman*, 396 Mass. 567, 578-79 (1986).  Accordingly, the plaintiffs here can—and do—state a claim against Backpage under Chapter 93A based solely on its grossly unfair business conduct.

The Supreme Judicial Court of Massachusetts has established three bases for finding unfairness: (1) when an act or practice is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) when it is immoral, unethical, oppressive, or unscrupulous; or (3) when it causes substantial injury to consumers.  *Klairmont v. Gainsboro Restaurant, Inc.*, 465 Mass. 165, 175 (2013) (citing *PMP Assocs., Inc. v. Globe Newspaper Co.*, 366 Mass. 593, 596 (1975)).  Backpage's allegedly calculated facilitation of

---

[36] The Oxford English Dictionary defines "knowingly" to mean:  "With knowledge or awareness (of what one is doing, of a fact, etc.); consciously, intentionally."  It defines "aid" to mean any of the following: "(a) To give help, support, or assistance to (a person); to relieve from difficulty or distress, to succor; (b) To be or constitute an aid to (a person or thing); to promote or encourage; to facilitate; or (c) To give help, support, or assistance; to help *to* do something; to assist *in* (also *with*) an undertaking; to be of assistance."

illegal sex trafficking arguably falls within all three categories of unfairness.  Moreover, the plaintiffs have met their burden at this stage of pleading a plausible causal connection between Backpage's facilitation of sex trafficking and the undisputed harm they suffered.  *See, e.g.*, *Katin v. Nat'l Real Estate Info. Servs., Inc.,* 2009 WL 929554, at *7, 10 (D. Mass. 2009) (*Twombly* standards for pleading injury in fact and causation can be met by establishing the overall effect of the defendant's unlawful behavior on the relevant market and the likelihood of harm to the plaintiff).  Backpage allegedly fostered a market for the illegal sale of children for sex, helped to increase the number of "sales" of each girl, and protected the traffickers from identification and prosecution.  It is enough that the plaintiffs were injured as an indirect result of Backpage's business conduct, even though they did not themselves purchase ad space or engage in any financial transaction with Backpage.[37]  *See* Mass. Gen. Laws c. 93A, § 1(b) ("'Trade' and 'commerce' . . . shall include any trade or commerce directly *or indirectly* affecting the people of this commonwealth.") (emphasis added).  It is well-established state law that parties need not be in privity for their actions to come within the reach of Chapter 93A, and that *any* person who has been injured may pursue claims under the statute.  *See Ciardi v. F. Hoffmann-La Roche, Ltd.*, 436 Mass. 53, 58-59 (2002); *Kattar v. Demoulas*, 433 Mass. 1, 14-15 (2000).

Finally, while the plaintiffs do allege that Backpage has intentionally deceived the public and law enforcement in order to protect its profits and prevent more intense scrutiny, these allegations do not "sound in fraud" such that they must be pled with particularity.  Backpage's allegedly deceptive scheme is better viewed as a component of its unfair business practices, rather than an independent basis for liability under Chapter 93A.  However, to the extent that the

---

[37] The Attorney General has successfully relied on a similar theory of liability in a number of cases involving unfair or deceptive practices in the mortgage industry.  For example, in recovering hundreds of millions of dollars in relief for distressed homeowners, the Attorney General obtained settlements from investment banks based, in part, on the theory that they facilitated unlawful conduct, even though these entities did not directly interact with borrowers.

plaintiffs are seeking to hold Backpage liable for separately deceptive acts and practices, it still

would not be fair to characterize their allegations as sounding in fraud and thus triggering the

heightened pleading standard imposed by Fed. R. Civ. P. 9(b).

