UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JANE DOE NO. 1, a minor child, by her parent and next friend MARY ROE, JANE DOE NO. 2, and JANE DOE NO. 3, a minor child, by her parents and next friends SAM LOE and SARA LOE,<br><br>      Plaintiffs,<br><br>      vs.<br><br>BACKPAGE.COM, LLC, CAMARILLO HOLDINGS, LLC (f/k/a VILLAGE VOICE MEDIA HOLDINGS, LLC, and NEW TIMES MEDIA, LLC,<br><br>      Defendants. | Civil Action No. 14-13870-RGS<br><br>**Leave to File Granted February 20, 2015** |

**BRIEF OF *AMICI CURIAE* CITY AND COUNTY OF SAN FRANCISCO, CITY OF ATLANTA, CITY AND COUNTY OF DENVER, CITY OF HOUSTON, CITY OF PHILADELPHIA AND CITY OF PORTLAND IN SUPPORT OF PLAINTIFFS**

---

DENNIS J. HERRERA, CA State Bar #139669
City Attorney
VICTORIA WONG, CA State Bar #214289
MOLLIE LEE, CA State Bar #251404
ELIZABETH PEDERSON, CA State Bar #288184
MARK D. LIPTON, CA State Bar #152864, BBO#652968
Deputy City Attorneys
City Hall, Room 234
1 Dr. Carlton B. Goodlett Place
San Francisco, California 94102-4682
Telephone:      (415) 554-4721
Facsimile:      (415) 554-4757
E-Mail:  victoria.wong@sfgov.org

Attorneys for *Amicus Curiae*
THE CITY AND COUNTY OF SAN FRANCISCO

SHELLEY R. SMITH, PA State Bar
#56171
City Solicitor
City of Philadelphia Law Department
1515 Arch Street
Philadelphia, PA  19102
Telephone:     (404) 546-4100
E-Mail:  Shelley.Smith@phila.gov

Attorney for *Amicus Curiae*
MICHAEL A. NUTTER, MAYOR
OF PHILADELPHIA


TRACY REEVE, OSB # 891123
City Attorney
Harry Auerbach, OSB # 821830
Chief Deputy City Attorney
430 City Hall
1221 SW Fourth Ave.
Portland, Oregon 97204
Telephone:     (503) 823-4047
E-Mail:
Tracy.Reeve@portlandoregon.gov

Attorneys for *Amicus Curiae*
CITY OF PORTLAND, OREGON


D. SCOTT MARTINEZ
City Attorney
City and County of Denver
1437 Bannock Street, Room 353
Denver, CO 80202
Telephone:     (720) 865-8770
E-Mail:
scott.martinez@denvergov.org

Attorney for *Amicus Curiae*
MICHAEL B. HANCOCK, MAYOR
OF THE CITY AND COUNTY OF
DENVER

DONNA L. EDMUNDSON, TX State Bar
#06432100
Houston City Attorney
900 Bagby Street, 4th Floor
Houston, Texas  77002
Telephone:     (832) 393-3628
Facsimile:     (832) 393-6259
E-Mail:
donna.edmundson@houstontx.gov

Attorney for *Amicus Curiae*
CITY OF HOUSTON


CATHY HAMPTON
City Attorney
City of Atlanta Law Department
55 Trinity Avenue, SW, Suite 5000
Atlanta, Georgia 30303
Telephone:     (404) 546-4100
E-Mail:
cathyhampton@atlantaga.gov

Attorney for *Amicus Curiae*
CITY OF ATLANTA

## CORPORATE DISCLOSURE STATEMENT

None of the *Amici* have a parent corporation. No publicly held company owns more than 10% of stock in any of the *Amici*.

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...........................................................................................................ii

INTRODUCTION AND INTEREST OF *AMICI CURIAE* ................................................. 1

DISCUSSION ............................................................................................................................ 2

I.    CONGRESS DID NOT INTEND FOR SECTION 230 TO PROVIDE IMMUNITY FOR ENTITIES THAT DEVELOP ONLINE CONTENT AND ENGAGE IN ILLEGAL BUSINESS PRACTICES. ................................................. 2

II.    SECTION 230 DOES NOT PROTECT WEBSITES FROM CLAIMS BASED ON INFORMATION THAT THE WEBSITE ITSELF DEVELOPS. ......................... 4

    A.    Section 230(c)(1) Does Not Provide Immunity When a Website Operator Interacts with Third-Party Content in a Way that Materially Contributes to the Alleged Illegality. ................................................................. 5

    B.    Section 230(c)(1) Does Not Provide Immunity When Claims Are Based on Information that Results from Defendants' Own Business Practices. ........... 8

III.    BACKPAGE IS NOT IMMUNE UNDER SECTION 230 BECAUSE IT HELPED DEVELOP THE INFORMATION AT ISSUE. ........................................... 9

    A.    Backpage Is Not a Passive Publisher but Rather Actively Develops Escort Ads ........................................................................................................ 10

    B.    Backpage's Business Practices Communicate to Users the Information that Its Escorts Section Is a Marketplace for the Illegal Sale of Sex. 12

IV.    BACKPAGE'S PROPOSED INTERPRETATION OF SECTION 230 WOULD EVISCERATE LOCAL GOVERNMENTS' ABILITY TO ENFORCE LAWS OF GENERAL APPLICABILITY. .......................................................................... 14

CONCLUSION ....................................................................................................................... 15

## <u>TABLE OF AUTHORITIES</u>

**Federal Cases**

*800-JR Cigar, Inc. v. GoTo.com, Inc.*,
   437 F. Supp. 2d 273 (D.N.J. 2006) ...................................................................... 10, 17

*Alvi Armani Med., Inc. v. Hennessey*,
   629 F. Supp. 2d 1302 (S.D. Fla. 2008) ...................................................................... 13

*Anthony v. Yahoo! Inc.*,
   421 F. Supp. 2d 1257 (N.D. Cal. 2006) ...................................................................... 9

*Barnes v. Yahoo!, Inc.*,
   570 F.3d 1096 (9th Cir. 2009) ...................................................................... 11

*Batzel v. Smith*,
   333 F.3d 1018 (9th Cir. 2003) ...................................................................... 3

*Ben Ezra, Weinstein, & Co., Inc., v. America Online Inc.*,
   206 F.3d 980 (10th Cir. 2000) ...................................................................... 7

*Boston Gas Co. v. Century Indem. Co.*,
   2006 WL 1738312, at *1 n.1 (D. Mass. June 21, 2006) ...................................................................... 1

