# UNITED STATES DISTRICT COURT

# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JANE DOE NO. 1, a minor child, by her parent and next friend MARY ROE, JANE DOE NO. 2, and JANE DOE NO. 3, a minor child, by her parents and next friends SAM LOE and SARA LOE, | |
| Plaintiffs, | Civil Action No. 14-13870-RGS |
| | **Leave to File Granted on March 10, 2015** |
| v. | |
| BACKPAGE.COM, LLC, CAMARILLO HOLDINGS, LLC (f/k/a VILLAGE VOICE MEDIA HOLDINGS, LLC) and NEW TIMES MEDIA, LLC, | |
| Defendants. | |

## BRIEF OF *AMICI CURIAE* ELECTRONIC FRONTIER FOUNDATION, CENTER FOR DEMOCRACY & TECHNOLOGY, AND PROFESSOR ERIC GOLDMAN IN SUPPORT OF DEFENDANTS

---

Kit Walsh
David Greene
Sophia Cope
Daniel Nazer
ELECTRONIC FRONTIER FOUNDATION
815 Eddy Street
San Francisco, CA 94109
Tel: (415) 436-9333
kit@eff.org

Emma Llansó
CENTER FOR DEMOCRACY &
TECHNOLOGY
1634 I Street, NW, Suite 1100
Washington, DC 20006
Tel: (202) 637-9800
ellanso@cdt.org

*Counsel for Amici Curiae*

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................1

INTEREST OF *AMICI CURIAE* ......................................................................................1

ARGUMENT......................................................................................................................2

    I.      Section 230 Categorically Shields Internet Intermediaries from Liability Based on the Speech of Their Users......................................................................................2

           A.      Congress Intended to Promote Freedom of Speech Online.........................3

           B.      Courts Have Broadly Interpreted Section 230(c)(1)...................................5

           C.      Lack of "Good Faith" Under Section 230(c)(2) Does Not Nullify Section 230(c)(1) Immunity ................................................................................7

           D.      Internet Intermediaries May Only Be Subject to Suit If They Actively Develop Actionable Content ....................................................................8

    II.      The Federal Criminal Law Exception to Section 230 Immunity is Appropriately Limited to Criminal Prosecutions and Does Not Include Related Civil Actions ..12

    III.     Section 230 Provides Immunity From Plaintiffs' Right of Publicity Cause of Action and Other Privacy-Based State Law Causes of Action ............................15

    IV.     Section 230 Explicitly Preempts All Inconsistent State Laws ..............................18

CONCLUSION ................................................................................................................19

# TABLE OF AUTHORITIES

## Federal Cases

*Almeida v. Amazon.com, Inc.*,
    456 F.3d 1316 (11th Cir. 2006) ...................................................................................18

*Alvarez Guedes v. Marcano Martinez*,
    131 F. Supp. 2d 272 (D.P.R. 2001) .............................................................................15

*Backpage.com, LLC v. McKenna*,
    881 F. Supp. 2d 1262 (W.D. Wash. 2012) ...................................................................18

*Barnes v. Yahoo!*,
    570 F.3d 1096 (9th Cir. 2009) .......................................................................................7

*Batzel v. Smith*,
    333 F.3d 1018 (9th Cir. 2003) ..............................................................................3, 4, 7

*Ben Ezra, Weinstein & Co. v. Am. Online*,
    206 F.3d 980 (10th Cir. 2000) .....................................................................................18

*Browne v. McCain*,
    611 F. Supp. 2d 1062 (C.D. Cal. 2009) .......................................................................16

*Carafano v. Metrosplash.com, Inc.*,
    339 F.3d 1119 (9th Cir. 2003) .......................................................................................6

*Cardtoons, L.C. v. Major League Baseball Players Ass'n*,
    95 F.3d 959 (10th Cir. 1996) .......................................................................................17

*Chicago Lawyers' Committee for Civil Rights Under Law, Inc. v. Craigslist, Inc.*,
    519 F.3d 666 (7th Cir. 2008) .........................................................................................9

*Dart v. Craigslist, Inc.*,
    665 F. Supp. 2d 961 (N.D. Ill. 2009)........................................................................9, 18

*Doe v. Friendfinder Network, Inc.*,
    540 F. Supp. 2d 288 (D.N.H. 2008) .............................................................................18

*Doe v. Internet Brands*,
    767 F.3d 894 (9th Cir. 2014) ...............................................................................11, 12

*Doe v. MySpace*,
    528 F.3d 413 (5th Cir. 2008) .......................................................................................18

*e360Insight, LLC v. Comcast Corp.*,
    546 F. Supp. 2d 605 (N.D. Ill. 2008) ............................................................................. 8

*Eldred v. Ashcroft*,
    537 U.S. 186 (2003) ......................................................................................................... 16

*ETW Corp. v. Jireh Publ'g, Inc.*,
    332 F.3d 915 (6th Cir. 2003) ........................................................................................... 16

*F.T.C. v. Accusearch Inc.*,
    570 F.3d 1187 (10th Cir. 2009) ....................................................................................... 10

*Fair Hous. Council of San Fernando Valley v. Roommates.com*,
    521 F.3d 1157 (9th Cir. 2008) ............................................................................. 6, 9, 10, 11

*Gill v. Arab Bank, PLC*,
    893 F. Supp. 2d 474 (E.D. N.Y. 2012) ........................................................................... 13

*Goddard v. Google, Inc.*,
    640 F. Supp. 2d 1193 (N.D. Cal. 2009) ........................................................................... 10

*Green v. Am. Online*,
    318 F.3d 465 (3d Cir. 2003) ............................................................................................. 3

*Hart v. Elec. Arts, Inc.*,
    717 F.3d 141 (3d Cir. 2013) ............................................................................................ 15

*Haskell v. Time, Inc.*,
    965 F.Supp. 1398 (E.D. Cal. 1997) ................................................................................. 15

*Hoffman v. Capital Cities/ABC, Inc.*,
    255 F.3d 1180 (9th Cir. 2001) ......................................................................................... 16

