UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| JANE DOE NO. 1, a minor child, by her parent and next friend MARY ROE, JANE DOE NO. 2, and JANE DOE NO. 3, a minor child, by her parents and next friends, SAM LOE and SARA LOE,<br><br>        Plaintiffs,<br><br>    v.<br><br>BACKPAGE.COM, LLC, CAMARILLO HOLDINGS, LLC (f/k/a VILLAGE VOICE MEDIA HOLDINGS, LLC) and NEW TIMES MEDIA HOLDINGS, LLC,<br><br>        Defendants. | Civil Action No. 14-13870-RGS<br><br>**Leave to file granted on March 24, 2015** |

## DEFENDANTS' RESPONSE TO BRIEFS OF *AMICI CURIAE* COMMONWEALTH OF MASSACHUSETTS AND CITY AND COUNTY OF SAN FRANCISCO, *ET AL.*, IN SUPPORT OF PLAINTIFFS

BACKPAGE.COM, LLC, et al.

By Their Attorneys,

Robert A. Bertsche (BBO #554333)
Jeffrey J. Pyle (BBO #647438)
PRINCE LOBEL TYE LLP
100 Cambridge Street, Suite 2200
Boston, MA 02114
(617) 456-8000 (tel.); (617) 456-8100 (fax)
rbertsche@PrinceLobel.com
jpyle@PrinceLobel.com

James C. Grant (admitted *Pro Hac Vice*)
Ambika K. Doran (admitted *Pro Hac Vice*)
DAVIS WRIGHT TREMAINE LLP
1201 Third Avenue, Suite 2200
Seattle, WA 98101
(206) 622-3150 (tel.); (206) 757-7700 (fax)
jimgrant@dwt.com
ambikadoran@dwt.com

## TABLE OF CONTENTS

I.    INTRODUCTION ........................................................................................ 1

II.    ARGUMENT ............................................................................................... 2

    A.    Amici's Assertions and Arguments Are Improper. ................................ 2

    B.    This Court Deserves a More Balanced View of Sex Trafficking than Amici's "Understandings." ................................................................. 3

    C.    Amici's Factual Accusations about Backpage.com Are Improper and Contradict Their Laws, Experiences, and Statements. ........................ 11

    D.    Amici Have Conceded Section 230 Bars Enforcement of State Laws. ................ 17

    E.    Amici Cannot Argue that Backpage.com is an "Information Content Provider," and Their Argument is Wrong. ........................................... 21

III.    CONCLUSION ......................................................................................... 27

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*800-JR Cigar, Inc. v. GoTo.com, Inc.*,
  437 F. Supp. 2d 273 (D.N.J. 2006) ...................................................27

*Alvi Armani Med., Inc. v. Hennessey*,
  629 F. Supp. 1302 (S.D. Fla. 2008) ..................................................26

*Am. Libraries Ass'n v. Pataki*,
  969 F. Supp. 160, 168 (S.D.N.Y. 1997)............................................18

*Anthony v. Yahoo! Inc.*,
  421 F. Supp. 2d 1257 (N.D. Cal. 2006) ............................................26

*Atl. Recording Corp. v. Project Playlist, Inc.*,
  603 F. Supp. 2d 690 (S.D.N.Y. 2009)...............................................23

*Backpage.com, LLC v. Cooper*,
  939 F. Supp. 2d 805 (M.D. Tenn. 2013) ...........................................11

*Backpage.com, LLC v. Hoffman*,
  2013 WL 4502097 (D.N.J. Aug. 20, 2013) ........................................11

*Backpage.com, LLC v. McKenna*,
  881 F. Supp. 2d 1262 (W.D. Wash. 2012)....................................11, 17

*Batzel v. Smith*,
  333 F.3d 1018 (9th Cir. 2003) .........................................................17

*Cisneros v. Sanchez*,
  403 F. Supp. 2d 588 (S.D. Tex. 2005) ..............................................27

*Dart v. Craigslist, Inc.*,
  665 F. Supp. 2d 961 962, 969 (N.D. Ill. 2009) ..............................11, 24

*Doe v. City of New York*,
  583 F. Supp. 2d 444 (S.D.N.Y. 2008)...............................................26

*Doe v. GTE, Corp.*,
  347 F.3d 655 (7th Cir. 2003) ...........................................................26

*Doe v. MySpace, Inc.*,
  629 F. Supp. 2d 663 (E.D. Tex. 2009) ..............................................23

*F.T.C. v. Accusearch, Inc.*,
    570 F.3d 1187 (10th Cir. 2009) ...............................................................23, 24, 26

*Fair Housing Council of San Fernando Valley v. Roommates.com, LLC*,
    521 F.3d 1157, 1174 (9th Cir. 2008) ....................................................21, 22, 23, 24

*Fraley v. Facebook, Inc.*,
    830 F. Supp. 2d 785 (N.D. Cal. 2011) ...............................................................26

*Goddard v. Google, Inc.*,
    640 F. Supp. 2d 1193 (N.D. Cal. 2009) ........................................................23, 27

*Hy Cite Corp. v. Badbusinessbureau.com, L.L.C.*,
    418 F. Supp. 2d 1142 (D. Ariz. 2005) .................................................................27

*Jones v. Dirty World Entertainment Recordings LLC*,
    755 F.3d 398 (6th Cir. 2014) ............................................................................25

*Katin v. Nat'l Real Estate Info. Servs., Inc.*,
    2009 WL 929554 (D. Mass. Mar. 31, 2009)........................................................19

*L.B. Corp. v. Schweitzer-Mauduit Int'l, Inc.*,
    121 F. Supp. 2d 147, 152 (D. Mass. 2000) ........................................................20

*Lane v. First Nat'l Bank of Bos.*,
    871 F.2d 166 (1st Cir. 1989).........................................................................3, 21

*Levitt v. Yelp! Inc.*,
    2011 WL 5079526 (N.D. Cal. Oct. 26, 2011), *aff'd*, 765 F.3d 1123 (9th Cir. 2014)..............27

*M.A. v. Village Voice Media Holdings, LLC*,
    809 F. Supp. 2d 1041 (E.D. Mo. 2011)..........................................................11, 26

*McCoy v. Mass. Inst. of Tech.*,
    950 F.2d 13 (1st Cir. 1991)...............................................................................21

*MCW, Inc. v. Badbusinessbureau.com, L.L.C.*,
    2004 WL 833595 (N.D. Tex. Apr. 19, 2004) ......................................................27

*Moving & Storage, Inc. v. Panayotov*,
    2014 WL 949830 (D. Mass. Mar. 12, 2014)........................................................26

*Nemet Chevrolet, Ltd. v. ConsumerAffairs.com, Inc.*,
    591 F.3d 250 (4th Cir. 2009) ....................................................................17, 24, 27

*New England Patriots Football Club, Inc. v. Univ. of Colo.*,
    592 F.2d 1196 (1st Cir. 1979).........................................................................2, 11

*Pharm. Research & Mfrs. of Am. v. Concannon*,
    249 F.3d 66 (1st Cir. 2001), *aff'd sub nom. Pharm. Research & Mfrs. of Am.*
    *v. Walsh*, 538 U.S. 644 (2003) ...........................................................................21

*PSINet, Inc. v. Chapman*,
    362 F.3d 227 (4th Cir. 2004) ............................................................................18

*Ray v. Ropes & Gray LLP*,
    961 F. Supp. 2d 344 (D. Mass. 2013) ...............................................................19

*Santos v. SANYO Mfg. Corp.*,
    2013 WL 1868268 (D. Mass. May 3, 2013) .......................................................19

*Strasser v. Doorley*,
    432 F.2d 567 (1st Cir. 1970) ...............................................................................2

*Swenson v. Yellow Transp., Inc.*,
    317 F. Supp. 2d 51 (D. Mass. 2004) ..................................................................19

*United States v. Certain Land Located in the Cnty. of Barnstable*,
    674 F.2d 90 (1st Cir. 1982) ...............................................................................11

*Universal Commnc'ns Sys., Inc. v. Lycos, Inc.*,
    478 F.3d 413 (1st Cir. 2007) .............................................................................24

*Weaver's Cove Energy, LLC v. R. I. Coastal Res. Mgmt. Council*,
    589 F.3d 458 (1st Cir. 2009) .............................................................................21

**State Cases**

*Demetriades v. Yelp, Inc.*,
    228 Cal. App. 4th 294, 175 Cal. Rptr. 3d 131 (2014) .........................................26

*Gentry v. eBay, Inc.*,
    99 Cal. App. 4th 816, 121 Cal. Rptr. 2d 703 (2002) ..........................................25

*Go-Best Assets Ltd. v. Citizens Bank of Massachusetts*,
    463 Mass. 50, 972 N.E.2d 426 (2012) ...............................................................18

*Hardin v. PDX, Inc.*,
    227 Cal. App. 4th 159, 173 Cal. Rptr. 3d 397 (2014) .........................................26

*Hill v. StubHub, Inc.*,
    727 S.E.2d 550 (N.C. Ct. App. 2012) ...........................................................25, 26

*Milgram v. Orbitz Worldwide, Inc.*,
    419 N.J. Super. 305, 16 A.3d 1113 (Law Div. 2010) ..........................................25

*NPS LLC v. StubHub, Inc.*,
   2009 WL 995483 (Mass. Super. Ct. Jan. 26, 2009)................................................................25

**Federal Statutes**

47 U.S.C. § 230........................................................................................................... *passim*

**State Statutes & Municipal Ordinances**

Atlanta Code of Ordinances § 30-641 to -668 ....................................................................12

Colo. Rev. Stat. § 12.25.5-101 *et seq*................................................................................12

Denver Mun. Code, § 7-320 ................................................................................................12

Mass. Gen. Laws ch. 93A ..............................................................................1, 18, 19, 20

Mass. Gen. Laws ch. 265 ......................................................................................1, 12, 18

San Francisco Police Code Art. 15.6 § 1074.4 ..................................................................12

**Rules**

Fed. R. Civ. P. 9(b) .............................................................................................................19

Fed. R. Civ. P. 12(b)(6)........................................................................................................1

**Other Authorities**

*APA Task Force Report Highlights Problem of Human Trafficking of US Women
   and Girls* (Mar. 12, 2014),
   http://www.apa.org/news/press/releases/2014/03/human-trafficking.aspx ............................8

Bloomberg Law, News & Law Reports, at 1 ........................................................................4

*Child Prostitution: Raids Rescue 105 Young People*, N.Y. TIMES (July 29, 2013),
   http://mobile.nytimes.com/aponline/2013/07/29/us/politics/ap-us-child-sex-
   arrests.html?from=us ......................................................................................................15

Chris Matyszczyk, *Study:  Facebook replacing Craigslist for prostitutes*, CNET
   (Feb. 7, 2011), http://www.cnet.com/news/ study-facebook-replacing-
   craigslist-for-prostitutes ....................................................................................................6

