UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
* * * * * * * * * * * * * * * * * * * * *
*JANE DOE NO. 1, a minor child,          *
by her parent and next friend MARY ROE;  *
JANE DOE NO. 2; and JANE DOE NO.3,       *
a minor child, by her parents and        *
next friends SAM LOE and SARA LOE        *
          Plaintiffs                     * CIVIL ACTION
              v.                         * No. 14-13870-RGS
                                         *
*BACKPAGE.COM, LLC,                      *
CAMARILLO HOLDINGS, LLC,                 *
(f/k/a VILLAGE VOICE MEDIA HOLDINGS, LLC),*
and NEW TIMES MEDIA, LLC                 *
          Defendants                     *
* * * * * * * * * * * * * * * * * * * * *
```

BEFORE THE HONORABLE RICHARD G. STEARNS
UNITED STATES DISTRICT JUDGE
HEARING: MOTION TO DISMISS
April 15, 2015

Courtroom No. 21
1 Courthouse Way
Boston, Massachusetts 02210

JAMES P. GIBBONS, RPR/RMR
Official Court Reporter
1 Courthouse Way, Suite 7205
Boston, Massachusetts 02210
jmsgibbons@yahoo.com

1    APPEARANCES:

2

3         ROPES & GRAY, LLP, (By John T. Montgomery, Esq.,
     and Dara A. Reppucci, Esq.), Prudential Tower, 800
     Boylston Street, Boston, Massachusetts  02199-3600, on
4    behalf of Plaintiffs

5         ROPES & GRAY, LLP, (By Ching-Lee Fukuda, Esq.),
     1251 Avenue of the Americas, New York, New York 10020,
6    on behalf of Plaintiffs

7         DAVIS WRIGHT TREMAINE, LLP, (By James C. Grant,
     Esq.), 1201 Third Ave., Suite 2200, Seattle, Washington
8    98101, on behalf of Defendants

9         PRINCE LOBEL TYE LLP, (By Robert A. Bertsche, Esq.,
     and Jeffrey Jackson Pyle, Esq.), 100 Cambridge Street,
10   Suite 2200, Boston, Massachusetts 02114, on behalf of
     Defendants

11

12        BACKPAGE.COM, (By Liz McDougall, General Counsel,
     Esq.), 1037 NE 65th St., Suite 364, Seattle, Washington
13   98103, on behalf of Defendant Backpage.com

14

15

16

17

18

19

20

21

22

23                  JAMES P. GIBBONS, RPR/RMR
                     Official Court Reporter
24              1 Courthouse Way, Suite 7205
                 Boston, Massachusetts  02210
25                  jmsgibbons@yahoo.com

P R O C E E D I N G S

THE CLERK:  All rise for this Honorable Court.

Court is open.  You may be seated.

Calling Case No. 14-13870, Jane Doe, et al. versus Backpage.com, LLC.

Counsel, please identify yourselves for the record.

MR. GRANT:  Your Honor, on behalf of -- I'm sorry.

MR. MONTGOMERY:  No.  Go ahead.

MR. GRANT:  On behalf of the defendants, movants, my name is Jim Grant, representing Backpage.com, defendants. And with me is Rob Bertsche and Jeff Pyle of the Prince Lobel firm, and Ms. Elizabeth McDougall, who is General counsel of Backpage.com.

MR. MONTGOMERY:  John Montgomery from Ropes & Gray, your Honor, and with me is Ching-Lee Fakuda of Ropes & Gray, as well as Dara Reppucci.

THE COURT:  All right.

This is before the Court on defendants' motion to dismiss.  So, Mr. Grant, are you going to take the laboring oar?

MR. GRANT:  I will.  I will be sharing time with Mr. Bertsche as well.

And may I address from the podium, your Honor?

THE COURT:  That's probably the most comfortable place, I think.

1          MR. GRANT:  From the podium?

2          THE COURT:  It's your election, but most lawyers

3    use the podium.

4          MR. GRANT:  I'm a podium person.

5          Good afternoon, and, as I mentioned a moment ago, I'm

6    Jim Grant on behalf of the Backpage.com defendants.

7          Your Honor, I think it's fair to say that Section 230

8    of the Communications Decency Act is the most important law

9    that's fostered the growth and development of the Internet

10   in the United States.

11         With millions of posts every day and every week on

12   respective websites, Congress recognized in 1996 that

13   traditional rules of tort liability and publisher liability

14   would not work for the Internet, and so they established a

15   different rule.  And they did so to encourage self-policing

16   and to preserve robust and free speech on the Internet.  And

17   those are the two express purposes of Congress in passing

18   Section 230.  And what they did was create a simple rule:

19   Websites and online service providers are immune from claims

20   that are based on content provided by third parties.  It is

21   that simple.

22         Congress recognized that websites -- that individuals

23   could misuse the Internet, and they recognized that harm

24   could flow from individuals misusing the website, but they

25   made a rule, and Section 230 is the rule, and it defines

that the website, the messenger, cannot be held liable for that harm or that misuse.

This case is fundamentally an effort by plaintiffs to avoid the immunity that's granted by Section 230, and they attempt to do that in several ways.

Section 230 is simple by its terms and simple by design. It's just slightly over 25 words: "No provider of an interactive computer service shall be treated as the publisher or a speaker of any information provided by another information content provider."

It creates a three-part test. The first is, is the defendant an interactive computer service?

The second is, Is the claim necessarily based on information that's provided by another information content provider, meaning a user of a website in most cases; and,

Third, does the plaintiff seek to hold the defendant liable for publishing content or for exercising publishers' functions.

The crux of the test is who created or developed the content that supposedly caused harm to the plaintiff.

It's also important, your Honor, to understand that Section 230 creates not just a defense to liability, it creates immunity from suit. It says, "No cause of action may be brought," and the purpose of that was clear. It's intended to stop lawsuits at the outset, rather than having

them proceed, because websites otherwise would be faced with the burden and costs of litigation.  That by itself chills speech, because a website faced with millions and millions of posts to have to deal with necessarily, and in all likelihood, will simply ban content, rather than have to defend itself.  It's always easier to take the content down.

The test is also simple by design because websites need clarity.  They need to understand that if a claim is based on third-party content, they are immune.  Websites may be held liable if they create content on their own, but so long as the content is premised from third parties, the website is immune.

And the websites need to understand that as well, because otherwise they can be the victims of the heckler's veto.  Someone who doesn't like a website simply can say that they're going to challenge that website.  Again, the natural inclination and the natural tendency will be the website will remove content, will chill speech, as opposed to publishing it and risking the liability.

In this case, plaintiffs have actually admitted all the elements of Section 230 immunity.  They base their claims on ads that were originally posted on Backpage.com.  There is no dispute that Backpage is an interactive computer service. Websites are interactive computer services.  The ads that the plaintiffs were advertised in were created, posted,

1  authored by pimps or at their direction.  There is no

2  dispute about that.  And plaintiffs here don't contend that

3  Backpage.com itself was an information content provider.  In

4  fact, they expressly admit it was not.  And plaintiffs'

5  claims attack Backpage for having published those ads and

6  for its publisher's functions.

7      That should be the end of the inquiry, but the crux of

8  this case, as I said, is plaintiffs' efforts to try to avoid

9  Section 230 and the various ways that they do that.

10      Plaintiffs say -- they contend their claims are wholly

11  independent of the ads about them, and they say they would

12  survive even if the ads had never been posted.  So

13  fundamentally this is a generic and general attack on

14  Backpage.com itself, on the entire website.

15      To the extent, though, that plaintiffs try to divorce

16  their claims from the ads that appeared about them, they

17  have no standing because without those ads, they have no

18  connection to causation, or no connection to the basis for

19  their claims.  You can't simply say that, A website exists,

20  therefore, I was harmed; and, therefore, I am going to sue.

21      And, as I say, if that kind of a claim was permitted,

22  then this would be the perfect example of the heckler's

23  veto; someone who doesn't like a website simply can attack a

24  website, assert a claim against the website, and, most

25  likely, can cause the website to pull down content or

potentially to stop content altogether.

It's difficult for me in the context of this argument to stress how uniformly and broadly plaintiffs' claims have been rejected,but they have been.

In the case of Hill v. StubHub, the Court there said that there had been some 300 cases decided under Section 230, and all but a handful of them the websites have been held immune from claims.

In Universal Communications v. Lycos, the First Circuit said that "Plaintiffs cannot evade Section 230 by challenging the construct and operation of a website or contending that the website was designed to lend culpable assistance to wrongdoers." And the Court said there that, "Efforts to evade those principles were mere artful pleading; that the website is entitled to immunity as much for the way it's designed, for its general decisions about what content to allow, for its construct in operation, as it is for any individual post on the site."

The Fourth Circuit said the same thing in Nemet Chevrolet. It said there that you cannot evade Section 230 by attacking the structure and design of a website.

In Doe v. MySpace, the Fifth Circuit, in a case that's very close to this one here, the plaintiff there was a minor who said that she was abused because she met someone through the MySpace website. She claimed that she was not attacking

the website for any specific content or specific ads, but, rather, that she was attacking the conduct of the website.

The Firth Circuit said that that was disingenuous, artful pleading because the claims of the plaintiff were fundamentally based on the website's publishing, editorial, and screening functions, all of which are exactly what Section 230 immunizes.

In Fair Housing Council v. Roommates.com, the Ninth Circuit said that, Arguments that a website encourages content will not defeat Section 230 immunity, saying that, Such cases must be resolved in favor of immunity, because allowing such a theory would cut the heart out of Section 230.

And just last year the Sixth Circuit said the same thing in Jones v. Dirty World, saying there that the encouragement theory was rejected again, and that if it were allowed, it would eclipse the immunity that Section 230 was intended to respect?