   Massachusetts courts interpreting Chapter 93A have consistently held that the statute is

"sui generis" in that "it is neither wholly tortious nor wholly contractual in nature, and is not

subject to the traditional limitations of preexisting causes of action such as tort for fraud and

deceit." *Slaney v. Westwood Auto, Inc.*, 366 Mass. 688, 703-04 (1975) (citing cases interpreting

similar provisions of the Federal Trade Commission Act).   Moreover, Massachusetts courts have

consistently held that because the concept of unfair or deceptive acts or practices "goes far

beyond the scope of the common law action for fraud and deceit," causes of action under

Chapter 93A are not subject to the same pleading requirements.[38]   *See Slaney,* 366 Mass. at 703;

*U.S. Funding Inc. of America v. Bank of Boston Corp*, 28 Mass. App. Ct. 404, 407 (1990)

(specifically refusing to apply Mass. R. Civ. P. 9(b)).   In fact, the elements of a Chapter 93A

claim are materially different than the elements of common law fraud.[39]   *See Demoulas*, 433

Mass. at 12-13, *citing Nei v. Burley,* 388 Mass. 307, 313 (1983) ("[A]nalogies between common

law claims for breach of contract, fraud, or deceit and claims under c. 93A are inappropriate

---

[38] We recognize that some federal courts have concluded otherwise. *See, e.g., Schwartz v. Indep. Appraisals, LLC*, 2011 WL 5593108 (D. Mass. 2011); *Martin v. Mead Johnson Nutrition Co.*, 2010 WL 3928707 (D. Mass. 2010). We respectfully submit that these cases misinterpret Massachusetts law.  In fact, none even addresses state court interpretations of Chapter 93A.  For the reasons set forth above, Rule 9(b) should not apply, particularly where the plaintiffs have not asserted separate claims for fraud or misrepresentation based on the same underlying conduct.

[39] An act is deceptive if it "could reasonably be found to have caused a person to act differently from the way he [or she] otherwise would have acted," *Purity Supreme, Inc. v. Attorney Gen.*, 380 Mass. 762, 777 (1980), or if it has "a tendency to deceive," *Leardi v. Brown*, 394 Mass. 151, 156 (1985).  The Attorney General, acting pursuant to her authority under G.L. c. 93A, § 2(c), has also promulgated regulations defining "misrepresentation" generally and outlining a number of specific acts and practices that violate the statute. *See* 940 CMR 3.00, *et seq.*  Importantly, neither the case law nor the regulations interpreting Chapter 93A require proof of actual reliance by the plaintiff on a misrepresentation, or proof that the defendant knew that the representation was false. *Slaney*, 366 Mass. at 703; *see also Hershenow v. Enterprise Rent-A-Car Company Of Boston, Inc.*, 445 Mass. 790, 800 n. 20 (2006) ("'Causation' is not, of course, the same as 'reliance' and the latter is not an essential element of a G.L. c. 93A claim.").  Both of these are essential elements of common law fraud.

because c. 93A dispenses with the need to prove many of the essential elements of those common law claims."). Thus, to equate deception under Chapter 93A with common law fraud and apply Rule 9(b)'s pleading requirements would improperly undercut this critical state law.

### III. THE COMMUNICATIONS DECENCY ACT DOES NOT PREEMPT STATE LAWS PROHIBITING ACTIVE PARTICIPATION IN SEX TRAFFICKING

The immunity that Congress conferred on websites is broad, but it is not without limitation. By its own terms, the CDA does not preempt state law claims that are consistent with Section 230. *See* 47 U.S.C. § 230(e)(3) ("[n]othing in this section shall be construed to prevent any State from enforcing any State law that is consistent with this section"). Because the plaintiffs' claims under the Massachusetts Anti-Trafficking Law and Chapter 93A seek to hold Backpage liable for its own business conduct—including both purposefully aiding sex traffickers in breaking the law and evading law enforcement, and contributing to development of illegal commercial sex advertisements—these state law claims are consistent with the purpose and scope of the CDA and should be allowed to proceed.

The CDA generally protects interactive computer service providers by preempting state law claims that (1) treat them as the publishers or speakers of content provided by third parties; or (2) hold them liable for good faith efforts to restrict objectionable material. 47 U.S.C. § 230(c). Congress's reasons for granting such broad immunity were twofold. Congress wanted to ensure the continued growth of free speech and free markets on the Internet. *Id.* § 230(b). At the same time, Congress also wanted to encourage the development and utilization of technologies that shield children from obscene or otherwise objectionable online material.[40] *Id.*

---

[40] One of Congress's primary goals in enacting the CDA was to protect children. In fact, the CDA originally contained provisions that criminalized the transmission of obscene or indecent materials to minors. The Supreme Court struck down these provisions on First Amendment grounds in *Reno v. American Civil Liberties Union*, 521 U.S. 844 (1997). This history is one more reason that the CDA should be interpreted narrowly enough that it cannot be used by websites like Backpage to avoid liability for the sexual exploitation of children.