*Carafano v. Metrosplash.com, Inc.*,
   339 F.3d 1119 (9th Cir. 2003) ...................................................................... 7

*Chicago Lawyers' Comm. for Civil Rights Under Law, Inc. v. Craigslist, Inc.*,
   519 F.3d 666 (7th Cir. 2008) ...................................................................... 11, 16

*Cisneros v. Sanchez*,
   403 F. Supp. 2d 588 (S.D. Tex. 2005) ...................................................................... 8

*Dart v. Craigslist, Inc.*,
   665 F. Supp. 2d 961 (N.D. Ill. 2009) ...................................................................... 12

*Doe v. City of New York*,
   583 F. Supp. 2d 444 (S.D.N.Y. 2008) ...................................................................... 13

*Doe v. GTE Corp.*,
   347 F.3d 655 (7th Cir. 2003) ...................................................................... 13

*Doe No. 14 v. Internet Brands, Inc.*,
   767 F.3d 894 (9th Cir. 2014) ...................................................................... 18

*F.T.C. v. Accusearch, Inc.*,
   570 F.3d 1187 (10th Cir. 2009) ...................................................................... 9, 16

*Fair Housing Council of San Fernando Valley v. Roommates.com*,
  521 F.3d 1157 (9th Cir. 2008) ............................................................... *passim*

*Fraley v. Facebook, Inc.*,
  830 F. Supp. 2d 785 (N.D. Cal. 2011) ............................................................ 9

*Green v. America Online*,
  318 F.3d 465 (3d Cir. 2003) ............................................................................ 7

*Hy Cite Corp. v. Badbusinessbureau.com, L.L.C.*,
  418 F. Supp. 2d 1142 (D. Ariz. 2005) ..................................................... 8, 16

*Levitt v. Yelp!, Inc.*,
  No. C-10-1321 EMC, 2011 WL 5079526, at *9
  (N.D. Cal. Oct. 26, 2011) ............................................................................ 10

*M.A. v. Village Voice Media Holdings*,
  809 F. Supp. 2d 1041 (E.D. Mo. 2011) ...................................................... 12

*MCW, Inc. v. Badbusinessbureau.com, L.L.C.*,
  No. Civ. A. 3:02-CV-2727-G, 2004 WL 833595, at *10
  (N.D. Tex. Apr. 19, 2004) ........................................................................ 8, 16

*Moving and Storage, Inc. v. Panayotov*,
  No. CIV.A. 12-12262-GAO, 2014 WL 949830
  (D. Mass. Mar. 12, 2014) ............................................................... 10, 14, 15

*Nemet Chevrolet, Ltd. v. Consumeraffairs.com,
  Inc.*, 591 F.3d 250 (4th Cir. 2009) ............................................................. 11

*Perkins v. LinkedIn Corp.*,
  No. 13-CV-04303-LHK, 2014 WL 6618753, at *13-15
  (N.D. Cal. Nov. 13, 2014) .............................................................................. 9

*Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*,
  632 F.3d 762 (1st Cir. 2011) ........................................................................... 1

*Romero v. Allstate Ins. Co.*,
  271 F.R.D. 96 (E.D. Pa. 2010) .................................................................... 13

*Stayart v. Yahoo! Inc.*,
  651 F. Supp. 2d 873 (E.D. Wis. 2009) *aff'd*, 623 F.3d 436
  (7th Cir. 2010) .............................................................................................. 15

*Stevo Design, Inc. v. SBR Mktg. Ltd.*,
  968 F. Supp. 2d 1082, 1091 (D. Nev. 2013) ................................................ 13

*Suk Jae Chang v. Wozo LLC*,
  2012 WL 1067643, at *14 (D. Mass. Mar. 28, 2012) .................................. 15

*United States v. Ulbricht,*
   31 F.Supp.3d 540 (S.D.N.Y. 2014) ....................................................................... 11

*Universal Comm. Sys., Inc. v. Lycos, Inc.,*
   478 F.3d 413 (1st Cir. 2007) .................................................................... 5, 7, 12

*Williams v. Sprint/United Mgmt. Co.,*
   230 F.R.D. 640 (D. Kan. 2005) .......................................................................... 13

*Zeran v. America Online, Inc.,*
   129 F.3d 327 (4th Cir. 1997) .............................................................................. 7

**Federal Statutes**
17 U.S.C. §§ 101 ................................................................................................. 2

18 U.S.C. § 1595 ................................................................................................. 2

47 U.S.C. §230 ......................................................................................... *passim*

47 U.S.C. §230(c) .................................................................................. 2, 4, 5, 12

47 U.S.C. § 230(c)(1) ........................................................................ 6, 7, 12, 17

47 U.S.C. § 230(f)(3) ............................................................................... 5, 7, 12

**State Cases**
*Demetriades v. Yelp, Inc.,*
   228 Cal. App. 4th 294 (2014) ............................................................................. 11

*Hardin v. PDX, Inc.,*
   227 Cal. App. 4th 159 (2014), *as modified on denial of reh'g*
   *(July 21, 2014), review denied (Sept. 24, 2014)* .......................................... 13

*Lake v. City of Phoenix,*
   222 Ariz. 547 (2009) .......................................................................................... 13

*NPS LLC v. StubHub, Inc.,*
   No. 06-4874-BLS1, 2009 WL 995483, at *10
   (Mass. Super. Ct. Jan. 26, 2009) ............................................................. 10, 11, 17

*O'Neill v. City of Shoreline,*
   170 Wash. 2d 138 (2010) ................................................................................... 13

*Stratton Oakmont, Inc. v. Prodigy Servs. Co.,*
   1995 WL 323710 (N.Y. Sup. Ct. May 24, 1995) ............................................... 4

**State Statutes & Codes**
Mass. Gen. Laws ch. 93A, § 9 .............................................................................. 2

Mass. Gen. Laws ch. 214, § 3A ........................................................................... 2

Mass. Gen. Laws ch. 265, § 50 ............................................................................... 2

R.I. Gen. Laws § 9-1-28.1 ..................................................................................... 2

**Other References**
141 Cong. Rec. H8281-02 (daily ed. Aug. 2, 1995)
    (statement of Rep. Wyden) ............................................................................ 3

141 Cong. Rec. H8460-01 (daily ed. Aug. 4, 1995)
    (statement of Rep. Cox) ................................................................................. 3

Amanda Walker-Rodriguez and Rodney Hill, *Human Sex Trafficking*, FBI Law Enforcement Bulletin
    (March 2011), http://leb.fbi.gov/2011/march/human-sex-trafficking ................................................. 1