*Holomaxx Technologies v. Microsoft Corp.*,
    2011 WL 865278 (N.D. Cal. 2011) .................................................................................. 8

*Holomaxx Technologies v. Yahoo!,*
    2011 WL 865794 (N.D. Cal. 2011) .................................................................................. 8

*Jones v. Dirty World Entm't Recordings LLC*,
    755 F.3d 398 (6th Cir. 2014) ............................................................................... 4, 6, 8, 9

*Levitt v. Yelp! Inc.*,
    2011 WL 5079526 (N.D. Cal. 2011) ................................................................................ 8

*Perfect 10, Inc. v. CCBill LLC*,
    488 F.3d 1102 (2007) ...........................................................................17

*Seale v. Gramercy Pictures*,
    949 F.Supp. 331 (E.D. Pa. 1996) ......................................................16

*Smith v. Trusted Universal Standards in Electronic Transactions, Inc. (d/b/a TRUSTe, Inc.)*,
    2011 WL 900096 (D. N.J. 2011) ........................................................8

*United States v. McCambridge*,
    551 F.2d 865 (1st Cir. 1977)..............................................................13

*Universal Commc'ns Sys., Inc. v. Lycos, Inc.*,
    478 F.3d 413 (1st Cir. 2007)....................................................6, 17, 18

*White v. Samsung Elec. Am., Inc.*,
    971 F.2d 1395 (9th Cir. 1992) ...........................................................17

*Zango, Inc. v. Kaspersky Lab, Inc.*,
    568 F.3d 1169 (9th Cir. 2009) .............................................................7

*Zeran v. Am. Online*,
    129 F.3d 327 (4th Cir. 1997) .......................................................3, 4, 5

**State Cases**

*Doe v. Am. Online*,
    783 So. 2d 1010 (Fla. 2001) ...............................................................18

*Doe v. TCI Cablevision*,
    110 S.W.3d 363 (Mo. 2003) ..............................................................17

*Foster-Milburn Co. v. Chinn*,
    120 S.W. 364 (Ky. 1909)...................................................................16

*Gentry v. eBay, Inc.*,
    99 Cal. App. 4th 816 (2002) ...........................................................9, 18

*Gionfriddo v. Major League Baseball*,
    94 Cal. App. 4th 400 (2001) ..............................................................17

*Giordano v. Romeo*,
    2011 WL 6782933 (Fla. App. Ct. 2011)...............................................8

*Guglielmi v. Spelling-Goldberg Prods.*,
    25 Cal. 3d 860 (1979) ........................................................................16

*Hogan v. A.S. Barnes & Co.*,
    1957 WL 7316 (Pa. Ct. C.P. 1957) .................................................................16

*Kunz v. Allen*,
    172 P. 532 (Kan. 1918) ...................................................................................16

*Pallorium v. Jared*,
    2007 WL 80955 (Cal. Ct. App. 2007) ..............................................................8

*Pavesich v. New England Life Ins. Co.*,
    50 S.E. 68 (Ga. 1905) .....................................................................................16

*Rosemont Enters. v. Urban Sys., Inc.*,
    340 N.Y.S.2d 144 (N.Y. Sup. Ct. 1973) .........................................................16

*Roskind v. Morgan Stanley Dean Witter & Co.*,
    80 Cal. App. 4th 345 (2000) ...........................................................................14

*Stewart v. Rolling Stone LLC*,
    181 Cal. App. 4th 664 (2010) .........................................................................16

*Stratton Oakmont, Inc. v. Prodigy Servs. Co.*,
    1995 WL 323710 (N.Y. Sup. Ct. 1995) .............................................................4

## Federal Statutes

18 U.S.C. § 2 ..............................................................................................................13

18 U.S.C. § 2333 ........................................................................................................14

18 U.S.C. § 2339 ........................................................................................................13

18 U.S.C. §§ 2331, *et seq.* .......................................................................................13

47 U.S.C. § 230 ...................................................................................................*passim*

## State Statutes

Cal. Bus. & Prof. Code § 17200 ..........................................................................14, 15

Cal. Bus. & Prof. Code § 17204 ..........................................................................14, 15

**Legislative Materials**

141 Cong. Rec. H8470 (daily ed. Aug. 4, 1995) ...........................................................6

28 U.S.C. § 4102(c)(1); Pub.L. 111-223 (Aug. 10, 2010).............................................6

**Other Authorities**

*Black's Law Dictionary* (10th Ed. 2014)....................................................................15

Eric Goldman, *Online User Account Termination and 47 U.S.C. §230(c)(2)* (September 23, 2011), UC Irvine Law Review, Vol. 2, 2012 ....................................................8

Philip N. Howard, *et al.*, *Opening Closed Regimes: What Was the Role of Social Media During the Arab Spring?* (Project on Info. and Tech. & Political Islam, Working Paper 2011.1)..3

Rebecca Tushnet, *A Mask that Eats into the Face: Images and the Right of Publicity*, 38 Colum. J.L. & Arts 1 (2015).......................................................................15

Restatement (Third) Of Unfair Competition §§ 46-49 .................................................16

Richard Ausness, *The Right of Publicity: A "Haystack in a Hurricane,"* 55 Temp. L.Q. 977 (1982)...............................................................................16

Shane Harris, *Justice Department: We'll Go After ISIS's Twitter Army*, The Daily Beast (Feb. 23, 2015).......................................................................13

*The State of Broadband 2014: Broadband for All*, Broadband Comm'n for Digital Dev. (Sept. 2014) ...........................................................................................3

## INTRODUCTION

Congress enacted 47 U.S.C. § 230 ("Section 230")[1] to encourage the development of the Internet and other interactive media by shielding intermediaries not only from liability for actionable content created or posted by third parties, but also from the cost and uncertainty associated with litigation itself. If online service providers were required to engage in protracted and expensive litigation whenever plaintiffs alleged that they were harmed by user-generated content hosted or transmitted by intermediaries, these online platforms for users' speech would inevitably become more expensive, more restrictive, and ultimately less available for individual expression.