Christina Bain, *et al.*, *How to Responsibly Create Technological Interventions to
   Address the Domestic Sex Trafficking of Minors* (April 8, 2013),
   http://www.danah.org/papers/TechnologistsCSEC.pdf.....................................................4, 8

danah boyd, et al., *Human Trafficking and Technology: A Framework for understanding the role of technology in the commercial sexual exploitation of children in the U.S.*, (2011), http://research.microsoft.com/en-us/collaboration/focus/education/htframework-2011.pdf .....................................................5, 6

danah boyd, *Combating Sexual Exploitation Online: Focus on the Networks of People, not the Technology*, Statement to Attorney General Coakley, Hearing on Sexual Exploitation Online (Oct. 19, 2010), http://www.mass.gov/ago/docs/community/testimony/db.pdf .........................................6, 7, 9

danah boyd, *How Censoring Craigslist Helps Pimps, Child Traffickers and Other Abusive Scumbags*, HUFFINGTON POST (Sept. 6, 2010), http://www.huffingtonpost.com/danah-boyd/how-censoring-craigslist-_b_706789.html ...............................................................................7, 8, 10

Daniel Fisher, *Backpage Takes Heat, But Prostitution Ads Are Everywhere*, FORBES (Jan. 26, 2012), http://www.forbes.com/sites/danielfisher/2012/01/26/backpages-takes-heat-for-prostitution-ads-that-are-everywhere ...........................6

*Domestic Minor Sex Trafficking: Hearing before Senate Subcomm. on Crime, Terrorism, and Homeland Security of the H. Comm. on the Judiciary*, 111th Cong. 297-99 (2010) .........................................................................................................20

Eliabieta Gozdziak & Micah Bump, Georgetown University Institute for the Study of International Migration, *Data and Research on Human Trafficking: Bibliography of Research-Based Literature* (Oct. 2008), https://www.ncjrs.gov/pdffiles1/nij/grants/ 224392.pdf ...........................................4

Gianna Caserta, *More than 60 men charged in HPD prostitution 'round-up,'* CLICK2HOUSTON (Mar. 4, 2015), http://www.click2houston.com/news/64-charged-in-hpd-prostitution-roundup-investigation/31605082...............................14

http://www.cityofboston.gov/cityclerk/dbasearch/Default.aspx?type_of_business=escort&order_by=file_number..............................................................................12

http://www.yellowpages.com ...............................................................................12

*Human Trafficking in the United States: Protecting the Victims*, Hearing Before Senate Judiciary Committee, 114th Cong. (Feb. 24, 2015) .................................4, 11

Institute of Medicine & National Research Council, *Confronting Commercial Sexual Exploitation and Sex Trafficking of Minors in the United States* (Ellen Wright Clayton *et al.* eds., 2013), http://www.iom.edu/~/media/Files/Report%20Files/2013/Sexual-Exploitation-Sex-Trafficking/sextraffickingminors_rb.pdf ...........................................................9

Jennifer Musto, *Institutionalizing Protection, Professionalizing Victim Management: Explorations of Multi-Professional Anti-Trafficking Efforts in the Netherlands and the United States* (UCLA 2011) ..............................................8

Julie Ruvolo, *Sex, Lies and Suicide:  What's Wrong with the War on Sex Trafficking*, FORBES (June 26, 2012), http://www.forbes.com/sites/julieruvolo/2012/06/26/sex-lies-and-suicide-whats-wrong-with-the-war-on-sex-trafficking/ ..................................................6, 7

Letter from AG Coakley, *et al.* to Sen. Rockefeller, *et al.* (July 23, 2013), https://www.eff.org/files/cda-ag-letter.pdf ..............................................20

Mark Latonero, *Human Trafficking Online, The Role of Social Networking Sites and Online Classifieds*, USC Annenberg Center on Communication Leadership & Policy (Sept. 2011)..............................................5

Mark Latonero, *The Rise of Mobile and the Diffusion of Technology-Facilitated Trafficking*, USC Annenberg Center on Communication Leadership and Policy (Nov. 2012), https://technologyandtrafficking.usc.edu/files/2012/11/HumanTrafficking2012_Nov12.pdf ............................................................. *passim*

Mark Masnick, *Oh Look:  Police Can Use Backpage.com To Track Down, Arrest & Convict Pimps & Prostitutes*, TECHDIRT (Oct. 2, 2012), https://www.techdirt.com/articles/20121002/07354820569/oh-look-police-can-use-backpagecom-to-track-down-arrest-convict-pimps-prostitutes.shtml.........................7

Maureen McGough, *Ending Modern-Day Slavery: Using Research to Inform U.S. Anti-Human Trafficking Efforts*, National Institute of Justice, NIJ Journal No. 271 (Feb. 2013), http://www.nij.gov/journals/271/pages/anti-human-trafficking.aspx ............................................................4

Megan Woolhouse, *Craigslist sex-ad ban doesn't end Web listings*, BOSTON GLOBE (Sept. 8, 2010)............................................................7

Meredith Dank, *et al.*, *Estimating the Size and Structure of the Underground Commercial Sex Economy in Eight Major US Cities*, Urban Institute, at 234 (March 2014), http://www.urban.org/UploadedPDF/413047-Underground-Commercial-Sex-Economy.pdf ............................................................7

Michael Lindenberger, *Craigslist Comes Clean: No More 'Adult Services,' Ever*, TIME, (Sept. 16, 2010), http://content.time.com/time/nation/article/0,8599,2019499,00.html ......................................7

National Institute of Justice, NIJ JOURNAL No. 271 (Feb. 2013), http://www.nij.gov/journals/271/pages/anti-human-trafficking.aspx.........................................4

O'Ryan Johnson, *Coakley reverses stance on site*, BOSTON HERALD, (Aug. 20, 2010) ...................................................................................................................20

*Oakland Man Accused Of Listing Teen On Sex Website Pleads Not Guilty*, CBS (Feb. 27, 2015), http://sanfrancisco.cbslocal.com/2015/02/27/oakland-man-who-listed-teen-on-web-for-sex-busted-by-website-pleads-not-guilty ...................15

Phillip Martin, *Two Years On, Mass. Human Trafficking Law Examined*, WGBH, (Aug. 19, 2013), http://wgbhnews.org/post/two-years-mass-human-trafficking-law-examined ...........................................................................................4

Press Release, Washington AG, *McKenna announces agreement with Craigslist to crack down on illegal sex trade ads* (Nov. 6, 2008), http://www.atg.wa.gov/news/news-releases/mckenna-announces-agreement-craigslist-crack-down-illegal-sex-trade-ads ..................................................16

Press Release, The White House, Remarks by the President to the Clinton Global Initiative (Sept. 25, 2012), http://www.whitehouse.gov/the-press-office/2012/09/25/remarks-president-clinton-global-initiative..................................9

Rachel Lewis Hilburn, *Websites with Adult Ads Contribute to Sex Trafficking of Kids; Law Officers Call the Sites Helpful*, WHQR (Mar. 4, 2015), http://whqr.org/ post/websites-adult-ads-contribute-sex-trafficking-kids-law-officers-call-sites-helpfu .........................................................................10

Richard Estes & Neil Alan Weiner, *The Commercial Sexual Exploitation of Children In the U.S., Canada and Mexico*, University of Pennsylvania, Center for the Study of Youth Policy (Sept. 18, 2001, rev. Feb. 20, 2002), *quoted at* http://www.justfacts.com/sexuality.asp#f40 .............................................5

Ronald Weitzer, *New Directions in Research on Human Trafficking*, 653 ANNALS AM. ACAD. POL. & SOC. SCI. (May 2014)..............................................4

Sadie Gurman, *Six Denver pimps arrested, 9 children saved as part of federal sting*, DENVER POST (July 29, 2013), http://www.denverpost.com/ci_23753147/six-denver-pimps-arrested-nine-children-saved-part ................................................................................15

Shared Hope International, *2013 Protected Innocence Challenge: A Legal Framework of Protection for the Nation's Children*, http://sharedhope.org/wp-content/uploads/2014/02/2013-Protected-Innocence-Challenge-Report.pdf...........9

Sheldon Zhang, *Beyond the 'Natasha' story—a review and critique of current research on sex trafficking*, GLOBAL CRIME vol. 10, no. 3, at 179 (Aug. 2009) ....................4

State Attorney General Letter (Sept. 21, 2010), http://www.illinoisattorneygeneral.gov/pressroom/2010_09/Backpage_com9-20-2010.pdf....................................................................................7

Statement of AG Kamala Harris, *Human Trafficking*, http://oag.ca.gov/human-trafficking.................................................................................................................9

Stephanie Hanes, *Human Trafficking:  a misunderstood global scourge*, CHRISTIAN SCI. MONITOR (Sept. 9, 2012) http://www.csmonitor.com/World/Global-Issues/2012/0909/Human-trafficking-a-misunderstood-global-scourge..................................................4, 5, 8

Steve Johnson, *Sex online: Police target lucrative Internet prostitution trade*, SAN JOSE MERCURY NEWS (Jan. 12, 2015) ...................................................................15

Vanessa Bouche, Thorn, *A Report on the Use of Technology to Recruit, Groom and Sell Domestic Minor Sex Trafficking Victims* (January 2015), https://www.wearethorn.org/resources-and-research/use-of-technology-in-domestic-minor-sex-trafficking ...................................................................6, 8, 10

Women's Commission for Refugee Women and Children, *The U.S. Response to Human Trafficking:  An Unbalanced Approach* (May 2007), http://www.humantrafficking.org/uploads/publications/ustraff.pdf ........................4

www.craigslist.org/about/help/Adult_Services_Posting_Guidelines ...........................17

## I.    INTRODUCTION

On the eve of Backpage.com's deadline for its last brief concerning its Motion to Dismiss, the Massachusetts Attorney General ("AG") and six municipalities ("Cities")[1] filed two amicus briefs in support of Plaintiffs.  For the reasons set forth in the accompanying Motion for Leave, Backpage.com respectfully asks the Court to consider this Response, which addresses four points.

*First*, amici offer their "understanding" of the issue of sex trafficking, but the Court should have a more balanced account of the public discourse about the problem and how best to address it.  Although amici advocate shutting down websites such as Backpage.com, many experts agree censorship is a misguided and ineffectual approach to combat the problem, while technology and working with cooperative websites can be an important part of the solution.

*Second*, amici offer their own fact allegations, with the apparent aim of tainting the Court's view of Backpage.com.  Amici's partisan view of the facts is improper, especially here, because Backpage.com's Rule 12(b)(6) motion turns on whether Plaintiffs have sufficiently alleged plausible facts to support a claim (and, indeed, Plaintiffs have admitted the key facts establishing immunity under 47 U.S.C. § 230 ("Section 230")).  Moreover, the fact that amici frequently work with Backpage.com—and often praise the website for its cooperation and support of law enforcement—belie the accusations they now make.

*Third*, amici urge the Court to permit them to enforce state and local laws against Backpage.com, yet the AG has admitted several times that Section 230 preempts such laws in exactly this context.  Further, while the AG's office apparently endorses Plaintiffs' statutory claims (under c. 265 § 50 and c. 93A), the authority it cites supports Backpage.com's arguments for dismissal.

---

[1] City and County of San Francisco, City of Atlanta, City and County of Denver, City of Houston, City of Philadelphia, and City of Portland, Oregon.

*Finally*, amici make a new argument—that Backpage.com is an "information content provider" and thus exempt from Section 230 immunity—even though Plaintiffs expressly disclaimed this position.  This too is an improper amicus argument.  Nonetheless, under well-established authority interpreting Section 230, Backpage.com is not the "information content provider" for the ads about Plaintiffs (which can be the only basis for their claims).  Amici's new argument is simply another variation of the oft-rejected theory that parties can avoid Section 230 by alleging a website, by its nature, "encourages," "promotes" or "induces" content.