THE COURT: Section 230 coexists with the takedown law, does it not?

MR. GRANT: Excuse me, your Honor?

THE COURT: That is, can not a person under the takedown law ask that offensive content in which they have a personal interest be removed from a site?

MR. GRANT: No.

1          THE COURT:  No?

2          MR. GRANT:  I believe the "takedown law" -- you're

3    probably referring to the Digital Millennium Copyright Act,

4    the DMCA?

5          THE COURT:  Right.

6          MR. GRANT:  Congress set up two different regimes,

7    and in the copyright regime it created the DMCA, which does

8    allow someone to send a notice to a website; and if it's a

9    compliant notice and it indicates that copyright has been

10   violated and that the website has proper notice of it, the

11   website then will take it down.  That's the takedown regime

12   of the DMCA.

13       Section 230, without regard to copyright, is completely

14   different.

15         THE COURT:  I was thinking of the late Count IV

16   that's been added to the complaint, which is a copyright

17   claim.

18         MR. GRANT:  It is, your Honor, and, in fact,

19   Mr. Bertsche is going to address the copyright claim

20   directly.

21       In a word, this is a circumstance where we never had --

22   there never was a takedown notice, and there was no

23   indication that there had been a copyright violation.

24   Plaintiffs actually registered the copyright in the one

25   photo, which is the only copyright claim here.  They

1    registered that after they filed their lawsuit.

2         THE COURT:  Does European law have anything that is

3    equivalent to 230?  I know European Courts can order --

4         MR. GRANT:  European law is not as protective.  It

5    depends upon which country within the E.U. you're talking

6    about.  It is not as protective as American law, and, in

7    fact, it is one of the reasons that Congress passed an

8    amendment a couple of years ago saying if there is a

9    defamation judgment overseas, it has to comply with American

10   standards under Section 230.  Congress has reiterated that

11   our standard is you cannot hold someone liable for

12   third-party content posted on the Internet.  In Europe that

13   is not always true.  In fact, French law is actually quite

14   different from that now recently.  So, yes, there is a

15   distinction between the two.

16      I wanted to go back to the difference between the DMCA

17   and the way Section 230 works, because under Section 230,

18   the principle is exactly the opposite.

19      Even if someone provides notice, even if the website

20   arguably has knowledge that content is unlawful, that is not

21   enough to make it the website's own speech.  That's Lycos

22   again.  The First Circuit said that.  So it's an established

23   principle.  And the reason that that's so is because, again,

24   if you can simply provide notice, say that's unlawful

25   content, that's defamatory, that's intended for some sort of

1    illegal action, then individuals could routinely cause

2    websites to chill speech, because they'll simply take the

3    content down.  So that's exactly what Section 230 was

4    intended to avoid and exactly what Congress meant to do with

5    Section 230 itself.

6         THE COURT:  Congress, I gather, is using a very

7    broad definition of "speech," or at least as you're using

8    it?

9         MR. GRANT:  I believe Congress did use a broad

10   definition of "speech" in terms of online content.

11        THE COURT:  Would that definition exclude what the

12   Supreme Court generally excludes from First Amendment

13   protection:  Obscenity, fighting words --

14        MR. GRANT:  Actually, in a First Amendment vein, if

15   you were talking about something like obscenity, it may not

16   have First Amendment protection.  But if it's posted online

17   and it's posted by a third party, even if it's obscene

18   speech, you still couldn't sue the website.

19        You can sue the individual who posted the speech, but

20   that's an example where Section 230 is actually broader than

21   the First Amendment.  And, again, the principle is because

22   otherwise even if you're trying to target obscene speech,

23   you're going to cut such a wide swath of eliminating speech,

24   given the breadth of the Internet, that Congress made the

25   decision to say, you still can't sue the website for the

1    fact that it published obscene speech.  230 covers that

2    action.

3        I was talking about how the plaintiffs' theory has been

4    rejected time and again by a number of circuit cases.  There

5    are actually two cases that are exactly on point, one, Dart

6    v. Craigslist, the other, M.A. v. Village Voice Media

7    Holdings, actually a case against Backpage.com.

8        In both of those cases, just as plaintiffs do here, the

9    plaintiffs -- one was Sheriff Dart in Chicago -- allege the

10   websites themselves violated criminal laws.  They contended

11   that there were generic allegations about the website as a

12   whole, including the same allegations that plaintiffs make

13   in this case, about sponsored ads, about posting rules, and

14   about the fact, according to the allegations, that the

15   website knew, or should have known, that sex trafficking was

16   occurring because it cooperated with law enforcement.

17       M.A. in that case against Backpage.com, just as

18   plaintiffs do here, even contended that the specific ads

19   that concerned the child sex trafficking victim there were

20   irrelevant to the case, that M.A. was attacking the conduct

21   of the website but not any specific ads.

22       Both courts held that Section 230 immunity applies.

23       In the M.A. case the Court pointed out, as we have said

24   as well, that the case necessarily had to depend on the ads

25   about the plaintiff, otherwise the plaintiff had no standing

to pursue the claims at all.  But, in any event, both cases involved content posted by third parties; therefore, in both instances, the websites were immune.

Let me talk a little bit about plaintiffs' allegations here because they talk about conduct.  They say they are challenging the conduct of Backpage, but they are not seeking to impute any specific ads to Backpage, and, therefore, are not treating the website as a publisher.

There's at least two fundamental problems with that.

First, the conduct that plaintiffs challenge is publishers' conduct.  It's the decision of which ads to permit.  It's the decision of how to screen those ads.  It's a decision of which ads to block.  Those are quintessential publishers' functions.

Second, the straightforward test of Section 230 remains the same.  It is not whether or not they are trying to impute a specific ad to Backpage.com.  It is whether the content that lies at the heart of their claims was generated by third parties.

I should point out as well that most, or many, of plaintiffs' allegations about conduct are to take common website features and somehow say that in this context, because of their allegations, they are evil or nefarious in some way.

So let me give you some examples.

1        Plaintiffs contend that Backpage, because it

2   categorizes ads by subject matter and geographic market, in

3   some fashion is encouraging sex trafficking.  But, of

4   course, all websites categorize by geographic markets or by

5   subject matter.  That's what websites do.

6        Plaintiffs challenge the fact that Backpage charges

7   fees for certain ads.  Much content on the web is subject to

8   fees and charges.

9        They attack the fact that Backpage accepts prepaid

10  credit cards.  Most websites accept prepaid credit cards and

11  many users prefer prepaid credit cards either because of

12  security concerns about online sites or because they can't

13  qualify for postpaid cards.

14       Plaintiffs contend that there's something nefarious

15  about the fact that Backpage does not retain metadata for

16  photos that are posted online, but as they recently admitted

17  in their most recent brief to the Court, most websites don't

18  maintain metadata for photos that are posted online.

19       Plaintiffs challenge the fact that Backpage allows

20  sponsored ads, certain ads that are given priority or

21  preferred placement because -- for an additional fee.  And,

22  in fact, the same is true of Google and Facebook and Twitter

23  and many, many other websites.

24       In fact, your Honor, the complaint overwhelmingly is

25  made up of conclusory aspersions based on neutral facts.

1    And what I think the Supreme Court has taught us from <u>Iqbal</u>

2    and <u>Twombly</u> is where you're making allegations that are

3    conclusions piled on facts that indicate lawful conduct as

4    easily as it does allegations of unlawful conduct, that

5    doesn't survive a 12(b)(6) motion.

6        Secondly, though, the plaintiffs' allegations about the

7    features of the Backpage website actually have nothing to do

8    with them?  They don't contend that they were ever the

9    subject of a sponsored ad.  They don't contend that charges

10   for ads had in any way harmed them.  They don't contend that

11   the customary practice of moving metadata had anything to do

12   with their circumstances.  They don't contend that there was

13   some law enforcement sting operation that was interfered

14   with in some way and, therefore, harmed them.

15       But, most important of all, is, as I mentioned, is that

16   the conduct they're challenging, even if they thought they

17   could divorce themselves from the specific ads, the conduct

18   they're challenging is publisher's conduct.

19       As I say, they challenge the types of ads that Backpage

20   allows, the fact that it has an adult category.  They

21   challenge the way Backpage categorizes its ads.  They

22   challenge the fact that Backpage has posting rules, as most

23   websites do, and they disallow certain terms and phrases, as

24   many websites do.  They challenge the fact that it has an

25   automated process to filter and to block improper ads,

though they think it's not good enough.  They challenge the

fact that Backpage has a two-tiered manual review system,

and that that process also blocks ads that it finds to be

improper or suspicious, and refers ads that may involve

children to the National Center for Missing and Exploited

Children.  They challenge the way Backpage processes

photographs for ads, and they challenge Backpage's

commitment and practice to remove ads, as it does, when

requested by law enforcement.

    The case law is uniform, that the kinds of claims that

they're asserting, all the functions they are talking about,

are publisher functions.

    This is from Barnes v. Yahoo, the Ninth Circuit case.

"Courts must ask whether the duty that the plaintiff alleges

the defendant violated derives from the defendant's status

or conduct as a publisher or a speaker."

    In this circumstance, the conduct they're challenging

is publisher conduct.  That's exactly what Section 230 is

meant to protect.

    "Lawsuits seeking to hold a service provider liable for

the exercise of a publisher's traditional editorial

functions, such as deciding whether to publish, whether to

withdraw, whether to postpone, or whether to alter content,

are all immune under Section 230," from Zaren in the Fourth

Circuit.