Because freedom of speech requires the protection of objectionable speech, Congress had good reason to shield legitimate websites from liability for harmful content posted by third parties, even when such content is foreseeable. *See Zeran v. America Online, Inc.*, 129 F.3d 327, 331 (4th Cir. 1997) ("[t]he specter of tort liability in an area of such prolific speech [as the Internet] would have an obvious chilling effect"). This logic behind CDA immunity does not apply, however, when the sole object of the website (or a portion thereof) is to host *illegal* content, or even worse, when the website is used as part of a scheme to facilitate illegal activity. Unlike America Online or Yahoo!, for example, which were sued for failing to restrict defamatory or otherwise tortious material (and appropriately protected under the CDA), Backpage's alleged role in sex trafficking is not an unfortunate or unavoidable consequence of free speech and commerce online. *See Barnes v. Yahoo!, Inc.*, 570 F.3d 1096 (9th Cir. 2009); *Zeran,* 129 F.3d 327, *supra.* Instead, assuming the truth of the plaintiffs' allegations, Backpage actively encourages, develops, and safeguards online advertisements selling sex and similar illicit content. In fact, its business model is predicated on facilitating and protecting criminal activity. Courts have declined to grant CDA immunity under far less egregious circumstances.

In *Fair Housing Council of San Fernando Valley v. Roommates.com LLC*, 521 F.3d 1157 (9th Cir. 2008), for example, the Ninth Circuit found that the defendant website could be held liable for "inducing third parties to express illegal preferences" via its own questionnaire including unlawful criteria, in violation of the Fair Housing Act. *Id*. at 1165-69. The court reasoned that a website helps to develop unlawful content if it contributes materially to the alleged illegality of the conduct. *Id*. at 1168. Similarly, in *FTC v. Accusearch, Inc.*, 570 F.3d 1187 (10th Cir. 2009), the Tenth Circuit found that the defendant website could be held liable "for the conversion of legally protected records from confidential material to publicly exposed

18

information," even though it essentially acted as an intermediary between the customers seeking the information and the researchers providing the information. *Id*. at 1199. The court emphasized the fact that the defendant knew the information was confidential and that researchers were likely to use improper methods. The court concluded that the defendant's actions were not "neutral" with respect to the offensive content, but rather "the offensive postings were [the defendant's] *raison d'etre* and it affirmatively solicited them." *Id*. at 1200.

Finally, in *Moving and Storage, Inc. v. Panayotov,* 2014 WL 949830 (D. Mass. 2014, O'Toole, J.), the court found that the operators of a moving company review website could be held liable for their "ill-intentioned" manipulation of customer reviews, coupled with their representations as to the accuracy and quality of the information available on the site. The court reasoned that the plaintiffs' claims against the website (including claims under Chapter 93A) did not seek to treat the defendants as the publisher or speaker of the customer reviews, and that the plaintiffs "[brought] 'causes of action based not on the defendants' publishing conduct but on their representations regarding such conduct, which would not be immunized under the CDA.'" *Id.* at *2 (citations omitted). The court went on to reject the defendants' claims that they merely filtered out inaccurate or suspect content, concluding that the plaintiffs had sufficiently alleged bad faith and that the issue was "better resolved on a developed factual record." *Id*.