H.R. Conf. Rep. No. 104-458, at 194 (1996) ........................................................ 4

*Merriam-Webster's Collegiate Dictionary* 641 (11th ed. 2003) ......................... 16

Paul Ehrlich, *Communications Decency Act § 230*, 17 Berkeley Tech. L.J. 401, 410 (2002) .............. 4

Robert Cannon, *The Legislative History of Senator Exon's Communications Decency Act: Regulating Barbarians on the Information Superhighway*, 49 Fed. Comm. L.J. 51, 68 (1996) ......................... 4

Thorn, *Child Trafficking Statistics*, http://www.wearethorn.org/child-trafficking-statistics (last visited Feb. 14, 2015) ............................................................................................... 1

U.S. Department of Homeland Security, *Blue Campaign: What is Human Trafficking?*
    (http://www.dhs.gov/blue-campaign/what-human-trafficking, last visited February 17, 2015) ........ 1

William Adams et. al, *Effects of Federal Legislation on the Commercial Sexual Exploitation of Children*, Juvenile Justice Bulletin, 1 (July 2010), https://www.ncjrs.gov/pdffiles1/ojjdp/228631.pdf
    ......................................................................................................................... 1

## INTRODUCTION AND INTEREST OF *AMICI CURIAE*

*Amici* are local governments with a strong interest in combating child sex trafficking.[1] Estimates suggest that up to 300,000 children are trafficked in the United States each year. *See* William Adams et. al, *Effects of Federal Legislation on the Commercial Sexual Exploitation of Children*, Juvenile Justice Bulletin, 1 (July 2010), https://www.ncjrs.gov/pdffiles1/ojjdp/228631.pdf. Human trafficking, including both sex and labor trafficking, is the second-most profitable criminal enterprise in the world and the fastest-growing type of organized crime. *See* U.S. Department of Homeland Security, *Blue Campaign: What is Human Trafficking?* (http://www.dhs.gov/blue-campaign/what-human-trafficking, last visited February 17, 2015); Amanda Walker-Rodriguez and Rodney Hill, *Human Sex Trafficking*, FBI Law Enforcement Bulletin (March 2011), http://leb.fbi.gov/2011/march/human-sex-trafficking. An estimated 63% of children sold for sex in the United States were trafficked online. *See* Thorn, *Child Trafficking Statistics*, http://www.wearethorn.org/child-trafficking-statistics (last visited Feb. 14, 2015).

According to the allegations in the complaint, the defendants in this case (collectively "Backpage") play an integral role in the sale of children for sex.[2] Plaintiffs have stated claims that Backpage violates the federal Trafficking Victims Protection Reauthorization Act (18 U.S.C. § 1595), the Massachusetts Anti-Human Trafficking and Victim Protection Act (Mass. Gen. Laws ch. 265, § 50), the Massachusetts statute prohibiting unfair and deceptive acts and practices (Mass. Gen. Laws ch. 93A, § 9), the Massachusetts and Rhode Island statutes prohibiting the unauthorized use of pictures of a person (Mass. Gen. Laws ch. 214, § 3A & R.I. Gen. Laws § 9-1-28.1) and the federal Copyright

---

[1] No party or counsel for a party authored this brief in whole or in part, and no person or entity, other than *Amici Curiae* or their counsel, made any monetary contribution to fund the preparation or submission of this brief. As explained further in the accompanying motion, *Amici* request that the Court exercise its inherent discretion to accept this brief. *See Boston Gas Co. v. Century Indem. Co.*, 2006 WL 1738312, at *1 n.1 (D. Mass. June 21, 2006) (stating that although "no procedural rule provides for filing of amicus briefs in federal district court, courts have inherent authority and discretion to appoint amici").

[2] For the purposes of this brief, *Amici* assume that all allegations in the complaint are true and construed in the light most favorable to plaintiffs, following the rule that applies to judicial review of a 12(b)(6) motion to dismiss. *See Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*, 632 F.3d 762, 771 (1st Cir. 2011) (stating rule).

Act (17 U.S.C. §§ 101 *et seq*.). Backpage's Motion to Dismiss argues that it is immune from liability under Section 230(c) of the Communications Decency Act (CDA) because, according to Backpage, it is merely the passive host of a domain in which third parties post advertisements that sometimes lead to the illegal sale of children for sex. Dkt. No. 24 at 2. As Plaintiffs explain in their opposition to Backpage's Motion to Dismiss, the CDA does not bar Plaintiffs' suit for many reasons, including that Plaintiffs' claims do not treat Backpage as the "publisher" of third-party content. Instead, Plaintiffs challenge Backpage's own participation in child trafficking and other unlawful acts, in violation of state and federal law.

*Amici* agree with Plaintiffs that the CDA does not apply because Plaintiffs' claims do not treat Backpage as a publisher and write separately to argue that the CDA does not apply for the additional reason that Backpage materially contributes to illegal activity as an "information content provider." *Amici* respectfully urge the court to construe the CDA to distinguish between neutral internet service providers and those that also act as "information content providers" and facilitate illegal conduct through their own actions. This interpretation of the CDA is critical to preserve local governments' ability to enforce laws designed to protect children from sex trafficking, as well as numerous other civil and criminal laws.

Here, Section 230 provides no immunity because Backpage allegedly does far more than simply display ads submitted by third parties. Instead, it actively facilitates sex trafficking by 1) materially contributing to the development and promotion of advertisements to sell children for sex on its website, and 2) engaging in business practices that communicate to posters and users the information that the "Escorts" section of the website is a marketplace for the illegal sale of sex.

## DISCUSSION

## I.  CONGRESS DID NOT INTEND FOR SECTION 230 TO PROVIDE IMMUNITY FOR ENTITIES THAT DEVELOP ONLINE CONTENT AND ENGAGE IN ILLEGAL BUSINESS PRACTICES.

In enacting the CDA, Congress never intended to shield websites from liability for their own illegal conduct. Rather, a primary purpose of the CDA was to protect minors from obscene and indecent material displayed over the internet. *Batzel v. Smith*, 333 F.3d 1018, 1026 (9th Cir. 2003). To

that end, Congress adopted Section 230 of the CDA—captioned "Protection for private blocking and screening of offensive material"—specifically to encourage internet service providers to screen out objectionable material without fear of liability. Section 230 began as the "Internet Freedom and Family Empowerment Act," an amendment to the CDA with a primary goal of better protecting children online. 141 Cong. Rec. H8281-02 (daily ed. Aug. 2, 1995) (statement of Rep. Wyden). To meet this objective, the amendment sought to "protect computer Good Samaritans, online service providers, anyone who provides a front end to the Internet" and "takes steps to screen indecency and offensive material for their customers" because "they should not face [liability] for helping . . . [to] solve this problem." 141 Cong. Rec. H8460-01 (daily ed. Aug. 4, 1995) (statement of Rep. Cox).