Section 230 must thus be interpreted broadly to immunize all conduct interrelated with the publication of third-party content regardless of how that conduct is labeled in the complaint. Likewise, exceptions to Section 230, including the federal criminal law and intellectual property exceptions, must be construed narrowly. Section 230 must certainly immunize against right of publicity claims that are invasion of privacy, not intellectual property, claims.

Given this, *amici* urge this Court to grant Backpage.com's motion to dismiss.

## INTEREST OF *AMICI CURIAE*[2]

The *amici* each have a strong interest in ensuring that the Internet remains a vibrant and diverse medium, and that service providers not be saddled with the expense of litigation or

---

[1] This was Section 509 of the Communications Decency Act, which was part of the Telecommunications Act of 1996, Pub. L. 104-104.

[2] Pursuant to Federal Rule of Appellate Procedure 29(c)(5), no party's counsel authored this brief in whole or in part, and neither any party, nor any party's counsel, contributed money towards the preparation of this brief. No person other than *amici*, its members, or its counsel contributed money that was intended to fund preparing or submitting this brief. Defendants have consented to the filing of this brief and Plaintiffs take no position.

burdened with the duty of reviewing all content posted by its users. *Amici* believe their expertise in Section 230 can assist the Court in this matter.

The Electronic Frontier Foundation ("EFF") is a San Francisco-based, non-profit, member-supported civil liberties organization working to protect rights in the digital world. We actively encourage and challenge industry, government, and the courts to support free expression, privacy, and openness in the information society. Founded in 1990, EFF has nearly 26,000 dues-paying members from across the United States. EFF has participated as *amicus curiae* in many cases involving claims against Internet intermediaries.

The Center for Democracy & Technology ("CDT") is a non-profit, public interest, Internet policy organization. CDT represents the public's interest in an open, innovative, and decentralized Internet, reflecting constitutional and democratic values of free expression, privacy, and individual liberty. CDT has also participated as *amicus curiae* in many cases involving claims against Internet intermediaries.

Eric Goldman is a Professor of Law at Santa Clara University School of Law, where he is also Co-Director of the school's High Tech Law Institute. His research and teaching focus on Internet law, intellectual property and marketing law. He is considered a national expert on Internet intermediary liability.

## ARGUMENT

### I. Section 230 Categorically Shields Internet Intermediaries from Liability Based on the Speech of Their Users

Section 230 was born from, and intended to dispense with, a broad range of legal uncertainty that enveloped online service providers in the early stages of the popular Internet. In the early to mid-1990s, the risk of potentially burdensome regulation and litigation emerged as a concrete threat to the proliferation of speech on the Internet. Moreover, the imposition of

common law publisher liability, including distributor liability, on service providers was acknowledged to be both inconsistent with how the Internet works and a brake on its growth and development.[3]

Congress' decision to shield the providers of online speech channels has been instrumental to the development of the modern Internet: approximately 2.9 billion people or 40 percent of the global population is online, and with "current growth rates, half of the world's population will be online by 2017."[4] Many of these individuals use U.S.-based services to access and distribute all manner of content, from organizing in opposition to oppressive regimes[5] to sharing pictures of children with grandparents. Today's Internet hosts third-party contributions from a broad array of voices, facilitating the speech of billions.

A.      Congress Intended to Promote Freedom of Speech Online

Congress enacted two separate but interrelated immunities. Section 230(c)(1) provides immunity for claims against providers of "interactive computer services"[6] (such as website operators) for content posted on and through their platforms by third parties.[7] Section 230(c)(2)

---

[3] *Zeran v. Am. Online*, 129 F.3d 327, 330 (4th Cir. 1997).

[4] *See The State of Broadband 2014: Broadband for All*, Broadband Comm'n for Digital Dev. [UN agency for information and communications technology] (Sept. 2014), *available at* http://www.broadbandcommission.org/documents/reports/bb-annualreport2014.pdf (last visited Feb. 27, 2015).

[5] *See, e.g.*, Philip N. Howard, *et al.*, *Opening Closed Regimes: What Was the Role of Social Media During the Arab Spring?* (Project on Info. and Tech. & Political Islam, Working Paper 2011.1), *available at* http://pitpi.org/wp-content/uploads/2013/02/2011_Howard-Duffy-Freelon-Hussain-Mari-Mazaid_pITPI.pdf.

[6] "The term 'interactive computer service' means any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet and such systems operated or services offered by libraries or educational institutions." 47 U.S.C. § 230(f)(2).

[7] *Batzel v. Smith*, 333 F.3d 1018, 1020 (9th Cir. 2003); *Green v. Am. Online*, 318 F.3d 465, 471 (3d Cir. 2003).

provides immunity from claims based on the defendant's removal or blocking of content from its Internet platform, or enabling others to do so.

The immunity provided by Section 230 serves three main purposes. *First*, it keeps to a minimum governmental interference with the "'robust nature of Internet communication'" by shielding intermediaries from tort liability for the speech of others.[8] *Second*, "the immunity provided by Section 230 protects against the 'heckler's veto' that would chill free speech" because otherwise those who disliked certain online content could pressure service providers to remove it or block access to it merely by threatening litigation.[9] *Third*, the "Good Samaritan" immunity granted by Section 230(c)(2) was deemed necessary in order not to discourage online service providers from self-regulating by screening or blocking offensive content posted through them.[10]

Given their ability to host a far greater range and volume of speech than had ever before been possible, Internet intermediaries were understandably wary of the potential exposure. While service providers could be held responsible for online content that they created, "a person who published or distributed speech over the Internet could be held liable for defamation even if he or she was not the author of the defamatory text, and, indeed, at least with regard to publishers, even if unaware of the statement."[11]

Indeed, the Internet would be a far more limited forum if websites were forced to second-guess their decisions about hosting content that they themselves did not author. As the Fourth

---

[8] *Jones v. Dirty World Entm't Recordings LLC*, 755 F.3d 398, 407 (6th Cir. 2014) (quoting *Zeran*, 129 F.3d at 330).

[9] *Id.*

[10] *Id.* at 407-08.