The Court should disregard the amicus briefs of the AG and the Cities, but even if it does not, it should reject their arguments.

## II.    ARGUMENT

### A.    Amici's Assertions and Arguments Are Improper.

In general, the briefs of the AG and the Cities consist of (1) amici's own accusations about (*i.e.*, attacks against) Backpage.com and efforts to endorse and embellish Plaintiffs' allegations; and (2) legal arguments Plaintiffs have not raised, and, in fact, have expressly disclaimed.  In both respects, amici's briefs are improper.

The role of amicus is not to offer a "highly partisan account of the facts," *New England Patriots Football Club, Inc. v. Univ. of Colo.*, 592 F.2d 1196, 1198 n.3 (1st Cir. 1979), and, indeed, "an amicus who argues facts should rarely be welcomed," *Strasser v. Doorley*, 432 F.2d 567, 569 (1st Cir. 1970).  This is especially true here because the Court is considering a 12(b)(6) motion, as to which the central issue is whether Plaintiffs have alleged (or can allege) plausible facts to pursue their claims—and Plaintiffs have admitted the only facts needed to decide the motion under Section 230 (*i.e.* third parties created and developed the ads).

Similarly, amici's legal argument that Section 230 does not protect Backpage.com because it is "an information content provider," *see, e.g.*, Cities Br. at 2, is also improper because

2

Plaintiffs expressly chose **not** to make this argument, *see* Opp. to Mot. to Dismiss at 15 n.5

("Plaintiffs do not contend at this stage of the litigation that Backpage.com is an 'information

content provider' …").  An amicus may not "interject into a case issues which the litigants,

whatever their reasons might be, have chosen to ignore."  *Lane v. First Nat'l Bank of Bos.*, 871

F.2d 166, 175 (1st Cir. 1989).

If the Court considers amici's arguments, it should also consider Backpage.com's

response, as follows.

**B.      This Court Deserves a More Balanced View of Sex Trafficking than Amici's "Understandings."**

Both briefs offer amici's views about their "experience and understanding of the problem

of human trafficking generally, and sex trafficking in particular."  AG Br. at 2; *see also id.* at

2-8; Cities Mot. for Leave at 1-4; Cities Br. at 1.  Certainly everyone in this action—Plaintiffs,

their amici, **and** Backpage.com—agrees human trafficking is a horrendous crime that should be

addressed by intelligent laws and policies.  But it is also important to have a full and balanced

understanding of the issue of sex trafficking and experts' analyses of the problem and approaches

to combat it—not merely the "understandings" amici advance to support their arguments.

Sex trafficking has become a high-profile public cause, championed by politicians,

celebrities, non-governmental organizations ("NGOs"), and others.  Although this has helped

raise public awareness, experts caution that laws, policy decisions, and law enforcement efforts

should be based on empirical data, not unsupported claims or anecdotal accounts.  Perhaps "in no

area of the social sciences has ideology contaminated knowledge more pervasively than in

writings on the sex industry.  Too often in this area, the canons of scientific inquiry are

suspended and research deliberately skewed to serve a particular political agenda."[2]  The concern

(and the consensus among experts) is that most writings about sex trafficking are not evidence-

based, but are premised on the views of groups seeking to advance political and moral agendas.[3]

For example, it is widely recognized there are no accurate estimates of the extent of sex

trafficking in the United States.[4]  Yet government authorities, NGOs, and others (including amici

---

[2] Sheldon Zhang, *Beyond the 'Natasha' story—a review and critique of current research on sex trafficking*, GLOBAL CRIME, vol. 10, no. 3, at 179 (Aug. 2009) (quoting GWU Professor Ronald Weitzer).

[3] Researchers at George Washington University comprehensively reviewed articles about trafficking and found they were not evidence-based, but relied on assertions by government agencies and NGOs advancing their views, while "[m]uch of the popular writing on human trafficking has been anecdotal or sensationalistic."  Ronald Weitzer, *New Directions in Research on Human Trafficking*, 653 ANNALS AM. ACAD. POL. & SOC. SCI., at 6 (May 2014).  *See also* Eliabieta Gozdziak & Micah Bump, Georgetown University Institute for the Study of International Migration, *Data and Research on Human Trafficking: Bibliography of Research-Based Literature*, at 43 (Oct. 2008), https://www.ncjrs.gov/pdffiles1/nij/grants/ 224392.pdf ("the dominant anti-trafficking discourse is not evidence-based but grounded in the construction of particular mythology of trafficking"); Christina Bain, *et al.*, *How to Responsibly Create Technological Interventions to Address the Domestic Sex Trafficking of Minors*, at 1 (April 8, 2013), http://www.danah.org/papers/TechnologistsCSEC.pdf (key findings from nineteen academic experts: "[A]ll too often, myths and public misunderstandings … drive political and legal agendas...."); Stephanie Hanes, *Human Trafficking:  a misunderstood global scourge*, CHRISTIAN SCI. MONITOR (Sept. 9, 2012), at 3, http://www.csmonitor.com/World/Global-Issues/2012/0909/Human-trafficking-a-misunderstood-global-scourge (quoting director of American University program on trafficking and forced labor: "the anti-domestic-sex-trafficking movement 'just took off and created its own industry,' in part because it touched upon a conservative social nerve"); Women's Commission for Refugee Women and Children, *The U.S. Response to Human Trafficking:  An Unbalanced Approach*, at 1 (May 2007), http://www.humantrafficking.org/uploads/publications/ustraff.pdf ("Another issue throwing trafficking protections off balance is the United States' policy which focuses government trafficking efforts on eradicating prostitution, which it conflates with sex trafficking.").

[4] *Human Trafficking in the United States:  Protecting the Victims*, Hearing Before Senate Judiciary Committee, 114th Cong. (Feb. 24, 2015), text from Bloomberg Law, News & Law Reports, at 1 (statement of Sen. Grassley:  "Reliable data of human trafficking victims within our country's borders is not readily available."); Maureen McGough, *Ending Modern-Day Slavery: Using Research to Inform U.S. Anti-Human Trafficking Efforts*, National Institute of Justice, NIJ JOURNAL No. 271 (Feb. 2013), http://www.nij.gov/journals/271/pages/anti-human-trafficking.aspx ("The data used to estimate the prevalence of human trafficking in the U.S. are lacking in scope and quality at the federal, state and local levels," and, as a result, "challenges also exist in gauging the effectiveness of the criminal justice system's response."); Gozdziak & Bump, *Data and Research on Human Trafficking*, at 13 ("there is little systematic and reliable data on the scale of" human trafficking, yet accurate information "is vital … to craft effective policies"); Phillip Martin, *Two Years On, Mass. Human Trafficking Law Examined*, WGBH, (Aug. 19, 2013), http://wgbhnews.org/post/two-years-mass-human-trafficking-law-examined ("It's not clear how many people in Massachusetts and New England are victims of human trafficking; and officials conceded that making that determination is difficult.").

here, *see* AG Br. at 3; Cities Br. at 1) often assert there are 100,000-300,000 underage sex

trafficking victims in the country.  That misstates a 2001 study that suggested only that this many

youth might be at risk because of their circumstances.[5]  As commentators have noted, "[h]ype

over such high and inaccurate numbers … leads to a misguided response, at best" and, at worst,

diverts resources and attention from real solutions to human trafficking.[6]

Similarly, while most agree "technology is increasingly playing a role in the practices and

processes surrounding human trafficking," experts acknowledge "[w]e do not know if there are

more human trafficking victims as a result of technology."[7]  In fact, no one—neither experts nor

websites—can determine whether any given online post concerns sex trafficking.[8]  Experts

caution that the increase in visibility due to technology should not lead to misguided decisions:

> Heightened visibility can easily prompt fear, as we become concerned about the
> things that we see that we don't like.  But the least productive thing that we can
> do with visibility is use it to generate fear.  While fear and outrage can propel us

---

[5] Hanes, *Human Trafficking*, at 3 (numbers came from 2001 University of Pennsylvania study estimating youths at risk of exploitation "because of an array of negative circumstances, from homelessness to drug addiction").  The Pennsylvania study actually stated that "[r]eliable estimates of the number of commercially sexually exploited children [CSEC] in the United States do *not* exist."  Richard Estes & Neil Alan Weiner, *The Commercial Sexual Exploitation of Children In the U.S., Canada and Mexico*, University of Pennsylvania, Center for the Study of Youth Policy, at 142 (Sept. 18, 2001, rev. Feb. 20, 2002), *quoted at* http://www.justfacts.com/sexuality.asp#f40.

[6] Hanes, *Human Trafficking*, at 3; *see also id.* (quoting American University director:  "You need to tailor your response to the reality [not] to the hype."); *id.* at 8 (funding is diverted, "prevention gets short shrift," and "[c]hildren most at risk of becoming trafficked … have difficulty getting help").

[7] danah boyd, et al., *Human Trafficking and Technology:  A Framework for understanding the role of technology in the commercial sexual exploitation of children in the U.S.*, at 1, (2011), http://research.microsoft.com/en-us/collaboration/focus/education/htframework-2011.pdf.  *See also* Mark Latonero, *Human Trafficking Online, The Role of Social Networking Sites and Online Classifieds*, USC Annenberg Center on Communication Leadership & Policy, at 11 (Sept. 2011), http://technologyandtrafficking.usc.edu/files/2011/09/HumanTrafficking_FINAL.pdf.

[8] Mark Latonero, *The Rise of Mobile and the Diffusion of Technology-Facilitated Trafficking*, USC Annenberg Center on Communication Leadership and Policy, at 19 (Nov. 2012), https://technologyandtrafficking.usc.edu/files/2012/11/HumanTrafficking2012_Nov12.pdf ("How an Internet service provider would actively determine or identify content that might signal human trafficking behavior remains unresolved."); *id.* at 22 (researchers applying analytic techniques cannot ascertain that any given ad concerns minor sex trafficking).

to act, driving policy by fear can easily backfire and harm those that we're trying to help."[9]

In short, "[f]ocusing on whether technology is good or bad misses the point; it is here to stay."[10]

It is also myopic to focus just on the Internet or any one website. Mobile communications (texting and apps) have "risen in prominence" and "are now of central importance in the sex trafficking of minors in the United States."[11] Pimps and johns increasingly are using gaming technologies such as Xbox Live and Sony Online Entertainment.[12] Even looking at just the Internet, traffickers and others misuse ***many*** websites,[13] including Facebook, MySpace, and Craigslist (still), Twitter, Tumbler, and others.[14]

---

[9] danah boyd, *Combating Sexual Exploitation Online: Focus on the Networks of People, not the Technology*, Statement to Attorney General Coakley, Hearing on Sexual Exploitation Online, at 1 (Oct. 19, 2010), http://www.mass.gov/ago/docs/community/testimony/db.pdf.

[10] boyd, *Human Trafficking and Technology*, at 1.

[11] Latonero, *The Rise of Mobile*, at iv. *See also* Vanessa Bouche, Thorn, *A Report on the Use of Technology to Recruit, Groom and Sell Domestic Minor Sex Trafficking Victims* (January 2015), https://www.wearethorn.and-research/use-of-technology-in-domestic-minor-sex-trafficking (study reporting that while the Internet and cell phones increasingly are used by sex traffickers to meet, groom and exploit victims, they also provide significant opportunities for outreach and help to victims).