So, as I mentioned before, plaintiffs' effort is to try to end run Section 230 in one fashion or another, and they do so in part because they allege that they're asserting a federal criminal claim.

The provision that they're relying on is the exemption for federal criminal -- enforcement of federal criminal laws.  Plaintiffs assert a claim under Section 1595 -- 18, U.S.C., 1595 -- which is a statutory provision allowing a private civil claim for damages based on a predicate showing of a violation of a criminal statute.  While Congress created a civil right to damages, it did not delegate to private litigants any powers to enforce federal criminal laws.  Only federal authorities, the Department of Justice, for instance, can enforce criminal laws by imposing punishment or seeking punishment or criminal fines or imprisonment.  And every case to have considered the exception in Section 230(e)(1) that allows exceptions for federal criminal claims, every case has held that means prosecution by a federal authority.  The CDA exception for federal criminal laws applies to government prosecutions, not to civil private rights of action under statutes with criminal aspects.

Plaintiffs only answer to the six cases that have held that is to say that the case law is wrong.

And I should note, too, that Section 1595 itself

actually distinguishes between a criminal action and a civil action.

In Section 1595(b) it provides that a civil action, if one has been brought, must be stayed during the pendency of a criminal action and has to wait until the criminal action concludes.

So Congress made it clear in 1595 itself that there's a difference between a criminal action and a civil action, and the civil action is subordinate to the criminal action.

So to the extent that plaintiffs are trying to argue that their effort to recover damages under a civil statute somehow is enforcement of federal criminal law, it's simply not.

And as well, part of Congress' intent in Section 230 itself, even allowing that exception for federal criminal prosecutions, was to limit regulation of the Internet and not to allow parties, private parties, to define their own version of what the laws ought to be and thereby to chill speech of websites. And it would defeat Congress' purposes if plaintiffs, in a situation like this, could come up with their own different and widely expansive interpretation of federal criminal law and say that they can pursue civil claims based on that. And, in particular, that's true here because we've pointed out that the Department of Justice has said, Websites that are classified as websites, such as

1    Craigslist or Backpage.com, where individuals may post

2    content that proves to be unlawful, that results in

3    prostitution or sex trafficking, you cannot hold the website

4    liable for that, and DOJ has said federal criminal laws do

5    not extend to that.

6         So let me touch on two of the other -- two other claims

7    in particular that plaintiffs address, and then I'm going to

8    allow Mr. Bertsche to discuss the right of publicity claim

9    and the copyright claim.

10        The first is plaintiffs' claim under Section 1591 and

11   1595 itself, and, fundamentally, the problem with that claim

12   is that plaintiffs misread the statute significantly.

13        Section 1591 provides that there can be criminal

14   liability for one who knowingly benefited financially from

15   participation in a venture that engaged in an act of sex

16   trafficking while knowingly or recklessly disregarding that

17   trafficker would use force, fraud, or coercion or that the

18   victim was under age.

19        Plaintiffs focus on one word from the statute, the word

20   "participation," they actually shorten that word to

21   "participate," and they say that all that's necessary is to

22   indicate -- show that a defendant took part in some action

23   that helped in any fashion sex trafficking ventures to

24   succeed.

25        In fact, no case has ever held that.  The cases that

1    have interpreted Section 1591 instead hold, and we've

2    pointed these out in the brief, that in order to find a

3    defendant liable, you would have to indicate that the

4    defendant was associated with a criminal venture for a

5    specific crime; that it participated in it, in the venture,

6    in some way that shows that it wished to bring about the

7    crime; that the defendant sought by his actions to make it

8    succeed; that he shared in the criminal intent of the

9    principal, and committed an overt act designed to aid in the

10   success of the venture.

11       That's the requirements to establish a violation of

12   Section 1591.

13       THE COURT:  Those are essentially the elements of

14   criminal conspiracy.

15       MR. GRANT:  They're very similar to the aiding and

16   abetting elements.  And, in fact, that's what the case law

17   has held, your Honor, that that definition of "participation

18   in a venture" is equivalent to aiding and abetting.  Courts

19   have held that.  No court has suggested that there is some

20   other variation on that.  And it's important as well,

21   because plaintiffs' suggestion that simply doing something

22   that in some way helps a sex trafficking venture to succeed

23   is such a broad standard of culpability that it would be

24   unheard of in the criminal law, and it would raise serious

25   problems of constitutionality both under due process,

vagueness, and, in this circumstance, the First Amendment as well.  So there is a reason the law is as carefully defined as it is.

And as I pointed out, the Department of Justice has said that's what the law means.  It requires culpability that a website actually participated with or conspired with someone to bring about a sex trafficking venture.

There is no indication here -- and it's absolutely not true that there was any reason for Backpage to know that these young girls were victimized or participated in any way in any of the acts of the people who victimized them.

All Backpage did was publish an ad that they posted.

I should turn briefly as well to the Chapter 93A claim.

The short answer to plaintiff's claim under Chapter 93A is that state laws of all kinds are expressly preempted by Section 230.  And if there was any doubt about that, the *amicus* brief, or the *amici*, supporting the plaintiffs, the Massachusetts Attorney General has made clear that Massachusetts state law is preempted because on three occasions, the Attorney General of the state has urged that Section 230 should be amended so that state law is no longer preempted so that state authorities could pursue claims and not have websites be immune from those claims.

But, secondly, the theory of causation and the basis of the plaintiffs' claims is so attenuated that they could not

1    survive even if they were not preempted.

2         Plaintiffs admit that Backpage works with law

3    enforcement authorities, but they contend, and this seems to

4    be the premise of their claim, that that's a mere pretense

5    or is in some fashion unfair.

6         First of all, your Honor, those are entirely conclusory

7    allegations and, I suggest, are not entitled to any

8    deference.  But plaintiffs don't allege that any of that had

9    anything to do with them.  Their theory is that if Backpage

10   had not somehow cooperated and conducted, as they allege,

11   this ruse, the site would have been shut down and the pimps

12   who exploited them would have never exploited them.

13        In the words of the recent case Ray v. Ropes & Gray, as

14   the Court wrote there, "This hypothesized chain of events

15   falls far short of Chapter 93A's causation requirement."

16        But even if that were not the case, plaintiffs' claims

17   also fail under Chapter 93A because they do not allege that

18   they suffered any injuries arising from transactions as

19   consumers, and that, too, is a necessary element of

20   Chapter 93A.  Chapter 93A only protects against unfair or

21   deceptive practices in trade or commerce.  It's intent is

22   not to protect against any unfair practice at all, and, in

23   fact, any other reading of the statute would defy common

24   sense.  That's from the LB Corporation case, also from this

25   Court.

1    Your Honor, at this point I am going to turn the podium

2    over to Mr. Bertsche, as I said, to address the copyright

3    and the right of publicity claims, subject to any other

4    questions the Court has.

5         THE COURT:  Thank you.

6         MR. GRANT:  Thank you.

7         MR. BERTSCHE:  Good afternoon, your Honor.

8    Counts IV and V of the complaint arise out of the

9    alleged appearance of the plaintiffs' photographs in the ads

10   that their pimps posted to Backpage.com.  Both of these

11   counts are obvious attempts to get around, to circumvent,

12   the immunity that Section 230 provides to the rest of the

13   case.

14   I want to deal very briefly with Count IV, the right of

15   publicity claim under both Massachusetts and Rhode Island

16   law.  The claim there is missing an essential element,

17   because there is no allegation that the photographs of these

18   women are being used for the commercial benefit of

19   Backpage.com.

20   The Massachusetts and Rhode Island right of publicity

21   statutes require the use by the defendants of the name,

22   likenesses, portrait of the plaintiff for purposes of trade

23   to promote the defendant, and these are not being used to

24   promote the defendant.  There is no way that they are being

25   used as advertisement for the Backpage site itself.

By analogy for example, your Honor, if the advertiser in the Boston Globe used plaintiff's photograph to sell that advertisers's product, then the advertiser might be liable under the right of publicity statute, but the Boston Globe would not be liable for violation of the right of publicity because it was not using the image to sell the Boston Globe. The same result here. The pimps might be liable, but Backpage.com is not.

Count V, the copyright claim, involves the allegation by Jane Doe No. 3 that she held the copyright in the photographs that the trafficker posted on Backpage.com, and that Backpage, not the advertiser, not the pimp, Backpage, should be liable for copyright infringement as a result of that posting.

The argument fails under any of the three theories that plaintiffs espouse to try to establish copyright infringement.

First of all, direct infringement theory. To be liable for direct infringement a website has to be engaged in some degree of volitional conduct. Specifically, the act constituting infringement has to be what the defendant engaged in. You can't automatically find a website liable for copyright infringement just because a user happens to post a photograph that infringes on someone's a copyright. There has to be something more.

And this has been established in a number of cases, including Judge Gorton in the Aereo case in this district in 2013. He said, "Requiring a showing of volitional conduct comports with the general principle that, even with the strict liability statute such as the Copyright Act, the challenged conduct must be what causes the harm."

There is a case, CoStar Group, that's directly on point and somewhat analogous to this one. It involves a real estate website to which users post ads, ads that frequently include photographs of commercial real estate properties, and some photographs being copyright or allegedly being copyright infringing.

In that case, the website owner had a system, just like it's alleged that Backpage did as well, where it screens and reviews the ads before accepting them for posting. It's the same kind of gatekeeping process that's alleged in this case.

The Court, the Fourth Circuit Court of Appeals, found that there was no volitional conduct by the website sufficient to find direct liability on the part of the website. "Any other rule," the Fourth Circuit said, "would result in the automatic liability of countless websites whose role in the infringement is nothing more than setting up and operating a system that's necessary for the functioning of the Internet."