As in these cases, the plaintiffs here allege that Backpage's own conduct runs afoul of laws intended to protect the public from a number of serious harms.[41] If the plaintiffs'

---

[41] A number of other courts in Massachusetts and elsewhere have denied motions to dismiss based on factual disputes as to whether the defendants in those cases participated in the development or creation of the content at issue and therefore were not eligible for CDA immunity. *See, e.g.*, *FTC v. LeanSpa, LLC*, 920 F. Supp. 2d 270 (D. Conn. 2013); *Suk Jae Chang v. Wozo LLC*, 2012 WL 1067643 (D. Mass. 2013); *Cybersitter, LLC v. Google, Inc.*, 905 F. Supp. 2d 1080 (C.D. Cal. 2012); *Fraley v. Facebook, Inc.*, 830 F. Supp. 2d 785 (N.D. Cal. 2011); *AlviArmani Med., Inc. v. Hennessey*, 629 F. Supp. 2d 1302 (S.D. Fla. 2008); *Hy Cite Corp. v. BadBusinessBureau.com*, 418 F. Supp. 2d 1142 (D. Ariz. 2005); *MCW, Inc. v. BadBusinessBureau.com*, 2004 WL 833595 (N.D. Tex. 2004); *see also NPS LLC v. Stubhub, Inc.*, 2009 WL 995483 (Mass. Super. 2009, Gants, J.).

allegations are true, Backpage does not operate as a neutral host for online speech and commerce (as contemplated by Section 230(c)(1)), nor does it engage in good faith efforts to monitor and remove offensive content from its website (as contemplated by Section 230 (c)(2)).  Instead, Backpage is in the business of facilitating illegal prostitution and sex trafficking.  Accordingly, subjecting Backpage to potential civil liability is entirely consistent with both the purpose and scope of the CDA.  To find that the CDA preempts state law and shields Backpage from liability would unreasonably and unnecessarily undermine laws enacted by the Commonwealth in the exercise of its traditional police powers.[42]  It would also allow Backpage and others like it to break the law with impunity, deprive victims of adequate remedies for the harms inflicted on them, and impede effective law enforcement.  Certainly this is not the result Congress intended.

## CONCLUSION

For the foregoing reasons, the court should deny Backpage's motion to dismiss and permit the plaintiffs to proceed with their claims.

Respectfully submitted,

COMMONWEALTH OF MASSACHUSETTS
ATTORNEY GENERAL
MAURA HEALEY

/s/ Genevieve C. Nadeau

GENEVIEVE C. NADEAU (BBO No. 677566)
Assistant Attorney General
Civil Rights Division
Office of the Attorney General
One Ashburton Place
Boston, MA 02108
(617) 727-2200
Dated: February 20, 2015          genevieve.nadeau@state.ma.us

---

[42] *See e.g.,* Ryan J.P. Dyer, *The Communications Decency Act Gone Wild: A Case for Renewing the Presumption Against Preemption*, 37 Seattle U. L. Rev. 837 (Winter 2014).

## CERTIFICATE OF SERVICE

I, Genevieve C. Nadeau, hereby certify that this *Brief of Amicus Curiae Commonwealth of Massachusetts In Support of Plaintiffs' Opposition to Motion to Dismiss*, filed through the CM/ECF system, will be sent electronically to the below named registered participants identified on the Notice of Electronic Filing, and that paper copies will be sent to those indicated as non-registered participants, if any, on this date.

For Plaintiffs:

John T. Montgomery
Aaron M. Katz
Dara A. Reppucci
Jessica L. Soto
Christine E. Singer
Cassandra Bolanos
ROPES & GRAY LLP
800 Boylston Street
Boston, MA 02199
john.montgomery@ropesgray.com
aaron.katz@ropesgray.com
dara.reppucci@ropesgray.com
jessica.soto@ropesgray.com
christine.singer@ropesgray.com
cassandra.bolanos@ropesgray.com

For Defendants:

Robert A. Bertsche
Jeffrey J. Pyle
PRINCE LOBEL TYE LLP
100 Cambridge Street, Suite. 2200
Boston, MA 02114
rbertsche@princelobel.com
jpyle@princelobel.com

James C. Grant
Ambika K. Doran
DAVIS WRIGHT TREMAINE LLP
1201 Third Avenue, Suite. 2200
Seattle, WA 98101
jimgrant@dwt.com
ambikadoran@dtw.com

Dated: February 20, 2015

*/s/ Genevieve C. Nadeau*
Genevieve C. Nadeau