In large part, the CDA was a response to *Stratton Oakmont, Inc. v. Prodigy Servs. Co.,* which imposed liability on an online service provider for hosting defamatory third-party content. 1995 WL 323710 (N.Y. Sup. Ct. May 24, 1995) (finding that because defendant exercised editorial control by deleting some objectionable posts, it was liable for the remaining third-party content as its publisher). Congress feared that this decision would discourage website operators from screening content and passed Section 230 to remedy this danger. Indeed, the House Conference Report explicitly states that "[o]ne of the specific purposes of [Section 230] is to overrule *Stratton Oakmont v. Prodigy* and any other similar decisions which have treated such providers and users as publishers or speakers of content that is not their own *because they have restricted access to objectionable material*." H.R. Conf. Rep. No. 104-458, at 194 (1996) (emphasis added); *see also* Robert Cannon, *The Legislative History of Senator Exon's Communications Decency Act: Regulating Barbarians on the Information Superhighway*, 49 Fed. Comm. L.J. 51, 68 (1996) (the only effect of Section 230 was to overrule *Stratton*); Paul Ehrlich, *Communications Decency Act § 230*, 17 Berkeley Tech. L.J. 401, 410 (2002) (CDA's legislative history "demonstrates that Congress did not want to give full immunity to ISPs.").

This legislative intent provides the appropriate lens through which to interpret Section 230 and specifically subsection (c), upon which Backpage relies in asserting immunity. Dkt. No. 24 at 10. Section 230(c) is titled "Protection for 'Good Samaritan' blocking and screening of offensive material," and subsection (c)(1) states:

Treatment of publisher or speaker. No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider.

An "information content provider" is defined as "any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service." 47 U.S.C. § 230(f)(3). As detailed below, Backpage is an information content provider because it materially contributes to the content of the escort advertisements that appear on its website and, through its business practices, also conveys the additional information that the website is a marketplace for the sale of illegal sex. This behavior falls well outside the Section 230 immunity intended by Congress.

II.   **SECTION 230 DOES NOT PROTECT WEBSITES FROM CLAIMS BASED ON INFORMATION THAT THE WEBSITE ITSELF DEVELOPS.**

The First Circuit has adopted a three-part test to determine whether Section 230 shields a business from liability. *See Universal Comm. Sys., Inc. v. Lycos, Inc.*, 478 F.3d 413, 418 (1st Cir. 2007). Under this test, a business is not liable if: "(1) [it] is a 'provider or user of an interactive computer service'; (2) the claim is based on 'information provided by another information content provider'; and (3) the claim would treat [the defendant business] 'as the publisher or speaker' of that information." *Id.* at 418. Backpage asserts that it enjoys immunity under *Lycos* because it merely provides "an interactive computer service" that displays "information provided by another information content provider." Dkt. No. 24 at 11 (quoting *Lycos*).

But Backpage misreads the caselaw on CDA immunity. While early decisions addressing Section 230(c) tended to characterize that provision broadly, those cases did not consider or anticipate information service providers that were *also* information content providers. In recent years, courts have developed a more nuanced approach to Section 230 immunity in such cases, finding Section 230(c)(1) immunity does not apply when a website operator "materially contributes" to the underlying illegal conduct. Thus, even were the Court to find that, contrary to Plaintiffs' argument, Backpage's conduct qualifies it as a "publisher" under Section 230, Backpage still is not immune because it does

not meet the second prong of the *Lycos* test: Plaintiffs do not seek to hold Backpage liable for

"information provided by *another* information content provider." 47 U.S.C. § 230(c)(1) (emphasis

added). Rather, Backpage is itself an information content provider and is therefore liable for its own

material contribution to the content at issue.

A.    **Section 230(c)(1) Does Not Provide Immunity When a Website Operator Interacts with Third-Party Content in a Way that Materially Contributes to the Alleged Illegality.**

When a website operator is both an internet service provider and an information content

provider, Section 230(c)(1) does not shield the website from liability for content that the website helps

develop. *Fair Housing Council of San Fernando Valley v. Roommates.com*, 521 F.3d 1157 (9th Cir.

2008) illustrates this analysis. Defendant Roommates.com operated a roommate-matching service

website that required users to complete a questionnaire stating their sex, sexual orientation and

parenting status as well as their roommate preferences with respect to these categories, using this

information to create user profiles and generate search results. *Id*. at 1161. Plaintiffs claimed that

Roommates.com's "business" violated federal and state housing discrimination laws by screening

tenants based on illegal criteria. *Id*. at 1162. An *en banc* panel of the Ninth Circuit found that to the

extent a website is "'responsible, in whole or in part' for creating or developing" content, it is an

"information content provider" that does not enjoy Section 230 immunity. *Id*. (citing 47 U.S.C. §

230(f)(3)). As the court explained, "a website helps to develop unlawful content, and thus falls within

the exception to section 230, if it contributes materially to the alleged illegality of the conduct." *Id*. at

1168. The court further explained that a material contribution includes "inducing" or "encourag[ing]"

a third-party user to engage in illegal conduct.[3] *Id*. at 1165, 1171, 1172 n.33. In addition, "substantial

_____

[3] *Roommates.com* distinguished many of the cases on which Backpage relies, including *Lycos* and *Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119 (9th Cir. 2003). In *Lycos*, the defendant enjoyed Section 230 immunity because the challenged features were "standard elements of web sites," and there were no allegations that the defendant engaged in affirmative steps to foster unlawful activity, which would constitute inducement. 478 F.3d at 420-21. The en banc panel in

affirmative conduct" by a website operator promoting the use of the website's functions "for unlawful

purposes" bars Section 230(c)(1) immunity. *Id*. at 1174 n. 37.