[11] *Batzel*, 333 F.3d at 1026-27 (citing *Stratton Oakmont, Inc. v. Prodigy Servs. Co.*, 1995 WL 323710 (N.Y. Sup. Ct. 1995), where the New York state appellate court held that an Internet service provider could be held responsible for the defamatory words of one of its users where the provider attempted (and failed) to filter objectionable content from its site).

Circuit aptly noted, "It would be impossible for service providers to screen each of their millions of postings for possible problems. Faced with potential liability for each message republished by their services, interactive computer service providers might choose to severely restrict the number and type of messages posted."[12]

Congress thus chose to protect and foster the Internet as a forum for unrestrained robust communication and "not to deter harmful online speech through the separate route of imposing tort liability on companies that serve as intermediaries for other parties' potentially injurious messages."[13] Congress clearly indicated that it was codifying a federal policy of non-regulation aimed at "preserv[ing] the vibrant and competitive free market that presently exists for the Internet and other interactive computer services."[14] Specifically, Congress found that:

- The Internet and other interactive computer services offer a forum for a true diversity of political discourse, unique opportunities for cultural development, and myriad avenues for intellectual activity;
- The Internet and other interactive computer services have flourished, to the benefit of all Americans, with a minimum of government regulation; and
- Increasingly Americans are relying on interactive media for a variety of political, educational, cultural, and entertainment services.[15]

**B.    Courts Have Broadly Interpreted Section 230(c)(1)**

As the parties acknowledge, Section 230(c)(1)[16] bars claims if "(1) the defendant asserting immunity is an interactive computer service provider, (2) the particular information at

---

[12] *Zeran*, 129 F.3d at 331.

[13] *Id.* at 330-31.

[14] 47 U.S.C. § 230(b)(2).

[15] 47 U.S.C. § 230(a)(3)-(5).

[16] "No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1).

issue was provided by another information content provider, and (3) the claim seeks to treat the defendant as a publisher or speaker of that information."[17]

Since the passage of Section 230, courts have routinely, and correctly, recognized the need to construe each of these requirements broadly to effectuate Congress' policy choice.[18] As the Ninth Circuit articulated, "[R]eviewing courts have treated § 230(c) immunity as quite robust, adopting a relatively expansive definition of 'interactive computer service' and a relatively restrictive definition of 'information content provider.'"[19]

Congress has also recognized the importance of expanding Section 230 immunity. For example, Congress in 2010 passed the SPEECH Act that states that U.S. courts "shall not recognize or enforce a foreign judgment for defamation against the provider of an interactive computer service" that is inconsistent with Section 230.[20]

Although the statute does not affect the liability of users who themselves create actionable material, Section 230 operates to "protect [online service providers] from taking on liability" and hence helps encourage the development of forums to host speech of all types in "what is right now the most energetic technological revolution that any of us has ever witnessed."[21]

---

[17] *Jones*, 755 F.3d at 409.

[18] *See Universal Commc'ns Sys., Inc. v. Lycos, Inc.*, 478 F.3d 413, 419 (1st Cir. 2007); *Fair Hous. Council of San Fernando Valley v. Roommates.com*, 521 F.3d 1157, 1174-75 (9th Cir. 2008); *Almeida v. Amazon.com, Inc.*, 456 F.3d 1316, 1321 (11th Cir. 2006).

[19] *Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119, 1123 (9th Cir. 2003).

[20] *Jones*, 755 F.3d at 408 (citing 28 U.S.C. § 4102(c)(1); Pub.L. 111-223 (Aug. 10, 2010)).

[21] 141 Cong. Rec. H8470 (daily ed. Aug. 4, 1995) (Rep. Christopher Cox speaking in support of Section 230).

**C.      Lack of "Good Faith" Under Section 230(c)(2) Does Not Nullify Section 230(c)(1) Immunity**

Plaintiffs have sued Backpage.com for harm they suffered that was allegedly caused by the ads placed on the website by traffickers. Any allegations, pursuant to Section 230(c)(2), that Backpage.com acted in "bad faith" in its efforts to block the posting of such ads have no bearing on the analysis of immunity under Section 230(c)(1) given that Plaintiffs' claims are fundamentally based on third-party content.

Section (c)(2) provides:

> No provider or user of an interactive computer service shall be held liable on account of –
> (A) any action voluntarily taken in *good faith* to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected; or
> (B) any action taken to enable or make available to information content providers or others the technical means to restrict access to material described in paragraph (1).[22]

It is easiest to consider the Section 230 immunities as follows: subsection 230(c)(1) focuses on Internet intermediaries' immunity from liability based on the harm plaintiffs suffered from the publication of third-party content; subsection 230(c)(2) provides a separate immunity to Internet intermediaries for claims brought by content creators themselves based on the intermediaries having removed or blocked their content or enabled others to do so.[23]

Courts have interpreted the two subsections as creating two immunities applicable in distinct situations, recognizing that the statute only references "good faith" in subsection (c)(2)(A) and cannot be read to impose a good faith condition on immunity under

---

[22] Emphasis added. This reference to "(1)" should instead probably be "(A)".
[23] *See Barnes v. Yahoo!*, 570 F.3d 1096, 1105 (9th Cir. 2009); *Batzel,* 333 F.3d at 1030 n. 14. *See also Zango, Inc. v. Kaspersky Lab, Inc.*, 568 F.3d 1169, 1175-76 (9th Cir. 2009) (applying (c)(2)(B) to shield malware-detector from liability for removing plaintiff's software from others' computers).