[12] boyd, *Human Trafficking and Technology*, at 7; Latonero, *The Rise of Mobile*, at 23 (platforms used to recruit or solicit minors include Mocospace.com and Xbox live).

[13] Latonero, *The Rise of Mobile*, at 28 ("traffickers and trafficked minors are not solely utilizing one ad site but rather draw upon a variety of sites and technologies, such as chat rooms, message boards, and text messages").

[14] For example, a study by a Columbia professor estimated that 83 percent of New York prostitutes have Facebook pages, and Facebook was becoming the leading online recruitment tool. Chris Matyszczyk, *Study: Facebook replacing Craigslist for prostitutes*, CNET (Feb. 7, 2011), http://www.cnet.com/news/study-facebook-replacing-craigslist-for-prostitutes. *See also* Daniel Fisher, *Backpage Takes Heat, But Prostitution Ads Are Everywhere*, FORBES (Jan. 26, 2012), http://www.forbes.com/sites/danielfisher/2012/01/26/backpages-takes-heat-for-prostitution-ads-that-are-everywhere ("Craigslist hasn't really gotten out of the business"); Bouche, *A Report on the Use of Technology*, at 18 (exploited youth reported using Craigslist, Facebook, Myspace and email accounts such as Yahoo Mail and Gmail); Julie Ruvolo, *Sex, Lies and Suicide: What's Wrong with the War on Sex Trafficking*, FORBES (June 26, 2012), http://www.forbes.com/sites/julieruvolo/2012/06/26/sex-lies-and-suicide-whats-wrong-with-the-war-on-sex-trafficking/ (if "we shut down Backpage, we're going to have to go back to Craigslist, because the sex ads are back," and "we're also going to have to shut down Facebook, Tumblr, Twitter, YellowPages.com and About.com because a research group found sex ads on all of these sites too"); Latonero, *The Rise of Mobile*, at 23, 28 (escort ads on Backpage.com also appeared on EroticMugShots.com, LocalEscortPages.com, MyProviderGuide.com, FindHotEscorts.com, AdultSearch.com, and

Nonetheless, state attorneys general (including the Massachusetts AG) pressured

Craigslist to censor its adult services category, and when that campaign succeeded in 2010,[15]

immediately (and have since) targeted Backpage.com.[16]  But experts and law enforcement

officials acknowledged that pressuring Craigslist to shutter adult advertising deprived law

enforcement of a cooperative partner and represented a "missed opportunity to explore creative

solutions to the problem of trafficking online."[17]  They warn now against repeating this mistake

with Backpage.com.[18]  Closing one site causes content to move elsewhere, further underground

and more likely beyond the jurisdiction and reach of law enforcement.[19]  This has been referred

---

nsaPals.com; noting use of Facebook, MySpace, and Tagged.com); Meredith Dank, *et al.*, *Estimating the Size and Structure of the Underground Commercial Sex Economy in Eight Major US Cities*, Urban Institute, at 234 (March 2014), http://www.urban.org/UploadedPDF/413047-Underground-Commercial-Sex-Economy.pdf (sites used by sex workers included "Adam4Adam.com, Eros.com, Adult Search.com, TheEroticReview.com, Cityvibe.com, Myspace.com and a variety of chat lines, escort service websites, and communities like Livelinks.com and LiveJasmin.com").

[15] *See* Michael Lindenberger, *Craigslist Comes Clean: No More 'Adult Services,' Ever*, TIME, (Sept. 16, 2010), http://content.time.com/time/nation/article/0,8599,2019499,00.html.

[16] *See* State Attorney General Letter (Sept. 21, 2010), http://www.illinoisattorneygeneral.gov/pressroom/2010_09/Backpage_com9-20-2010.pdf.

[17] Latonero, *The Rise of Mobile*, at 26-27 (also quoting federal law enforcement agent stating "we don't like" losing Craigslist because they were "very pro-law enforcement" and "[i]f you shut that down, they're going to go somewhere else"); Megan Woolhouse, *Craigslist sex-ad ban doesn't end Web listings*, BOSTON GLOBE (Sept. 8, 2010) at B7 (interview of John Palfrey, Harvard Berkman Center for Internet and Society, noting that "[s]trategically, you have to go to the root causes, and not just focus on the intermediaries [*i.e.*, websites] but directly on the wrongdoers").

[18] Ruvolo, *Sex, Lies and Suicide* ("And now we're about to miss another opportunity with Backpage."); Mark Masnick, *Oh Look:  Police Can Use Backpage.com To Track Down, Arrest & Convict Pimps & Prostitutes*, TECHDIRT (Oct. 2, 2012), https://www.techdirt.com/articles/20121002/07354820569/oh-look-police-can-use-backpagecom-to-track-down-arrest-convict-pimps-prostitutes.shtml ("No one seems to recognize that attacking Backpage instead of *those actually responsible* only makes it that much more difficult to track down the real criminals.").

[19] boyd, *Combatting Sexual Exploitation Online*, at 2 ("Going after specific sites … and attempting to eradicate the visibility does nothing to address the networks of supply and demand—and it simply pushes them to evolve and exploiters find new digital haunts and go further underground."); danah boyd, *How Censoring Craigslist Helps Pimps, Child Traffickers and Other Abusive Scumbags*, HUFFINGTON POST (Sept. 6, 2010), http://www.huffingtonpost.com/danah-boyd/how-censoring-craigslist-_b_706789.html (pimps and traffickers will "move on and invade a new service," perhaps "an offshore one that American law enforcement can do nothing about"; "Taking something that is visible and making it invisible makes a politician look good, even if it does absolutely nothing to help victims who are harmed.").

to—and criticized—as a "whack-a-mole" approach that fails to address root causes of the

problem and makes efforts to prevent, pursue and prosecute traffickers more difficult.[20]

As the American Psychological Association has written: "Preventing the trafficking of

women and girls is a complex problem that requires cross-disciplinary research, training and

education, public awareness and new policies at every level of government."[21]  Thus, many

experts—and some lawmakers and NGOs—have come to realize that combatting underage sex

trafficking requires a holistic approach addressing the factors that make youth vulnerable,

improving outreach and prevention efforts, and providing support and rehabilitative services

rather than criminalizing victims.[22]  For example, the National Research Council recently

recommended funding to improve multi-sector collaboration to prevent, identify and respond to

exploitation and trafficking of minors, focusing on vulnerable populations; enacting safe-harbor

laws to treat those harmed by sex trafficking as victims; pursuing legal responses to perpetrators

of sex trafficking, with an emphasis on deterring demand; implementing and strengthening laws

to respond to and support victims; and setting a national research agenda to improve the evidence

---

[20] Latonero, *The Rise of Mobile*, at 26 (quoting Jennifer Musto, *Institutionalizing Protection, Professionalizing Victim Management: Explorations of Multi-Professional Anti-Trafficking Efforts in the Netherlands and the United States* (UCLA 2011)); *id.* ("shutting down one site does not address the root causes of the problem"); boyd, *How Censoring Craigslist Helps Pimps* ("Censorship online is nothing more than whack-a-mole, pushing the issue elsewhere or more underground.").

[21] *APA Task Force Report Highlights Problem of Human Trafficking of US Women and Girls* (Mar. 12, 2014), http://www.apa.org/news/press/releases/2014/03/human-trafficking.aspx.  *See also* Latonero, *The Rise of Mobile*, at 23.

[22] *See* Bain, *How to Responsibly Create Technological Interventions*, at 2-4 (urging increased emphasis on social services for at-risk youth, treating youth as victims, implementing intervention plans to help victims, and using technology to identify criminal activity and help vulnerable youth); Bouche, *A Report on the Use of Technology*, at 25-31 ("there is clearly a strong need for programs that assist [victims] in getting out," though most victims reported that no one reached out to them, and "[m]ultiple survivors mention the lack of help, understanding and compassion they received from law enforcement"); *see also id.* at 38-39 (recommendations); Hanes, *Human Trafficking*, at 8-9.

base for informed policy-making.[23]   Shared Hope International similarly has emphasized four

issues:  eliminating the demand for trafficking by punishing those who buy sex, prosecuting

traffickers without relying entirely on victim testimony, identifying victims as such rather than

criminals, and providing protection, services, and shelter to victims.[24]

   Experts also advocate that technology should be a part of these broader approaches to

combat sex trafficking intelligently.[25]   "Instead of singling out these technologies [*e.g.*, websites,

mobile communications] as a root cause of trafficking," they should be used "to further the anti-

trafficking goals of prevention, protection, and prosecution."[26]   Websites and mobile platforms

are valuable tools in several ways.  They provide a digital trail to identify, track down and

prosecute traffickers (if law enforcement can work with cooperative online providers).[27]   They

---

[23] Inst. of Medicine & Nat'l Research Council, *Confronting Commercial Sexual Exploitation and Sex Trafficking of Minors in the United States*, at 5-16 (Ellen Wright Clayton *et al.* eds., 2013), http://www.iom.edu/~/media/Files/Report%20Files/2013/Sexual-Exploitation-Sex-Trafficking/sextraffickingminors_rb.pdf.  The NRC, the advisory arm of the National Academy of Sciences, conducted this study in response to a request from the Department of Justice.

[24] *See* Shared Hope International, *2013 Protected Innocence Challenge: A Legal Framework of Protection for the Nation's Children*, at 9, http://sharedhope.org/wp-content/uploads/2014/02/2013-Protected-Innocence-Challenge-Report.pdf.  The organization issues an annual report evaluating states based on their respective laws addressing sex trafficking and these policy goals.

[25] As President Obama has stated:  "Just as [traffickers] are now using technology and the Internet to exploit their victims, we're going to harness technology to stop them."  Press Release, The White House, Remarks by the President to the Clinton Global Initiative (Sept. 25, 2012), http://www.whitehouse.gov/the-press-office/2012/09/25/remarks-president-clinton-global-initiative.

[26] Latonero, *The Rise of Mobile*, at iv (while, "increasingly, the business of human trafficking is taking place online and over mobile phones[,] the same technologies … can become a powerful tool to combat trafficking").  *See also* boyd, *Combatting Sexual Exploitation Online*, at 1 ("When it comes to the Internet and exploitation, most people lament the new opportunities for buyers and sellers to connect, but fail to realize how these very same structures also provide new opportunities to intervene because it's possible to 'see' the trade in entirely new light.").

[27] As California's Attorney General has noted, technology can provide a "digital trail" for law enforcement, prevent and disrupt human trafficking online, and provide new ways of outreach to victims and raising public awareness.  Statement of AG Kamala Harris, *Human Trafficking*, http://oag.ca.gov/human-trafficking.  *See also* Latonero, *The Rise of Mobile*, at iv-v ("Mobile communication may also represent a breakthrough for interventions by law enforcement and the anti-trafficking community" by providing "a trail of information and evidence" for "identifying, tracking, and prosecuting traffickers.").

present a "significant opportunity" to communicate with vulnerable youth "to prevent recruitment in the first place" and "inform young victims once they have been recruited about options to seek help."[28]  And, law enforcement can use websites to set up sting operations and thereby make online spaces too risky for criminals.[29]  Indeed, some have suggested that, because police monitor and use Backpage.com and the website cooperates with authorities, it has become a risky place for traffickers and criminals.[30]

Notably, none of these experts that have examined the role of technology in trafficking—including from Harvard, Wellesley, USC, and TCU—have advocated shutting down websites. Although perhaps not politically popular, some law enforcement officials have stated publicly that this is a bad idea because cooperative sites such as Backpage.com (and Craigslist before) are valuable resources in fighting sex trafficking.[31]  Indeed, in a recent hearing before the Senate Judiciary Committee, the Director of Iowa's Human Trafficking and Enforcement Prosecution Initiative responded to questioning about Backpage.com by saying we should "move cautiously

---

[28] Bouche, *A Report on the Use of Technology*, at 19.  *See also* Latonero, *The Rise of Mobile*, at v (technology can be used as a tool "to reach vulnerable communities and raise public awareness"); boyd, *How Censoring Craigslist Helps Pimps* ("Visibility makes it easier to help victims.").