1    And there is no allegation here, your Honor, that

2    Backpage.com engaged in volitional conduct that caused the

3    posting of copyright-infringing photographs.

4    The allegations in the complaint, Paragraph 142 of the

5    Second Amended Complaint, refers to photographs that Jane

6    Doe No. 3, "at the direction of her traffickers" and, quote,

7    "which the traffickers then included in the Backpage.com

8    advertisements," the traffickers who posted these photos,

9    and not BackPage.com.  And simply reviewing the ads before

10   they're posted is not sufficient because review doesn't

11   amount to the act constituting infringement.  The infringing

12   acts, which was the uploading of photographs, were done by

13   third parties.

14   So there can be no direct liability against

15   Backpage.com.

16   That gets you then to the question of, Well, can there

17   be indirect liability?

18   Well, there's no allegation anywhere in the complaint

19   that anyone other than Backpage.com was directly liable for

20   the copyright infringement.  So if Backpage.com is not

21   directly liable, there can be no secondary infringement by

22   Backpage.com if there was no direct liability.  You can't

23   have secondary liability unless there was an underlying

24   direct liability by someone else.  And there is no

25   allegation of any direct liability in this complaint.

1    But even putting that aside, the two theories they

2 espouse are contributory infringement and vicarious

3 infringement.

4    They cannot established contributory infringement

5 because they cannot show that Backpage.com materially

6 contributed to the pimps' infringing content.  Backpage

7 didn't take the picture.  Backpage didn't require its

8 display.  Backpage didn't create the ad itself.  It did not

9 encourage anyone else to do so, and there is no allegation

10 otherwise.

11    These kinds of contributory liability occur when you've

12 got some website or system that's essentially being used as

13 a tool to facilitate or enable infringement by someone else,

14 by a user, and there's no allegation like that here.

15    There's also no allegation -- the second requirement

16 for contributory infringement -- that Backpage had knowledge

17 of the pimps' infringing conduct, which is a prerequisite

18 for contributory liability.  There has to be a showing of

19 actual knowledge or reason to know of specific acts of

20 infringement.

21    The only thing that's alleged in the complaint is that

22 people post photos to websites.  They say at Paragraph 141,

23 "It's common knowledge that pimps and traffickers require

24 child trafficking victims to provide photos for use in

25 Backpage ads."

Well, it's just a conclusory recital, but even beside that, it isn't alleging knowledge of Backpage of infringing activity. The fact that Backpage even has common knowledge that some photos are being put up there doesn't mean that it had specific knowledge that there are copyright infringing photos being placed there.

Finally, vicarious liability requires an agency relationship. It comes from the doctrine of *respondeat superior*. Backpage just does not have the right and ability to control the individual engaging in the infringement. Merely because Backpage.com could have refused to do business with a pimp by blocking an allegedly infringing ad is not enough to establish right and ability to control the infringer, which is what's required for vicarious liability.

Also required for vicarious liability is that Backpage.com receive a direct financial benefit from the photograph. Magistrate Bowler in the Sarvis case talks of this as a "causal relationship between the infringing activity and the financial benefit that a defendant reaps." And there is no such causal relationship between any financial benefit to Backpage and the posting of copyright infringing photographs. In fact, there is no premium charged for including a photograph. So Backpage does not charge more for an ad with a photograph than for an ad without a photograph. It doesn't receive additional benefit

1   by there being photographs on the sites.

2       So for all these reasons, the Court must dismiss the

3   plaintiffs' attempt to use these meritless right of

4   publicity and copyright claims to defeat the immunity from

5   suit that Section 230 provides.

6       THE COURT:  Just one question.

7       The registration is of no effect since it occurred

8   after the --

9       MR. BERTSCHE:  The registration doesn't have any

10   effect in terms of establishing statutory damages or

11   attorneys' fees.

12       THE COURT:  I was going to say --

13       MR. BERTSCHE:  So we've got a case here that, if it

14   were to go forward, does not bring statutory damages, does

15   not bring with it attorneys' fees.

16       It's an exceedingly weak copyright infringement claim,

17   even putting aside the DMCA protections.

18       THE COURT:  Without statutory damages, I am trying

19   to envision what the theory of compensible damages are.

20       MR. BERTSCHE:  I'm sorry?  I could not hear you,

21   your Honor.

22       THE COURT:  I said I am puzzled over what the

23   theory of damages is.  In terms of profits to Backpage, it's

24   hard to attribute any --

25       MR. BERTSCHE:  It would be infinitesimally hard to

1    attribute any direct benefit or profit to Backpage from the

2    appearance of this one photograph.

3         THE COURT:  Then again, actual damage, I think, is

4    also a difficult concept.  I mean, hedonic damage I could

5    see, but this is a compensatory theory.

6         MR. BERTSCHE:  I don't believe that hedonic damages

7    are available.

8         THE COURT:  They're not available.

9    So I'm trying to think of what the compensatory, the

10   actual damages, would be under the copyright law, but maybe

11   Mr. Montgomery can answer that question.

12        MR. BERTSCHE:  Thank you, your Honor.

13        THE COURT:  Okay.

14        MR. MONTGOMERY:  I think Ms. Fukuda will answer

15   that.

16        THE COURT:  I knew there would be an answer

17   somewhere.

18        MR. MONTGOMERY:  We'll get there soon enough.

19   (Pause in proceedings.)

20        MR. MONTGOMERY:  Your Honor, I would like to begin

21   with a few introductory remarks to attempt to set the stage

22   for our argument this afternoon.

23        As your Honor knows from our briefs, we believe that

24   the proper analysis here begins not with Section 230, where

25   Mr. Grant begins, but, rather, with the sufficiency of the

allegations under Rule 12(b)(6) for each of our claims. And as your Honor is, of course, more than well aware, your task under Rule 12(b)(6) is: To consider the complaint in context; to assume that the facts and inferences therefrom are true; and, to apply your experience and common sense in assessing whether the allegations taken as a whole are sufficiently plausible that you will permit us to proceed to develop a complete record upon which these claims can be assessed.

Now, the context here, I would just like to note briefly, is the growing market for illegal sex with children that is fostered in part by the Internet.

The three plaintiffs we represent are victims of the tragic and horribly damaging exploitation that occurs on the Internet with increasing frequency and which indisputably occurred here.

The plaintiffs here allege that Backpage plays a knowing and intentional role in the use of the Internet as a result of the purposeful actions that we have described in some detail, considerable detail, in our complaint.

These actions are all about leveraging the Internet for the purpose of expanding the market for illegal sex, including sex with children, including our plaintiffs, and to secure for themselves a dominant market position in that business. And the overall big-picture issue here is whether

1   the law provides any remedies for plaintiffs under the

2   statutes on which we've based these claims.

3       We think it's clear, as we've argued in the brief, and

4   hope to expand upon today, that the law does provide

5   remedies.

6       Now, we understand, and Mr. Grant has repeated here

7   today, that the defendants say that Section 230 of the

8   Communication Decency Act erects an insuperable barrier to

9   the plaintiffs' achievement of those remedies.

10      We think, as you know, that that gets Section 230 all

11  wrong.  We think that it reflects a strategy to use

12  Section 230 as a sword to affirmatively protect illegal

13  conduct, rather than the shield that was intended by

14  Congress.

15          THE COURT:  Is there not some difficulty in that

16  the argument has been pretty effective with almost every

17  court?

18          MR. MONTGOMERY:  I'm sorry?

19          THE COURT:  I said the 230 argument seems to have

20  succeeded in almost every court that has heard it.

21          MR. MONTGOMERY:  I'm sorry.  I didn't quite get

22  that.

23          THE COURT:  Maybe the microphone is not on.

24      I was saying, is there not a problem in the fact

25  that -- I understand you have a different view of 230 -- but

1    it is hard to find a court, of the many who have heard these

2    cases, that agrees with that interpretation.

3              MR. MONTGOMERY:  Well, actually we do disagree with

4    that.

5         We, of course, accept that if you count, as Mr. Grant

6    was doing, that there really are hundreds of cases that have

7    applied Section 230 to dismiss plaintiffs' claims in various

8    contexts.

9         There are several features of most of those claims,

10   however.

11        First of all, they generally involve either defamation

12   cases or claims or defamation-related claims, efforts on the

13   part of plaintiffs not to directly make a defamation claim

14   in light of the cases against them, but to make a defamation

15   claim in the guise of yet another claim.  And the Courts

16   have said, Well, that's not appropriate.  This statute was

17   absolutely intended, if you look at the language of the

18   statute, to preclude those kinds of tort claims.  So there

19   really are hundreds of defamation-related claims that apply

20   Section 230.

21        At the same time, there is a trend, if you will, that

22   we've described in the cases, a growing trend among the

23   courts, to view 230 as, perhaps, having been too broadly

24   applied in the early days of the statute when, to be sure,

25   the Internet was in its infancy.  And the courts certainly

1    heard Congress loud and clear that Congress wanted to

2    protect this nascent technology and make sure that it was

3    able to develop without undue interference from plaintiffs'

4    claims.  So there are a number of cases that have begun to

5    trim, if you will, the edges of Section 230, and one of

6    which that we want you to take a particular look at that's

7    critical.

8        Barnes v. Yahoo was decided by the Ninth Circuit in

9    2009, and we would urge the Court to take a particularly

10   close look at Barnes v. Yahoo, because it stands not alone,

11   but among a very small group of cases that address the third

12   prong of Section 230.