Applying this standard, the court held that Roommates.com's "own acts—posting the

questionnaire and requiring answers to it—are entirely its doing and thus section 230 of the CDA does

not apply to them." *Id*. at 1165. Furthermore, the court held that Roommates.com had no immunity for

its "development and display of subscribers' discriminatory preferences" through user profiles, even

though a third party made the ultimate decision to post a given user profile. *Id*. at 1165-67. Finally, the

court held that Section 230(c)(1) immunity did not apply to "the operation of [Roommates.com's]

search system . . . or of its email notification system," which limited the listings available to

subscribers based on illegal criteria. *Id*. at 1167-69.[4]

Numerous courts have applied a similar analysis to deny Section 230 immunity when websites

create, induce, or encourage the development of objectionable content. For example, in *Hy Cite Corp.*

*v. Badbusinessbureau.com, L.L.C.*, 418 F. Supp. 2d 1142 (D. Ariz. 2005), plaintiffs sued the "Rip-Off

Report" website, which allowed users to post complaints about businesses, alleging that the reports

contained false and defamatory statements. *Id*. at 1145. The court determined that under the CDA, no

immunity existed if the defendants "created or developed any of the allegedly wrongful content." *Id*. at

1148. The court concluded that, where defendants solicited reports and created titles to the rip-off

---

*Roommates.com* also rejected *Carafano* as "unduly broad" and went on to "disavow" any suggestion that an information content provider is "*automatically* immune so long as the content originated with another information provider." 521 F.3d at 1171 & 1171 n.31 (emphasis in original). *Roommates.com* also distinguished *Zeran v. America Online, Inc.*, 129 F.3d 327 (4th Cir. 1997), *Green v. America Online*, 318 F.3d 465 (3d Cir. 2003), and *Ben Ezra, Weinstein, & Co., Inc., v. America Online Inc.*, 206 F.3d 980 (10th Cir. 2000), finding that defendants in those cases neither encouraged nor solicited the challenged content. *See Roommates.com*, 521 F.3d at 1171& 1172 n.33.

[4] In contrast, the *Rommmates.com* court held that Section 230(c)(1) shielded from liability the defendant's publication of "additional comments" by users, where Roommates.com "does not provide any specific guidance as to what the essay should contain." 521 F.3d at 1173. This is consistent with the court's holding that "generic search engines such as Google, Yahoo! and MSN Live Search" differ from Roommates.com in that their search functions are not designed to steer users to certain results. 521 F.3d at 1167.

reports, as well as editorial comments and other content, Section 230 immunity did not apply. *Id*. at 1149. The Northern District of Texas reached a similar result in *MCW, Inc. v. Badbusinessbureau.com, L.L.C.*, finding that "[b]ecause the defendants are information content providers with respect to the report titles, headings, and some of the defamatory messages posted on the websites, they cannot claim § 230 immunity under the CDA." No. Civ. A. 3:02-CV-2727-G, 2004 WL 833595, at *10 (N.D. Tex. Apr. 19, 2004). *See also Cisneros v. Sanchez*, 403 F. Supp. 2d 588, 592 (S.D. Tex. 2005) (rejecting CDA immunity for a defendant who authored the content at issue and reasoning that Congress did not "intend[] to create a different standard for the authors of defamatory statements who double as the administrators of web-sites"); *F.T.C. v. Accusearch, Inc*., 570 F.3d 1187, 1199 (10th Cir. 2009) (rejecting CDA immunity for a website that contributed to unlawful conduct by paying researchers to find confidential telephone records and selling that information to the public; "a service provider is 'responsible' for the development of offensive content . . . if it in some way specifically encourages development of what is offensive about the content.").

Courts have also found that CDA immunity does not apply when websites present third-party content in a deceptive or unlawful manner. *See, e.g.*, *Perkins v. LinkedIn Corp*., No. 13-CV-04303-LHK, 2014 WL 6618753, at *13-15 (N.D. Cal. Nov. 13, 2014) (defendant was not immune for unauthorized use of plaintiffs' profile information in reminder emails inviting other users to join its network); *Fraley v. Facebook, Inc*., 830 F. Supp. 2d 785, 802 (N.D. Cal. 2011) (rejecting Section 230 immunity at the motion to dismiss stage because "Plaintiffs allege not only that Facebook rearranged text and images provided by members, but moreover that by grouping such content in a particular way with third-party logos, Facebook transformed the character of Plaintiffs' words, photographs, and actions into a commercial endorsement to which they did not consent"); *Anthony v. Yahoo! Inc*., 421 F. Supp. 2d 1257, 1263 (N.D. Cal. 2006) (finding that Yahoo! had no Section 230 immunity for sending false and expired dating profiles to subscribers to encourage them to continue subscriptions;

while the users created these profiles, Yahoo! could be liable for its "manner of presenting the profiles").

**B.      Section 230(c)(1) Does Not Provide Immunity When Claims Are Based on Information that Results from Defendants' Own Business Practices.**

Courts have also found Section 230 immunity inapplicable where a plaintiff's claims relate to a website operator's own business practices, where those practices facilitate unlawful conduct. *See Roommates.com*, 521 F.3d at 1174 n.37. In *Moving and Storage, Inc. v. Panayotov*, No. CIV.A. 12-12262-GAO, 2014 WL 949830 (D. Mass. Mar. 12, 2014), for example, the plaintiffs alleged that the defendant website MyMovingReviews.com purported to operate a neutral website but in fact deleted positive reviews about plaintiffs' moving companies and deleted negative reviews about a competitor company. The Massachusetts District Court rejected defendants' argument that they were immune from suit under Section 230, reasoning that "plaintiffs' claims do not arise from the content of the reviews," but instead from defendants' own business practices. *Id.* at *2. The court further found that the plaintiffs' claims were based "not on the defendants' publishing conduct but on their representations regarding such conduct," which would not be immunized under the CDA. *Id.* (quoting *Levitt v. Yelp!, Inc.*, No. C-10-1321 EMC, 2011 WL 5079526, at *9 (N.D. Cal. Oct. 26, 2011) (internal punctuation omitted).

Similarly, in *NPS LLC v. StubHub, Inc.*, No. 06-4874-BLS1, 2009 WL 995483, at *10 (Mass. Super. Ct. Jan. 26, 2009), the court refused to dismiss anti-scalping claims against an online ticket broker because the broker "materially contributed" to illegal ticket scalping by waiving fees for certain classes of sellers, tying revenue to ticket prices, and failing to inform users about the face value of tickets, thereby "intentionally induc[ing] or encourag[ing] others to violate" the law or "profit[ing] from such violations while declining to stop or limit" them. *See also 800-JR Cigar, Inc. v. GoTo.com, Inc.*, 437 F. Supp. 2d 273, 295 (D.N.J. 2006) (internet search engine was not immune under Section 230 because the alleged harm was plaintiffs' business practice of allowing paying advertisers to bid on defendants' trademark as a search term); *Demetriades v. Yelp, Inc.*, 228 Cal. App. 4th 294, 313 (2014) (rejecting CDA immunity because "plaintiff seeks to hold Yelp liable for its own statements regarding

the accuracy of its filter," not for the content of user reviews); *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1107-09 (9th Cir. 2009) (holding that the CDA did not bar a claim under a theory of promissory estoppel for Yahoo!'s failure to remove an unauthorized profile because claim arose from Yahoo!'s contractual obligations, not its role as a publisher of third-party content).