Section 230(c)(1). Indeed, Section 230(c)(1) immunity has been applied in cases even where plaintiffs alleged that the defendants acted in bad faith because those cases involved claims that were grounded in the harm that flowed to the plaintiffs from content posted by others. Most recently, in *Jones*, 755 F.3d 398, the Sixth Circuit applied (c)(1) immunity despite allegations that the website operator had in bad faith encouraged the allegedly tortious third-party content.[24] By contrast, many courts have analyzed the question of good faith, and finding no absence of it, granted immunity pursuant to Section 230(c)(2) when plaintiffs sued Internet intermediaries for voluntarily flagging and filtering their messages as spam.[25] Also focusing on the two distinct immunities, *amicus* Eric Goldman has written about Section 230(c)(2) immunity in relation to suits brought by account holders when intermediaries have chosen to shut down their accounts or profiles.[26]

### D.   Internet Intermediaries May Only Be Subject to Suit If They Actively Develop Actionable Content

Section 230(c)(1)'s immunity was designed and has repeatedly been judicially interpreted to be categorical for third-party content. A website operator – or any other provider of an interactive computer service – falls outside the protections of Section 230 only if it creates the specific content that is alleged to be actionable.[27]

---

[24] *See also Levitt v. Yelp! Inc.*, 2011 WL 5079526 (N.D. Cal. 2011) (finding (c)(1) immunity despite allegations of extortion); *Giordano v. Romeo*, 2011 WL 6782933 (Fla. App. Ct. 2011) (finding (c)(1) immunity despite website refusing to takedown user's own defamatory post).

[25] *See, e.g.*, *Pallorium v. Jared*, 2007 WL 80955 (Cal. Ct. App. 2007); *e360Insight, LLC v. Comcast Corp.*, 546 F.Supp.2d 605 (N.D. Ill. 2008); *Holomaxx Technologies v. Yahoo!*, 2011 WL 865794 (N.D. Cal. 2011); *Holomaxx Technologies v. Microsoft Corp.*, 2011 WL 865278 (N.D. Cal. 2011); *Smith v. Trusted Universal Standards in Electronic Transactions, Inc. (d/b/a TRUSTe, Inc.)*, 2011 WL 900096 (D. N.J. 2011).

[26] Eric Goldman, *Online User Account Termination and 47 U.S.C. §230(c)(2)* (September 23, 2011), UC Irvine Law Review, Vol. 2, 2012; Santa Clara Univ. Legal Studies Research Paper No. 19-11, *available at* http://ssrn.com/abstract=1934310.

[27] 47 U.S.C. § 230(f)(3); *Jones*, 755 F.3d at 408-09.

Allegations that a website operator created "neutral tools" – such as a classified advertising website or a comments section on a website – by which users post actionable content or engage in illegal activities do not bring a service provider outside the protections of the statute. In *Fair Housing Council of San Fernando Valley v. Roommates.com*, 521 F.3d 1157 (9th Cir. 2008), the court held that discriminatory statements made by users in the "additional comments" section provided by the site did not transform the site operator into an information content provider.[28] In *Chicago Lawyers' Committee for Civil Rights Under Law, Inc. v. Craigslist, Inc.*, 519 F.3d 666, 672 (7th Cir. 2008), the Seventh Circuit similarly held that an online classified ad site was not an information content provider of allegedly discriminatory housing postings where the site operator neither induced nor required its users to post any discriminatory content.[29]

Nor, as the Sixth Circuit recently explained, does a website operator lose immunity by encouraging users to provide content that may be actionable, or then commenting approvingly on that content.[30] The arguments by Plaintiffs' *amici* that Backpage.com should be liable because it "coaches" or "encourages" the posting of trafficking advertisements must thus be rejected.[31]

Nor do any similar actions short of creating or requiring the creation of actionable content void Section 230(c)(1) immunity. Website operators do not become information content providers by categorizing third-party content.[32] Nor do they become information content

---

[28] *Id.* at 1174.

[29] *Id.* at 671.

[30] *Jones*, 755 F.3d at 409, 410 (citing *Roommates.com*).

[31] Brief of City and County of San Francisco, *et al.* at 11; Brief of Commonwealth of Massachusetts at 18.

[32] *See, e.g.*, *Dart v. Craigslist, Inc.*, 665 F. Supp. 2d 961 (N.D. Ill. 2009) (rejecting argument that Craigslist became an information content provider "by having an 'adult services' category" and enabling users to search by sexual preference); *Gentry v. eBay, Inc.*, 99 Cal. App. 4th 816, 832 (2002) (rejecting argument that eBay became a content provider for auctions of counterfeit goods

providers by creating tools, such as search engines, to guide users in finding third-party content, or by disseminating such content.[33]

By contrast, providers of interactive computer services become information content providers – and correspondingly lose Section 230(c)(1) immunity – only when they affirmatively author or otherwise develop the substance of the content in question. Although a provider may cross that threshold in multiple ways, at a minimum, a service provider must directly author or *require* others to author the illegal content. In *Roommates.com*, for example, while the site operator enjoyed protections regarding the creation of its open "additional comments" section, the Ninth Circuit held that it could still be liable for requiring users to use a form, authored by the website operator, to make selections that were allegedly actionable under the Fair Housing Act.[34] The holding that Section 230 immunity did not apply in *Roommates.com* was extremely narrow, and Plaintiffs' *amici*'s reliance on that case is misplaced given that Plaintiffs have not

---

by collecting and displaying positive and negative feedback, hosting an auction site, and displaying seller's product descriptions).

[33] *See Roommates.com*, 521 F.3d at 1167 (noting that "the broadest sense of the term 'develop' could include the functions of an ordinary search engine . . . [b]ut to read the term so broadly would defeat the purposes of section 230 by swallowing up every bit of the immunity that the section otherwise provides"); *Goddard v. Google, Inc.*, 640 F. Supp. 2d 1193, 1197 (N.D. Cal. 2009) ("[E]ven if a particular tool facilitates the expression of information, it generally will be considered 'neutral' so long as users ultimately determine what content to post, such that the tool merely provides a framework that could be utilized for proper or improper purposes.") (citations and internal quotation marks omitted).