[29] boyd, *How Censoring Craigslist Helps Pimps* ("Woking with [websites] to collect data and doing systematic online stings can make an online space more dangerous for criminals," "[e]ventually … mak[ing] a space uninhabitable for criminals by making it too risky for them to try to operate there," while "[c]ensoring [a website] does absolutely nothing to hurt the criminals.").

[30] Laterno, *The Rise of Mobile*, at 31 (quoting detective who observed:  "No one uses Backpage anymore. Everyone thinks cops are on there now.").  *See also* Fisher, *Backpage Takes Heat* ("Backpage isn't the best place to run an illegal enterprise, at least if you want to keep your business secret from the cops.").

[31] Latonero, *The Rise of Mobile*, at 26-27 (quoting law enforcement official as saying Craigslist was "always very cooperative" and "we don't like it [that the site was shut down]," because "[i]f you shut that down, they're going to go somewhere else"); Rachel Lewis Hilburn, *Websites with Adult Ads Contribute to Sex Trafficking of Kids; Law Officers Call the Sites Helpful*, WHQR (Mar. 4, 2015), http://whqr.org/post/websites-adult-ads-contribute-sex-trafficking-kids-law-officers-call-sites-helpful (quoting North Carolina detective saying Backpage.com is "an important tool for local law enforcement" and is "extremely cooperative," whereas if it was shut down, law enforcement would "los[e] investigative tools"; also quoting representative of North Carolina AG's office stating that "she's heard similar sentiments from other members of [the] law enforcement" community).

so that we don't remove one of the best tools that law enforcement currently has available."[32]

**C.   Amici's Factual Accusations about Backpage.com Are Improper and Contradict Their Laws, Experiences, and Statements.**

Amici go on to offer their own accusations against Backpage.com.  As noted, this is improper—the Court should disregard an amicus that offers a "highly partisan account of the facts," *New England Patriots Football Club*, 592 F.2d at 1198 n.3, and briefs of this sort are "as far from an amicus as one can get," *United States v. Certain Land Located in the Cnty. of Barnstable*, 674 F.2d 90, 91 n.1 (1st Cir. 1982).  It is not appropriate for an amicus simply to malign a party in hopes of tainting the Court's view.  Here, amici's attacks against Backpage.com are not only improper, they are contradicted by amici's own laws, statements, and practices.

First, the AG asserts its "cursory review of the website" reveals that all escort ads "offer sex for sale," AG Br. at 10, and the Cities contend the "actual goods advertised [in the escort category] are illegal sex," Cities Br. at 13.  Attorneys General in Washington, Tennessee, and New Jersey made the same argument, and federal courts in those states rejected it, holding that escort ads on Backpage.com are constitutionally protected speech.  *Backpage.com, LLC v. McKenna*, 881 F. Supp. 2d 1262, 1282 (W.D. Wash. 2012); *Backpage.com, LLC v. Cooper*, 939 F. Supp. 2d 805, 825 (M.D. Tenn. 2013); *Backpage.com, LLC v. Hoffman*, 2013 WL 4502097, at *7 (D.N.J. Aug. 20, 2013).[33]  Moreover, amici's argument is incongruous, given that they ***permit*** escort services.  San Francisco, Atlanta and Denver all license and regulate escort services, and

---

[32] *Human Trafficking in the United States*, Hearing before Senate Judiciary Comm., at 24 (testimony of Mike Ferjak, acknowledging that websites provide "intelligence … to law enforcement to track and obtain data as far as how these people conduct their operations and where they're going to do it and all sorts of things").

[33] *Accord M.A. v. Village Voice Media Holdings, LLC*, 809 F. Supp. 2d 1041, 1049-50 (E.D. Mo. 2011); *Dart v. Craigslist, Inc.*, 665 F. Supp. 2d 961 962, 969 (N.D. Ill. 2009).

Colorado has an "Escort Service Code."[34]  The City of Boston has granted business name certificates to entities identifying their "type of business" as "escorts," "escort service," and "personal escort."[35]  Indeed, yellow page listings for the cities represented by amici reveal hundreds of escort services.[36]

The AG also attempts to dismiss Backpage.com's role in supporting law enforcement and helping rescue victims,[37] saying the website is responsive only "to varying degrees" and its "monitoring and reporting efforts … rarely yield results."  AG Br. at 10.  This hyperbole ignores the many times Backpage.com has cooperated with the AG's office (and the Cities), including in the very cases the AG cites to criticize Backpage.com.  The AG refers to cases in Dorchester and Everett, *see* AG Br. at 6, yet fails to mention Backpage.com supported both investigations.  In the Dorchester case, prosecutors acknowledged Backpage.com provided credit card information that led to identification of the defendant as well as "over one thousand pages of records related to these prepaid cards."[38]  In the case concerning an Everett massage parlor, agents traced the

---

[34] San Francisco Police Code Art. 15.6 § 1074.4, http://police.sanfranciscocode.org/15.6/1074.4; Atlanta Code of Ordinances § 30-641 to -668, http://atlanta.elaws.us/code/coor_ptii_ch30_artviii; Denver Mun. Code, § 7-320, http://denver-co.eregulations.us/code/coor_titleii_ch7_artxiii_div2_sec7-320; Colo. Rev. Stat. § 12.25.5-101 *et seq*.

[35] Registered names include:  "Exotic Day Dream Escort Service," "Sophistikatts Escort Agency," "A Plus College Escorts," "VIP Escort," "Erotic Pleasures," and "All Kinds of Adult Entertainment."  *See* http://www.cityofboston.gov/cityclerk/dbasearch/Default.aspx?type_of_business=escort&order_by=file_number.

[36] A yellow pages search for "escort service" in the cities represented by amici results in over 350 listings:  Boston (61 listings), San Francisco (42), Atlanta (80), Denver (60), Houston (58), Philadelphia (21), Portland (32).  *See* http://www.yellowpages.com.

[37] The AG states that "seventy-five percent of the cases [the office] has prosecuted under our state human trafficking law … involve advertising on Backpage.com."  AG Br. at 7.  But this refers to just six of the eight cases the office has brought since M.G.L. c. 265, § 51 took effect three years ago, and none of the cases involving ads on Backpage.com concerned allegations of underage sex trafficking.  Moreover, pointing to the number of prosecutions that involve ads on Backpage.com speaks more to the fact that law enforcement routinely work with the site because of its help and cooperation.

[38] Commonwealth's Statement of the Case, at 8, *Commonwealth v. Leoney*, SUCR2013-10947.

defendant by locating her phone number on a Backpage.com ad, and the website fully complied with a subpoena, providing records dating back to 2013.[39]

In fact, Backpage.com has voluntarily responded to over 100 subpoenas and requests from Massachusetts law enforcement authorities in 2014 and 2015—including many from the AG's office.  Contrary to the AG's assertion that Backpage.com's "monitoring and reporting … rarely yield results," AG Br. at 10, for many or most subpoenas involving suspected child victims, Backpage.com previously reported the ads to the National Center for Missing and Exploited Children ("NCMEC").  Perhaps more telling, while amici now contend Backpage.com's cooperation is a ruse, more than thirty times law enforcement officials from the AG and the Cities have thanked and commended Backpage.com for its help,[40] as others across the country have done hundreds of times.  Some examples:

> You guys are fantastic thank you [from Massachusetts AG's office]
>
> Thank you so much, you have really gone above and beyond.  I always like working with your group because it is professional and prompt.[41]
>
> Thank you very much for your assistance.  By the way, as a Detective with the … Police, I deal with numerous hospitals, banks, cell phone companies, etc.  You guys have been by far the best and easiest to deal with.
>
> As usual your staff at Backpage.com is awesome!  Thank you for this additional information it helps out tremendously.
>
> Backpage staff.  Great job.  This will help in the investigation.  Thanks for further researching and going the extra mile.
>
> Thank you!  I appreciate your proactive efforts to protect our children.  Again, thank you.

---

[39] Commonwealth's Statement of the Case, at 4, *Commonwealth v. Cipriano*, SUCR2014-1309.

[40] Including from the Massachusetts AG's office, the Houston Police Department, and officials with the Cities of Houston, Portland, Denver, Atlanta, San Francisco and Boston.

[41] Backpage.com typically responds to law enforcement subpoenas and requests within forty-eight hours and often in the same day.

Thank you so much.  We have been waiting to obtain records from some of these sites. … Thank you very much for your assistance and attention to details.  I wish more companies were like this.[42]

Backpage is the very best thank you!!!!!!!!!!!! [from Massachusetts AG's office]

Thanks once again for going above and beyond what we ask of you.  Your team has always been helpful, diligent, and worked with a [sense] of urgency, and it is greatly appreciated.

[Y]our staff did a great job!  We appreciate Backpage's vigilance to help protect kids.  On our team over the weekend were the Secret Service, Department of Homeland Security, the United States Attorney's Office and several local law enforcement agencies and all commented on how effective Backpage was on getting the ads removed quickly and blocking future ads from the same posters.

I can't thank you and your staff enough for being so responsive and supportive of my and other law enforcement efforts concerning these cases.  Your company's level of cooperation is not the norm and makes a huge difference in our ability to target and ultimately arrest the offender. [from Massachusetts AG's office]

Amici further assert that "Backpage has taken various affirmative steps to maximize the security of the website for traffickers and to hinder law enforcement" by "remov[ing] advertisements for support groups or posts by law enforcement officers engaged in sting operations."  AG Br. at 12; Cities Br. at 11.  Again, amici offer no support[43] and their accusations are surprising, given their use of Backpage.com.  For example, the month before joining the Cities' brief, Houston police conducted a sting operation by placing ads on Backpage.com, arresting sixty men for soliciting prostitution.[44]  The week after San Francisco filed the Cities' brief, Bay Area authorities rescued an underage victim based on a tip from Backpage.com to

---

[42] In addition to providing its records, in several cases Backpage.com staff have also voluntarily conducted and provided further research (*e.g.*, concerning other websites where a victim was advertised).

[43] Vaguely alleging that Backpage.com removed some sting ad, without explaining the premise for such an allegation, is particularly unfair.  For example, if amici are referring to an instance when an ad was blocked because Backpage.com's filters or monitors determined it was improper, that would underscore the effectiveness of the website's policing, not that it was trying to hinder law enforcement.

[44] Gianna Caserta, *More than 60 men charged in HPD prostitution 'round-up*,' CLICK2HOUSTON (Mar. 4, 2015), http://www.click2houston.com/news/64-charged-in-hpd-prostitution-roundup-investigation/31605082.  It bears noting the Houston sting operation did not concern sex trafficking.