13       Mr. Grant correctly told your Honor that Section 230

14   has three prongs.  I have not done a count, but I would be

15   prepared, I think safely, to suggest to the Court that

16   95 percent of the hundreds of cases upon which Backpage is

17   relying involve the information content prong.  It is that

18   body of cases upon which Mr. Grant almost exclusively

19   relies.  If you look at the Backpage briefs, you'll see the

20   citation to this litany of decisions.

21       But if you look underneath, they're all about the

22   question whether the website is responsible for the creation

23   or investment of the content.

24       But there's another element, and that is, even if the

25   website is not responsible for the content, it's entirely

1    third-party content, whether the claim treats the defendant

2    as a publisher.

3         Now, parenthetically, that's a phrase that comes from

4    Prosser on Torts and the law of defamation, which is

5    reflective of what Congress had in mind when it enacted the

6    statute.

7         But, leaving that aside, the Court independently needs

8    in this case, as it did in Barnes v. Yahoo, to determine,

9    Does this claim, the claims that we've laid out here, do

10   they treat the defendant as a publisher in a legal sense;

11   that is, are they directed to it's publishing functions?

12        And what Barnes v. Yahoo was about -- and, by the way,

13   the Ninth Circuit has easily the most experience of any

14   Circuit with Section 230 issues, and they've got, you know,

15   upwards of ten or more cases that the Circuit has decided.

16        In Barnes v. Yahoo, a disappointed former boyfriend

17   posted some information on Yahoo and effectively generated a

18   bit of a campaign, an inappropriate campaign, against his

19   former girlfriend, Ms. Barnes.

20        Ms. Barnes brought a lawsuit against Yahoo, and it had

21   two elements to it.  One was that Yahoo was negligent in

22   failing to take down this series of communications that were

23   posted by her boyfriend.

24        The Court said, Negligent undertaking, that's, you

25   know, really kind of just a classic tort claim.  It is

tethered exclusively to the content itself, and, as a result, Section 230 bars that claim.

However, there was another claim, and the other claim was a promissory estoppel claim, because Ms. Barnes had contacted Yahoo and Yahoo spoke directly to her, a person of some influence there, and said, I'm going to take care of this. I'm going to walk down the hall and take care of this right now.

And what the Court said was, Well, wait a minute. 230 doesn't reach that, because this particular claim, the promissory estoppel claim, arises out of conduct by Yahoo which, while related to the content, actually comes -- arises out of a different duty, and it's a contractual duty, and in making a claim that seeks to enforce a contractual duty, Ms. Barnes is not treating Yahoo like a publisher. So it's critical, the Ninth Circuit says, that you look at source of the duty, and whether the source of the duty really focuses on the publisher function.

What we're saying here, if you'll permit me to turn back to the claims and let me just focus in particular on the Trafficking Victims Protection Act, is that we have made a claim under the private right of action provision of a criminal statute, that the source of the duty, for purposes of the analysis of Section 230, the source of that duty is a criminal statute. And if you look at the complaint, we have

1    the whole raft of factual conduct that we've identified by

2    Backpage which violates that criminal statute.

3        I'm prepared to get into this in some detail, but we

4    have made, we think plainly, a plausible claim that they are

5    participants in the venture of trafficking these kids in the

6    sense that Congress had in mind when it attempted to create

7    a much broader net that would ensnare those who are

8    effectively promoting --

9        THE COURT:  Let's think about that for a moment.

10    I mean, the theory, which I think Mr. Grant carefully

11    corrected, and properly, is not a conspiracy one under the

12    law, because that would require evidence of an agreement,

13    and I do not think there is any allegation in the complaint

14    that there was an explicit agreement between the defendant

15    and a third party and the plaintiffs that would be

16    enforceable.

17        MR. MONTGOMERY:  Correct.

18        THE COURT:  So the theory is one then of what we

19    classically call a "joint venture."  I think in the more

20    modern parlance "aiding and abetting" is the preferred term.

21    Two things though about the theory.  It's a theory of

22    criminal liability.  I spent any numbers of years as a

23    prosecutor before I became a judge, and I am not aware of

24    any state or federal statute that ever authorized a private

25    right of criminal enforcement.  There certainly are civil

laws, the *qui tam* laws being a classic example, of where we enlist private citizens to perform certain functions that an Attorney General or a prosecutor would otherwise perform. But in terms of invoking a criminal sanction itself, I don't know of an example.

But assuming we get past that conceptually. One of the difficulties with a joint venture theory is that mere knowledge that someone is committing a crime does not expose one to liability either under the law of conspiracy or under the law of joint venture. I mean, we set criminal liability fairly high, much higher than we would civil liability, in an otherwise equivalent context.

So I am not sure that the concept that you are trying to invoke translates that easily from a criminal into a civil context, but I leave that to you to convince me.

MR. MONTGOMERY: Well, your Honor, I understand the points that you're making, and I certainly bow to your considerably superior experience with the criminal law, but I don't agree with where you may be coming out on the question.

Mr. Grant, in effect, suggests that it's really not possible for a website which creates a marketplace to be criminally responsible for conduct that occurs on the website where the website doesn't have any direct relationship, other than receiving fees from those who

1    participate in the marketplace.

2        I think that's wrong as a premise.  I think the

3    Department of Justice thinks it's wrong.

4        If I can just put up a slide which identifies three

5    recent Department of Justice prosecutions of Internet

6    service providers, one of them quite celebrated, it's been

7    in the news quite frequently in the last year or two

8    involving a prosecution of an individual who started a

9    website called Silk Road.

10        THE COURT:  I'm familiar with the case.

11        MR. MONTGOMERY:  So you're familiar with the Silk

12    Road case.

13        The defendant in the Silk Road case went to trial --

14    actually, before trial made a motion to dismiss.  I am glad

15    to hand up the decision by the judge on the motion to

16    dismiss, which actually, your Honor, I think speaks to some

17    of the very issues that you're expressing some concern

18    about.

19        The other two cases involve prosecutions by the Justice

20    Department of websites operated by defendants which were

21    marketplaces not dissimilar from our description -- or our

22    allegations about Backpage who were involved in the sex

23    business.  Those are two very recent prosecutions.  We don't

24    have the benefit of a judicial opinion on a motion to

25    dismiss, or the benefit, as we do in the Silk Road case, of

1    a trial because the defendants in each case pled guilty.

2        But to your point whether we're trying to enforce the

3    criminal law, I think what's clear to us is that because the

4    private right of action appears in Title 18, that the

5    private right of action is a part of, in Congress' judgment,

6    the enforcement of criminal law.

7        I'm not suggesting for a moment that a private party

8    has the right to independently enforce the criminal law.

9        But Congress created this new provision, if you --

10   Maybe I could put up 1591, because the structure of 1591, I

11   think, is important.  Because in Section (a) it says what

12   you would expect, Anybody who "recruits, entices, harbors,

13   transports," etc., a child is engaging in criminal activity.

14   So there was no surprise there.

15       But Subsection 2 of 1591(a) is different.  It is very

16   different.  And it says, Gee, anybody who participates

17   knowingly in a venture which has engaged in acts that

18   violate the Chapter, including (a), has also committed a

19   crime.

20       And the use of the word "participation" is very

21   intentional.  The word "participation" is an exceedingly

22   broad term in the law, including in the criminal law, where,

23   of course, it's routinely used in concepts like "aiding and

24   abetting," particularly in connection with conspiracy.  But

25   here we think it's even more flexible, because we've got

another section of Title 18 that already criminalizes aiding and abetting, that's Section 2.

We've got another Section, 371, which criminalizes conspiracy. So there's no need for this participation point, unless it means something different, perhaps along the continuum of aiding and abetting and conspiracy, but we would suggest to your Honor more flexible, because for the first time the federal government was trying to get into the enforcement that goes beyond the perpetrator, and in doing that, the Congress also added the private right of action.

And I want to put that up because I think that makes the point even more clear.

Because in fashioning the private right of action, Congress explicitly draws the distinction between the perpetrator. So there's a private right of action against the perpetrator. Typically you would expect that to be an individual who had violated Subsection (a), recruiting, enticing, harboring, transporting, etc.

But then there's this additional provision, which you can see here, which is anybody who knowingly benefits, financially or otherwise, or by receiving anything of value, from participation in a venture.

Now, the "participation-in-a-venture" language happens to be, you know, precisely the same as the language used in criminal statute.

1        So when we say, and I have said here today, that we

2    are, in effect, enforcing a criminal statute, as a technical

3    matter, we're just enforcing 1595, which happens to be a

4    provision in Title 18.

5        It's 1591 that is, itself, exclusively a criminal

6    provision.

7            THE COURT:  Well, the words, though, that have to

8    be puzzled through is the phrase "from participation."

9            MR. MONTGOMERY:  Correct.

10           THE COURT:  If Congress had really meant this to be

11   a strict liability statute, it would have simply dropped

12   those words out and said, "Whoever benefits knowingly from a

13   venture"...

14           MR. MONTGOMERY:  Correct.

15           THE COURT:  Then you would have a strict liability

16   statute.

17       But here, by inserting the phrase "from participation

18   in a venture," Congress meant it to be more protective, it

19   would seem, of anyone accused as a defendant, either

20   criminally or, in this case, civilly.

21           MR. MONTGOMERY:  I certainly would agree with that.

22   There is a scope of conduct that fits within "participation

23   in a venture," and the question is whether the conduct that

24   we have described in our complaint is sufficient under Iqbal

25   and Twombly to rise enough of a suspicion of illegal

1  activity that we're entitled to proceed further with this

2  case.

3      And we've gone, I think, in our brief in some length to

4  try to explain to your Honor the breadth of the term

5  "participation," which in RICO, for example, is qualified.