Furthermore, a website is not entitled to Section 230 immunity where it is fundamentally "designed to help people" violate the law. *See Chicago Lawyers' Comm. for Civil Rights Under Law, Inc. v. Craigslist, Inc.*, 519 F.3d 666, 670 (7th Cir. 2008); *StubHub*, 2009 WL 995483, at *10; *Roommates.com*, 521 F.3d at 1167 (finding that the operation of search and email notification systems that support housing discrimination was not immunized under Section 230); *cf. United States v. Ulbricht*, 31 F.Supp.3d 540, 546-47 (S.D.N.Y. 2014) (denying defendant's motion to dismiss indictment for "narcotics trafficking, computer hacking, and money laundering conspiracies" based on his role "designing, launching, and administering a website called Silk Road" as an "online marketplace for illicit goods and services").[5]

## III.   BACKPAGE IS NOT IMMUNE UNDER SECTION 230 BECAUSE IT HELPED DEVELOP THE INFORMATION AT ISSUE.

Under the *Lycos* test, Backpage is not entitled to Section 230(c)(1) immunity because Backpage's alleged conduct makes it responsible "for the creation or development of information provided" on its website and it therefore is an information content provider. 47 U.S.C. § 230(c)(1) &

---

[5] *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250 (4th Cir. 2009), cited by Backpage, does not contradict these holdings. That case merely held the site's structure and design, which supported the development of information about class actions, did not lead to illegal content development because such information is legal. *Id.* at 257. Moreover, contrary to Backpage's assertion, a website can be liable for inducing or encouraging illegal conduct. Dkt. No. 24 at 18-20. *See Roommates.com*, 521 F.3d at 1165 ("The CDA does not grant immunity for inducing third parties to express illegal preferences."); *Chicago Lawyers' Comm.*, 519 F.3d at 671-72 (website may induce someone to post illegal content, e.g., by offering discount); (*StubHub*, 2009 WL 995483, at *10–13 (finding a material issue of fact whether defendant "intentionally induced" users to violate anti-scalping laws). In addition, neither *Dart v. Craigslist, Inc.*, 665 F. Supp. 2d 961 (N.D. Ill. 2009) nor *M.A. v. Village Voice Media Holdings,* 809 F. Supp. 2d 1041 (E.D. Mo. 2011) supports Backpage's argument. To the contrary, *Dart* applied the inducement test to evaluate whether Craigslist had induced the posting of unlawful ads. *See Dart* at 969. And *M.A.* does not even discuss the inducement standard. Furthermore, neither case involved allegations that the defendants' sites contained non-standard features or that they engaged in the host of business practices alleged in the instant case, which materially contribute to illegal conduct.

(f)(3); *Lycos*, 478 F.3d at 418. Nor is Backpage immune for its business practices with respect to the Escorts section of its site, which create a marketplace for the sale of sex. Through these actions and practices, Backpage becomes an information content provider under the terms of Section 230(c), rather than merely a publisher of third-party content.

### A.    Backpage Is Not a Passive Publisher but Rather Actively Develops Escort Ads.

Like Roommates.com, Backpage is "much more than a passive transmitter of information provided by others . . . ." *Roommates.com*, 521 F.3d at 1166. Instead of a passive website that provides a blank slate for posters, Backpage employs business practices that convey information separately from third parties. For example, Backpage creates, develops, and posts illegal content in "Sponsored Ads" by choosing images and text from the full advertisement to highlight and by creating new text to summarize portions of the original advertisement or to describe an escort's location and availability. Dkt. No. 22 ¶¶ 64-65. This conduct takes Backpage out of the immunized role of publisher. *See Stevo Design, Inc. v. SBR Mktg. Ltd.*, 968 F. Supp. 2d 1082, 1091 (D. Nev. 2013) (defendant acted as "developer" of content by promoting publication of materials, "thereby contributing to the misappropriation of Plaintiffs' trade secrets and commercial property"); *Alvi Armani Med., Inc. v. Hennessey*, 629 F. Supp. 2d 1302, 1306 (S.D. Fla. 2008) (rejecting CDA immunity at the motion to dismiss stage where plaintiff alleged that a website posted negative comments about a doctor that were attributed to patients but were in fact written by defendants or affiliates); *Doe v. City of New York*, 583 F. Supp. 2d 444, 449 (S.D.N.Y. 2008) (rejecting CDA immunity because defendant "added his own allegedly tortious speech to the third-party content he forwarded" to a listserv). In addition, Backpage profits significantly from the creation of Sponsored Ads, which posters pay to utilize, and this profit also supports a rejection of immunity. *See Doe v. GTE Corp.,* 347 F.3d 655, 659 (7th Cir. 2003) (finding a website enjoys CDA immunity in part because it does not profit from illegal content).

In another instance of active participation in content development, Backpage allegedly removes content provided by third parties. First, Backpage strips "metadata" from digital photographs uploaded in the Escorts section by using software at an additional expense. Dkt. No. 22 ¶ 51. Courts have repeatedly recognized that the metadata associated with a given photograph or document is

included in the definition of its original content.[6] By purposefully deleting this information, Backpage actively alters third-party content in a manner inconsistent with the role of a passive speaker or publisher. *See Hardin v. PDX, Inc*., 227 Cal. App. 4th 159, 170 (2014), *as modified on denial of reh'g (July 21, 2014), review denied (Sept. 24, 2014)* (noting where defendant "intentionally modified its software to allow [a third party] to distribute abbreviated drug monographs that automatically omitted warnings of serious risks," defendant had not "'merely distributed information from a third party author or publisher'"). Second, and analogous to the conduct at issue in *Panayotov*, discussed *supra*, the complaint alleges that Backpage selectively removes advertisements for support groups or posts by law enforcement officers engaged in sting operations while failing to remove posts flagged as depicting minor children. Dkt. No. 22 ¶ 40.