[34] 521 F.3d at 1166 ("By requiring subscribers to provide the information as a condition of accessing its service, and by providing a limited set of pre-populated answers, Roommate becomes much more than a passive transmitter of information provided by others; it becomes the developer, at least in part, of that information."). *See also Goddard*, 640 F. Supp. 2d at 1198 ("The Ninth Circuit's partial denial of immunity to the website turned entirely on the website's decision to *force* subscribers to divulge the protected characteristics and discriminatory preferences 'as a condition of using its services.'"); *F.T.C. v. Accusearch Inc.*, 570 F.3d 1187, 1199 (10th Cir. 2009) (holding that a website operator that affirmatively solicited and paid researchers to publish confidential records protected by the law was an "information content provider" for Section 230 purposes).

alleged that Backpage.com required or forced traffickers to post certain content within their advertisements for underage sex.[35]

Nor can Plaintiffs themselves plead around Section 230 by bringing various claims based on Defendants' business practices or business model, including the "design and operation" of the Backpage.com website.[36] Plaintiffs' claims are fundamentally grounded in the harm they allegedly suffered due to content posted by third parties, thus Plaintiffs should not be able to avoid the broad immunity granted intermediaries under Section 230(c)(1) unless Plaintiffs can show that Defendants' actions made them an "information content provider" consistent with *Roommates.com*. Allowing Plaintiffs to create such a loophole for business practices claims would eviscerate Section 230 and undermine Congress' goal of promoting "the continued development of the Internet and other interactive computer services and other interactive media."[37]

Finally, Plaintiffs' attempt to circumvent Section 230's immunity provisions based on *Doe v. Internet Brands*, 767 F.3d 894 (9th Cir. 2014), must also be rejected. First, the Ninth Circuit has vacated that opinion and ordered a rehearing of the appeal.[38] But even if that opinion remained good law, it would have no applicability here. In the vacated opinion, the Ninth Circuit had held that the website operator did not have Section 230(c)(1) immunity – not because the plaintiff's claim was based on actionable third-party content and the website operator was deemed a "publisher or speaker" of that content – but because the plaintiff's claim was based on

---

[35] Brief of City and County of San Francisco, *et al*. at 11; Brief of Commonwealth of Massachusetts at 18.
[36] *See* Second Amended Complaint Counts I-III.
[37] 47 U.S.C. § 230(b)(1).
[38] 2015 WL 774493 (9th Cir. 2015).

the website's own alleged negligence for failure to warn the plaintiff about the criminal acts of others who read, but did not post on, the website.[39]

## II.      The Federal Criminal Law Exception to Section 230 Immunity is Appropriately Limited to Criminal Prosecutions and Does Not Include Related Civil Actions

As Backpage.com has explained, the majority of courts have appropriately limited the federal criminal law exception to Section 230 immunity[40] to criminal *prosecutions*.[41] Including related civil actions in the exception would swallow the immunity rule and defeat Congress' intent in enacting Section 230.

Extending the federal criminal law exception beyond prosecutions to include civil actions authorized by criminal statutes would result in very serious practical consequences for freedom of speech and innovation online. Prosecutorial discretion and the higher standard of proof together mitigate the chilling effect created by the lack of immunity for Internet intermediaries against criminal prosecutions due to Section 230(e)(1). Limiting the exception makes practical sense given that government prosecutors generally exercise their discretion to bring criminal charges with care because so much is at stake in criminal cases – that is, the defendants' life or liberty. Additionally, the standard of proof in criminal cases is much higher than in civil cases.

Unlike federal prosecutors, private plaintiffs typically do not exercise such judiciousness in deciding whether to bring lawsuits where money damages are the remedy and the standard of proof is lower. Exposing Internet intermediaries to the whims of a broad array of civil claimants whose actions are authorized by criminal statutes would disincentivize online innovation and ultimately diminish the free speech and the free exchange of ideas and information that Internet

---

[39] 767 F.3d at 898-99.
[40] 47 U.S.C. § 230(e)(1).
[41] Defendants' Memorandum in Support of Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(6) at 20-23; Defendants' Reply in Support Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(6) of at 4-5.

platforms facilitate. This unfortunate result would be contrary to Congress' recognition that "The Internet and other interactive computer services offer a forum for a true diversity of political discourse, unique opportunities for cultural development, and myriad avenues for intellectual activity."[42]

This potential result is particularly concerning for *amici* who believe in the fundamental power of Internet platforms to be a force for good. Our concern about online service providers having to defend against civil claims authorized by federal criminal statutes goes far beyond classified ad websites like Backpage.com. There are numerous online communications platforms such as social media websites, email services, and instant messaging applications that, while they would not be able to invoke Section 230(c)(1) immunity if criminally prosecuted, should be able to do so if they find themselves subject to related civil lawsuits based on third-party content.

For example, there are several federal crimes related to terrorism[43] and aiding and abetting a crime is always a valid theory of liability pursuant to 18 U.S.C. § 2.[44] Federal law also provides civil remedies for victims of international terrorism.[45] It is possible (though not justifiable) that a federal prosecutor could seek to hold Twitter, for example, criminally liable for aiding and abetting terrorism because terrorists use Twitter to entice new recruits and advance their terrorism goals.[46] This would be an outrageous exercise of prosecutorial discretion and would require a distorted reading of the criminal statutes, and any such prosecution would

---

[42] 47 U.S.C. § 230(a)(3).

[43] 18 U.S.C. §§ 2331, *et seq.*

[44] *United States v. McCambridge*, 551 F.2d 865, 871 (1st Cir. 1977). Providing "material support" for terrorism is also a stand-alone crime similar to the aiding and abetting theory of liability. 18 U.S.C. § 2339A.

[45] 18 U.S.C. § 2333. Many courts have recognized aiding and abetting under this civil cause of action. *See, e.g.*, *Gill v. Arab Bank, PLC*, 893 F. Supp. 2d 474, 497-502 (E.D. N.Y. 2012).

[46] *See* Shane Harris, *Justice Department: We'll Go After ISIS's Twitter Army*, The Daily Beast (Feb. 23, 2015), http://www.thedailybeast.com/articles/2015/02/23/justice-department-we-ll-go-after-isis-twitter-army.html.

certainly fail on the merits. Nevertheless, if such a prosecution were brought, Twitter would not be able to invoke Section 230(c)(1) immunity due to Section 230(e)(1)'s clear exception for criminal *prosecutions*.