NCMEC, crediting the website's work for "helping [them] catch the suspect."[45]   Additionally, the

FBI (working with local law enforcement) has used Backpage.com for its annual "Operation

Cross-Country" efforts to target sex trafficking (including numerous arrests and rescues in San

Francisco and Denver), and Backpage.com has stated that it was "very, very pleased" with these

efforts.[46]   Indeed, Backpage.com conducts training of law enforcement officials across the

country, explaining how the website and its staff can help track down and convict sex traffickers.

Finally, although amici repeat the unsupported allegation that Backpage.com removes ads from

victim support groups, the website prominently features such ads.[47]

Otherwise, amici endorse and seek to expand on Plaintiffs' allegations.   For example,

they assert Backpage.com creates content[48] in "'Sponsored Ads' by choosing images and text

from the full advertisement to highlight and by creating new text to summarize portions of the

original advertisement ...."   Cities Br. at 10; *see also* AG Br. at 12.   In fact, a sponsored ad is one

featured in search results for an additional fee, which is common on websites.[49]   The text of such

ads on Backpage.com is auto-generated by a function that selects portions of the ad text users

---

[45] *Oakland Man Accused Of Listing Teen On Sex Website Pleads Not Guilty*, CBS (Feb. 27, 2015),
http://sanfrancisco.cbslocal.com/2015/02/27/oakland-man-who-listed-teen-on-web-for-sex-busted-by-
website-pleads-not-guilty (quoting Santa Clara deputy district attorney).  *See also* Steve Johnson, *Sex
online: Police target lucrative Internet prostitution trade*, SAN JOSE MERCURY NEWS, (Jan. 12, 2015),
http://www.mercurynews.com/business/ci_27296210/sex-online-police-target-lucrative-internet-
prostitution-trade (quoting San Francisco police lieutenant as acknowledging that Backpage.com makes
"it easier for police to identify people selling or seeking to buy sex through online solicitations").

[46] *Child Prostitution: Raids Rescue 105 Young People*, N.Y. TIMES (July 29, 2013),
http://mobile.nytimes.com/aponline/2013/07/29/us/politics/ap-us-child-sex-arrests.html?from=us; Sadie
Gurman, *Six Denver pimps arrested, 9 children saved as part of federal sting*, DENVER POST (July 29,
2013), http://www.denverpost.com/ci_23753147/six-denver-pimps-arrested-nine-children-saved-part.

[47] *See* http://boston.backpage.com/FemaleEscorts (Children of the Night post stating "Want Out? National
Free Help 24/7: 1-800-551-1300. Tired of Turning Tricks? Pimps Don't Care. We Do!").  Backpage.com
pointed out this ad in its motion to dismiss, *see* Mem. in Supp. of Mot. to Dismiss at 7 n.4.

[48] Amici's argument that Backpage.com is an "information content provider" outside of Section 230—an
argument Plaintiffs have eschewed—is discussed in Section II.E, below.

[49] *See* Mem. in Supp. of Mot. to Dismiss at 7 n.4.

create.[50]  This is readily apparent by comparing sponsored ads to the original ads, although amici

ignore the obvious to allege Backpage.com itself creates the content—which it does not.

The AG casts aspersions about Backpage.com's charges for ads in the "adult

entertainment" section, "unlike the rest of the site," AG Br. at 11-12, and while this is also not

true (*e.g.*, fees are also charged for dating and some employment ads), it is more important to

note why charges were added in the first place.  Charges for adult-oriented ads were instituted

after an agreement between forty-three state attorneys general and Craigslist, when the AGs

***requested*** that charges be imposed to provide information for law enforcement.[51]

Amici also allege Backpage.com "strips 'metadata' from digital photographs uploaded in

the Escorts section by using software at an additional expense."  Cities Br. at 10; *see* AG Br. at

12.  This is baseless as well.  Backpage.com does not "strip" metadata, intentionally or

otherwise.  Rather, when users upload photos for ads—whether to sell household items, for

dating, or in any other category on the website—the photos are resized so they can appear on the

site, an automated process that does not capture or retain metadata.  This is also a common

process for websites, including Facebook, Instagram, Twitter, Craigslist and others.  Here too,

amici offer no plausible basis to show why common website practices are somehow nefarious.

Finally, amici's assertion that Backpage.com supposedly "coach[es]" posters to

"facilitate[] illegal activity by helping it go undetected," Cities Br. at 11, is also argument, not

fact.  This refers to the website's enforcement of its posting rules to prevent improper ads.[52]

---

[50] There is one exception.  The notice for Children of the Night is presented as a sponsored ad, *see supra* note 47, and the text is created by the organization.  All other sponsored ads are auto-generated.

[51] *See* Press Release, Washington AG, *McKenna announces agreement with Craigslist to crack down on illegal sex trade ads* (Nov. 6, 2008), http://www.atg.wa.gov/news/news-releases/mckenna-announces-agreement-craigslist-crack-down-illegal-sex-trade-ads.

[52] Plaintiffs' allegations apparently are based on efforts by Plaintiffs' lawyers to post numerous fake ads trying to test and evade Backpage.com's automated filters.  Shortly before Plaintiffs filed suit,

Most (or all) websites that host third-party content impose rules and restrictions, and many use filters and screening to block or remove improper content. This includes Facebook, YouTube, Craigslist, and Match.com, which have rules similar to or the same as Backpage.com's, even identifying and disallowing particular terms and phrases, as Backpage.com does.[53] Put simply, to paint Backpage.com's efforts to prevent improper content as a scheme to encourage such content is beyond the pale of fair argument. Moreover, to give credence to this argument would eviscerate Section 230, because, rather than police user content—one of Congress's express purposes—websites would be far better off to impose no rules or restrictions and do no monitoring, because they would only create liability risks by undertaking such efforts.[54]

### D.    Amici Have Conceded Section 230 Bars Enforcement of State Laws.

Amici urge the Court to adopt a "reading of Section 230 [that] preserves the ability of local governments … to make and enforce local and state laws through their police powers." Cities Br. at 14; *see also* AG Br. at 20 (urging the Court apply Section 230 immunity so as not to "undermine laws enacted by the Commonwealth in the exercise of its traditional police powers").

---

Backpage.com's filters blocked a number of ads posted to the Boston website because of improper terms (*e.g.* "high school," "innocent schoolgirl," "sexy teen"). Backpage.com determined the ads came from a single IP address and blocked the addresses as well. The IP address is assigned to Ropes & Gray LLP.

[53] For example, Craigslist's "Adult Services Posting Guidelines" are essentially identical to Backpage.com's rules; they also prohibit (1) "content that is unlawful, obscene, or which advertises illegal services," (2) ads that "suggest or imply an exchange of sexual favors for money" including by using "any and all code words" (giving sexually explicit examples); (3) any "attempt to avoid detection of forbidden language by using spelling variations" (again providing explicit examples); and (4) "ads containing obscene images." *See* www.craigslist.org/about/help/Adult_Services_Posting_Guidelines. *See also* www.match.com/registration/membagr.aspx; www.facebook.com/communitystandards; www.youtube.com/t/community_guidelines.

[54] *See McKenna*, 881 F. Supp. 2d at 1273 (making Backpage.com or other websites liable for efforts to prohibit content would "create[] an incentive for online service providers *not* to monitor the content that passes through [their] channels[,] precisely the situation that [Section 230] was enacted to remedy"); *see also Nemet Chevrolet, Ltd. v. ConsumerAffairs.com, Inc.*, 591 F.3d 250, 258 (4th Cir. 2009) (plaintiff's claims would thwart Congress's purpose to "remove disincentives for the development and utilization of blocking and filtering technologies" (quoting 47 U.S.C. § 230(b)(4))); *Batzel v. Smith*, 333 F.3d 1018, 1028 (9th Cir. 2003).

The short answer is that, in Section 230, Congress **expressly preempted** state laws because its aim was to prevent government regulation of the Internet and eliminate a patchwork of different and potentially inconsistent state regulation. *PSINet, Inc. v. Chapman*, 362 F.3d 227, 240 (4th Cir. 2004) (state efforts to regulate the Internet "highlights the likelihood that a single actor might be subject to haphazard, uncoordinated, and even outright inconsistent regulation …." (quoting *Am. Libraries Ass'n v. Pataki*, 969 F. Supp. 160, 168 (S.D.N.Y. 1997)).  Indeed, the AG has acknowledged several times that Section 230 preempts enforcement of the Commonwealth's laws against classified ad websites such as Backpage.com and Craigslist.

The AG first purports to endorse Plaintiffs' claim under M.G.L. c. 265, § 50 (the Massachusetts anti-trafficking law), but ultimately supports Backpage.com's position.  Plaintiffs argue that any kind of direct or indirect assistance is enough to allege a business entity "knowingly aids or is a joint venturer in trafficking" under Chapter 265.  *See* Opp. to Mot. to Dismiss at 7; Surreply at 4.  But as Backpage.com has explained, this standard refers to aiding and abetting liability, meaning a defendant must know another party was engaged in sex trafficking, shared the intent to make it succeed, and participated in the illegal activity.  Reply on Mot. to Dismiss at 6-7 & n.10.  The AG actually supports this interpretation by citing *Go-Best Assets Ltd. v. Citizens Bank of Massachusetts*, 463 Mass. 50, 972 N.E.2d 426 (2012), *see* AG Br. at 14, which held that a bank could not be liable for aiding and abetting an attorney's fraudulent use of his bank account where there was no evidence the bank knew or shared his intent to misappropriate funds or actively participated in the misappropriation.  463 Mass. at 64.

The AG's attempt to support Plaintiffs' Chapter 93A claim fares no better.  The AG claims Plaintiffs need only show Backpage.com's website had an "overall effect" on "the relevant market" for "the illegal sale of children for sex" and therefore "[i]t is enough that the

plaintiffs were injured as an indirect result of Backpage.com's business conduct."  AG Br. at 15.