6  We actually think this language came from RICO.

7      But in RICO, "participation" is fairly constrained by

8  the surrounding words.  RICO says, you know, it's unlawful

9  to conduct or participate in the conduct of an enterprise.

10  Well, here we've had all of that stripped away.  It's just

11  "participation in a venture."  RICO, of course, is further

12  constrained by "racketeering enterprise," which is what --

13  "racketeering activity" --

14      THE COURT:  RICO wouldn't work in this context

15  because the defendant couldn't be both the defendant and the

16  enterprise.

17      MR. MONTGOMERY:  Exactly.

18      THE COURT:  The enterprise has to be a separate

19  entity.

20      MR. MONTGOMERY:  So we think what Congress did here

21  was very intentional, and what they envisioned was the

22  federal law really developing the kind of flexibility that a

23  lot of state and local law has that permits local police to

24  prosecute the hotels and the cab drivers, not every hotel

25  and cab driver, where there are appropriate facts that

actually meet the requirements of those statutes.

Congress was saying, Well, gee, we've got a very significant national problem here, and we're going to insert something new in this Trafficking Victims Protection Reauthorization Act.

The statute has been around since the year 2000, but in a reauthorization this new provision came in.  It -- contrary to what Mr. Grant has said, it has not been construed or applied in a manner that is adverse to what we're advocating here.  Indeed, the only case that really directly applies the statute, and it does it in a context like this, in a motion to dismiss, is the Perlitz case.

And the Perlitz case is very helpful to us here, although involving a very different case.  It involves a sex abuse case against a university and certain administrators with respect to activity that occurred some years before at a school that was operated by the university, Fairfield University.  But it involved an actual application of the language of "participating in a venture," and the Court determined that it was -- the allegations were sufficient for the case to proceed because there was at least some reason to believe on the basis of the allegations in the complaint, accepted as true of course, that the university either knew or should have known of the misconduct that was occurring with some regularity allegedly at the school.

1    So, you know, we would recommend that the Court look at

2    the Perlitz case because it actually is a case that has at

3    least attempted to grapple with an element of -- I'm not

4    suggesting it's directly on point here because the conduct

5    is very, very different.

6         THE COURT:  To bear down on the allegations of the

7    complaint here, we still have to reconcile Section 1595 and

8    Section 230.

9         MR. MONTGOMERY:  Yes.

10        THE COURT:  You may say Congress has added a new

11    avenue of redress in 1595, but the law, as we know, doesn't

12    favor implied repeal.  So it is doubtful that Congress meant

13    to repeal any aspect of Section 230 in providing a civil

14    remedy under 1595.  So we know, at least I think we agree,

15    at least on the core of what 230 protects, which is the

16    publishing functions.

17    So what allegations here take the defendant out of the

18    protections of 230 into potential participation in a venture

19    as it's described in 1595?

20        MR. MONTGOMERY:  Well, I don't want to quibble.  I

21    think the defendant is out of 230 by virtue of the nature of

22    the allegations that we're making; that is, that they are

23    not allegations which treat the defendant as a publisher.

24    So we think 230 is gone.  That's our reading of 230.  I know

25    Mr. Grant would disagree.

1    Even if you accept Mr. Grant's reading, I think you end

2    up -- if you believe we've stated a claim under the

3    Trafficking Victims Protection Act, or 93A, or the state

4    statute, then you have a conflict.  And that conflict is a

5    particularly acute with the federal statute, and you would

6    have, you know, a case stating a claim for violation of a

7    federal statute, and, under Mr. Grant's reading, an

8    application of 230 that would preclude that.  I suggest your

9    obligation there would be to harmonize, if you can, those

10   two statutes as applied to these facts, but --

11       THE COURT:  Well, under the theory of the

12   complaint, is Backpage a content provider?  Is that the

13   suggestion?

14       MR. MONTGOMERY:  I need to be careful here.

15   We believe that Backpage is a content provider, but it

16   is not an aspect of the case upon which we are defending

17   this motion to dismiss.  We think the respects in which they

18   are a content provider is something that ought to be

19   developed on a full record.  And at summary judgment, if we

20   get to summary judgment, this issue would come back before

21   your Honor.

22   We're resting, for our purposes today and in the

23   briefs, exclusively on the third prong.  It has to be the

24   case, in order for 230 to apply, even if they're not a

25   content provider, it has to be the case that the claim

treats them as a publisher.  And, you know, there is a limited amount of 230 case law on what that means; but, as I mentioned earlier, the Barnes case in particular, I think, is important for your Honor to look at.

The Lycos case -- Mr. Grant mentioned Lycos a number of times.  Lycos is the only First Circuit case on 230, and the Lycos case mentioned the third prong, the publisher prong, in passing.  And the reason it mentions it only in passing is because the Court considers it self-evident that the complaint in that case, the claims, treat Lycos as a publisher.  So that's really the end of the analysis.

This case is entirely different, but your Honor asked me about the facts, and the facts are developed in considerable detail, and I will just give you an overview.

The facts here are that, at least as alleged, that Backpage has -- first of all, that Backpage knows that its website contains entirely, or almost entirely, illegal content.  They know that a significant portion of that illegal content involves advertisements offering children for sale.

Armed with that knowledge, they have made repeated representations to law enforcement and to advocacy organizations, and organizations, substantial organizations, like the National Center for Missing and Exploited Children, to the effect that Backpage intends to be, in light of the

knowledge that they concede they have, the sheriff of the

Internet, that they are going to do a whole number of

things, which we've delineated in the complaint, to be an

effective sheriff of the Internet, and to make sure that, to

the extent possible, children are not offered for sale on

their website.  And with that knowledge as a backdrop, and

with those representations as a backdrop, Backpage then

turned around and designed and operated a site which

accomplished a very, very different purpose.

I have a list -- which may be a little bit much for the

ELMO, but let me try it -- which just gives examples of what

Backpage has done to support, promote, facilitate the use of

their site for the activity that's the subject of this case.

So they, first of all, have devoted themselves to

developing a brand which is attractive to traffickers.  One

of the ways they've done that is by a number of very

specific efforts to make sure it is difficult to find the

traffickers.  They, in effect, protect their anonymity.

Now, they do this through means like untraceable

payment methods, including Bitcoin.  Bitcoin, by the way,

was a piece of evidence, and evidence of intent, criminal

intent, that was front and center in the Silk Road case.

Stripping metadata from the photos in order to impede

the ability of law enforcement to identify exactly where a

photograph was taken, to make connections between

1  traffickers and other victims who are, you know, in the
2  so-call "stable" of that particular trafficker, a whole lot
3  of things that metadata enables you to do.

4      They host communications, private communications, on
5  their site between traffickers and perspective customers, in
6  effect, again like Silk Road, Escort.com, and MyRedbook.com,
7  facilitating the transactions that are made, which involved,
8  at least in the case of our plaintiffs, children.

9      There are various ways in which they interface with law
10  enforcement, usually at law enforcement's request, which,
11  behind the scenes, involve practices on their part which
12  defeat or thwart the interests of law enforcement.

13      So -- I have a second page, which I won't put on the
14  ELMO, your Honor, but which we describe in the papers which
15  involve the use of signaling terminology, and that they have
16  designed their website in a way in which they, in effect,
17  steer users towards the use of terminology which will be, as
18  we say, more effective in advancing the business of the
19  traffickers on the one hand, and, on the other hand, less
20  likely to attract the attention of law enforcement.

21      So there is a whole litany of these kinds of practices,
22  many of which, I submit to your Honor, are very similar to
23  the kinds of things that the defendant, Mr. Ulbricht, in the
24  Silk Road case was engaged in.

25      And the real question is whether this rather extensive

list of affirmative business decisions in the aggregate,

considered in context, give rise to a sufficient suspicion

that Backpage knows exactly what it is doing, that it is

intentionally creating a marketplace devoted entirely, or

almost entirely, to illegal activity which has an effect on

the marketplace because they have succeeded, in the years in

which we've described the operation of this scheme, from

going from a bit player in the online sex business to the

gorilla of the online sex business.

So this entire strategy has been successful. They now

control, at least as of two years or so, 80 to 85 percent of

all of this traffic. They have succeeded in creating that

brand, which is what Silk Road was, a brand; same thing with

MyRedbook, a brand, which facilitates and ends up being

devoted virtually exclusively to illegal activity.

It is that set of cumulative actions that, we submit to

your Honor, justifies the conclusion we draw, at least the

allegation we make, that this conduct is sufficient to

constitute participation in a venture.

And I want to mention one other thing about

Section 230.

I said earlier to your Honor that there were signs that

the courts were beginning, particularly as the Internet has

substantially matured, if you will, to trim the sails of

this statute, to take a more discerning look, rather than

1    simply accepting the views that Mr. Grant advances that it's

2    critically important that these cases simply be treated

3    summarily in a motion to dismiss stage.

4        Last month, the Second Circuit decided a 230 case.

5    While they applied Section 230, they also said Section 230

6    is an affirmative defense; and, as an affirmative defense,

7    it is appropriate to apply 230 at a motion to dismiss stage

8    only when it is evident, self-evident, from the complaint.

9            THE COURT:  What is the Second Circuit case?

10           MR. MONTGOMERY:  I am going to hand it up to your

11   Honor.  It's the Ricci case, R-I-C-C-I.  We have copies.  I

12   am going to hand it up to you.  It is a case we didn't cite

13   in our brief, but which actually accepts and adopts the

14   identical conclusion by the D.C. Circuit last summer in the

15   Klayman v. Zuckerberg case.  I will also hand that case up

16   to you.

17           THE COURT:  Before I lose the thought, the facts as

18   you have described them from the complaint would mean that

19   participation would have to reach purely passive activity.