Backpage also contributes materially to content ultimately generated in its advertisements by affirmatively "coaching" posters with respect to what language they can and cannot use in their advertisements. According to the complaint, Backpage helps to develop content by allowing slight misspellings or common abbreviations of banned content, such as "high schl" and "brly legal." *Id.* ¶ 56. When a poster attempts to use a term banned on the site, Backpage responds with an error message that tells the poster what specific language is objectionable. *Id.* ¶ 55. Posters are then able to change their postings to use synonyms or misspellings to the same effect as the original text. Backpage also prevents posters from entering truthful content, such as their real age if they are minors. *Id.* ¶ 48. Rather than preventing children from being advertised for sex by simply blocking objectionable ads, Backpage's coaching facilitates illegal activity by helping it to go undetected. Whereas Roommates.com influenced content at the front end through visible categories of required information, Backpage influences content at the back end through messages to posters regarding their content and the type of content allowed and disallowed. This back-end interaction with content, while less visible than the front-end interaction of Roommates.com, is just as extensive. As such, Backpage's "own acts . . . are entirely its doing and thus section 230 of the CDA does not apply to them." *Roommates.com,*

---

[6] *See, e.g., Romero v. Allstate Ins. Co*., 271 F.R.D. 96, 107 (E.D. Pa. 2010); *O'Neill v. City of Shoreline*, 170 Wash. 2d 138, 147 (2010); *Lake v. City of Phoenix*, 222 Ariz. 547, 550 (2009); *Williams v. Sprint/United Mgmt. Co*., 230 F.R.D. 640, 652 (D. Kan. 2005).

521 F.3d at 1165.

In all of these examples, Backpage helps develop the content, and this development results in misinformation. After Backpage's interaction with the content, photos no longer contain data regarding their origins, posters who should be identified accurately as underage children are instead advertised as adults, and obvious references to paid sex—which accurately describe what is being sold—are cloaked with the misrepresentation of legality. All of these changes are alterations to third-party content that Backpage itself directly makes or prompts. Because the "manner in which the information is presented, or withheld, is the conduct at issue," Backpage's "conduct provides substantial basis to find that the defendants were developers of the alleged misinformation." *Panayotov*, 2014 WL 949830, at *2.

Backpage disputes that it helps develop content supplied by third parties. Dkt. No. 24 at 11. However, a motion to dismiss based on Section 230 immunity should not be granted when there is a factual dispute about whether a defendant contributed to the development of the content at issue. *See Suk Jae Chang v. Wozo LLC*, 2012 WL 1067643, at *14 (D. Mass. Mar. 28, 2012) (denying defendant's motion to dismiss based on CDA immunity when the plaintiff alleged "the content was developed at least in part" by the defendant); *Stayart v. Yahoo! Inc.*, 651 F. Supp. 2d 873, 886 (E.D. Wis. 2009) *aff'd*, 623 F.3d 436 (7th Cir. 2010) (rejecting CDA immunity at the pleadings stage where defendants' role in creating the banner ads at issue was unclear).

### B.    Backpage's Business Practices Communicate to Users the Information that Its Escorts Section Is a Marketplace for the Illegal Sale of Sex.

In addition to liability for directly developing content displayed on its site, Backpage is also subject to liability as an information content provider for its alleged business practices related to the design and operation of the Escorts section of its website, which in and of itself communicates to users that it is a marketplace for the illegal sale of sex. Backpage.com's site conveys information to viewers beyond the content provided by third parties. Merriam-Webster defines "information" in part as "the communication or reception of knowledge or intelligence." *Merriam-Webster's Collegiate Dictionary* 641 (11th ed. 2003). Backpage is an information content provider in part because the manner in which

it operates its website conveys certain information—specifically, Backpage's practices communicate to posters and viewers alike that illegal sex is sold in the Escorts section of the site.

As an initial matter, by creating the "Escorts" title and subcategory, despite knowing that the actual goods advertised are illegal sex (Dkt. No. 22 ¶ 39), Backpage intentionally mislabels content in a manner that signals to users that this section is actually a marketplace for the illegal sale of sex. *See Hy Cite Corp.,* 418 F. Supp. 2d at 1149 (rejecting CDA immunity when plaintiffs alleged that defendants created wrongful content in titles, as well as elsewhere on the website); *MCW,* 2004 WL 833595, at *10 (same). Backpage "specifically encourages development of what is offensive about the content" by providing a category for ads that are illegal. *Accusearch*, 570 F.3d at 1199. Creating this space "induces [users] to post . . . listing[s] or express [] preference[s] for" the illegal exchange of sex for money. *Chicago Lawyers' Comm.*, 519 F.3d at 671. Backpage.com's name itself is an inducement to those familiar with the Back Page, an advertising section in the now-defunct *Village Voice* weekly that was widely known to host classified advertisements for paid sex. Dkt. No. 22 ¶ 23.

In addition, unlike for example the Pets section of Backpage, the Escorts section does not require phone number verification and allows users to post numbers that replace numerals with alphabetic characters or spelled-out numbers, such as "twoO13fourFive678niNe" rather than "201-345-6789." Dkt. No. 22 ¶ 49. By allowing obscured phone numbers in the Escorts section but not elsewhere, Backpage signals that the Escorts listings are for illegal activity. *Id.* ¶¶ 49 & 84.

Also unlike the many other subsections of its website, Backpage charges a fee for posters in the Escorts section and accepts payment via both prepaid credit cards—which unlike traditional credit cards are not linked to a specific name, address, or any other identifying information—and Bitcoin, a digital currency that is not linked to a bank and is largely untraceable. Dkt. No. 22 ¶ 47. In fact, Backpage induces and encourages the use of untraceable payment by offering a 10 percent discount for customers that use Bitcoin. *Id*. Similarly, Backpage does not require posters to provide identifying information in advertisements posted in the Escorts section. As with the payment system, this practice has the effect of inducing and encouraging illegal activity by providing those selling illegal sex with a means to maintain anonymity and evade detection efforts. *See StubHub,* 2009 WL 995483, at *8

("[M]inimizing the risk of detection is simply part of [the] inducement to commit the breach itself.").

Because these business practices materially contribute to the illegal sale of sex, Backpage is not entitled to immunity for these practices. *See Roommates.com*, 521 F.2d at 1167; *StubHub*, 2009 WL 995483, at \*13; *800-JR Cigar*, 437 F. Supp. 2d 295.

## IV. BACKPAGE'S PROPOSED INTERPRETATION OF SECTION 230 WOULD EVISCERATE LOCAL GOVERNMENTS' ABILITY TO ENFORCE LAWS OF GENERAL APPLICABILITY.