However, if victims of international terrorism were to sue Twitter pursuant to 18 U.S.C. § 2333 on an attenuated (and, as noted above, not justifiable) theory of aiding and abetting terrorism by providing an open content-hosting platform that is used by (among millions of others) some engaged in terrorist activities, any proper reading of the federal criminal law exception to Section 230 leads to the conclusion that Twitter should be immune from this civil claim because the claim is ultimately based on third-party content that Twitter had no direct hand in creating or posting. To permit such a suit to go forward merely because claimants make a tenuous link to federal criminal law would eviscerate Section 230 immunity and undermine congressional intent given the myriad criminal statutes that authorize attendant private rights of action.

That Plaintiffs' expansive reading of the federal criminal law exception would enable the exception to swallow the rule is further evident when considered in light of state unfair competition laws such as California's Business & Professions Code § 17200, which authorizes civil actions for violations of other laws, including federal criminal laws.[47] A private party could "borrow" a federal criminal law as the underlying substantive violation for a § 17200 claim even

---

[47] Civil actions may be brought "by a person who has suffered injury in fact and has lost money or property as a result of the unfair competition." Cal. Bus. & Prof. Code § 17204; *see also Roskind v. Morgan Stanley Dean Witter & Co.*, 80 Cal.App.4th 345, 352-356 (2000) (finding that "case authority clearly provides that violation of a federal law may serve as a predicate for a section 17200 action" and holding that "since trading ahead constitutes the crime of mail fraud under federal law, it is actionable under the UCL, which borrows other law, including federal law, to define the 'unlawful' practices that are UCL violations.").

when that federal criminal law does not itself authorize civil actions.[48] According to Plaintiffs' theory of liability, Internet intermediaries defending against civil unfair competition claims predicated on federal criminal laws (and based on third-party content) would not be able to invoke Section 230 immunity.

### III. Section 230 Provides Immunity From Plaintiffs' Right of Publicity Cause of Action and Other Privacy-Based State Law Causes of Action

Plaintiffs' argument that Section 230 does not apply to state law intellectual property claims is irrelevant because their right of publicity claim is not an intellectual property claim.[49] Rather, the right of publicity is a recent offshoot of privacy law.[50] Although the right of publicity is sometimes loosely referred to as a form of intellectual property, it falls well outside the core of intellectual property law. Unlike intellectual property, the right of publicity does not protect works of the human intellect.[51] Rather, it limits the use of factual information (such as accurate visual depictions or biographical information).[52] As a privacy right, it stands in marked contrast

---

[48] *Haskell v. Time, Inc.*, 965 F.Supp. 1398, 1402 (E.D. Cal. 1997) ("Under § 17200 of the California Business and Professions Code, 'unfair competition' includes 'any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising.' A private plaintiff may bring an action under §§ 17200 and 17204 to redress any unlawful business practice, including an unlawful practice that does not otherwise permit a private right of action, such as a criminal statute.") (footnotes omitted).

[49] For the reasons given in Backpage.com's motion and reply, *amici* agree that Plaintiffs' right of publicity claims have not been properly pled.

[50] *See Alvarez Guedes v. Marcano Martinez*, 131 F. Supp. 2d 272, 278 (D.P.R. 2001) ("the right of publicity flows from the right to privacy"); *see also* Rebecca Tushnet, *A Mask that Eats into the Face: Images and the Right of Publicity*, 38 Colum. J.L. & Arts 1, 3-4 (2015), *available at* http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2557985.

[51] *See Black's Law Dictionary* (10th Ed. 2014) (defining intellectual property as "[a] category of intangible rights protecting commercially valuable products of the human intellect").

[52] *See, e.g., Hart v. Elec. Arts, Inc.*, 717 F.3d 141, 168 (3d Cir. 2013) (imposing liability for "realistic depictions" of college football players).

to copyright and patent law, which have a long history and constitutional pedigree as intellectual property rights.[53]

In this case, Plaintiffs assert right of publicity claims founded on the use of their pictures for the purpose of advertising.[54] This is precisely the kind of allegation that early cases characterized as privacy claims.[55] In recent years, the right of publicity has grown to include aspects of unfair competition such as false endorsement.[56] But the right of publicity is still very distant from intellectual property.

Exempting right of publicity claims from Section 230 would frustrate Congress' purpose of protecting free speech online. The right of publicity potentially burdens a staggering range of speech. Far from its origins as a limited privacy right, it has since been asserted against biographies, comics, songs, computer games, movies, and magazines, and has come to encompass virtually anything that "evokes" a specific person.[57] In some states, right of publicity claims are not even limited to economic harms.[58]

---

[53] *See, e.g., Eldred v. Ashcroft*, 537 U.S. 186, 219 (2003) (noting that the Copyright Clause and the First Amendment were adopted "close in time").

[54] Plaintiffs' Opposition to Defendants' Motion to Dismiss at 25-26.

[55] *Pavesich v. New England Life Ins. Co.*, 50 S.E. 68 (Ga. 1905) (the "publication of a picture of a person, without his consent, as a part of an advertisement . . . is a violation of the right of privacy of the person whose picture is reproduced"); *see also Kunz v. Allen*, 172 P. 532 (Kan. 1918); *Foster-Milburn Co. v. Chinn*, 120 S.W. 364, 366 (Ky. 1909).

[56] *See Hogan v. A.S. Barnes & Co.*, 1957 WL 7316, at *11 (Pa. Ct. C.P. 1957) (noting that the right of publicity is "unfair competition under another label"); *see also* Restatement (Third) Of Unfair Competition §§ 46-49; Richard Ausness, *The Right of Publicity: A "Haystack in a Hurricane,"* 55 Temp. L.Q. 977, 1054 (1982) ("Analytically, the right of publicity could be classified as a form of unfair competition."), *available at* http://uknowledge.uky.edu/law_facpub/392/.

[57] *See ETW Corp. v. Jireh Publ'g, Inc.*, 332 F.3d 915 (6th Cir. 2003) (painting); *Guglielmi v. Spelling-Goldberg Prods.*, 25 Cal. 3d 860 (1979) (film); *Rosemont Enters. v. Urban Sys., Inc.*, 340 N.Y.S.2d 144 (N.Y. Sup. Ct. 1973) (board game); *Browne v. McCain*, 611 F. Supp. 2d 1062 (C.D. Cal. 2009) (presidential campaign commercial); *Seale v. Gramercy Pictures*, 949 F. Supp. 331 (E.D. Pa. 1996) (book and film); *Stewart v. Rolling Stone LLC*, 181 Cal. App. 4th 664 (2010) (magazine feature); *Hoffman v. Capital Cities/ABC, Inc.*, 255 F.3d 1180 (9th Cir. 2001)

For the reasons given above, the right of publicity should not be considered an intellectual property right.