The AG bases this argument on cases in which plaintiffs claimed they were injured by unfair

trade practices of competitors in the same market.  *See, e.g.*, *Katin v. Nat'l Real Estate Info.*

*Servs., Inc.*, 2009 WL 929554, at *5-7, *10 (D. Mass. Mar. 31, 2009) (refusing to dismiss claims

by attorney plaintiffs alleging real estate settlement service providers were engaged in the

unauthorized practice of law, as plaintiffs sufficiently alleged lost business under the competitor

standing doctrine).  Such decisions have nothing to do with this case.  Plaintiffs do not allege

they were competitors of Backpage.com and harmed by its conduct in a market where they

competed.  Rather, they allege that if Backpage.com had not cooperated with law enforcement

and reported to NCMEC, public pressure would have shut down the site, and the pimps would

not have trafficked them.  *See* Mem. in Supp. of Mot. to Dismiss at 23-25.  This "hypothesized

chain of events falls far short of chapter 93A's causation requirement."  *Ray v. Ropes & Gray*

*LLP*, 961 F. Supp. 2d 344, 361 (D. Mass. 2013).[55]  Plaintiffs' claims also fail because they have

not alleged they suffered any injury as consumers, arising from a business transaction with the

website.  *See Swenson v. Yellow Transp., Inc.*, 317 F. Supp. 2d 51, 56-57 (D. Mass. 2004)

(dismissing Chapter 93A claim arising from auto accident, where plaintiffs contended the

defendant trucking company's policies encouraged speeding; "ch. 93A 'is intended to protect

---

[55] The AG additionally contends the Court should not require particularity for Plaintiffs' Chapter 93A claims, citing state cases, but recognizing "federal courts have concluded otherwise."  AG Br. at 16 & n.38.  Of course, Fed. R. Civ. P. 9(b) governs in this Court, no matter the pleading requirements in Massachusetts courts.  And, in federal court, under the federal rule, Chapter 93A claims that sound in fraud must be pleaded with particularity.  *See Santos v. SANYO Mfg. Corp.*, 2013 WL 1868268, at *6 (D. Mass. May 3, 2013) ("Where a Chapter 93A action sounds in fraud, a plaintiff must plead such fraud with particularity."); *see also* Mem. in Supp. of Mot. to Dismiss at 8.

against unfair and deceptive practices in trade, not unfair practices in general'" (quoting *L.B. Corp. v. Schweitzer-Mauduit Int'l, Inc.*, 121 F. Supp. 2d 147, 152 (D. Mass. 2000)).[56]

Most important, amici's entreaties that the Court should permit Plaintiffs' state-law claims directly contradicts the AG's admissions that Section 230 preempts such laws.  In 2010, when other state attorneys general demanded Craigslist eliminate the "adult services" section of the website, Attorney General Coakley refused to join because she believed Section 230 shielded online providers.[57]  Shortly thereafter, she joined the opposition against Craigslist, insisting the law "must change" to eliminate immunity.[58]  In 2010, the AG wrote to Congress that Section 230 immunity "may no longer be warranted,"[59] and later signed on to another letter to Congress urging amendment of Section 230 to exempt from immunity all state criminal laws.[60]  Now, the

---

[56] In *L.B. Corp.*, the Court granted summary judgment on the plaintiff's Chapter 93A claim against an adjacent landowner because "[i]n essence, plaintiff is complaining of excessive pumping from a well, not of unfair acts or practices in a commercial transaction."  121 F. Supp. 2d at 152.  The Court explained: "Chapter 93A is a consumer protection law that also encompasses business transactions.  It is intended to protect against unfair and deceptive practices in trade, not unfair practices in general.  Apart from claims of unfair competition, a plaintiff must allege some sort of transaction between the parties for liability to attach ….  This is the 'common thread' of 93A cases.  Plaintiff's position, if accepted would run the danger of converting any tort claim against a business into a Chapter 93A claim, because all torts encompass 'acts or practices' that could arguably be considered 'unfair.'  [T]his position tests the limits of common sense."  *Id.* (internal citations and quotation marks omitted).

[57] O'Ryan Johnson, *Coakley reverses stance on site*, BOSTON HERALD, (Aug. 20, 2010), http://nl. newsbank.com/nl-search/we/Archives?p_product=BNHB&p_theme=bnhb&p_action=search&p_ maxdocs=200&p_field_fselect-0=&p_text_fselect-0=coakley%20reverses%20stance&s_dispstring=all (coakley%20reverses%20stance)%20AND%20date(01/01/1970%20to%2003/04/2015)&p_field_date-0=YMD_date&p_params_date-0=date:B,E&p_text_date-0=01/01/1970%20to%2003/04/2015)&xcal _numdocs=40&p_perpage=20&p_sort=YMD_date:D&xcal_useweights=no.

[58] Warren's Washington Internet Daily (Aug. 23, 2010) (quoting AG Coakley:  "At the present time, Craigslist and other 'providers and users of interactive computer services' are largely shielded from civil and criminal liability by Section 230 of the federal Communications Decency Act.  This must change." "Congress should take action and amend this statute to eliminate the immunity provision.").

[59] *Domestic Minor Sex Trafficking:  Hearing before Senate Subcomm. on Crime, Terrorism, and Homeland Security of the H. Comm. on the Judiciary*, 111th Cong. 297-99 (2010) (letter from AG Coakley to Reps. Scott and Gohmert, dated Sept. 15, 2010, stating "Section 230 provides [immunity] for interactive computer service providers that may no longer be warranted.").

[60] Letter from AG Coakley, *et al.* to Sen. Rockefeller, *et al.* (July 23, 2013), https://www.eff.org/files/cda-ag-letter.pdf.

AG asserts Section 230 does *not* preempt Plaintiffs' state-law claims, without explaining all the prior statements that such claims *are* preempted.

### E.    Amici Cannot Argue that Backpage.com is an "Information Content Provider," and Their Argument is Wrong.

Amici's central legal argument is that they contend Section 230 "does not apply for the additional reason that Backpage.com [is] an information content provider."  Cities Br. at 2; *id.* at 4-14; *see also* AG Br. at 17-20.  The Court should disregard this argument because Plaintiffs have expressly chosen *not* to make it, Opp.  to Mot. to Dismiss at 15 n.5 ("Plaintiffs do not contend at this stage of the litigation that Backpage.com is an 'information content provider' …").  *See Lane*, 871 F.2d at 175; *Weaver's Cove Energy, LLC v. R. I. Coastal Res. Mgmt. Council*, 589 F.3d 458, 467 (1st Cir. 2009) ("Amici cannot insert new arguments, not made by a party, into a case.").[61]  But even so, amici's argument is meritless.  Plaintiffs admit Backpage.com did not create or develop the ads about them (the ads were solely created by the pimps or others at their direction), and so, under well-established law, Backpage.com is not the "information content provider" and is fully entitled to Section 230 immunity.

Amici claim "early decisions … tended to characterize [Section 230] broadly … [but] did not consider or anticipate [websites] that were *also* information content providers," and "[i]n recent years, courts have developed a more nuanced approach."  Cities Br. at 4.  This misstates the law interpreting Section 230, which has been consistent for years.  In fact, in the case on which amici primarily rely, *Fair Housing Council of San Fernando Valley v. Roommates.com, LLC*, the Ninth Circuit observed that courts have "adopt[ed] a relatively expansive definition of

---

[61] *See also Pharm. Research & Mfrs. of Am. v. Concannon*, 249 F.3d 66, 74 n.5 (1st Cir. 2001) ("Because these issues were raised for the first time on appeal by an amicus, not by a party, we do not consider them."), *aff'd sub nom. Pharm. Research & Mfrs. of Am. v. Walsh*, 538 U.S. 644 (2003); *McCoy v. Mass. Inst. of Tech.*, 950 F.2d 13, 23 n.9 (1st Cir. 1991) ("To the extent that the amicus raises different grounds in support of reversal," a court should "decline to consider those grounds.").

'interactive computer service' and a relatively restrictive definition of 'information content provider.'"   521 F.3d 1157, 1174 (9th Cir. 2008) (en banc) (quoting *Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119, 1123 (9th Cir. 2003)).  Since then, **every** federal circuit court that has addressed Section 230 has held it gives online providers broad immunity for claims based on third-party content.  *See* Mem. in Supp. of Mot. to Dismiss at 10-11.

Mischaracterizing parts of the decision in *Roommates.com*, amici contend a website is an information content provider beyond Section 230 protections if it "induce[s]" or "encourages" content in some fashion or "promote[s]" use of the website for "unlawful purposes."  *See* Cities Br. at 5-6; *see also* AG Br. at 18.  Actually, *Roommates.com* held the opposite.

Roommates.com was a website designed to match prospective roommates.  One portion of the site required users to make selections from prescribed menus about their gender, sexual orientation, and whether they lived with children, and to indicate their preferences about living with others based on the same criteria.  521 F.3d at 1161.  The plaintiffs alleged these criteria were discriminatory under federal and state fair housing laws.  *Id.* at 1162.  The Ninth Circuit refused to dismiss under Section 230, because the site authored and ***required*** users to answer questions to elicit discriminatory preferences, *id.* at 1166,[62] thus "materially contributing to [the] alleged unlawfulness" of the content at issue, *id.* at 1168.[63]  Courts applying *Roommates.com*

---

[62] *See, e.g.*, 521 F.3d at 1167 ("Roommate designed its search system … based on the preferences and personal characteristics that Roommate itself forces subscribers to disclose."); *id.* at 1170 n.26 ("it is Roommate that *forces* users to express a preference and Roommate that forces users to disclose the information that can form the basis of discrimination by others"); *id.* at 1172 ("Roommate does not merely provide a framework that could be utilized for proper or improper purposes; rather, Roommate's work in developing the discriminatory questions, discriminatory answers and discriminatory search mechanism is directly related to the alleged illegality of the site.").

[63] The Ninth Circuit stated:  "In other words, a website helps to develop unlawful content, and thus falls within the exception to section 230, if it contributes materially to the alleged illegality of the conduct."  521 F.3d  at 1168.  Amici warp this language to suggest Section 230 immunity does not apply if a website "'materially contributes' to the underlying illegal conduct."  Cities Br. at 4.  As discussed in the text above, the Ninth Circuit said no such thing.

have interpreted it as "carv[ing] out only a narrow exception" that "turned entirely on the website's decision to *force* subscribers to divulge the protected characteristics and discriminatory preferences as a condition of using its services." *Goddard v. Google, Inc.*, 640 F. Supp. 2d 1193, 1198-99 (N.D. Cal. 2009) (internal quotation marks omitted).[64]

However, the Ninth Circuit held that Roommates.com *was* entitled to immunity for a second part of the website, which allowed users to post "Additional Comments" of their own choosing. 521 F.3d at 1174. The plaintiffs alleged Roommates.com encouraged subscribers to make discriminatory statements in comments by requiring discriminatory preferences in the registration process. *Id.* The Ninth Circuit disagreed, emphasizing that courts must reject such "encouragement" theories, as they would gut Section 230:

> [T]here will always be close cases where a clever lawyer could argue that *something* the website operator did encouraged the illegality. *Such close cases, we believe, must be resolved in favor of immunity, lest we cut the heart out of section 230 by forcing websites to face death by ten thousand duck-bites, fighting off claims that they promoted or encouraged – or at least tacitly assented – to the illegality of third parties*. Where it is very clear that the website directly participates in developing the alleged illegality – as it is clear here with respect to Roommate's questions, answers and the resulting profile pages – immunity will be lost. *But in cases of enhancement by implication or development by inference* – such as with respect to the "Additional Comments" here – *section 230 must be interpreted to protect websites* not merely from ultimate liability, but from having to fight costly and protracted legal battles.

*Id.* at 1174-75 (bold emphasis added).

Amici also rely on *F.T.C. v. Accusearch, Inc.*, 570 F.3d 1187 (10th Cir. 2009). Cities Br. at 7; AG Br. at 18-19. The AG claims *Accusearch* held that a website that sold confidential, personal data provided by researchers was not entitled to immunity "even though it essentially

---

[64] *See also Atl. Recording Corp. v. Project Playlist, Inc.*, 603 F. Supp. 2d 690, 701 (S.D.N.Y. 2009) (finding *Roommates.com* "readily distinguishable" because it "was based solely on the fact that the content on the website that was discriminatory was supplied by Roommates.com itself"); *Doe v. MySpace, Inc.*, 629 F. Supp. 2d 663, 665 (E.D. Tex. 2009) (distinguishing *Roommates.com* because "[t]he Ninth Circuit repeatedly stated … that the Roommates.com website *required* its users to provide certain information as a condition of its use ….").

acted as an intermediary between the customers seeking the information and the researchers providing the information." AG Br. at 19. This is not a fair reading of *Accusearch* or its holding. The website defendant in *Accusearch* was not a mere "intermediary" for content posted by third parties. Rather, the defendant **retained** and **paid** the researchers to obtain the information (and then sold it to customers), which required violating or circumventing the Telecommunications Act by fraud or theft. 570 F.3d at 1192, 1199, 1200 ("By paying its researchers to acquire telephone records, knowing that the confidentiality of the records was protected by law, [the website] contributed mightily to the unlawful conduct of its researchers."). Backpage.com did not hire or pay anyone to create and post the ads about Plaintiffs.