20   I do not think there is any suggestion in the complaint that

21   there is direct collusion in a face-to-face sense.

22           MR. MONTGOMERY:  There is no such -- that is

23   correct.

24           THE COURT:  So, in other words, as Chuck E. Cheese

25   designs a venue that is going to be attractive to children,

1    even though they have no intention of turning their parents

2    away or not hosting adults if they arrive, what you are

3    saying is that "participation" can be read broadly enough

4    under the statute to encompass purely passive activity in

5    the expectation that it will produce a given result?

6        MR. MONTGOMERY:  That's right, with sufficient

7    specificity of intentional conduct, coupled with intent,

8    then the DOJ prosecutions, those were criminal cases, they

9    were all racketeering cases, but the sort of essential

10   principle then of those cases comes into play, which is that

11   you can be -- I mean, you say "passive," I think I'm sure

12   the Justice Department in each of those cases would say, No,

13   no, very active, exceedingly active --

14       THE COURT:  As a prosecutor you always over --

15       MR. MONTGOMERY:  That's right.

16       But exceedingly active with criminal intent to

17   accomplish an object which didn't require that the defendant

18   have, you know, direct interaction, other than receiving

19   fees.  Because, of course, there is a direct interaction

20   that triggers the receipt of a financial benefit, or

21   something of value, and that's every time that an ad is

22   posted -- and, by the way, ads might be posted five or six

23   times a day -- and every time it's posted it's between 12

24   and $20.

25       So there is that relationship, but certainly not the

1    kind of traditional relationship that you would expect when

2    one is accused of participating in an illegal undertaking.

3    But we suggest, your Honor, it's not required.

4         And, at a minimum, what ought to occur here is that the

5    questions that you're asking, and I sense, your Honor, you

6    have a number of questions and you have concerns, but those

7    ought to be applied on a complete record, because it is not

8    self-evident -- if I'm correctly quoting those cases, but

9    you will see the quotation in the cases, but it's very close

10   to that -- it is not self-evident.  And this is a case that,

11   notwithstanding Section 230, we think cries out for the

12   development of a full record so that you can truly, on a

13   full record, determine whether it's appropriate to apply the

14   concept of "participation in a venture" or the concept under

15   state law of "aid in trafficking."

16        And then there's the 93A claim.  I will just leave it

17   to the brief, because I suspect I'm over time here, your

18   Honor.

19        But the 93A claim, there isn't any argument that I can

20   see that Section 230 ought to apply to the 93A claim.  You

21   know, Judge O'Toole and Judge Casper each rejected 230

22   motions to dismiss in 93A cases last year.  I don't think

23   the floodgates that Mr. Grant sort of suggests might open

24   have occurred as a result of those decisions, nor have the

25   floodgates opened because the Ninth Circuit made its duty

1    determination in <u>Barnes</u>.

2        So we think there's plenty of room here for this case

3    to proceed on a full record and then for the Court to

4    revisit the legal questions, which we do understand exist

5    and to do it at that time.

6        So if you have the patience, I would like to turn it

7    over to Ms. Fukuda to discuss the intellectual property.

8        THE COURT:  I think she deserves a speaking role.

9        (Laughter.)

10        MR. MONTGOMERY:  That's right.

11    Thank you, your Honor.

12        MS. FUKUDA:  Good afternoon, your Honor.  Ching-Lee

13    Fakuda on behalf of the plaintiffs.

14        Your Honor, I think I would like to start with just the

15    preface that we heard the defendants here say that the

16    plaintiffs here are attempting to get around Section 230

17    immunity with these intellectual property claims.  And the

18    first point is, as Mr. Montgomery has just stated, we don't

19    think that Section 230 applies in this case.  However, even

20    if it does, Section 230 makes clear that it will not touch

21    and will neither limit nor expand the existing intellectual

22    property laws.  So the fact that there are intellectual

23    property claims being asserted here means that defendants

24    must be held to those laws.  They cannot run to Section 230

25    for immunity under this.  And there is no dispute here that

the federal copyright laws here and the claims that were made by plaintiffs under that set of laws is immune under Section 230.

Now, what defendants do say are a couple of things.

Number one is that under the copyright statute that there are certain elements that have not been met, and I will address them briefly.

With respect to direct infringement, they point to the requirement of volitional conduct.

I believe they mention the Fourth Circuit CoStar case. What the CoStar case says is that only passive conduct by a website host does not qualify as direct infringement.

What that means is somebody else posts content on your website, you do nothing other than present that content, that does not qualify as direct infringement.

But, as Mr. Montgomery has pointed to, what Backpage is doing here is not merely passive activity.  They're not merely a conduit for the content.  And to distill down the affirmative acts list, I'm putting up here a number of items that are relevant to the copyright case here.

So, for example, what Backpage does is they will review, and they've represented -- they've touted the fact that they have trained personnel that reviews each proposed advertisement and decides whether to post it on the website. They've used that as a way to expand their market and tell

the world what a great site they are.  So having made that
representation, they have taken on the obligation of
actually looking at every one of these ads.

     And why is that important?

     As we have alleged in our Second Amended Complaint,
with respect to Jane Doe No. 3, Backpage received a specific
notice that the photograph, and if you take a look at the
photograph of Jane Doe No. 3, at least with respect to one
of them, it is a selfie.  It is a photograph taken -- and
Backpage had notice that this was a 15 year old, so a minor
that's not capable of giving concept to use her selfie
photograph.  And with that knowledge, what Backpage had to
do was to immediately remove the photograph.

     Defendant's do not bring up the DMC safe harbor statute
because it doesn't help them.  Under the DMC safe Harbor
requirements, they also are required to immediately remove
infringing photos as soon as they get the notice.

     And, as we have alleged, your Honor, in the complaint,
even a week after Backpage had received notice that there is
potential copyright infringement in this posted photo of
Jane Doe 3, the photographs and the ads were still posted
online.

     So here again another example with stripping the
metadata.  So they are not just passing along content posted
by users, they are actively removing information from this

content before posting it.

Again, creating special sponsored ads for higher paying customers, when Backpage takes content posted by the users, the ads, they are actually editing them. They are putting in certain words. They're taking out certain words. They are rearranging them to create these sponsored ads. Again, affirmative acts. And even if the volitional act is required for direct infringement, for copyright infringement in this Circuit, that has been satisfied as alleged in the complaint.

Now, let me also speak quickly to the contributory and vicarious infringement allegations.

One of the things that we heard defendants argue is that for contributory infringement the defendants must have knowledge, and that is based on the Napster case. What the Napster case says -- this is the Ninth Circuit, A&M Records v. Napster case -- is that, Knowledge requires only that the defendant knew or had reason to know. And, in fact, willful blindness would suffice as knowledge in this context.

And as we have just shown, your Honor, Backpage certainly was aware of circumstances in which they should have known that the selfie photograph of a minor that was posted on their ads, which they reviewed, should not -- is a copyright infringement, and they have should have immediately taken that down. They have done that. They

1    have both directly infringed and they have contributorily

2    infringed.

3        And, finally, with respect to the vicarious liability.

4    For copyright infringement, vicarious liability, actual

5    knowledge of infringement is not required as long as

6    defendants had the right and responsibility to supervise the

7    infringing activity and a direct financial interest in the

8    exploitation of the copyrighted material.

9        And here the complaint has alleged both.

10       Again, the slide I had just put up names just some of

11   those acts which indicate that defendants here had the right

12   and ability to supervise the infringing activity.

13       Number 2, in terms of a direct financial interest,

14   again, a couple of cases would be helpful over here.  There

15   is a case Columbia Pictures v. Fung, it's a Ninth Circuit

16   case that's in our briefs, and there in that particular case

17   the Court specifically talked about income stream that's

18   derived from advertising.

19       We heard defendants previously say that, Hey, we're not

20   deriving any direct commercial benefits from this.  All

21   we're doing is posting up these ads and that should not

22   count.

23       However, in the Columbia Pictures v. Fung case, this is

24   exactly the situation where the Court found that the

25   connection between the infringing activity, which is

1    copyright infringement, and defendants's income stream

2    derived from advertising, is sufficiently direct to meet the

3    direct financial benefit requirement.

4         I would like to also get to your Honor's question

5    regarding whether there are any damages at issue and whether

6    the plaintiff, Jane Doe 3, would be able to go after

7    damages.

8         Your Honor is correct that the registration of the

9    copyright of the photo was done after the infringing

10   activity at the time was posted.  What that does is it gives

11   Jane Doe the right to bring suit and to demonstrate

12   ownership.  And there is no dispute from the other side

13   that, in fact, that photograph was not -- let me rephrase,

14   your Honor.

15        There is no contention from defendants that they have

16   the right or the copyright to post that photograph of Jane

17   Doe 3.

18        So what we're left here is, Yes, that's true, we don't

19   get statutory damages.  However, we do have the opportunity

20   to make a showing of what actual damages there were.  And if

21   this is a case of willful copyright infringement, there

22   could be enhanced -- let me take that back.

23        We get actual damages and we get to do discovery on

24   whether defendants have retained a copy of the photograph.

25   If they still have that, or if they're posting it at any

1    instance, they need to be enjoined from doing so.

2         So there's actual damages, and then there is injunctive

3    relief that Jane Doe No. 3 would be entitled to seek.

4         THE COURT:  Actual damages would ordinarily consist

5    of actual loss to the plaintiff or profits that the

6    infringer obtained by virtue of violation of the copyright.

7         I doubt the first would apply, the first form of

8    damages.

9         Maybe the second, that is, infringer's profits, maybe

10   there is some claim there.  But I don't think the defendants

11   are claiming that 230 preempts a copyright claim.