Backpage is not entitled to Section 230(c)(1) immunity for its alleged actions in operating a website that facilitates the sale of children for sex. Congress did not intend for Section 230 to immunize an online business for actively developing content and taking other affirmative steps to support illegal activities. This commonsense reading of Section 230 preserves the ability of local governments, such as *Amici*, to make and enforce local and state laws through their police powers. Under Backpage's unduly expansive reading of Section 230, a website operator's otherwise illegal activity need only take place in an online format, rather than at a brick-and-mortar facility, to escape liability. But as the *Roommates.com* court held, the CDA did not eviscerate laws of general applicability. "The [CDA] was not meant to create a lawless no-man's-land on the Internet." 521 F.3d at 1164; *see also Doe No. 14 v. Internet Brands, Inc.*, 767 F.3d 894, 899 (9th Cir. 2014) ("Congress has not provided an all purpose get-out-of-jail-free card for businesses that publish user content on the internet, though any claims might have a marginal chilling effect on internet publishing businesses."). "When Congress passed section 230 it didn't intend to prevent the enforcement of all laws online; rather it sought to encourage interactive computer services that provide users *neutral* tools to post content online to police that content without fear that" their good Samaritan activities would subject them to liability. *Roommates.com*, 521 F.3d at 1175 (emphasis in original).

Although Backpage argues that anything less than blanket immunity for internet service providers under Section 230(c)(1) would inhibit the development of the internet, the *Roommates.com* court refuted that concern convincingly. As the court explained, the internet, as a "dominant" means of communication central to our everyday lives, thrives under the material contribution standard:

> The Internet is no longer a fragile new means of communication that could
> easily be smothered in the cradle by overzealous enforcement of laws and

> regulations applicable to brick-and-mortar businesses. Rather, it has become a dominant—perhaps the preeminent—means through which commerce is conducted. And its vast reach into the lives of millions is exactly why we must be careful not to exceed the scope of immunity provided by Congress and thus give online businesses an unfair advantage over their real-world counterparts, which must comply with laws of general applicability.

*Roommates.com*, 521 F.3d at 1164 n.15; *see also id.* at 1169 n.24 ("Compliance with laws of general applicability seems like an entirely justified burden for all businesses, whether they operate online or through quaint brick-and-mortar facilities.").

## CONCLUSION

The CDA does not insulate Backpage from liability for its own actions. First, Congress did not intend the CDA to confer such broad immunity. Second, under the CDA, immunity does not apply to the claims that arise from a website's role as an information content provider. Backpage is an information content provider because it develops the content of illegal escort ads and adopts business practices that themselves convey information about the illegal nature of the Escorts marketplace. Finally, the broad reading of the CDA sought by Backpage would prevent local governments from enforcing laws that protect society's most vulnerable members, such as children sold for sex.

For the reasons stated above, *Amici* respectfully request that the Court deny Backpage's Motion to Dismiss.

Dated: February 20, 2015

By: _____/s/ Mark D. Lipton_____
     MARK D. LIPTON,   BBO#652968

     DENNIS J. HERRERA, CA State Bar #139669
     City Attorney
     VICTORIA WONG, CA State Bar #214289
     MOLLIE LEE, CA State Bar #251404
     ELIZABETH PEDERSON, CA State Bar #288184
     MARK D. LIPTON, CA State Bar #152864
     Deputy City Attorneys
     City Hall, Room 234
     1 Dr. Carlton B. Goodlett Place
     San Francisco, California 94102-4682
     Telephone:      (415) 554-4721
     Facsimile:       (415) 554-4757
     E-Mail:  victoria.wong@sfgov.org

     Attorneys for *Amicus Curiae*
     THE CITY AND COUNTY OF SAN  FRANCISCO

By:_____/s/ *Shelley R. Smith*
   SHELLEY R. SMITH

     SHELLEY R. SMITH, PA State Bar
     #56171
     City Solicitor
     City of Philadelphia Law Department
     1515 Arch Street
     Philadelphia, PA  19102
     Telephone:    (404) 546-4100

     Attorney for *Amicus Curiae*
     MICHAEL A. NUTTER, MAYOR OF
     PHILADELPHIA

By:_____/s/ *Donna L. Edmundson*
   DONNA L. EDMUNDSON

     DONNA L. EDMUNDSON, TX State Bar
     #06432100
     Houston City Attorney
     900 Bagby Street, 4th Floor
     Houston, Texas  77002
     Telephone:    (832) 393-3628
     Facsimile:    (832) 393-6259
     E-Mail:
     donna.edmundson@houstontx.gov

     Attorney for *Amicus Curiae*
     CITY OF HOUSTON

By:_____/s/ *Tracy Reeve*
   TRACY REEVE

     Tracy Reeve, OSB # 891123
     City Attorney
     Harry Auerbach, OSB # 821830
     Chief Deputy City Attorney
     430 City Hall
     1221 SW Fourth Ave.
     Portland, Oregon 97204
     Telephone: 503-823-4047
     Email:
     Tracy.Reeve@portlandoregon.gov

     Attorneys for *Amicus Curiae*
     CITY OF PORTLAND, OREGON

By:_____/s/ *Cathy Hampton*
   CATHY HAMPTON

     CATHY HAMPTON
     City Attorney
     City of Atlanta Law Department
     55 Trinity Avenue, SW, Suite 5000
     Atlanta, Georgia 30303
     Telephone:    (404) 546-4100
     E-Mail:
     cathyhampton@atlantaga.gov

     Attorney for *Amicus Curiae*
     CITY OF ATLANTA

By:_____/s/ *D. Scott Martinez*
   D. SCOTT MARTINEZ

     D. Scott Martinez
     City Attorney
     City and County of Denver
     1437 Bannock Street, Room 353
     Denver, CO 80202
     Telephone:    (720) 865-8770
     E-Mail:
     scott.martinez@denvergov.org

     Attorney for *Amicus Curiae*
     MICHAEL B. HANCOCK, MAYOR
     OF THE CITY AND COUNTY OF
     DENVER

<u>CERTIFICATE OF SERVICE</u>

      I, Mark D. Lipton, hereby certify that this document filed through the ECF system will be  sent electronically to the registered participants as identified on the Notice of Electronic Filing   ("NEF") and paper copies will be sent to those indicated as non-registered participants, on February 20, 2015.


                                    */s/ Mark D. Lipton*
                                   Mark D. Lipton