Finally, even if a right of publicity action were an intellectual property action, Section 230 immunity should still apply because Section 230 exempts only federal intellectual property claims. The only federal appeals court to squarely address this issue held that Section 230's immunity extends to *all* state laws relating to intellectual property. In *Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102 (2007), the Ninth Circuit held that Section 230's exception for "laws relating to intellectual property" applied only to federal claims. The court noted that states have a wide variety of laws that, arguably, could be squeezed into the category of intellectual property.[59] These laws include wide-ranging causes of action such as the right of publicity and unfair competition. The court reasoned that including state law causes of action within the "intellectual property" exception would create widespread uncertainty as to the scope of the exception and impose considerable ligation costs on defendants.[60] The court concluded that this would "fatally undermine the broad grant of immunity provided by the CDA."[61]

The First Circuit's decision in *Lycos*, 478 F.3d at 413, is not to the contrary. In that case, the court found that the plaintiffs' state law trademark dilution claim was not properly pled.[62] In dicta, the court suggested, but did not decide, that the state law trademark claim related to

---

(digitally-altered photograph); *Doe v. TCI Cablevision*, 110 S.W.3d 363 (Mo. 2003) (comic books); *Cardtoons, L.C. v. Major League Baseball Players Ass'n*, 95 F.3d 959 (10th Cir. 1996) (parody trading cards); *Gionfriddo v. Major League Baseball*, 94 Cal. App. 4th 400 (2001) (documentary).

[58] *See, e.g., White v. Samsung Elec. Am., Inc.*, 971 F.2d 1395, 1397 (9th Cir. 1992) (defining the right as applying to "appropriation of plaintiff's name or likeness to defendant's advantage, commercially or otherwise") (emphasis added).

[59] *Id*. at 1107.

[60] *Id*.

[61] *Id.* at 1108.

[62] *Id.* at 424-25.

"intellectual property" law and thus was not subject to Section 230 immunity.[63] The court in *Doe v. Friendfinder Network, Inc.*, 540 F. Supp. 2d 288, 298-99 (D.N.H. 2008), which followed the *Lycos* dicta, thus erred and should not be relied upon here.[64]

## IV.    Section 230 Explicitly Preempts All Inconsistent State Law

Section 230 clearly states, "No cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section."[65]

Plaintiffs' tortured reading of the word "inconsistent" must be rejected. State and federal courts across the country have found state tort law claims to be preempted when they conflict with Section 230 by providing for liability where section 230 would provide immunity.[66] Indeed, courts have held preempted state law tort claims similar to the specific ones asserted in this case.[67]

---

[63] *Id.* at 423 n.7.

[64] In any event, neither *Lycos* nor *Friendfinder* considered whether right of publicity claims qualify for Section 230 immunity.

[65] 47 U.S.C. § 230(e)(3).

[66] *See Almeida v. Amazon.com, Inc.*, 456 F.3d 1316, 1321 (11th Cir. 2006) ("The CDA preempts state law that is contrary to this subsection."); *Ben Ezra, Weinstein & Co. v. Am. Online*, 206 F.3d 980, 984-85 (10th Cir. 2000) ("47 U.S.C. § 230 creates a federal immunity to any state law cause of action that would hold computer service providers liable for information originating with a third party."); *Doe v. Am. Online*, 783 So. 2d 1010, 1013 (Fla. 2001) ("[We] find that section 230 does preempt Florida law as to such a cause of action based upon alleged negligence."); *Gentry*, 99 Cal. App. 4th at 830 ("Other courts have applied [Section 230 immunity] to bar not only defamation claims, but other tort causes of action asserted against interactive service providers.").

[67] *See Doe v. MySpace*, 528 F.3d 413, 420 (5th Cir. 2008) (Section 230 bars claims brought by minors asserting negligence in failing to institute safety measures to adequately protect them from online predators); *Dart*, 665 F. Supp. 2d at 969 (Section 230 bars claims that an online service provider's "erotic services" section constitutes a public nuisance because it caused or induced prostitution); *Backpage.com, LLC v. McKenna*, 881 F. Supp. 2d 1262, 1269, 1273 (W.D. Wash. 2012) (finding that the law was likely expressly preempted by Section 230 because it treated websites like Backpage.com as the publisher or speaker of information created by its users "by imposing liability on Backpage.com . . . for information created by third parties— namely ads for commercial sex acts depicting minors.").

## CONCLUSION

For the above-stated reasons, Backpage.com's motion to dismiss should be granted.


Dated: March 9, 2015                Respectfully submitted,

                    By:    /s/ Kit Walsh
                           Kit Walsh (BBO#673509)
                           David Greene
                           Sophia Cope
                           Daniel Nazer
                           ELECTRONIC FRONTIER FOUNDATION
                           815 Eddy Street
                           San Francisco, CA 94109

                           Emma Llansó
                           CENTER FOR DEMOCRACY & TECHNOLOGY
                           1634 I Street, NW, Suite 1100
                           Washington, DC 20006

                           *Counsel for Amicus Curiae*
                           *ELECTRONIC FRONTIER FOUNDATION, CENTER FOR*
                           *DEMOCRACY & TECHNOLOGY, AND PROFESSOR*
                           *ERIC GOLDMAN*

**CERTIFICATE OF SERVICE**

I, Kit Walsh, hereby certify that this document, filed through the ECF system on March 9, 2015, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing ("NEF") and paper copies will be sent to those indicated as non-registered participants.

Dated: March 9, 2015 /s/ Kit Walsh
Kit Walsh

*Counsel for Amicus Curiae*
*ELECTRONIC FRONTIER FOUNDATION*