Fundamentally, *Roommates.com*, *Accusearch*, and the other cases amici cite do **not** support their assertion that application of Section 230 hinges on an "inducement" or "encouragement" test, *i.e.*, that immunity does not apply if plaintiffs allege a website generally encourages, induces, promotes or solicits unlawful content. *See, e.g.*, Cities Br. at 5-6 & 9 n.5.[65] *Roommates.com* rejected this argument. 521 F.3d at 1174. The First Circuit said the same in *Universal Communications Systems, Inc. v. Lycos, Inc.*, 478 F.3d 413, 420-21 (1st Cir. 2007), holding that plaintiffs cannot override Section 230 by artful pleading challenging the "construct and operation" of a website. *See also Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 256-57 (4th Cir. 2009) (website does not lose immunity because of allegations about its "structure and design" or that it "solicited" content). And, contrary to amici's claim that courts' views of Section 230 have changed or become more "nuanced," the Sixth Circuit last

---

[65] For example, the Cities contend *Dart v. Craigslist, Inc.*, 665 F. Supp. 2d 961 (N.D. Ill. 2009), "applied the inducement test to evaluate whether Craigslist had induced the posting of unlawful ads," Cities. Br. at 9 n.5, while, in fact, *Dart* **rejected** any "inducement" test. *Id.* at 969 (rejecting "conclusory allegations … that Craigslist induces users to post ads for illegal services" because Section 230 "would serve little if any purpose if companies like Craigslist were found liable under state law for 'causing' or 'inducing' users to post unlawful content in this fashion").

year expressly rejected the "encouragement" argument.  In *Jones v. Dirty World Entertainment Recordings LLC*, 755 F.3d 398 (6th Cir. 2014), that court reversed a district court decision refusing to apply Section 230 on the premise that a gossip website "encourage[d] illegal … postings," holding that such an "encouragement" theory would "eclips[e] the immunity from publisher-liability that Congress established."  *Id.* at 413-14.  Amici do not mention *Jones* or any of the many other cases Backpage.com has cited rejecting the "encouragement" theory.  *See* Mem. in Supp. of Mot. to Dismiss at 15-19.

Amici's arguments are also flawed because they claim Plaintiffs can avoid Section 230 by alleging Backpage.com is an "information content provider" in some respect, without regard to whether any information provided by the website had anything to do with Plaintiffs' claims.  *See, e.g.*, Cities Br. at 2; AG Br. at 18.  All websites create content, but that is irrelevant if a site did not create the content that is the basis for a plaintiff's claim.  *See Gentry v. eBay, Inc.*, 99 Cal. App. 4th 816, 833 n.11, 121 Cal. Rptr. 2d 703 (2002) ("[T]he fact [plaintiffs] allege eBay is an information content provider is irrelevant if eBay did not itself create or develop the content for which [plaintiffs] seek to hold it liable.").  Amici ignore the longstanding interpretation of Section 230 that an "'entire website' approach is fatally flawed," *Hill v. StubHub, Inc.*, 727 S.E.2d 550, 562 (N.C. Ct. App. 2012),[66] and an online provider can be liable only if it created or

---

[66] *Hill* dismissed the plaintiffs' claims asserting the StubHub website is designed to facilitate illegal ticket scalping.  Amici cite a different case, *NPS LLC v. StubHub, Inc.*, 2009 WL 995483, at *13 (Mass. Super. Ct. Jan. 26, 2009), *see* Cities Br. at 8, which refused to enforce Section 230 immunity on summary judgment, stating that "there is evidence in the record that StubHub materially contributed to the illegal 'ticket scalping' of its sellers."  Every court to consider *NPS* has rejected it.  *See, e.g.*, *Milgram v. Orbitz Worldwide, Inc.*, 419 N.J. Super. 305, 16 A.3d 1113, 1126-27 (Law Div. 2010) (finding online ticket marketplace immune; dismissing *NPS* as inconsistent with other cases, and noting it was "quite frankly, unclear … which facts the court used in reaching the conclusion that § 230 did not apply"); *Hill*, 727 S.E.2d at 563 ("declin[ing] to follow" *NPS* as "inconsistent with the decisions concluding that knowledge of unlawful content does not strip a website of [Section 230] immunity").

developed "the specific content that was the source of the alleged liability," *Accusearch*, 570 F.3d at 1198-99. *See* Mem. in Supp. of Mot. to Dismiss at 14-15.

Amici's attempts to cast Backpage.com as an "information content provider" have nothing to do with the ads about Plaintiffs, which can be the only premise of their claims. *See* Reply on Mot. to Dismiss at 2 (Plaintiffs have no standing otherwise). For example, amici cast aspersions about "sponsored ads" on Backpage.com, but no one has alleged anyone posted sponsored ads about Plaintiffs.[67] Amici incorrectly argue Backpage.com "strips" metadata from photos uploaded on the website, but there is no allegation Plaintiffs' victimization by their pimps was related in any way to missing metadata. Amici allege (also without any factual basis) that Backpage.com removed law enforcement "sting ads," but, again, no one has pointed to any such ads that could have had anything to do with Plaintiffs.

Otherwise, the cases amici cite to attempt to establish that courts "deny Section 230 immunity when websites create, induce or encourage the development of objectionable content," Cities Br. at 6, actually show only that websites may not be protected when they ***create*** content that is the basis of plaintiffs' claims.[68] Here, Plaintiffs admit Backpage.com did ***not*** create the

---

[67] Amici argue Backpage.com's revenues from sponsored ads "supports a rejection of immunity," Cities Br. at 10, but courts interpreting Section 230 have uniformly rejected this argument too. *See, e.g.*, *Hill*, 727 S.E.2d at 560 ("[t]he fact that a website elicits online content for profit is immaterial"); *M.A.*, 809 F. Supp. 2d at 1051 ("neither notice or profit make Backpage liable for the content and consequences of the ads posted by [the pimp]"); *see also Doe v. GTE, Corp.*, 347 F.3d 655, 659 (7th Cir. 2003).

[68] *See Alvi Armani Med., Inc. v. Hennessey*, 629 F. Supp. 2d 1302, 1306 (S.D. Fla. 2008) (allowing claim against defendant that "itself created tortious content"); *Doe v. City of New York*, 583 F. Supp. 2d 444, 449 (S.D.N.Y. 2008) (claim of hostile work environment stemming from defendant's emails); *Hardin v. PDX, Inc.*, 227 Cal. App. 4th 159, 170, 173 Cal. Rptr. 3d 397 (2014) (patient education pamphlet provided by defendant online pharmacy that omitted warning about adverse side effects of drug); *Moving & Storage, Inc. v. Panayotov*, 2014 WL 949830, at *2 (D. Mass. Mar. 12, 2014) (claims based on website's statements about the accuracy of third-party reviews on site); *Demetriades v. Yelp, Inc.*, 228 Cal. App. 4th 294, 313, 175 Cal. Rptr. 3d 131 (2014) (claims based on Yelp's "own statements regarding the accuracy of its filter," not "the statements of third parties (i.e., reviewers) on its website"); *Fraley v. Facebook, Inc*., 830 F. Supp. 2d 785, 801 (N.D. Cal. 2011) (Facebook not immune where it allegedly "create[d] new content"); *Anthony v. Yahoo! Inc*., 421 F. Supp. 2d 1257, 1263 (N.D. Cal. 2006) ( "If …

ads about them, so these cases are inapposite.  Indeed, courts uniformly reject conclusory allegations that a website ***may have*** created the content at issue, recognizing that permitting such claims would defeat Section 230 and its purposes.[69]

Backpage.com is not an "information content provider" for the ads that are the basis of Plaintiffs' claims.  Those ads were created, authored, developed and posted by third-parties, which is exactly what Section 230 immunizes.

## III.   CONCLUSION

Amici's briefs improperly raise new accusations and legal arguments, detracting from (not aiding) this Court's review of Backpage.com's Motion to Dismiss.  The Court should disregard them.  But even if it considers the arguments, they do not support denying Backpage.com's Motion.  Plaintiffs have admitted the facts that establish Section 230, *i.e.*, that third parties created and posted the ads about them on Backpage.com.  As a matter of law, Section 230 bars Plaintiffs' claims.

---

Yahoo! manufactured false profiles, then it is an 'information content provider' itself"); *Hy Cite Corp. v. Badbusinessbureau.com, L.L.C.*, 418 F. Supp. 2d 1142, 1148-49 (D. Ariz. 2005) (defendant had provided content and paid for allegedly defamatory posts).

In fact, some of the cases amici cite did not even hold that websites were "information content providers." *See, e.g., 800-JR Cigar, Inc. v. GoTo.com, Inc.*, 437 F. Supp. 2d 273, 295 (D.N.J. 2006) (defendant not an "interactive computer service" eligible for Section 230 immunity); *MCW, Inc. v. Badbusinessbureau.com, L.L.C.*, 2004 WL 833595, at *9-10 (N.D. Tex. Apr. 19, 2004) (defendants were not interactive computer service; stating, in dicta, that even if they were, they did not dispute they "personally write and create numerous disparaging and defamatory messages"); *Cisneros v. Sanchez*, 403 F. Supp. 2d 588, 592 (S.D. Tex. 2005) (deciding whether Section 230 creates federal question jurisdiction; stating, in dicta, that "author" of defamatory statement is not entitled to immunity merely because he also administers the website hosting the content).

[69] *See Nemet Chevrolet*, 591 F.3d at 259 (rejecting allegations that website created content as "pure speculation and a conclusory allegation"); *Levitt v. Yelp! Inc.*, 2011 WL 5079526, *1, *5 (N.D. Cal. Oct. 26, 2011) (rejecting as "entirely speculative" allegation that Yelp! posted false reviews to extort businesses to pay for advertising), *aff'd*, 765 F.3d 1123 (9th Cir. 2014); *Goddard*, 640 F. Supp. 2d at 1202 (rejecting plaintiff's "sweeping allegations" of Google's involvement in developing content).

Dated:  March 25, 2015.

Respectfully submitted,

s/    *Robert A. Bertsche*
Robert A. Bertsche (BBO #554333)
Jeffrey J. Pyle (BBO #647438)
PRINCE LOBEL TYE LLP
100 Cambridge Street, Suite 2200
Boston, MA 02114
(617) 456-8000 (tel.); (617) 456-8100 (fax)
rbertsche@PrinceLobel.com
jpyle@PrinceLobel.com

James C. Grant (admitted *pro hac vice)*
Ambika K. Doran (admitted *pro hac vice)*
DAVIS WRIGHT TREMAINE LLP
1201 Third Avenue, Suite 2200
Seattle, WA 98101
(206) 622-3150 (tel.); (206) 757-7700 (fax)
jimgrant@dwt.com
ambikadoran@dwt.com

## CERTIFICATE OF SERVICE

I hereby certify that on March 25, 2015, the within document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and by first-class mail to any non-registered participants.

s/    *Robert A. Bertsche*
Robert A. Bertsche