12        So, just as a general matter, I think that --

13        MS. FUKUDA:  They have not.

14        THE COURT:  -- you are fairly secure in that.

15        I just have a question about Count IV, the right of

16   publicity claim.

17        Divorce the copyright issue.

18        Can a person's image actually constitute an

19   intellectual property?  I think in the common law that would

20   not have been the case.

21        MS. FUKUDA:  It has certainly been treated, even by

22   the First Circuit, as an intellectual property law -- or let

23   me rephrase that, by Courts in the First Circuit.

24        THE COURT:  As phrased, the right to publicity, I

25   know, gets treated by some courts, maybe most, as

intellectual property.  But the image of a person itself, I would not have thought could, itself, constitute intellectual property.  It is not something that is a creation of the mind.  We are stuck with the way we look, for the most part.

MS. FUKUDA:  Certainly a photographed image could be copyrighted and, therefore, value can be --

THE COURT:  We all concede the copyright claim is viable.

MS. FUKUDA:  That's correct.

THE COURT:  I am not so clear about Count IV.

MS. FUKUDA:  And even without that creativity element, I think my point, your Honor, is because copyright in a photograph can exist, the image itself can qualify as intellectual property.  They're deriving -- one of the -- I think what's common to the notion of photographs and publicity, and, you know, sort of the staple copyright intellectual property, is that once an image is created, it can be reproduced over and over and over again.  And it's not your classic sense of property, it's subject to the abuse; and, therefore, intellectual property protection should exist so that you can derive value from things like your photographs and your writings and so forth.

THE COURT:  Thank you.

Mr. Grant, would you like the last word briefly to

1  balance things out?

2      MR. GRANT:  Thank you, your Honor.

3      Let me begin where Ms. Fakuda left off, and just a

4  couple of words about the copyright claim and, for the most

5  part, because some of the things she was saying are not

6  allegations in the complaint and they're not, so far as I

7  know, true.

8      The reference that there was a notice provided to

9  Backpage.com of a copyright violation, that's not an

10 allegation in the complaint.  There's an allegation about

11 someone asking for an ad to be taken down, but not for that

12 reason.

13     More generally, the references she had to a number of

14 affirmative acts that supposedly indicate that Backpage took

15 volitional action to violate a copyright, they have nothing

16 to do with the photograph, and they certainly have nothing

17 to do with the one photograph of Jane Doe No. 3.

18     To the extent that Backpage does other affirmative acts

19 in connection with running a website, that doesn't establish

20 a basis for volitional conduct that's sufficient to assert a

21 copyright claim.

22     What happens is if someone uploads a photograph, it's a

23 mechanical, automatic process, that the photograph goes into

24 the ad, subject to a review about whether it's improper, and

25 if Backpage believes it is, they eliminate the photo.

1    I want to go back to Mr. Montgomery's positions, and

2    just a few points, your Honor.

3        First, his theme was that the trend has been that

4    courts have looked at Section 230 more narrowly in recent

5    years, and he cited Barnes v. Yahoo as an example.

6        Categorically not true. Courts have continued to

7    interpret Section 230 as a very broad immunity. And the

8    case that Mr. Montgomery pointed out, the Ricci case from

9    the Second Circuit, the Second Circuit now becomes the 12th

10   Circuit to give a broad interpretation to Section 230. And

11   in that case the Court said not that there was a limitation

12   to dismissing a claim based on third-party content on a

13   12(b)(6) motion, but, in fact, affirming just that.

14       So just as the Fourth Circuit said it in Nemet

15   Chevrolet, as the Sixth Circuit said it in Jones v. Dirty

16   World, Section 230 is supposed to be applied at the earliest

17   possible opportunity in order to prevent websites from being

18   burdened by litigation, and the Second Circuit now has done

19   the same thing.

20       As to Barnes v. Yahoo, it's not -- it doesn't indicate

21   any trend of the cases. Barnes is a case in which the Ninth

22   Circuit properly held that you could not assert a claim

23   based on the content that was published by the website, by

24   Yahoo, that was submitted by a third party. But what

25   happened in that case was when the person complained to

Yahoo, the website, the individual, as Mr. Montgomery correctly pointed out, the website undertook an affirmative duty, saying, We're going to take that down. And what the Court allowed in that case was a promissory estoppel theory saying, All right, that's a different action of the website. It did not have to do with the website acting as a publisher nor any of its publisher or editorial functions. So it's a very narrow decision, and it's been interpreted very narrowly on that point. I think Smith v. Craigslist is an example saying, It's defined to that point. It's not been broadened further.

THE COURT: The easy point you could make is you have to show an element of reliance to maintain a promissory estoppel claim.

MR. GRANT: Well -- and in this case there is no suggest at all that there is any commitment by Backpage.com. There's no communication between parties. There's nothing remotely close to the allegations in the Barnes case. And, as I say, that's not exactly the beginning of some sort of broadening of Section 230's interpretation.

Mr. Montgomery suggested and said that the difference here is that plaintiffs alleged that the website is illegal, that it's premised on an illegal theory.

Your Honor, that allegation has been made, and that's been the premise of claims and efforts to avoid Section 230

1    time and again.  So in Doe v. Bates or Doe v. MySpace, the
2    allegation was that the website was promoting child
3    pornography and that its intent was to promote child
4    pornography.
5        In the recent GoDaddy v. Toups case, the argument was
6    that the website's intent was to promote revenge porn.
7        In the StubHub case itself, the whole allegation was
8    that the website in its entirety was designed for illegal
9    ticket scalping.
10       And then in the two cases I mentioned at the outset,
11   the allegations against Craigslist, in Dart v. Craigslist,
12   and the allegations against Backpage.com in the M.A. case,
13   were the exact same concept.  So the notion that you can
14   simply allege that a website is intended to foster or foment
15   some sort illegal conduct, that doesn't except you from
16   Section 230 immunity either.
17       There was a fair amount of discussion about the
18   requirements of Section 1591, and I'm not sure I need to add
19   a great deal to that because Mr. Montgomery's position is
20   still much the same as before, that this is a broad -- a
21   statute of broad scope that "participate" means to aid in
22   some way.  He's sort of parsed the words so carefully that
23   he doesn't notice it's "participation in a venture."
24       I think the Court's questions correctly note that that
25   would effectively mean even if you knew -- even though joint

1    venture liability could not apply if one party knew the

2    other was committing a crime but didn't participate in it, a

3    suggestion the plaintiffs make is that you could be held

4    criminally liability for that.

5        And, in fact, I think the Court's other question was --

6    you correctly noted that, according to plaintiffs' theory,

7    even purely passive activity would be enough to establish

8    criminal liability.

9        I suggest no one has ever interpreted any of the

10   Section 1590 statutes or Section 2255, remotely close to

11   that.  And if that were true, then Facebook would be subject

12   to liability, because it's known that people do solicit

13   through Facebook.  And, unfortunately, Xbox would also be at

14   risk of liability since it's become a technique to actually

15   lure young people in connection with sex trafficking through

16   Xbox.

17       So the theory that plaintiffs advance would be

18   enormously overbroad.

19       I heard Mr. Montgomery's comments that the distinction

20   of Backpage.com is that the entire website, the website in

21   its entirety, is devoted to illegal conduct.

22       First of all, bear in mind, this is a general purpose

23   classified advertising website that has millions of ads on

24   everything from selling furniture to dating to a variety of

25   other subjects, including escorts.

1    Bear in mind as well that three courts, in Washington

2  state, in Tennessee, and in New Jersey, have all held that

3  this is a constitutionally protected form of speech.  Escort

4  advertising has been common and has been around for decades.

5  All three of those Courts said, Not only was that portion of

6  the Backpage.com website protected by Section 230, it's

7  protected by the First Amendment as well.

8    So let me come back to, I think, where Mr. Montgomery

9  started, as to -- when he was talking about the Ricci case,

10  he was suggesting that it is not self-evident here that

11  Backpage is covered by Section 230.  And I suggest to your

12  Honor that given that 230 is premised on the notion of who

13  posted and created the content at issue, and plaintiffs

14  admit that here that's the pimps or others at their

15  direction, that's the test, and it is self-evident here,

16  that is not Backpage.com, and, therefore, it is self-evident

17  here that back Backpage is immune and plaintiffs' claim

18  should be dismissed.

19    THE COURT:  Let me thank all counsel.

20    I am sure it is apparent to everyone that there are

21  difficult issues that are raised by the case, even more

22  difficult than I thought in trying to prepare for the

23  hearing, so you are going to have to give me a few days to

24  think through the decision.

25    All right.

1          MR. MONTGOMERY:  Your Honor, with your permission,

2     I would like to hand up the list of the prosecutions and the

3     three cases that I mentioned.

4          THE COURT:  That would be very helpful.

5          MR. MONTGOMERY:  And I will provide a set to

6     counsel.

7       (Documents handed to the Court.)

8          THE COURT:  All right.  I'll take the matter under

9     advisement.

10         THE CLERK:  All rise.

11      Court is now in recess.

12      (Proceedings adjourned.)

# **C E R T I F I C A T E**

I, James P. Gibbons, Official Court Reporter for the United States District Court for the District of Massachusetts, do hereby certify that the foregoing pages are a true and accurate transcription of my shorthand notes taken in the aforementioned matter to the best of my skill and ability.

/s/James P. Gibbons                    August 11, 2015
    James P. Gibbons



            JAMES P. GIBBONS, CSR, RPR, RMR
                Official Court Reporter
             1 Courthouse Way, Suite 7205
              Boston, Massachusetts 02210
                 jmsgibbons@yahoo.com